# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>Plaintiff,<br>v.<br><br>RICHARD ALEXANDER MURDAUGH, SR., CORY FLEMING, MOSS & KUHN, P.A., CHAD WESTENDORF, and PALMETTO STATE BANK,<br><br>Defendants. | Case No.: 2:22-cv-1307-RMG<br><br>**NAUTILUS' REPLY TO DEFENDANT PALMETTO STATE BANK'S RESPONSE IN OPPOSITION TO MOTION TO COMPEL** |

Pursuant to Local Civ. Rule 7.07 (D.S.C.), Plaintiff Nautilus Insurance Company ("Nautilus") replies in support of its Motion to Compel Responses to Discovery ("Motion to Compel"), (ECF No. 122) to address the arguments raised in Palmetto State Bank ("Defendant PSB")'s Memorandum in Opposition to Motion to Compel (the "Opposition"), (ECF No. 127).

## ARGUMENT

### I. The Information Sought by Nautilus is Relevant.

Defendant PSB's primary argument in its Opposition to Nautilus' Motion to Compel is that the information sought by Nautilus is "not relevant to any party's claim or defense in the pending action, which pertains to allegations of insurance fraud in 2018 under a policy issued by Nautilus to Alex Murdaugh, nor reasonably calculated to lead to the discovery of admissible evidence". (ECF No. 127 at 1.) Indeed, Defendant PSB goes so far as to label Nautilus' claims as "fantasy" and "nonsense", and it states that Nautilus is "seek[ing] to capitalize on the sensationalism of totally unrelated matters dating back many years before Mrs. [Gloria] Satterfield's death" as part of a "mission to conflate the issues and muddy the waters with matters involving Murdaugh that have nothing to do with this case." (*Id.* at 5, 9-10.) Nautilus replies herein to the arguments raised.

1

**A. As Conceded by Defendant PSB's Own Board Member, Information Regarding Prior Instances of PSB Officers Serving in Fiduciary Capacities is Relevant to Establishing a Pattern and to Defendant PSB's Additional Exposure.**

Nautilus seeks to discover information important to understanding Defendant PSB's pattern of conduct as revealed through, *inter alia*, other incidents of the same general type.[1] Importantly, the relevant nature of Nautilus' discovery request has already been highlighted by Defendant PSB's own board member, Henry Spann Laffitte ("H.S. Laffitte"), who testified about PSB board concerns during the federal criminal trial of Russell Laffitte ("R. Laffitte") held before this Court:

> Q. I want to fast-forward from August and change gears again a little bit. The jury has heard about some continued concerns from Board members about the bank's potential exposure with respect to Murdaugh. Moving into September and October, do you recall Board conversations about bank employees who had previously served either as a personal representative or as a conservator in Alex Murdaugh's cases?
>
> A. Yes, ma'am.
>
> Q. What prompted those conversations?
>
> A. There was exposure to the bank through the Satterfield conservatorship that Chad Westendorf was involved in. And a question was raised, did anybody else in the bank serve as conservator? Uncle Charlie said he served as conservator 20 years ago and it was too much trouble and wouldn't do it again. And Russell said he served as conservator a couple of times but it was no big deal.

---

[1] *See* Committee Notes on Rules—2015 Amendment, FRCP 26(b)(1):

> The 2000 Note offered three examples of information that, suitably focused, would be relevant to the parties' claims or defenses. The examples were "other incidents of the same type, or involving the same product"; "information about organizational arrangements or filing systems"; and "information that could be used to impeach a likely witness." Such discovery is not foreclosed by the amendments. Discovery that is relevant to the parties' claims or defenses may also support amendment of the pleadings to add a new claim or defense that affects the scope of discovery.

> *Q.  So why did you, as a bank member, think it was important to understand whether bank employees had served in a fiduciary capacity for Murdaugh's clients in the past?*
>
> *A.  Just was there a pattern there, was there additional exposure, or was it isolated to simply to one event with Satterfield.*

(<u>Ex. A, Excerpts of 11/14/2022 Testimony of H.S. Laffitte from Trial of R. Laffitte, at 10:3-24 (emphasis added)</u>.)  In other words, matters which Defendant PSB now contend are irrelevant—e.g., information relating to or revealing prior instances of PSB officers serving in fiduciary capacities—are matters which Defendant PSB's own board believed were important to understanding whether there was a "pattern" and "additional exposure" at PSB.  (*Id.*)

In the matter *sub judice*, rather than allowing Nautilus its own full and fair opportunity to discover facts relevant to a decade-long pattern of deceitful fiduciary service by its officers for one of its biggest clients, Defendant PSB would have Nautilus and this Court simply take its word that "PSB was not involved" in any conspiracy.  (ECF No. 127 at 5.)  However, Nautilus is entitled to conduct its own discovery regarding matters which Defendant PSB's own board member(s) has publicly stated were important for its investigation and analysis of exposure.  Therefore, this Court should reject Defendant PSB's proffer and instead hold that the information sought by Nautilus is relevant and subject to discovery.

> **B.  The Information Sought is Relevant Because Defendant PSB Knew What R. Laffitte Knew, and Despite this Knowledge, Senior Management of PSB in Hampton Approved Chad Westendorf ("Defendant Westendorf") Serving as a PR for the Estate of a PSB Client—i.e., Gloria Satterfield ("Satterfield")—Pursuant to the Request of Another PSB Client Who Was Directly Adverse to Such Estate—i.e., Richard Alexander Murdaugh, Sr. ("Defendant Murdaugh").**

Defendant PSB argues that "Defendant Westendorf has not been charged with any crime" and that "Nautilus has no proof that he knew [Defendant] Murdaugh intended to steal the Satterfield settlement funds or that anyone, other than Murdaugh, even knew about the account at

Bank of America that Murdaugh used to do so." (*Id.* at 8.) This argument is a red herring. What is crucial is that Defendant PSB had knowledge of what R. Laffitte—its former CEO, COO, executive vice president, and branch manager—knew.[2] *See, e.g.*, *Mauldin Furniture Galleries, Inc. v. Branch Banking & Tr. Co.*, No. CA 6:10-240-TMC, 2012 WL 3680426, at *7 (D.S.C. Aug. 27, 2012) ("[N]otice of facts by an officer or agent of a corporation is normally imputed to the corporation."); *In re Infinity Bus. Grp., Inc.*, 612 B.R. 76, 132, 134 (Bankr. D.S.C. 2019) ("[A] corporation's knowledge stems from its agent's knowledge, which is imputed to the corporation as the law presumes that an agent will disclose all information to its principal. . . . [T]he general principles of agency law provide that a single agent's knowledge can be imputed to the company as a whole."), *aff'd*, 628 B.R. 213 (D.S.C. 2021), *aff'd*, 31 F.4th 294 (4th Cir. 2022); *S.C. L. Enf't Div. v. Michael & Lance (68 Foot Double Net Shrimp Trawler, White Hull with Black Trim, N. Carolina Fisheries License No. AC-892)*, 284 S.C. 368, 370, 327 S.E.2d 327, 328 (1985) ("A corporation can not know anything nor do anything except through its agents."). As the Supreme Court of South Carolina has explained:

> If Bryant the corporate officer had delivered the boat to John Doe knowing that John Doe was going to smuggle marijuana, it could be hardly argued that the corporation was an innocent owner. In the same fashion, when Bryant, the corporate officer, turned the boat over to Bryant, the drug smuggler, Bryant, the corporate officer, was not innocent and, in turn, the corporation was not innocent.
>
> If Bryant was not acting on behalf of the corporation when he hauled the marijuana, he was certainly an officer of the corporation when he surrendered it to himself as a drug smuggler. All of his knowledge and all of his acts were, as a matter of law, imputed to the corporation. In reality, it might be just as forceably argued that since

---

[2] In addition to knowing what R. Laffitte knew, Defendant Westendorf—as vice president of Defendant PSB—was infected with what Cory Fleming ("Defendant Fleming") knew. *See, e.g., Faulkner v. Millar*, 319 S.C. 216, 221, 460 S.E.2d 378, 381 (1995) (finding notice to an attorney is notice to the client). This would include, *inter alia*, that Defendant Murdaugh was going to receive some of the Nautilus funds purportedly constituting Fleming's attorneys' fees. (*See* Ex. B., Excerpts of 5/25/2023 Testimony of Def. Fleming from his Arraignment and Change of Plea Hearing, at 29:9-30:22.)

4

Bryant had the knowledge, the corporation had the knowledge and that accordingly, the corporation had actual knowledge.

*S.C. L. Enf't Div.*, 284 S.C. at 370, 327 S.E.2d at 328.

Importantly, this Court has previously summarized some of the wrongdoing that R. Laffitte knew of and did, as briefly noted by Defendant PSB in its Opposition. (*See, e.g.*, ECF No. 127 at 6-7). Yet, despite this knowledge, the board of Defendant PSB's complicit inaction (or evidence to the contrary), is highly relevant to Nautilus' suit, and discoverable under this court's rules. This is particularly true where, after years of conspiring with Defendant Murdaugh as a bank "fiduciary", and per the testimony of Defendant Westendorf given in this case, R. Laffitte—Defendant PSB's then-COO/executive vice president and Hampton branch manager—and additionally PSB chairman and R. Laffitte's father, Charles A. Laffitte, Jr. ("C. Laffitte"), approved PSB's then-vice president, Westendorf, to serve as a PR at the request of Murdaugh:

> **Q.** Thank you. When you were approached about being PR, I asked you if you had run that by Russell Laffitte. Is there anybody else at the bank you ran that past?
>
> **A.** When I went and spoke to Russell, I asked him if I could serve as a PR in a case that Alec was involved in. I didn't know what the case was at that time. I asked him if he could do it. He said, Let me talk to my dad. So both him and Mr. Laffitte said I could do it.

(Ex. C, Excerpts of 6/30/2023 Deposition Testimony of Def. Westendorf, at 24:13-24.) Accordingly, as Defendant PSB's 30(b)(6) designee, Jan Malinowski ("Mr. Malinowski"), testified in this case, "senior management of the bank in Hampton" approved Defendant Westendorf to serve as a personal representative ("PR") in the Satterfield matters:

> **Q.** I'd like to come back to some more detailed questions about the service of bank personnel as fiduciaries for, in this case, Alex Murdaugh. So again, I'm limited in this deposition to speaking from 2018 afterwards. ***Do you know how Mr. Westendorf came to be the personal representative for the Estate of Gloria Satterfield?***

5

> *A.     I believe he was requested by Alex Murdaugh to serve as the PR.*
>
> *Q.     And did he receive permission from anybody to serve in that role, do you know?*
>
> *A.     Yes, he did.*
>
> *Q.     And from whom?*
>
> *A.     Senior management of the bank in Hampton.*
>
> *Q.*     And can you be more specific?
>
> *A.*     I believe either Charles A. Laffitte, Jr., chairman, or Russell L. Laffitte, the COO, or both together.

(Ex. D, Excerpts of 6/30/2023 Deposition Testimony of Def. PSB 30(b)(6) Witness, at 61:11-62:6 (emphasis added).) Therefore, the extent of what Defendant PSB actually knew and what it knew by imputation with regard to prior instances of the same general type is relevant to Nautilus' claims because it would have possessed that knowledge at the time it approved Defendant Westendorf serving as a PR for the Estate of Satterfield (who herself had been a PSB client) upon the request of Defendant Murdaugh (a separate PSB client who was adverse to the Estate of Satterfield).

> **C.     With Knowledge of What R. Laffitte Knew, Defendant PSB Acknowledges That it Should Not Have Allowed Defendant Westendorf to Serve as a PR at the Request of Defendant Murdaugh, and but for this, Nautilus Would Not Have Been Injured.**

Importantly, in Defendant PSB's 30(b)(6) deposition in this matter, Mr. Malinowski further testified under oath that PSB should not have agreed to allow Defendant Westendorf to serve as a PR in the Satterfield matters if it knew of Defendant Murdaugh's prior malfeasance—which, as briefly summarized above, it did:

> **Q.**     If Mr. Murdaugh's malfeasance was known to the bank in November of 2018, could the bank under its own code of ethics have authorized Mr. Westendorf to serve as the PR in that case?
>
> MR. GRESSETTE:     Objection.  Scope and form.

| | |
|---|---|
| **A.** | Knowing of malfeasance, could the bank have authorized him to be the PR? Yes, they could, but it would have been bad judgment. |
| **Q.** | They shouldn't have if they had known. |
| | MR. GRESSETTE**:** Objection. Scope and form. |
| **Q.** | Do you agree? |
| **A.** | Repeat that again. |
| **Q.** | If the bank had known of Mr. Murdaugh's malfeasance, they should not have authorized Chad Westendorf to serve as the PR, correct? |
| | MR. GRESSETTE**:** Objection. Scope and form. |
| **A.** | Correct. |

(Ex. D at 89:23-90:17.) Accordingly, information shedding light on what Defendant PSB knew and should have known about Defendant Murdaugh's malfeasance is highly relevant to this case, and some of such information is likely to be garnered from "[m]inutes of board meetings containing reference to Alex Murdaugh."

Furthermore, Defendant Westendorf—Defendant PSB's former vice president—testified in this case that when PSB approved him serving as PR for the Estate of a PSB client (i.e., Satterfield), R. Laffitte should have disclosed his knowledge of prior malfeasance in connection with his service as a fiduciary at the behest of Defendant Murdaugh, and that if it would been disclosed, then he would not have served as PR:

| | |
|---|---|
| **Q.** | Let's say that someone knew about all the instances of wrongdoing. Let's say they happened and someone knew about it. And let's say that it had happened every single time Alex Murdaugh had asked someone to serve as a PR. In that situation, do you think it's reasonable to expect that something – more wrongdoing would occur if you serve as a PR for Alex Murdaugh in the future? |
| | MS. ALLEN: Object to the form.<br>MR. GRESSETTE: Objection. |

**A.** You could assume that, yes.

**Q.** Are you aware that Mr. Laffitte has been convicted of much of the things that we just described in federal court?

**A.** Yes, sir.

. . .

**Q.** If Mr. Laffitte's work as a conservator or a PR for Mr. Murdaugh had involved wrongdoing every time, you would expect by 2018 that Mr. Laffitte would have understood that was the gig, right?

**A.** I would assume.

**Q.** When you were asked to serve as PR for the Estate of Gloria Satterfield, you ran that request by Mr. -- by Russell Laffitte, correct?

**A.** That is correct.

**Q.** Did he tell you anything about any of the wrongdoing associated with serving as a fiduciary for Alex Murdaugh when you asked?

MR. GRESSETTE:   Objection.

**A.** No, sir.
. . .

**Q.** Did Mr. Laffitte tell you that when he was a vice president like you were, he had caused PSB to issue illegal loans to Alex Murdaugh from a conservatorship account?

MS. ALLEN: Objection to the form.
MR. GRESSETTE: Objection.

**A.** He did not.

**Q.** *Did he tell you that funds had been disbursed in prior conservatorships in violation of the disbursement statements approved by the court?*

**A.** *He did not.*

**Q.** *He should have informed you of these things, though, right?*

MR. GRESSETTE:   Objection.

8

A. *I would hope so.*

Q. *You would have liked to know?*

A. *Yes, sir.*

Q. *If you had known these things in 2018, would you have agreed to serve as a PR for the Estate of Gloria Satterfield?*

A. *No, sir.*

Q. Would you have signed the application for the appointment to be made a PR when Murdaugh brought it to your office?

A. If I knew those things, no, sir, I wouldn't have.

. . .

Q. *As part of serving as PR for the Estate of Gloria Satterfield, you endorsed a check from Nautilus, correct?*

A. *Yes, sir.*

Q. *I think you were at your office when you did that?*

A. *That's correct.*

Q. Did you receive a letter with that check?

A. Yes, sir.

Q. And did that letter say these funds are to be held in trust until an order approving the settlement has been filed?

A. Yes, sir.

Q. If you had known of Alex Murdaugh's wrongdoing in the past, would you have endorsed -- well, let me ask you this. I'm sorry. Did you do anything to ensure that an order approving the settlement was filed before the funds were distributed?

A. No, sir.

. . .

> *Q. If you had known about Alex Murdaugh's prior wrongdoing and you were in this position, you probably would have checked more things, right?*
>
> *A. Correct.*

(Ex. C at 9:25-10:15, 10:21-11:10, 11:14-12:15, 14:6-15:1, 15:4-15:8 (emphasis added).) Finally, Defendant PSB's 30(b)(6) witness testified in this case that Nautilus would not have been injured if the Satterfield family had been aware of the circumstances (which, of course, is something that its vice president, as the PR, had a duty to ensure):

> Q. Does PSB agree that Mr. Murdaugh could not have defrauded Nautilus and stolen the money and kept it concealed if the Satterfield family had been aware of the settlement?
>
> MR. GRESSETTE: Objection, scope and form.
>
> MR. PENDARVIS: Objection
>
> A. Yes.

(Ex. D at 88:24-89:6.)

## II. The Satterfield Funds Did Ultimately Reach Defendant PSB.

PSB's claims that they didn't receive or touch Nautilus' funds; not true. As testified by Carson Burney ("Mr. Burney")—a forensic accountant in the State Grand Jury Division at the South Carolina Attorney General's office—during the murder trial of Defendant Murdaugh, at least $1,590,000.00 of the Nautilus funds made its way to three Defendant PSB accounts opened for Defendant Murdaugh, and funds were also then disbursed from those accounts:

> Q. I'm showing you a document labeled as State's Exhibit 375.[3] Do you recognize this document?
>
> A. I do.

---

[3] Nautilus has requested copies of the trial exhibits entered during the testimony of Mr. Burney, which show his tracing of funds, from the clerk of court in Colleton County but has not yet received them. Nautilus requests permission to supplement this filing with the relevant exhibits when received, to aide in this Court's review of the issue.

| | |
|---|---|
| Q. | And what is it? |
| A. | This is a tracing summary of a check from the Moss, Kuhn, and Fleming client trust account roughly in the amount of $2.9 million.[4] |
| Q. | And when was the -- this instrument deposited? |
| A. | That was May 15, 2019. |
| Q. | And you indicated it was roughly $2.9 million? |
| A. | Yes, sir. |
| Q. | And into what account was it deposited? |
| A. | Into a Forge account ending in 7625. |
| Q. | And here we have a summary table of all of the various expenses of that $2.9 million funded and the sum total. This first account appears to be the farm account. How much money was ultimately disbursed from the farm account?[5] |
| A. | $147,247. |
| Q. | And this next one would be for the checking account. Is that correct? |
| A. | That is correct, ending in 6092.[6] |
| Q. | And how much money -- those are long ones. We have to flip over. How much money was ultimately disbursed from that checking account? |
| A. | $1,429,753.[7] |

---

[4] A copy of the referenced check, which was issued in the amount of $2,961,931.95 from a Moss & Kuhn Trust account at BB&T on May 13, 2019 (just two weeks after Nautilus' $3,800,000.00 check was deposited therein but supposed to be "held in trust" per the instructions accompanying such check) is attached hereto. (*See* Ex. E, M&K to Forge Check, Deposit Copy.)

[5] The "farm account" refers to Defendant Murdaugh's PSB account ending in #1646, which primarily dealt with the Moselle property. (*See, e.g.*, Ex. F, 2/3/2023 In-Camera Testimony of Mr. Burney from Trial of Def. Murdaugh, at 12:14-19.)

[6] "6092" refers to Defendant Murdaugh's PSB checking account ending in # 6092, which was "one of his most active accounts at Palmetto State Bank." (*See* Ex. F at 12:7-13.)

[7] Mr. Burney's testimony indicates a pattern where stolen funds sometimes arrived in PSB account #6092 from a Murdaugh BOA checking account (which ended in #6779), before being disbursed elsewhere (e.g., as payments to others or on other obligations). (*See* F. at 14:24-15:7, 18:11-14.)

| Q. | And this next one says 6649. Is that an additional account at Palmetto State Bank? |
|---|---|
| A. | That is another checking account under the name of Alex Murdaugh. |
| Q. | And how much ultimately was disbursed from that account? |
| A. | $13,000. |

(Ex. F at 17:4-18:10.) This shows that, in fact, Nautilus funds were deposited in Defendant PSB accounts. Furthermore, Mr. Burney also traced where "Satterfield money" was used to pay "loans that were held at Palmetto State Bank that were under Alex's name, at least some of them in part, some of them in – in – solely him" (*id.* at 15:16-18; *see also id.* at 13:14-15:18), which would have inarguably been a benefit to PSB, as it would have included interest and lowered risk inherent in the amount of credit extended to Murdaugh, and it would likely include loans opened up for Defendant Murdaugh by R. Laffitte.[8] Of course, this is consistent with the improper use of other person's funds to pay off Defendant Murdaugh's loans in the past, which in turn is relevant here.

## **CONCLUSION**

What R. Laffitte knew from January 2011 to the date of his termination is relevant in time and scope to the claims in this action. Defendant PSB knew what R. Laffitte knew, and what R. Laffitte knew PSB knew, and furthermore, what its 30(b)(6) witness testified to is binding on PSB. R. Laffitte and therefore Defendant PSB's actions were malfeasance, and Defendant Westendorf would not have been the personal representative except for R. Laffitte—PSB's then-COO and Hampton branch manager—and his father—C. Laffite, the PSB chairman—having approved him

---

[8] While Mr. Burney did not testify as to each disbursement of the Satterfield money or Nautilus funds from Defendant PSB's accounts during the *in camera* hearing, his testimony indicates that the exhibits entered during his testimony document such disbursements, including details as to any funds ultimately disbursed as payments on PSB loans. (*See* Ex. F at 20:22-21:19.)

to serve as the PR in the Satterfield case. Defendant PSB's minutes are relevant in time and scope as they will reveal additional knowledge of PSB and R. Laffitte arising out of other instances of the same general type.[9] Nautilus believes the minutes may also provide evidence that Defendant PSB purposefully kept conflicts of interest and other information regarding Defendant Murdaugh from disclosure, even though Mr. Malinowski testified that the PSB's Conflict of Interest/Ethics policy requirement that all directors, principal shareholders, and executive officers must make "annual disclosures to the entire board of any actual and potential conflicts of interest and any potential conflicts of their related interests" was taken very seriously by PSB. (*See* Ex. D. at 80:2-10.)

The minutes may well contain no reference to any board or committee activity which itself would prove Defendant PSB's culpability; as the scope and duration of Defendant Murdaugh, R. Laffitte, and Defendant Westendorf's fraud was never detected and stopped by PSB. Ultimately, Defendant PSB requested in its Opposition that this Court "deny Plaintiff's Motion to Compel and issue an Order sustaining PSB's objections to Nautilus's Request No. 3," as follows:

   a.   to the extent it seeks information prior to January 1, 2018, the Request is not properly limited in time, and is therefore overly broad and unduly burdensome; and

   b.   the meeting minutes of this Defendant's board, its executive and loan committee, and ALCO committee are not relevant to any party's claim or defense in the pending action.

---

[9] *See, e.g.,* Committee Notes on Rules—2000 Amendment, FRCP 26(b)(1):

> A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.

13

However, as explained herein, the time and scope of the Request for meeting minutes is appropriate. Therefore, this Court should grant Nautilus' Motion to Compel.

**Respectfully submitted:**

This 19th day of July, 2023
Charleston, South Carolina

*/s/ Clinton T. Magill*
EPTING & RANNIK, LLC
Jaan G. Rannik (Fed. ID No. 12621)
Clinton T. Magill (Fed. ID No. 12459)
46A State Street
Charleston, SC 29401
P: (843) 377-1871
F: (843) 377-1310
jgr@epting-law.com
ctm@epting-law.com

*COUNSEL FOR NAUTILUS INSURANCE COMPANY*