# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>RICHARD ALEXANDER MURDAUGH, SR., CORY FLEMING, MOSS & KUHN, P.A., CHAD WESTENDORF, and PALMETTO STATE BANK,<br><br>      Defendants. | Case No.: 2:22-cv-1307-RMG<br><br>**NAUTILUS INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANT PALMETTO STATE BANK'S MOTION FOR PROTECTIVE ORDER PURSUANT TO FEDERAL RULE 26 AND LOCAL RULE 30.04** |

Plaintiff Nautilus Insurance Company ("Nautilus") opposes the Motion for Protective Order Pursuant to Federal Rule 26 and Local Rule 30.04 (the "2nd Motion for Protective Order") filed by Palmetto State Bank ("Defendant PSB"). (*See* ECF No. 124.)

## THIS CASE

This suit alleges, *inter alia*, a conspiracy.[1] (*See* ECF No. 8.) Richard Alexander Murdaugh, Sr. ("Defendant Murdaugh") has admitted to committing insurance fraud. (*See* ECF No. 113.) Cory Fleming ("Defendant Fleming"), a former partner at Moss & Kuhn, P.A. ("Defendant M&K"), and the former CEO, COO, executive vice president, and Hampton branch manager of Defendant PSB, Russell Laffite ("R. Laffitte"), have pled guilty to or been convicted of criminal conspiracies for their dealings with Defendant Murdaugh. With the approval of Defendant PSB's senior management, Chad Westendorf ("Defendant Westendorf") served as a Personal Representative ("PR") for claims on behalf of the Estate of Gloria Satterfield ("Satterfield"), who was a PSB client prior to her death, as well as the beneficiaries of Satterfield. Nautilus has alleged

---

[1] Nautilus expects that it will need to seek leave from the Court to amend its pleading and assert additional causes of action revealed by the ever-evolving landscape surrounding Defendant Murdaugh. This motion is viewed through the lens of Nautilus' existing conspiracy claim.

1

all "Defendants"—i.e., Defendants Murdaugh, Fleming, M&K, Westendorf, and PSB—conspired to Nautilus' detriment. (*see, e.g.*, ECF No. 8.)

**STATEMENT OF FACTS**

**I.     Defendant PSB Claims That the Satterfield Monies Were Never at PSB.**

In its Motion for Protective Order, PSB once again advises this Court that "the funds intended for the Satterfield family were never held in a PSB account." (ECF No. 124 at 2.) This is wrong.[2]

At the criminal trial of Defendant Murdaugh held before the Honorable Judge Clifton B. Newman ("Judge Newman") in the South Carolina Court of General Sessions in Colleton County, Carson Burney ("Mr. Burney")—a forensic accountant in the State Grand Jury Division at the South Carolina Attorney General's Office—testified on February 2, 2023. (*See, e.g.*, Ex. A, Excerpts of 2/3/2023 "*In-Camera*" Testimony of Mr. Burney from Trial of Def. Murdaugh, at 1-2, 5:3-6:24.)[3] At that time, Mr. Burney testified to his methodology. (*Id.* at 6-8.) He testified to

---

[2] In Nautilus' Reply to Defendant PSB's Response in Opposition to Motion to Compel (the "MtC Reply"), it advised this Court that "Satterfield money" was, in fact, deposited into PSB accounts and used by Defendant Murdaugh to pay off certain Alex Murdaugh obligations, including PSB loans which R. Laffitte likely opened for Defendant Murdaugh. (ECF No. 129 at 12.) Also in its MtC Reply, Nautilus requested the right to supplement its argument with the relevant records when received from the Colleton County court. (*Id.* at 10 n.3.) The referenced records were ultimately received yesterday, July 20, 2023, and Nautilus has elected to provide these records to this Court as part of this Response given the assertion repeated by Defendant PSB in its 2nd Motion for Protective Order that Nautilus' funds never made their way through a PSB account. (*See* ECF No. at 2.) Nautilus respectfully requests that this Court to take judicial notice of these exhibits as it promotes judicial efficiency.

[3] Mr. Burney's February 3rd testimony, technically labeled "*in-camera*," was given for purposes of determining the relevancy of certain financial issues in the criminal trial of Defendant Murdaugh. "*In camera*" signified that the jury was not present for the testimony, but it was otherwise public. After receiving "*in-camera*" testimony, Judge Newman ruled that financial evidence could be presented to the jury. Therefore, Mr. Burney came back on February 14th and testified again in the presence of the jury, at which point he was also qualified by the Court as an expert in "forensic accounting, particularly as to the tracing of funds." (*See, e.g.*, Ex. B, Excerpts of 2/14/2013 Testimony of Mr. Burney from Trial of Def. Murdaugh, at 1-2, 3:4-6:6.)

the disbursement of $2,961,931.95 from a check issued in connection with the Satterfield matter. (*Id.* at 17-18.) From State's Exhibit 375, it appears the following check was issued from Defendant M&K's trust account to a fake Forge account of Defendant Murdaugh's at BOA (no. 7625), and from there, a significant portion of the funds went into PSB accounts and were disbursed from there. (*See* Ex. C, "State's Exhibit 375" Received from Colleton County, at 1.)[4] For example, Mr. Burney testified $147,247.00 was disbursed from Defendant Murdaugh's "farm" account at PSB (no. 1646), $1,429,753.00 was disbursed from Defendant Murdaugh's main checking account at Defendant PSB (no. 6092), and $13,000.00 from another of Murdaugh's accounts at PSB (no. 6649). (Ex. A at 17:4-18:10.) From State's Exhibit 375, how the funds were ultimately disbursed through his accounts with Defendant PSB is shown. (*See* Ex. C.) For example, $609,686.98 was used to pay Defendant PSB loan no. 6991524, and $500,000.00 was used to pay PSB loan #6987336. (*See, e.g.*, *id.* at 2, 7, 9.)

Defendant PSB benefited from the Satterfield settlement.

**II.     Facts Related to PSB Instruction Not To Answer the Question.**

On June 23, 2023, nearly one month after first receiving the topics of its 30(b)(6) notice and one week prior to the date scheduled for the deposition, Defendant PSB moved to strike or otherwise significantly limit the topics and subtopics that Nautilus noticed for PSB's 30(b)(6) deposition, as well as over 50% of the time-period noticed for such deposition. (*See* ECF No.

---

[4] During his February 3, 2023 testimony and for purposes of the hearing at that time, counsel for the State and Defendant Murdaugh, "stipulate[d] to the admissibility of [State's Exhibits 373 through 397] for the Court's *in-camera* review." (Ex. A at 22.) Mr. Burney confirmed that these exhibits were "documents that [he] prepared tracing the flow of funds from instruments involving money going through the Forge account through checks negotiated in the name of Palmetto State Bank, and from the Faris fees from the *Mack Truck* case,"(*id.* at 21:3-21:8), "[g]oing from 2021 all the way back to a date of deposit on December 20, 2011. (*Id.* at 21:23-21:25; s*ee also id.* at 8:14-20, 13:14-21:2, 21:9-19.) State's Exhibit 375 involves funds derived from the Nautilus check deposited into Defendant M&K's trust account.

3

118.); the motion remains pending. (*See* ECF No. 128*; see also* ECF Nos. 125-26.) On Sunday, July 7, 2023, PSB filed its 2nd Motion for Protective Order. (*See* ECF No. 124.) The basis for Defendant PSB's 2nd Motion for Protective Order is that its counsel for Defendant PSB instructed its 30(b)(6) witness and CEO, Jan Malinowski ("Mr. Malinowski"), not to answer the following question:

> Q: . . . Did the bank have discussions with counsel about its potential exposure to any parties relating to anybody's service as a fiduciary in connection with Alex Murdaugh?
>
> MR. GRESSETTE: Objection, calls for attorney-client privileged information, calls for work product, it's outside the scope of the noticed topics, it also implicates information and deliberation during executive sessions of the bank's governing committees, furthermore it implicates trade secrets and business operation information which are protected, for those reasons I'm instructing the witness not to answer that question.[5]
>
> MR. RANNIK: And I will just say for the record so that this is clear, this exhibit is one of the exhibits that was admitted at the trial of Russell Laffitte. It was Government's Exhibit 200 and it is a matter of public record.

(Ex. D, Excerpts of 6/30/2023 Deposition of Def. PSB 30(b)(6) Witness, at 67:5-24.)

Defendant PSB's instructions were improper because: (I) the question posed does not ask for an answer that is subject to a claim of privilege; (II) multiple board members of Defendant PSB, at a time where they were board members, have publicly testified on this very subject matter and meeting minutes containing some of the discussions have also been entered into the public

---

[5] Defendant PSB has not advanced any argument in its 2nd Motion for Protective Order supporting its purported objections based on "information and deliberation during executive sessions of the bank's governing committees", "trade secrets" or "business operation information", nor would any argument in that regard have validity. (*Compare* ECF No. 124 with ECF No. 124-1.) Defendant PSB has thus waived these objections.

4

record; (III) during the federal criminal trial of R. Laffitte before this Court, two of Defendant PSB's board members, Norris Laffitte ("N. Laffitte") and Becky Laffite, Esq. ("B. Laffitte"), were both presented with and publicly testified regarding Gov. Exhibit 200b, which was an excerpt of the testimony contained in Nautilus' exhibit 4 to the 30(b)(6) deposition of PSB; and, (IV) even if the public disclosures themselves were sufficient to waive any potentially applicable privilege, Defendant PSB's failure to timely claim such privilege by way of protecting or sealing the public records waived such privilege.  As explained more fully below, this Court should deny Defendant PSB's motion on these grounds.

## **LEGAL STANDARD**

"Discovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003) (citation omitted); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 983 (4th Cir. 1992).  "Conversely, limitations on discovery are to be construed narrowly."  *Hege v. Aegon USA, LLC*, No. 8:10-cv-1578, 2011 WL 1791883, at *3 (D.S.C. May 10, 2011) (citation omitted). While Federal "Rule [of Civil Procedure] 26 provides that the 'court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense,'" because "Rule 26 'provides for broad discovery,'" the "'standard for issuance of a protective order is high.'" *In re Aqueous Film-Forming Foams Products Liab. Litig.*, No. 2:19-cv-1806-RMG, 2022 WL 678996, at *2 (D.S.C. Feb. 14, 2022) (citations omitted); *see also Gioioso v. Thoroughgood's Transp. LLC*, Civ. A. No. ADC-16-3841, 2017 WL 3726028, at *1 (D. Md. Aug. 28, 2017) (explaining that protective orders "should be sparingly used and cautiously granted.").

"A party moving for a protective order has the burden of making a particularized showing of why discovery should be denied, and conclusory or generalized statements in the motion fail to meet this burden." *Artis v. MurphyBrown LLC*, No. 7:14-cv-0237-BR, 2018 WL 3352639, at *2 (E.D.N.C. July 9, 2018). Ultimately, when asking the Court to prohibit or limit a plaintiff from deposing a witness, defendants face a heavy burden. *See, e.g., Order That Discovery Not Be Had*, 8A Fed. Prac. & Proc. Civ. § 2037 (3d ed.) ("It is even more difficult to show grounds for ordering that discovery not be had when it is a deposition that is sought, and most requests of this kind are denied.").

## ARGUMENT

I. **The Question Does Not Request An Answer Subject To A Claim Of Attorney Client Privilege.[6]**

In the matter *sub judice*, the question complained of by Defendant PSB was a mere yes or no question, and did not seek privileged information:

> *Did* the bank have discussions with counsel about its potential exposure to any parties relating to anybody's service as a fiduciary in connection with Alex Murdaugh?
>
> (Ex. D at 67:5-8 (emphasis added).)

Whether there were discussions by PSB with its counsel does not seek privileged

---

[6] As to purported work product protection, "[t]he doctrine protects from discovery any 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for [a] party or its representative (including the ... party's attorney, consultant, surety, indemnitor, insurer, or agent).'" *State Farm Fire & Cas. Co. v. Admiral Ins. Co.*, 225 F. Supp. 3d 474, 483 (D.S.C. 2016) (quoting Fed. R. Civ. P. 26(b)(3)(A)). "The party claiming work product protection has the burden of establishing entitlement to the protection." *Id.* (citing *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988)). Defendant PSB's only argument is that "[b]ecause counsel's question seeks to invade the attorney-client relationship between PSB and its counsel inherently seeks protected attorney work product." (ECF No. 124 at 7.) This argument fails to establish such protection, therefore, for the same reasons it cannot establish that the attorney-client privilege applies and has not been waived.

6

communications.

II. **Defendant PSB's Objection and Instructions not to Answer Were Improper Because PSB's Board Members Have Already Publicly Testified Regarding Subject Matter Responsive to the Deposition Question Complained of, and Meeting Minutes Containing Responsive Discussions Have Also Been Entered Into the Public Record.**

This Court need look no further than the prior individual testimony of Defendant PSB's designated 30(b)(6) deponent and current CEO, Mr. Malinowski, at the federal criminal trial of R. Laffitte held before this Court:

> Q. Okay. So did you learn about this Satterfield matter?
>
> A. Yes.
>
> *Q. Okay. Why was the bank involved in that matter?*
>
> *A. One of our other bank officers had been -- had an appointment as a personal representative in that action.*
>
> Q. Who was that bank officer?
>
> A. Chad Westendorf.
>
> Q. So, the jury heard a lot already about funds from Hakeem Pinkney, Natasha Thomas, and Arthur Badger moving through Palmetto State Bank. Had any of the funds related to the Satterfield matter gone through Palmetto State Bank?
>
> A. No.
>
> *Q. So what did the bank do to assess its liability?*
>
> *A. It hired attorneys.*
>
> *Q. So about when were these attorneys retained?*
>
> *A. September -- late September.*

(Ex. E, Excerpts of 11/9/2022 Testimony of Mr. Malinowski from R. Laffitte Trial, at 61:1-17.)

In other words, Mr. Malinowski previously testified that Defendant PSB "hired attorneys" (i.e.,

7

"ha[d] discussions with counsel") "to assess its liability" (i.e., "about its potential exposure") when it was "involved in [the Satterfield] matter [because] . . . [o]ne of [PSB's] bank officers . . . had an appointment as a personal representative in that action" (i.e., "relating to anybody's service as a fiduciary in connection with Alex Murdaugh"). Simply put, Defendant PSB's objection and its instructions for its 30(b)(6) witness not to answer a question which seeks information this very same witness testified to in a court of law is untenable, as its objections scope, given the topics noticed.

By instructing its witness not to answer the simple question as to whether discussions occurred, Defendant PSB effectively objected to everything related to the underlying subject matter. Importantly, however, such an objection is improper because Defendant PSB's board members have already testified regarding the details and subject matter of responsive conversations with counsel. For example, the below sworn testimony from Defendant PSB's board members was given during the federal criminal trial of R. Laffite held before this Court:

### B. Laffitte, PSB Board Member
[*referencing the Arthur Badger ("Badger") and Satterfield matters*]

**Q.**   Y'all, the bank does not want Mr. Badger to know the bank is paying part of the settlement, and that's –

**A.**   Our concern was damage control, what is the best for the bank. I can't say -- I mean, these are our lawyers speaking, you can interpret it, they can interpret it. . . . And I recall that Mr. Walker suggested to us that night, what I would recommend is that let me go to Ronnie Crosby and say, hey, Ronnie, what if -- would you consider signing a release with indemnification for the bank. . . . Our directive was to Mr. Walker that night, was the 680 is out the door, what do we do to protect the bank. . . .

(Ex. F, Excerpts of 11/14/2022 Testimony of Becky Laffitte from R. Laffitte Trial, at 53:10-22.)

8

> Q. But you are at a Board meeting and you've got the lawyer who is talking to you about this, and he's talking strategy, and you never -- no one at the Board meeting ever says, oh, we don't want that strategy; did they?
>
> A. We are relying on some of the best lawyers in the state of South Carolina. . . .You don't understand. You weren't in that situation. We are faced where a family member sent $680,000 out of the door. We have a responsibility to many others who have shares in this bank. We have a responsibility to the reputation of this bank. Our concern was protecting the bank. . . .

(*Id.* at 55:1-12.)

> Q. And read the next paragraph.
>
> A. "But our view, the lawyers talked at length about this with the Litigation Committee."
>
> Q. That's your committee?
>
> A. Yes, sir.
>
> Q. Okay.
>
> A. It's a committee on which I serve. It's not my committee.
>
> Q. But you serve on that committee.
>
> A. "And everybody believes that we are better off having Ronnie go and satisfy Mr. Badger by handing him the check and using his diplomacy so that if, by chance, anything about Badger gets out and Bland –"
>
> Q. Next paragraph, please.
>
> A. Yes, sir. "-- and Richter get ahold of it – I'm sorry. "-- Richter get ahold of it, then their case will be much less, because unlike Satterfield, their alleged victim will have been fully compensated by the law firm and that we will be side-by-side with the law firm in that."
>
> Q. Okay. And Bland and Richter are some plaintiffs lawyers that represented other plaintiffs. And they are sort of trolling for clients, is your understanding of it?
>
> A. No, sir. They had the lawsuit that we were meeting about on October 31st. That's the Satterfield case.

| | |
|---|---|
| Q. | But in this one, your lawyers concerned with them finding another client, Mr. Badger? |
| A. | Well, I don't like the word "trolling," sir, so I am not going to say trolling. . . . We knew that there could be other litigation.[7] |

(*Id.* at 56:2-57:6.)

### Dr. Henry Lucius Laffitte ("H.L. Laffite"), PSB Board Member
[*referencing the Hakeem Pinckney ("Pinckney") and Satterfield matters*]

| | |
|---|---|
| Q. | So what did you do to gain more information about this Hakeem Pinckney situation? |
| A. | Well, I was able to look up the public record, the southcarolinacourts.org. And I searched for Mr. Hakeem Pinckney until I found in the record where the gentleman who had given me the information name was on the actual chart. And Russell Laffitte was listed, along with several other attorneys. But at that point, it still did not mean anything to me other than – |
| Q. | You are a doctor. |
| A. | -- potentially that he had been a personal representative and he may have forgotten or may have not, but we needed to track this down. |

(Ex. G, Excerpts of 11/14/2022 Testimony of Dr. Henry Lucius Laffitte from R. Laffitte Trial, at 9:17-10:4.)

| | |
|---|---|
| Q. | So you took the information you found on the public record and you shared it with the attorneys y'all had retained to assess the liability and conduct an internal investigation? |
| A. | Well, I gave it to the original attorneys who were involved with the Satterfields. And at the next meeting, the emergency meeting, we hired the group because the original attorneys said they were not criminal attorneys, we needed to get expertise in that field, along with the FDIC attorney. |

(*Id.* at 10:16-24.)

### H.L. Laffitte (Continued)
*(referencing the Badger matter)*

---

[7] Defendant PSB argues that the pattern of claims and activity of many years is not relevant to Nautilus' conspiracy claim, yet it is their very "relatedness" that is PSB's justification for suppressing the other claims so that the Satterfield attorneys not know of PSB's exposure.

> Q. Was it your understanding there was a pause put on that [$680,000.00] payment at any point?
>
> A. Was there a pause put on the payment?
>
> Q. Yes, sir.
>
> A. I think what you are referring to is our attorney was concerned about an indemnification that the Murdaugh law firm would then not sue us if that money never got to the other victim. I don't know about how the pause would work, but that was more of, don't let the law firm hand out the money to the victim without giving us some indemnification or some release in case they wanted to turn back around and sue the bank --

(*Id.* at 37:2-13.)  A waiver of any privilege has thus occurred.  *See, e.g.*, *Berchtold Corp. v. Faegre Baker Daniels, LLP*, No. 2:14-CV-00774-RMG, 2014 WL 12609704, at *2 (D.S.C. Dec. 3, 2014). In addition to testimony from Defendant PSB representatives, there was an exhibit, Gov. Exhibit 223, at issue and entered in the federal criminal trial of R. Laffitte which is comprised of PSB meeting minutes containing discussions between PSB's counsel and board on the relevant subject matter.

**III.  During the Federal Criminal Trial of R. Laffitte Held Before This Court, two of Defendant PSB's Board Members, N. Laffitte and B. Laffitte, Were Both Presented With and Publicly Testified Regarding Gov. Exhibit 200b, Which Consists of Transcript Pages That are Included Within Nautilus' Exhibit 4 to the 30(b)(6) Deposition of PSB, and Furthermore, During the Direct Examination of N. Laffitte, Gov. Exhibit 200 was Admitted in its Entirety and Received as Evidence Into a Public Record Without Objection, and Nautilus' Exhibit 4 to the 30(b)(6) Deposition of Defendant PSB is Merely an Excerpt of Gov. Exhibit 200.**

On November 8, 2023, the United States of America (the "US Government"), as the plaintiff in the federal criminal trial of R. Laffite, called PSB Board member N. Laffitte as its first witness in the trial.  Importantly, during his direct examination, Gov. Exhibit 200—which consisted of redacted transcripts of testimony previously given by R. Laffitte before the Office of Disciplinary Counsel (the "ODC"), was admitted in its entirety, and received into evidence without

objection. Importantly, Nautilus' exhibit 4 to the 30(b)(6) deposition of Defendant PSB is merely an excerpt of Gov. Exhibit 200. (*See* Ex. I, "Exhibit 4 to PSB's 30(b)(6) Deposition.") To this day, Gov. Exhibit 200 remains part of a public record. As such, no privilege is attached to these discussions with counsel that have long-been disclosed.

Furthermore, Gov, Exhibit 200b, which consists of two of the pages which are included in Nautilus' exhibit 4, was specifically presented to PSB Board members N. Laffitte and B. Laffite, and they both testified regarding matters contained therein. Crucially, the first page of Gov. exhibit 200b—which itself is only two pages—begins with the following testimony of R. Laffitte:

> [A . . .]   the best interest of the bank at that point to do that, to try to settle these, where we knew – because I didn't – we didn't think – *the bank didn't think we had exposure in the Satterfield case when it was proven by the attorneys – I can't remember the bank's attorney's name – Trenholm Walker said, you know, Hell, y'all have go liability because you used the bank.*
>
> *So I said, All right, we have got liability in all of these.* Let's try to settle it. Let's try to make it right. . . .

(Ex. H, "Gov. Ex. 200b", at 1 (emphasis added).) Nautilus respectfully asks that this Court take judicial notice of these matters and the testimony held before it, and hold that, under circumstances like this, any privilege has been waived. *See, e.g.*, *In re Associated Gas & Elec. Co.*, 59 F. Supp. 743 (S.D.N.Y. 1944).

### IV. Defendant PSB has Failed to Timely Claim Privilege Over the Publicly Disclosed Subject Matter by way of Protecting or Sealing the Public Record, and it has Therefore Waived Such Privilege.

Defendant PSB moved to seal and protect certain matters in the federal criminal trial of R. Laffitte. However, neither Gov. Exhibit 200 nor 200b have been protected beyond the redactions already included, nor have they otherwise been sealed. Because Nautilus' exhibit 4 concerns the same communications and matters, any privileged has already been waived. Redactions on part

of Gov. Exhibit 200 and no other part, compels the result that there was a deliberate decision made not to claim the privilege as to the balance of the exhibit. Defendant PSB's failure to ensure Gov. Exs. 200 and 200b were further redacted or otherwise sealed waived any privilege. *See, e.g.*, *Popov by & through Delgado v. QBE Ins. Corp.*, No. 2:20-CV-00739-RMG, 2021 WL 2328035, at *5 (D.S.C. June 8, 2021) ("Waiver may be explicit or implied.").

## CONCLUSION

For the reasons set forth above, Nautilus respectfully requests this Court deny Defendant PSB's 2nd Motion for Protective Order.

**Respectfully submitted:**

This 21st day of July, 2023
Charleston, South Carolina

*/s/ Clinton T. Magill*
EPTING & RANNIK, LLC
Jaan G. Rannik (Fed. ID No. 12621)
Clinton T. Magill (Fed. ID No. 12459)
46A State Street
Charleston, SC 29401
P: (843) 377-1871
F: (843) 377-1310
jgr@epting-law.com
ctm@epting-law.com

COUNSEL FOR NAUTILUS INSURANCE COMPANY