# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY, ) | C/A No.: 2:22-cv-1307-RMG |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | **MOTION FOR SUMMARY** |
| ) | **JUDGMENT BY DEFENDANT** |
| RICHARD ALEXANDER MURDAUGH, ) | **CHAD WESTENDORF AND** |
| SR., CORY FLEMING, MOSS & KUHN, ) | **NOTICE OF JOINING PALMETTO** |
| P.A., CHAD WESTENDORF, and ) | **STATE BANK'S MOTION FOR** |
| PALMETTO STATE BANK, ) | **SUMMARY JUDGMENT** |
| ) | |
| Respondents. ) | |
| ) | |

Defendant Chad Westendorf, through counsel, hereby moves this court for an order of summary judgment pursuant to the Federal Rules of Civil Procedure, Rule 56, dismissing all claims by Plaintiff Nautilus. Westendorf respectfully requests this court grant summary judgment in his favor and dismiss the claims for civil conspiracy and violation of South Carolina Unfair Trade Practices Act. Plaintiff named Defendant Westendorf in this case in his individual capacity. Yet, Westendorf was also employed by Defendant Palmetto State Bank (hereinafter "PSB") during the time period in question. PSB is alleged to be a co-conspirator with all defendants, and the allegations against Westendorf are similar to those against PSB. So as not to repeat equally applicable legal principles and argument, Westendorf joins and incorporates Palmetto State Bank's Motion for Summary Judgment (ECF#131). This motion and supporting argument seek only to address issues and facts specific to Westendorf. In that vein, the facts related to Westendorf

1

demonstrably fail to create an issue of fact or issue of law sufficient to preclude summary judgment.

## I.    FACTS RELATED SPECIFICALLY TO CHAD WESTENDORF

### A.    NAUTILUS' ALLEGATIONS

The Amended Complaint references Westendorf in three (3) places. It alleges that beginning in July 2021, Nautilus became aware of what it labels "Irregularities" related to the Satterfield claims, including that "Murdaugh and Fleming arranged for Westendorf to serve as the personal representative of the Estate of Gloria Satterfield in exchange for a fee, as they had previously done with other officers and directors at Palmetto, effectively removing the Satterfield family from the proceedings," and that "there was no effort made by Westendorf, Palmetto, Fleming, or MKF to ensure that the funds intended for the Satterfield family were received by the Satterfield family, violating their obligations regarding escrow funds and their disbursement." (Am. Compl., ECF #8, ¶14 (c) and (h)). Finally, the Amended Complaint alleges that through the "Irregularities," Murdaugh and others -- including Fleming, MKF, Westendorf, and Palmetto (collectively, "the Co-Conspirators") -- coordinated efforts to improperly obtain insurance money and disburse insurance proceeds for their own personal gain and at the expense of Nautilus." *Id*. ¶ 15. It is on these alleged facts that Nautilus bases its claims of civil conspiracy and unfair trade practices against Westendorf.

### B.    FLEMING AND MURDAUGH SAW TO IT THAT WESTENDORF HAD LIMITED INVOLVEMENT IN THE CLAIM AGAINST NAUTILUS AND THE SETTLEMENT. WESTENDORF NEITHER RECEIVED THE FUNDS NOR PARTICIPATED IN THEIR DISBURSEMENT.

Westendorf had never served as a Personal Representative (hereinafter "PR") or fiduciary

for Murdaugh, Fleming or MKF prior to being asked to serve as the PR for the Estate of Gloria Satterfield in November 2018. (Ex. 1 - 2022 Deposition of Chad Westendorf (hereinafter "CW Depo. #1) at p. 4.). When Westendorf agreed to Murdaugh's request that he serve as PR on a case, Murdaugh told him only that Defendant Corey Fleming would be his lawyer, and that the purpose of the case was to get some money for Gloria Satterfield's "boys." Murdaugh explained Ms. Satterfield had recently died as a result of a fall at Murdaugh's property caused by his [Murdaugh's] dog. (Ex. 1, CW Depo. #1, at pp. 21-22, 25, 51-52).

Westendorf first met Fleming on December 19, 2018 at the Hampton County Courthouse, immediately prior to a hearing to approve the first settlement obtained by Fleming for the benefit of the Estate. (Ex. 1, CW Depo. #1 at pp. 47-48). Murdaugh and Fleming explained that Lloyds of London had agreed to pay its $505,000 to the Estate, that those monies were going to Forge, and represented to both Westendorf and the judge that they expected there to be additional funds from other insurance policies. (Ex. 1, CW Depo. #1 at pp. 51, 53-54, 60). At this initial meeting, Westendorf asked Fleming whether he needed to open a bank account for the Estate. Fleming replied "no," he did not need to open an account, that he [Fleming] planned to pay Ms. Satterfield's medical bills from that first settlement, and that he would handle what needed to be done with the funds. (Ex. 1, CW Depo #1 at pp. 8-9, 18, 51). At the December hearing, Fleming represented to the court that he was counsel for Westendorf, as the PR of the Estate. (Ex. 1, CW Depo. #1 at p. 45). He and Murdaugh told the court about the dog causing Ms. Satterfield's fall and subsequent death, and explained they believed this was one of several settlement approvals they would need. (Ex. 1, CW Depo #1 at pp. 51-52). After presenting the Petition to Approve the settlement to

Westendorf for signature, Fleming presented the same to the court that day. (Ex. 1, CW Depo. #1 at p. 59). Westendorf endorsed the back of Lloyd's of London $505,000 settlement check as directed by Fleming and returned it for deposit in the law firm account. (Ex. 2, Check Copy).

On January 7, 2019, Murdaugh delivered to Westendorf a check from Fleming's law firm account in the amount of $10,000 made out to Westendorf identified as PR fee on an accompanying Disbursement sheet with figures approximating the settlement, attorneys' fees, costs, the PR fee, and remainder going to Forge, a company Westendorf understood to be an annuity company being used to set up annuity for Ms. Satterfield's children. (Ex. 1, CW Depo. #1 at pp. 65-67, 53-54; Ex. 3, 1/7/2019 Disbursement Statement). Westendorf signed and returned the Disbursement sheet as directed.

Other than a January 14, 2019 email from Westendorf to Fleming requesting a courtesy copy of the prior Petition to Approve and Disbursement, Westendorf received no further communications from Murdaugh or Fleming until March 19, 2019. (Ex. 4, Moss & Kuhn, P.A. 30(b)(6) Depo. (hereafter "MK Depo.") at pp. 51-52; Ex. 5 MK Depo. Ex. #2). On March 19, 2019, he received a letter from Fleming via US Mail directing him to attend a mediation in Charleston on March 22, 2019. (Ex. 1, CW Depo. #1 at p. 78). Due to the last-minute notice and staffing issues at PSB, Westendorf was unable to attend the mediation in person, and arranged to participate by telephone. At the mediation, he was introduced to the mediator and persons present at the mediation, (which did not include Murdaugh at the time), and thereafter, only spoke to Fleming a few times throughout the day. (Ex. 1, CW Depo. #1 at p. 80). Murdaugh recently revealed that he asked Ms. Satterfield's two sons not to attend the mediation (Ex. 1 to PSB MSJ,

4

ECF #131-1, at p. 7), a fact concealed from Westendorf until the date of the filing. Importantly, Westendorf did not witness or participate in any communication by any person to any Nautilus representatives, nor did he overhear or witness any communications by Murdaugh to any person that day. (Ex. 1, CW Depo. #1 at pp. 81-82). At the conclusion of the mediation, Fleming reported the case did not settle (Ex. 1, CW Depo. #1 pp. 32, 79-80). Westendorf then received a phone call a few days later informing him that Nautilus had offered to pay $3.8 million to the Estate. (Ex. 1, CW Depo. #1 at p. 80). He recognized that as a tremendous sum, and agreed Fleming should accept it, with the understanding only that those monies were ultimately destined for Ms. Satterfield's family via an annuity being set up through Fleming's office. (Ex. 1, CW Depo. #1 at p. 53-54, 73, 80-81).[1]

Westendorf signed the Release Agreement negotiated between the attorneys. (Ex. 6 Release). Some time prior to the Nautilus check being issued, Fleming, without notice to Westendorf, directed his law firm be added as an additional payee on the check. (Ex. 4, MK Depo. at p. 62; Ex. 7 Email from Cory Fleming to John Grantland). On April 25, 2019, one of Fleming's investigators delivered the Nautilus check to Westendorf, waited while he endorsed it, and returned to the law firm with the check. (Ex. 1, CW Depo. #1 at p. 95). Fleming deposited the check into his firm trust account on April 26, 2019. (Ex. 8 CHF_00047). On May 13, 2019, Westendorf attended a second settlement hearing at the same courthouse before the same judge. (Ex. 1, CW Depo. #1 at p. 91). Fleming again presented Westendorf with a Petition to Approve,

---

1 In discovery, Westendorf learned that, on or about March 25, 2019, Fleming, Murdaugh, and the other attorneys signed a South Carolina Rules of Civil Procedure, Rule 43(k) Settlement Memorandum affirming the terms of their agreement. (Ex. 9, Exhibit 19 to CW Depo. #1). Westendorf was neither informed of or shown that document, nor was he listed as a signatory.

and a Settlement Statement similar to the prior Disbursement Statement sheet showing the cumulative $4.3 Million settlement, fees, and costs, with the remainder listed as "Total to Beneficiaries." (Ex. 10 Petition to Approve; Ex. 11 Filed Order and Settlement Statement). In Westendorf's presence, the judge signed what he understood to be the Order approving the total settlement and disbursements. (Ex. 1, CW Depo. #1 p. 93, Ex. 11 Filed Order and Settlement Statement). With regard to the Nautilus check, other than endorsing the check so that Fleming could deposit it into his firm's trust account and receiving and negotiating the two (2) checks signed by Fleming on his firm's trust account for the PR fees, Westendorf had no involvement in how the Nautilus funds were deposited, disbursed, split, or otherwise funneled.

    C.    WESTENDORF DID NOT KNOWINGLY JOIN WITH FLEMING OR THE MOSS KUHN LAW FIRM TO INJURE NAUTILUS.

It is undisputed that Murdaugh sought out Westendorf to act as the PR of the Estate of Satterfield and set him up with an attorney, Cory Fleming, his close friend. Unbeknownst to Westendorf, as he had never been involved in a lawsuit before, (Ex. 1, CW Depo. #1 at pp. 22, 48-49), this was not a typical attorney – client relationship. Fleming proposed no representation agreement, and did not discuss how much or how one would calculate either the attorneys' fees or the PR fee. (Ex. 1, CW Depo. #1 at pp. 9, 32-34; Ex. 4, MK Depo. at pp. 47-48, 55). Fleming did not provide Westendorf with any instruction on the responsibilities of a PR, did not provide Westendorf with copies of estate records or, even, medical bill claims against the estate. (Ex. 4, MK Depo. pp. 55-58; Ex. 1, CW Depo. #1 pp. 5, 8, 29). Fleming did not copy Westendorf on ANY communications with third parties, did not provide Westendorf drafts of pleadings or agreements; he did not consult with Westendorf regarding the merits of the case, litigation strategy or the

6

judicial process. (Ex. 4 MK Depo at pp. 58-59).

A paper file containing approximately 22 pages represents the universe of written correspondence located between Westendorf and Fleming or any person at MKF. (See Ex. 2 to MK Depo., attached hereto as Ex. 10). Moss Kuhn law firm admitted that it had no knowledge that Westendorf had any knowledge of any scheme to misappropriate funds, no information to support a claim that Westendorf made any agreement with Fleming to misappropriate funds, and no information to support claims that Westendorf participated in any misappropriation of funds. (Ex. 4, MK Depo. at pp. 64-66). It is undisputed that Fleming took complete control of the Nautilus settlement funds, (Ex. 4, MK Depo. at pp. 62, 64) and practically instructed Westendorf: "trust me." Prior to September 2021, Westendorf had no reason not to do so, and relied solely on Fleming's counsel. (Ex. 1, CW Depo. #1 at p. 19).

### D. WESTENDORF DID NOT KNOWINGLY JOIN WITH PALMETTO STATE BANK TO INJURE NAUTILUS.

When serving as the PR for the Estate, Westendorf was also employed by PSB. It is undisputed that upon receiving the initial call from Murdaugh in late November 2018, Westendorf asked his direct supervisor at PSB, Russell Laffitte, who then represented that he had asked Charles A. "Charlie" Laffitte, Russell's father and then PSB CEO and Chairman of the Board, if it was acceptable to the bank if he served as PR for one of Alex Murdaugh's cases. (Ex. 1, CW Depo #1 pp. 42-43). Russell Laffitte responded that it would be fine if Westendorf took on that matter. *Id*. Laffitte, however, did not disclose to Westendorf (1) that Murdaugh had asked that he serve as PR for Satterfield first, and that he declined (Ex. 12 PSB 30(b)(6) Depo. Ex. 4 at pp. 353-56, 358-61, 368); (2) why he declined (Ex. 13, 2023 Deposition of Chad Westendorf (hereinafter "CW

7

Depo. #2") at p. 28); (3) whether Laffitte had recommended Murdaugh ask Westendorf instead; (4) that he had been involved, even, in questionable or unethical transactions involving Murdaugh in prior dealings; or (5) that there was any risk associated with serving as a fiduciary or PR in one of Murdaugh's cases. (Ex. 13, CW Depo. #2 at p. 11). No evidence has been presented to show that Westendorf ever communicated again with any person at PSB about the Satterfield matter, until such time as the fraud was uncovered. (Ex. 1., CW Depo. #1 at pp. 6, 62).

Over two (2) years later, and within 2-3 weeks of learning of claims of fraud related to Murdaugh and the Satterfield settlement and retaining new counsel, Westendorf refunded all of those fees to counsel for the Estate of Satterfield (Ex. 1 CW Depo. #1 at p.116). Westendorf took out a personal loan so that he could refund those fees, and is paying on that loan each and every month in the normal course. (Ex. 13 CW Depo. #2 at p. 16).

## II.     LAW AND ANALYSIS

### A. CIVIL CONSPIRACY

"The tort of civil conspiracy has four elements: (1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." *Paradis v. Charleston Cnty. Sch. Dist.*, 861 S.E.2d 774, 780 (S.C. 2021). In addition to the agreement, and intent to injure the plaintiff, there must also be "an overt act done pursuant to a common design." *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (S.C. 1981) (reversed on different grounds).

Nautilus has alleged that Westendorf failed to ensure the Satterfields received the

settlement monies, and that he coordinated to obtain the insurance proceeds and disburse settlement funds for his own gain. A complaint about the failure of Westendorf to ensure the settlement funds were paid to the Satterfields, however, simply does not belong to Nautilus and has been addressed in other related litigation.[2] Nautilus has discovered no evidence to support the claim that Westendorf coordinated with any person to improperly obtain insurance proceeds. Nautilus, like any insurance company facing a covered claim against an insured, voluntarily made the decision to settle the case. Westendorf had no knowledge of any falsity regarding the cause of Ms. Satterfield's death, or any indication that Murdaugh might be lying about the dogs being the cause of the fall. Westendorf certainly was not informed in any way of Murdaugh's and Fleming's plan to misappropriate any monies from the Satterfield settlement. Finally, Westendorf did not actually obtain or possess any of the Nautilus funds. Those funds were deposited by Fleming, on his directive, into his firm's trust account. Westendorf received only the PR fees paid by Fleming from his firm's trust account, and his receipt of those fees appeared to have been court approved. The receipt of PR fees, alone, cannot form the basis of a civil conspiracy claim. There is simply no evidence that Westendorf combined with others to injure Nautilus in any way. Receipt of the PR fee was not an unlawful act, nor a lawful act by unlawful means.

Based on failure to present any disputed issue of fact related to the first three (3) of the four (4) elements of civil conspiracy, Westendorf is entitled to summary judgment on Nautilus' claim for civil conspiracy.

---

2  As the court is aware, the Satterfields brought claims against Westendorf, along with the other defendants. See *Satterfield v. Murdaugh, et al.*; C/A No. 2021-CP-25-00298. That case resulted in a settlement and dismissal with prejudice of Westendorf.

### B. FLEMING'S KNOWLEDGE OR ACTS CANNOT BE IMPUTED TO WESTENDORF

Nautilus has argued that Westendorf, as a client – the principal, is charged with the knowledge of his attorney – the agent. See Pl's Reply in Support of Motion to Compel, ECF #129 at p. 4, FN. 2, citing *Faulkner v. Millar*, 460 S.E.2d 373, 381 (S.C. 1995)). The case of *Faulkner v. Millar*, however, does not get Nautilus to where it wants to go in this case. While *Faulkner* states the general rule and incorporates earlier precent discussing when notice to an agent is notice to a principle, *id*. (citing *Citizens Bank v. Heyward*, 133 S.E. 709 (S.C. 1925)), it is consistent with the broader law as set forth herein.

> The rule of imputing notice or knowledge from the agent to his principal is generally said to be based upon the theory that it is the duty of the agent to communicate to his principal the knowledge possessed by him relating to the subject-matter of his agency, and material to his principal's protection. Such notice, in order to bind the principal, must, therefore, come to an agent who has authority to act or deal in reference to those matters which the knowledge or notice affects, and which, upon grounds of public policy, it is presumed he has communicated to his principal.

*Hill v. Carolina Power & Light Co*., 28 S.E.(2d) 545, 550 (S.C. 1943). While notice to an attorney is notice to the client in the most general sense, s*ee Dorman v. Campbell*, 500 S.E.2d 786, 790 (S.C. Ct App. 1998), the law provides an exception for fraud. *See* C*rystal Ice Co. v. First Colonial Corp.*, 257 S.E.2d 496, 498 (S.C. 1979) (emphasis added). The fraud exception disallows the imputation of notice from an attorney to client when (1) the attorney (agent) is acting fraudulently against his client's (the principal) interest, or (2) for any other reason has an interest in concealing his acquired knowledge from his principal. *Id*. However, when a third-party victim of the alleged fraud *has no connection to the fraud or had no knowledge or notice that fraud was being*

*perpetrated*, South Carolina courts have held that knowledge or acts of an agent can, in fact, be imputed to the principal. *Id*. (emphasis added).

Nautilus cannot claim to be an ignorant third-party victim. In this case, it is undisputed that Nautilus had notice of indications of fraud involving Murdaugh's claims that Ms. Satterfield's fall was caused by his dog. As is set forth in detail in PSB's Motion for Summary Judgment, (PSB MSJ, ECF #131 at pp. 4-6), prior to the mediation which resulted in Nautilus paying $3.8 Million to settle the claim, Nautilus had retained investigators, lawyers, and adjusters to assess the claim being asserted on behalf of the Estate of Satterfield. Nautilus' agents communicated their concerns regarding Murdaugh's claim that his dog caused Ms. Satterfield's fall and why his former law partner was bringing suit against him. Nautilus was perfectly capable and had every right to reject the demands made by Fleming and Murdaugh at the mediation. With notice of possible fraud and falsity of claims, Nautilus made the decision to pay the $3.8 Million to the Estate, and as consideration, received a Release from the Estate of Satterfield. In this case and under these circumstances, Nautilus cannot be deemed an innocent party with no notice of fraud.

As such, the court should simply apply the fraud exception to the rule of imputation, and reject Nautilus' efforts to tether Westendorf to Fleming or Murdaugh any longer. The undisputed facts place Westendorf squarely within the fraud exception to imputation. Fleming has admitted to misappropriating funds from the settlement monies for his personal benefit. (Ex. 14, Fleming Guilty Plea Tr. at pp. 27-29). It is undisputed that Fleming concealed his plan with Murdaugh to take a portion of the settlement funds for himself. Fleming concealed material information regarding the Estate's status and claims from Westendorf, and kept Westendorf in the dark

regarding the merits of the case. Fleming continued to conceal his taking of certain settlement funds for his personal benefit as late as September 16, 2021, even as the world was learning of the fraud Murdaugh perpetrated on the Satterfield family.

The undisputed facts detailing how little Westendorf knew and how little he was allowed to know by those around him only amplify Westendorf's lack of notice or knowledge of any past wrongdoing by Laffitte or anyone else at PSB, his lack of notice of potential wrongdoing related to serving as PR for Estate of Satterfield, and form no link between Westendorf and PSB or its officers.

### C. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE UNFAIR TRADE PRACTICES CAUSE OF ACTION

In the interest of brevity, Westendorf refers to PSB's Motion for Summary Judgment setting forth the necessary elements of a SCUTPA claim. (PSB MSJ, ECF #131 at pp. 13-14). Westendorf, too, was not involved in "trade" or "commerce" with Nautilus. Acting as a plaintiff in a civil matter does not involve conduct of advertising, offering for sale, sale or distribution of any services, property, or thing of value with respect to Nautilus. Nautilus' voluntary decision to pay to settle the Satterfield claim in exchange for a release of any and all claims by the Estate of Satterfield is the sole cause of Nautilus' damages.

Nautilus has failed to present any material disputed issues of fact to possibly support the elements of the SCUTPA claim. The court should grant summary judgment in favor of Westendorf.

### III. CONCLUSION

Defendant Chad Westendorf respectfully requests this court grant summary judgment as to Nautilus' claims, and dismiss him from this action.

s/Christy Ford Allen
John A. Massalon (Federal ID #5227)
Christy Ford Allen (Federal ID #7549)
WILLS MASSALON & ALLEN LLC
Post Office Box 859
Charleston, South Carolina   29402
(843) 727-1144
jmassalon@wmalawfirm.net
callen@wmalawfirm.net

ATTORNEYS FOR CHAD WESTENDORF

CHARLESTON, SC

July 28, 2023