# EXHIBIT "1"

1                   - - -

2               P R O C E E D I N G S

3                   - - -

4        THE VIDEOGRAPHER:  Today is February 22nd,

5    2022.  The time is approximately 10:04 a.m.  We

6    are now on the record.

7        This is the beginning of media 1 in the

8    deposition of Chad Westendorf in the matter of

9    Michael Tony Satterfield and Brian Harriott

10   versus Richard Alexander "Alex" Murdaugh, et

11   al.  The case is in the Court of Common Pleas

12   for the Fourteenth Judicial Circuit, County of

13   Hampton, State of South Carolina, case Civil

14   Action Number 2021-CP-25-0298.  Today's

15   location is 1500 Calhoun Street, Columbia,

16   South Carolina 29201.

17       My name is Chuck Habrack.  I am the

18   videographer.  The court reporter is Cindy

19   First.  We are representing EveryWord, Inc.  If

20   counsel will please introduce yourself, whom

21   you're representing, then the court reporter

22   can swear in the witness.

23       MR. BLAND:  I'm Eric Bland, Scott Mongillo

24   and Ronnie Richter, on behalf of the Plaintiff,

25   the Estate of Gloria Satterfield.

1      MR. LYDON:  Tommy Lydon on behalf of Chad
2    Westendorf.
3      THE COURT REPORTER:  Please raise your
4    right hand to be sworn.  Do you solemnly swear
5    the testimony you are about to give shall be
6    the truth, the whole truth, and nothing but the
7    truth, so help you God?
8      MR. WESTENDORF:  Yes, ma'am.
9                  - - -
10      CHAD WESTENDORF, being first duly
11      sworn, was examined and testified as
12      follows:
13                  - - -
14              EXAMINATION
15                  - - -
16  BY MR. BLAND:
17      Q    Good morning, Mr. Westendorf.
18      A    Good morning.
19      Q    My name is Eric Bland.  I represent, as
20  you know, the Estate of Gloria Satterfield and the
21  personal representative of her estate, her son, Tony
22  Satterfield.
23      We are here to take your deposition today
24  in the case that's pending at this time against Alex
25  Murdaugh, Eddie Smith and, I believe, Bank of

1    America.  You are no longer a party.  Your bank is

2    no longer a party; and so that is the circumstances

3    of we're taking your deposition today.  It's by a

4    videographer and court reporter.

5              Have you ever had your deposition taken

6    before?

7       A    No, sir.

8       Q    Okay.  Do you understand the rules of the

9    road, how it's going to be, in terms of I ask you

10   questions and then you give answers to those

11   questions, and everything is recorded by Cindy and

12   also by the videographer?

13      A    Yes, sir.

14      Q    You'll have the opportunity at the end of

15   this deposition to make a decision whether you want

16   to read and sign your transcript.  Your lawyer will

17   give you that advice.

18              So with that said, let's get started.

19      A    Okay.

20      Q    How many times did you meet with Tony

21   Satterfield or Brian Harriott?

22      A    I didn't.

23      Q    How many times did you ever speak to Tony

24   or Brian?

25      A    I didn't.

1      Q    How many documents did you send to Tony

2  and Brian in connection with the work that you did

3  as personal representative of the Estate of Gloria

4  Satterfield?

5      A    None.

6      Q    Did you speak with any of the family

7  members of Gloria Satterfield during your

8  representation of the estate as the PR?

9      A    No, sir.

10     Q    Okay.  And my understanding is you were

11  personal representative from about December 18th,

12  2018, until late September of 2021.  Is that

13  correct?

14     A    That is correct.

15     Q    All right.  Other than your initial

16  documents that you filed with the probate court, and

17  then the documents that Tommy helped you filed in, I

18  think, October or September of 2021, did you file

19  any other documents with the probate court?

20     A    No, sir.

21     Q    Okay.  My understanding in this matter is

22  that this was the first time you acted as personal

23  representative of somebody's estate.  Is that

24  correct?

25     A    Yes, sir.

1    Q    Okay.  What did you do to educate yourself

2  or avail yourself of what your responsibilities and

3  duties were?

4    A    Spoke to Cory Fleming, the attorney for

5  the estate, when I met with him.

6    Q    Okay.

7    A    Asked him what I needed to do as the

8  personal representative.

9    Q    Did he give you any written documents or a

10  list of items that you were supposed to do?

11    A    No, sir.

12    Q    Did you do any independent research on

13  your own and look up under South Carolina law what a

14  PR is supposed to do on behalf of an estate?

15    A    No, sir.

16    Q    All right.  Did you talk with Alex

17  Murdaugh at all about what your duties would be as

18  personal representative?

19    A    I had questions when he asked me if I

20  would serve.

21    Q    Okay.  Did the request come from Cory or

22  from Alex for you to serve?

23    A    Alex.

24    Q    Okay.  And I know that there's a document

25  that we'll get to where you said that you sought

1    permission from your supervisors, whether it was

2    Russ Laffitte or somebody else on the board.  Did

3    they give you the consent to serve as PR?

4          A    Yes, sir.

5          Q    All right.  Did they assist you in your

6    duties as PR?

7          A    No, sir.

8          Q    Did they tell you, hey, this is what you

9    need to do or this is what you don't need to do?

10         A    No, sir.

11         Q    Were you aware that Russ Laffitte had been

12   a PR for the Murdaugh firm clients in other cases?

13         A    I was told he had served, but I didn't ask

14   him.

15         Q    Okay.  Did you understand that, as a

16   personal representative, that you were a fiduciary?

17   Do you understand the term "fiduciary"?

18         A    I did not.

19         Q    Okay.  Do you understand it now?

20         A    Not really.

21         Q    Okay.  That you owed duties not only to

22   the estate, who you were a personal representative

23   for -- right?

24         A    Yes, sir.

25         Q    -- but that you realize that you are an

1    officer of the court?  Did you realize that?

2         A    I did not.

3         Q    Okay.  Did you realize that you had to be

4    approved by the probate court to be a PR, right?

5         A    Yes.

6         Q    Did you ever have any concerns about the

7    duties, what your duties were or what you were

8    supposed to be doing or you were more reactive, and

9    Cory Fleming would ask you or tell you to do

10   something?

11        A    Prior to accepting, I had some concerns

12   about what -- what liability I would have for --

13   from creditors.  That was my main question I asked,

14   if there was any personal back on me.

15        Q    Who did you ask that of?

16        A    Alec.

17        Q    What did Alec tell you?

18        A    He said there wasn't any problem, it

19   wouldn't come back on me.

20        Q    Did you wonder if you had to have like a

21   bond or insurance?

22        A    I did not.

23        Q    Okay.  And so your main concern was what

24   liability you may have to the creditors?

25        A    Sure.

1       Q     And who were the creditors?  Do you

2   remember?

3       A     I don't know.

4       Q     Do you remember whether they were medical

5   providers, funeral homes, or anything like that?

6       A     No, sir.

7       Q     All right.  Do you think it was your job

8   to find out who the creditors of the estate were if

9   you were going to be the PR?

10      A     Again, I asked the attorney what I needed

11  to do.

12      Q     Okay.  What was your job?  As PR, tell me

13  what you were supposed to do.

14      A     I don't know.

15      Q     Were you supposed to be just in name only

16  or did you have actually affirmative duties?  You

17  don't know?

18      A     I don't know.  I mean, my first meeting

19  with Cory, I asked what I needed to do as personal

20  representative; did I need to --

21      Q     What did he tell you?

22      A     He said, "Nothing at this moment.  I'll

23  take care of it."

24            And I asked specifically about opening an

25  account, did I need to open an account, did it need

1    to have an estate account.

2           And he said, "Not at this time."

3    Q    Well, did you have a fee agreement with

4    the estate that would set forth how you would be

5    compensated or what your scope of duties would be?

6    A    No, sir.

7    Q    Did you ever think that you needed such a

8    fee agreement?

9    A    I didn't know about it, no, sir.

10   Q    Did you ever educate yourself on what the

11   actual claims were that were being made by Cory

12   Fleming on behalf of the estate or the PR against

13   Alex Murdaugh?  Did you ever educate yourself on

14   those claims?

15   A    On the accident?

16   Q    Yes.

17   A    I was told in judge's chambers, the first

18   time we met, what those were.

19   Q    So when you accepted to become PR, and

20   before you actually got approved, there was a gap in

21   time.

22   A    Yes, sir.

23   Q    You didn't educate yourself on what the

24   claims were?

25   A    When I accepted it initially, I wasn't

CHAD WESTENDORF - ROUGH DRAFT

1  aware of what the case was.  And after I accepted,

2  then I was told what the case was, but from that

3  point forward, no.

4       Q    So the first time you really found out

5  about it was when you went to Judge Mullen's

6  chambers on December 19th?

7       A    Correct.

8       Q    Is that your custom, to accept a title or

9  an office without understanding what the office

10  would entail?

11            MR. LYDON:  Object to the form.

12            You can answer if you can.

13  BY MR. BLAND:

14       Q    You know, somebody names you as president

15  of the banking association, do you say, "Well, look,

16  I need to know what my duties would be or what I'm

17  supposed to do as a president and what it's all

18  about"?  Do you understand?

19       A    Yeah, I understand your question.

20       Q    I'm a little taken aback that you would

21  accept becoming a PR for a claim and not really

22  understand what the claim would be.

23            Did you find it strange that Alec was the

24  one that was asking you to be the PR when he was

25  the, quote, target defendant?  There hadn't been

1    litigation started, so there was a claim.

2              You understand the difference between a

3    claim and litigation?

4        A    No.

5        Q    Okay.  At that time Cory had written

6    Alex's homeowners insurance carrier and the excess

7    carrier and made a demand for the death of Gloria

8    Satterfield.  Do you remember hearing about that?

9        A    Yes.

10       Q    Okay.  And that was not in litigation.

11   Cory didn't file a complaint.  Alex didn't get a

12   lawyer to answer the complaint.  There weren't

13   depositions.  He wrote a letter; and as a result of

14   that, the primary carrier tendered their limits, and

15   then the excess carrier offered a portion of their

16   limits.

17             Are you aware of that?

18       A    Yeah.

19       Q    Okay.  So when you accepted to become PR,

20   did Cory give you all of the documents --

21       A    No, he did not.

22       Q    -- to say, hey, here's what I have

23   demanded.  You know, the accident happened on

24   February 2nd.  The dogs caused Gloria to fall down

25   the stairs.  We're making a demand of these

1    characters.

2          Did Cory do that?

3    A    No, sir.

4    Q    Okay.  Would you agree with me just

5    because somebody falls on a property and dies, that

6    doesn't make a landowner liable, right?

7          MR. LYDON:  Object to the form.

8          You can answer.

9          THE WITNESS:  Excuse me?

10         MR. LYDON:  You can answer, if you can.

11   BY MR. BLAND:

12   Q    Did you educate yourself?

13   A    No, I did not on the insurance, no.

14   Q    Did you educate yourself on finding out,

15   what was Alex's responsibility for Gloria's death?

16   Why does his homeowners carrier, his excess carrier

17   have to pay?  Did you ever ask those questions?

18   A    I didn't investigate, no, sir.

19   Q    Okay.  So from March 28th, 2018, up until

20   December 18th, 2018, when you became PR, Tony

21   Satterfield was PR.  And you told me you had no --

22   you didn't meet him; you didn't speak to him or

23   whatever.

24   A    No.

25   Q    What made you more qualified to be PR than

CHAD WESTENDORF - ROUGH DRAFT

1    Tony?

2        A    I don't know.

3        Q    Did you ever ask why Tony shouldn't

4    continue to serve?

5        A    No, sir.

6        Q    Did you know that Tony was the PR and that

7    you were replacing him?

8        A    I saw in my document from the probate that

9    I was successor PR.

10       Q    Okay.  You appear to me to be a very

11   serious individual.  I've done some research on you.

12   You know, you're well-regarded in the Hampton

13   community.  I mean, you would agree to take on this

14   responsibility to be a personal representative of an

15   estate is a serious thing?

16       A    Yes, sir.

17       Q    And I assume that you wanted to take it

18   seriously.

19       A    Yes, sir.

20       Q    Now, looking back in hindsight, I would

21   think that you would say to yourself, I wish I would

22   have done this or this or this, right?

23       A    Yes.

24       Q    Okay.  So in this case -- 1 -- Tommy sent

25   me your complete file.

1      A     Okay.

2                       - - -

3            (Description           marked

4            PARTYEXB                      Exhibit

5            Number             for identification.)

6                       - - -

7    BY MR. BLAND:

8      Q     And so I'm going to show you as Exhibit 1

9    the documents that Tommy sent to me (handing).  And

10   these are Bates stamp number Westendorf 000001 --

11   five zeros and a 1 -- through 65.  And I'm going to

12   ask you just to review it.  I'm not going to ask you

13   questions.

14           But do these appear to be the extent of

15   the file documents that you had in connection with

16   your duties as PR?

17     A     (Witness complies with request.)

18           Yes, sir.

19     Q     Okay.  And those are documents that you

20   either obtained or were sent to you.  Who -- I

21   assume Cory would have provided those to you, Cory

22   Fleming.

23     A     Some of those.

24     Q     Some of those.  Okay.

25           Would you agree with me that up until the

1  time you actually resigned as PR in late

2  September 2021, you continued to owe duties up until

3  that time to the estate, which you were a personal

4  representative, as well as to the probate court?

5      A    Could you ask that one more time?  I'm

6  sorry.

7      Q    Would you agree with me that up until the

8  time that you resigned in late September 2021, that

9  you would have continued to owe duties up until that

10  date to not only the estate, but to the probate

11  court?

12      A    I understand that now.  Yes, sir.

13      Q    Okay.  So that is the extent of the

14  documents that you have in your possession?

15      A    Yes, sir.

16      Q    All right.  So I'm going to show you

17  Exhibit Number 1, and we're just going to run

18  through these real quick.  I mean Exhibit Number 2.

19  Sorry.

20                      - - -

21              (Description          marked

22              PARTYEXB                      Exhibit

23              Number          for identification.)

24                      - - -

25  BY MR. BLAND:

CHAD WESTENDORF - ROUGH DRAFT

1    Q    Here are the -- this is 2.  This is the

2    initial documents that were filed by Tony

3    Satterfield (handing).

4          Did you ever get a copy of these?  This is

5    when he became PR and he filed the initial inventory

6    of Gloria Satterfield.  Brian renounced -- he would

7    renounce his right to be a PR.  And this is Tony's

8    initial documents dated March 28th.

9          Did you ever see these before you became a

10   PR?

11   A    No, sir.

12   Q    Did you educate yourself on what the

13   inventory of the estate is?  Do you know that

14   expression that I'm saying?

15   A    Now I do.

16   Q    Okay.

17   A    But no, I did not, to answer your

18   question.

19   Q    That neither Alec nor -- do you prefer

20   that I call him Alec?  I call him Alex.  It confuses

21   me.

22   A    Whatever.

23   Q    That neither Alex nor Cory said, hey, you

24   need to understand --

25   A    No, I did not.

 1      Q    Do you know how much was the initial

 2  inventory in the estate?

 3      A    Now I do.

 4      Q    About $26,000?

 5      A    Yes, sir.

 6      Q    And when you filed your inventory, you

 7  said it was $26,000, too.  Is that correct?

 8      A    Yes.

 9           MR. LYDON:  Object to the form.

10  BY MR. BLAND:

11      Q    Your exit inventory.  Is that correct?

12           MR. LYDON:  Accounting.  For the record,

13      it was his accounting.

14           MR. BLAND:  Accounting.  Sorry.  Thanks.

15      He's better at it than me.

16  BY MR. BLAND:

17      Q    When you filed your accounting, you filed

18  it as the same amount as the initial inventory; is

19  that correct?

20      A    That is correct.

21      Q    And you never advised the court, the

22  probate court, about any of the settlements, the

23  505,000 one and the 3.8 million?  You never advised

24  the probate court about those, did you?

25      A    No, sir.

1      Q     And you were aware that $50,000 of the

2  overall settlement amount of 4.3 million --

3  4,305,000, 50,000 was allocated to the survival

4  claim.  Are you aware of that?

5      A     Yes, sir.

6      Q     Do you know the difference between

7  wrongful death and survival?

8      A     No, sir.

9      Q     Okay.  Did anybody tell you that the

10  survival claim, the survival money, the $50,000, had

11  to be paid to the probate court?

12      A     No, sir.

13      Q     Did you have an understanding that it was

14  your job to get money or assets to advise the

15  probate court if the probate court had to be the

16  recipient of those assets?  Did you realize that?

17      A     I would have thought so, yes.

18      Q     Okay.  Tell me why you never even

19  marshaled the $50,000 and paid that into the probate

20  court.

21      A     I asked Cory what I needed to do, and he

22  said he would handle it -- I know I'm saying that --

23  and he was going to pay some medical bills.  This

24  was at our first meeting.

25      Q     But I'm talking about after the

1    settlements came in, you know, after the first

2    settlement conference on December 19th.

3        A    He said he was going to handle it.

4        Q    Okay.  So is it fair to say that your

5    answer or defense for what you did or didn't do was

6    based on the reliance of your counsel?

7        A    Yes, sir.

8        Q    So it was Cory Fleming who told you what

9    to do and not to do, or you expected that Cory

10   Fleming would tell you what to do or not to do?

11       A    I was expecting that, yes, sir.

12       Q    Okay.  So who prepared the probate

13   documents for you to accept to become PR?  Did

14   Alex's firm do that?

15       A    I would assume so.

16       Q    Not Cory?

17       A    No, sir.

18       Q    Okay.  Did you deal with any of Alex's

19   paralegals --

20       A    No, sir.

21       Q    How did you get the document to sign your

22   name and do that?  Did Alex give it to you?

23       A    He brought it to me.

24            MR. BLAND:  Okay.  The next document I'm

25            going to show you is Exhibit Number 3

1          (handing).

2                          - - -

3                  (Description          marked

4            PARTYEXB                    Exhibit

5            Number              for identification.)

6                          - - -

7    BY MR. BLAND:

8          Q     This is a letter dated 5/24/2018.  So it's

9    a couple months into when Tony's PR, before you

10   became a PR that year.  This is the Murdaugh firm

11   actually writing a letter to Trident Anesthesia

12   Group saying that they represent Michael Satterfield

13   as the PR for the Estate of Gloria Satterfield.

14          Do you see that?

15         A     Where is that?

16         Q     The first line (indicating).

17         A     Oh, okay.

18         Q     Did you ever see this letter before?

19         A     No, sir.

20         Q     Did Cory Fleming ever tell you that not

21   only he but the Murdaugh law firm and Alex Murdaugh

22   were also representing the Estate of Gloria

23   Satterfield?

24         A     No, sir.

25         Q     Were you ever made aware by Alex that he

1    had sent out letters saying that his law firm had

2    represented Gloria Satterfield in the estate?

3         A    No, sir.

4         Q    Okay.  Now, you were taking -- or you were

5    having discussions before you became PR and after

6    you became PR with Alex Murdaugh about the -- these

7    claims, right?

8              MR. LYDON:  Object to the form.

9              You can answer.

10   BY MR. BLAND:

11        Q    Did you have discussions with Alex,

12   obviously, before --

13        A    Not about the claims, no.

14        Q    But you had discussions with Alex about

15   becoming PR?

16        A    Correct.

17        Q    Okay.  Did that strike you as curious that

18   the target defendant was having discussions with you

19   instead of the plaintiff?

20        A    Not really.

21        Q    All right.  Why didn't that -- why didn't

22   you find that strange?  Did you think that everybody

23   had a unity of interest?

24        A    No, but I thought he was helping the kids

25   out.  That's what he claimed to be doing; he was

 1  helping the boys.

 2       Q    Doing what?  How did he help them?

 3       A    Giving him funds, money.

 4       Q    To do what?

 5       A    Because they lost their mother.

 6       Q    And was it also to pay medical bills, too?

 7       A    He didn't say that.

 8       Q    Okay.  Have you ever been involved in a

 9  lawsuit before?

10       A    No, sir.

11       Q    Anybody you know that has been in a

12  lawsuit that you know of?

13       A    No, sir.

14       Q    The concept of a defendant, do you know

15  the difference between a plaintiff and --

16       A    Yes, sir.

17       Q    The concept of a defendant helping out the

18  plaintiffs is not a usual concept that we see as

19  lawyers.  You would agree with that?

20       A    I would agree, yes, sir.

21       Q    So in this particular case, there seemed

22  to be cooperation between Cory and Alex in what was

23  being done to facilitate the claim in connection

24  with Gloria's death.  Is that a fair statement?

25       A    Yes.

1      Q    Okay.  So you never saw this letter?

2      A    No, sir.

3           MR. BLAND:  Okay.  The next document is

4      Exhibit Number 4 (handing).

5                      - - -

6           (Description          marked

7           PARTYEXB                     Exhibit

8           Number          for identification.)

9                      - - -

10   BY MR. BLAND:

11     Q    And this would indicate that Alex's

12   paralegals are -- do you know who agriswold is?

13     A    No, sir.

14     Q    At Alex's firm?

15     A    No, sir.

16     Q    Do you know who Tanya King is?

17     A    No, sir.

18     Q    Do you know whether Tanya King is the

19   paralegal to Cory Fleming?  If you look under --

20     A    Yes.  I'm reading that, yes.

21     Q    Okay.  So would you see here that they're

22   communicating with each other to get signatures of

23   Tony Satterfield as the PR?

24     A    Yes.

25     Q    Okay.  But you had not seen that document?

1    A    No, sir.

2         MR. BLAND:  Okay.  The next document is

3    Exhibit Number 5 (handing).

4                    - - -

5         (Description          marked

6    PARTYEXB                     Exhibit

7    Number            for identification.)

8                    - - -

9    BY MR. BLAND:

10        Q    Did you know that Tony, prior to becoming

11   PR, was seeking advice from Alex about bills that

12   came in about the insurance policy from Vanderbilt,

13   and then Trident Hospital?  Do you know Trident's

14   relationship to this whole matter?

15        A    Now I do, yeah.

16        Q    You didn't know then?

17        A    I did not.

18        Q    Did you ever find out who Gloria was when

19   you became her PR?  Did you know that she was the

20   housekeeper?

21        A    Yes.

22        Q    Did you know that she had died?

23        A    Yes.

24        Q    Did you know she had died at the Moselle

25   property?

1    A    Yes.

2    Q    Who told you all that?

3    A    Alec.

4    Q    Alec did.  What did he tell you about her

5 death?

6    A    That she had a fall with his dog.

7    Q    His dog -- dog or dogs?

8    A    Dog.

9    Q    Okay.  And that she --

10    A    Hit her head and spent some time in the

11 hospital, and then she --

12    Q    Passed away --

13    A    -- passed away from the injuries.

14    Q    Okay.  So you were unaware, when you

15 accepted the PR, that Tony was seeking legal advice

16 all throughout 2018 from not only Cory Fleming but

17 Alec, as well?

18    A    I had no idea.

19    MR. BLAND:  Next is Exhibit 6 (handing).

20              - - -

21    (Description        marked

22    PARTYEXB             Exhibit

23    Number        for identification.)

24              - - -

25 BY MR. BLAND:

1     Q     Do you remember the date that you were

2  approached by Alec to become PR?

3     A     I want to say it was November the 21st.  I

4  know it was the Wednesday before Thanksgiving --

5     Q     Okay.

6     A     -- because I was in the mountains with my

7  family, and he called me.

8     Q     He called you on the phone?

9     A     Yes, sir.

10    Q     And he had your number?

11    A     Yes, sir.

12    Q     Did he have your number because you guys

13 were friends or because you were a banker?

14    A     I would say it would be more friends

15 because I didn't bank him.

16    Q     So how did you know him?

17    A     Grew up around him and just been in the

18 town.

19    Q     Would you call him a friend?

20    A     Yeah.

21    Q     Did you socialize with him?

22    A     No.

23    Q     Okay.

24    A     I mean --

25    Q     And does your wife have any relationship

1    to him at all?

2         A    No.

3         Q    Okay.  So this is a letter that Cory

4    Fleming wrote demanding the $500,000.  And he put a

5    deadline that they had until 5:00 p.m. on

6    November 12th to respond.

7              Were you aware that there was a demand,

8    when you were asked to become a PR, that the

9    insurance proceeds be paid of $505,000?

10        A    No, sir.

11        Q    Okay.  Do you know who Scott Wallinger is?

12        A    No, sir.

13        Q    He was the attorney for Lloyd's.  Do you

14   know who Lloyd's was?

15        A    Insurance company.

16        Q    Were they the primary or the excess?  Do

17   you remember?

18        A    They were the first one.

19        Q    Right; which is rare.  Usually when you

20   think of Lloyd's, you think that they are the

21   excess.  But this one -- who was the excess in this

22   case?  Do you remember?

23        A    I believe Nautilus.

24        Q    Nautilus.  And Nautilus was represented by

25   a guy named John Grantland.  Did you ever meet him?

1    A    Over the phone.

2    Q    Over the phone?

3    A    Yes, sir.

4    Q    What was that for?

5    A    Mediation.

6    Q    So it was, like, COVID times or whatever?

7    A    No, sir.  I just was unable to make it due

8    to bank stuff.  There was several out at the bank.

9    Q    I was told that neither Wallinger nor

10   Grantland came to either hearing in front of Judge

11   Mullen.  Is that true?

12   A    That's true.  That I was at --

13   Q    Right.

14   A    -- let me say that.

15   Q    So the two settlement hearings that you

16   attended on December 19th, 2018, and then May 13th,

17   2019, it was just you, Cory, and Alex, and then

18   Judge Mullen?

19   A    And her clerk was at the first one.  And

20   then the second was just Judge Mullen, myself, and

21   Cory Fleming.

22   Q    So the only difference was there was a

23   clerk at the first one?

24   A    And Alec.  Alec wasn't at the second one.

25   Q    Alec wasn't?

1          A      No, sir.

2          Q      So at the second one, who was there?

3          A      Cory Fleming, me, and Judge Mullen.

4          Q      All right.  I want to show you Exhibit

5     Number 7 (handing).

6                         - - -

7                  (Description            marked

8                  PARTYEXB                       Exhibit

9                  Number           for identification.)

10                        - - -

11    BY MR. BLAND:

12         Q      This is the creditor's claim that was

13    filed by a law firm for one of the medical

14    providers.  And this was the hospital, and it was

15    more $655,539.60.

16                Do you -- do you ever recall seeing a copy

17    of this creditor's claim in the probate court file?

18         A      Not early on.  After the fact.

19         Q      Okay.  When you became PR, did you get

20    a -- did you go to the probate court and say, "Hey,

21    I want to see a copy of all the files"?

22         A      No, sir.

23         Q      Do you know whether that's your duty to

24    actually review?

25         A      I do not.

CHAD WESTENDORF - ROUGH DRAFT

1      Q    Do you know today whether you would have a
2  duty to review the probate --
3      A    Yes, sir.
4      Q    And you did not do that; is that right?
5      A    I did not go the probate court, no, sir.
6      Q    Do you realize that as PR for the estate,
7  if there's creditors that have filed claims against
8  the estate, you have an obligation to deal with
9  those creditors on behalf of the estate?
10     A    Yes, sir.
11     Q    And so a creditor filed a claim for
12  $655,000.  And then throughout the course of your
13  becoming a PR, you learned that $50,000 would go to
14  the survival of Gloria for her death, right?  And
15  then the rest went for wrongful death.  Do you know
16  the difference?
17     A    I do now.
18     Q    You didn't know the difference --
19     A    I did not.
20     Q    Did Cory ever explain that to you, what
21  the difference was?
22     A    No, sir.
23     Q    That the wrongful death travels outside of
24  the estate, and survival has to be an estate asset,
25  the survival moneys.  Do you know that now?

1      A     Yes, sir.

2      Q     Do you know how it was determined that

3  $50,000 would only be allocated for survival?

4      A     I don't.

5      Q     Gloria lived three weeks, right?

6      A     Okay.

7      Q     She died February 26th, after the fall.

8      A     Right.

9      Q     So -- and $4.3 million was recovered.

10  Which did you ever educate yourself on whether that

11  was a good settlement or not a good settlement?

12      A     No, sir.

13      Q     Do you realize that you actually had to

14  approve that settlement?

15      A     Yes, sir.

16      Q     So when somebody came to you and said,

17  "Look, we've settled for $505,000," did you say,

18  "Why are we settling for that amount?"  Or "What's

19  the status?  Is there any more insurance money?"

20  Did you ask those kind of questions?

21      A     It was told in the meeting with Judge

22  Mullen on the 19th that there was -- there was

23  another claim out and we might have some mediation

24  on that.

25      Q     Okay.

1    A    So the first one was for 500 that we were

2  in, and then --

3    Q    And so when you go to the mediation and it

4  settles for 3.8 million at the mediation --

5    A    Yes, sir.

6    Q    -- did you -- what did you do to satisfy

7  yourself that that was a good settlement or whether

8  you should have gotten more on behalf of the estate?

9    A    I thought it was a good settlement.  But

10  no, I did not educate myself.

11         Cory called me a couple days after

12  mediation and said that they're willing to settle

13  for the 3.8; are you -- is that good with you?

14    Q    You realize you're the client?

15    A    Sir?

16    Q    You realize you were the client?

17    A    I did not.

18    Q    Did you -- you never realized that you

19  were Cory's client?

20    A    I thought we were working together.

21    Q    Okay.  But that Cory owed duties to you as

22  an attorney.  Did Cory ever sign a fee agreement

23  with you --

24    A    No, sir.

25    Q    -- explaining what he would do for you?

CHAD WESTENDORF - ROUGH DRAFT

1        A     No, sir.

2        Q     But you realize that it's your duty, once

3    you accept to become PR, is to prosecute a claim on

4    behalf of the estate, and that was a claim against

5    Alex.  That's your duty.  You realize that?

6              You have to say yes or no.

7        A     Yes.

8        Q     Okay.  And whether Alec was your friend,

9    you accepted to become PR where he was the, quote,

10   target defendant, right?

11       A     Yes, sir.

12       Q     And it would require you, am I correct, to

13   put aside your friendship and do what was in the

14   best interest of the estate which you represented.

15   That would be your single-minded focus, right?

16       A     Yes, sir.

17       Q     Couldn't do what was best for Cory, right?

18       A     Yes.

19       Q     Couldn't do what's best for Chad?

20       A     Correct.

21       Q     Couldn't do what's best for Alec.  It had

22   to be for the estate and the estate only.

23       A     Yes, sir.

24       Q     So you got paid $10,000 on the first

25   settlement --

1       A    Yes.

2       Q    -- as the PR fee.  And then you got paid

3    $20,000 on the second settlement.  How was that

4    determined?

5       A    I have no idea.

6       Q    Did you negotiate that with Cory and Alec?

7       A    No, sir.

8       Q    Did -- did they call you on the phone and

9    say, "What would you want?"

10      A    No, sir.

11      Q    Did you understand what it was for?

12      A    Yes, sir.

13      Q    What was it for?

14      A    I was told it was for the PR fee.

15      Q    Okay.  What did you do for that fee?

16      A    Went to meetings with the judge and --

17      Q    Two hearings.

18      A    -- and then was on a mediation call.

19      Q    That would be it?

20      A    That would be it.

21      Q    Okay.  Do you realize, as the PR, you had

22    a duty to account for moneys?

23      A    I do now.

24      Q    Okay.  Do you realize that, like, when

25    Cory would take legal fees and costs in connection

1    with these settlements, it was your job to verify

2    that?

3         A    I did not.

4              MR. LYDON:  Object to the form.

5    BY MR. BLAND:

6         Q    Did you ever verify reimbursements or

7    costs that he was claiming for this claim?

8         A    No, sir.

9         Q    Did you ever verify his entitlement to a

10   legal fee?

11        A    No, sir.

12        Q    Were you ever made aware that contingency

13   fee agreements in South Carolina have to be signed

14   by the lawyer and the client?

15        A    I didn't know that.

16        Q    Do you know what a contingency fee

17   agreement is?

18        A    No, sir.

19        Q    Okay.  Tommy works by the hour.  I'm a

20   contingent lawyer.  So you pay him or somebody's

21   paying him by the hour to work.  He gets an hourly

22   rate.  Me, I work based on if I recover something, I

23   get a percentage.

24        A    Okay.

25        Q    And that percentage can be 33 and a third

1    percent.  It's kind of the market rate.  Sometimes

2    it's 40 percent.  But our Rules of Professional

3    Conduct say that if I'm going to collect a

4    contingency fee, a piece of the outcome, I'm willing

5    to give my time; but at the end, if there's a

6    recovery by settlement or verdict, and I'm getting a

7    percentage of that, there has to be a signed

8    writing.

9            So you recognize that you were the client,

10   right, of Cory?

11       A    Now I do.

12       Q    What gave him the right to collect the

13   legal fee if you didn't ever see a fee agreement

14   with him?

15           MR. LYDON:  Object to the form.

16           If you can answer.

17           THE WITNESS:  I don't know.

18   BY MR. BLAND:

19       Q    Okay.  Would you agree with me that you

20   were responsible for making sure that the estate got

21   the money that the court ordered?

22       A    Yes.

23       Q    Okay.  And so if the court ordered my

24   clients to get $2.765 million, and they didn't get

25   any of that, whose responsibility was that?

1      A     I had no opportunity to give them that

2   money.  I never received the funds.

3      Q     But the checks were made payable to you

4   that I'm going to show you.

5      A     And to Moss and Kuhn.  And it went into

6   their account.  I didn't have any opportunity to get

7   it.  It had to come out of their trust.  That's how

8   I was viewing it.

9      Q     Okay.  But do you realize you actually had

10  the right to get those checks as the PR?

11     A     No, I did not.

12     Q     You realize you signed documents regarding

13  the disbursement of those checks?

14     A     Yes, sir.

15     Q     So when you signed a document, wasn't it

16  incumbent upon you to make sure the checks were

17  disbursed properly?

18     A     Yes.

19     Q     Okay.  And if somebody's charging $11,500

20  of expenses on the first $505,000 settlement, wasn't

21  it incumbent upon you to ask what were those

22  expenses for?

23         MR. LYDON:  Object to the form.

24         But you can answer.

25         THE WITNESS:  I guess.  I don't know.

1    BY MR. BLAND:

2        Q    I'm not trying to trick you.

3        A    I mean, I don't.  I don't know what those

4    were and I didn't ask.  I trusted Cory was doing

5    what was right.

6        Q    When you see something that says 11,500 --

7        A    Yes.

8        Q    And I'm going to show you the second

9    disbursement sheet shows 105,000 even, didn't your

10   antenna go up and say, how do those expenses come

11   out on the perfect zero, not, you know, 105,000.37?

12       A    I wasn't aware.  I mean, it's not

13   something I ever looked at before and I had no

14   previous experience with it.

15       Q    But you got common sense.

16       A    Yes.

17       Q    Okay.  And common sense would tell you

18   this claim was not in litigation, right?

19       A    Yes.

20       Q    You never were asked to attend

21   depositions?

22       A    No, sir.

23       Q    Okay.  And the only thing that took place

24   were a couple demand letters and then a mediation.

25   Obviously, you had to paid the mediator.  That was

1    John Austin in Charleston, right?

2         A    Yes, sir.

3         Q    So if you have a mediator cost, and you

4    have a couple stamps, and maybe a filing fee for the

5    probate court for you to become PR, did you ever ask

6    yourself:  What could comprise $10,500, and then

7    another $105,000 of expenses?  How is it --

8         A    No.

9         Q    -- that a lawyer or a law firm put that

10   down in front of a judge and said to the court, "We

11   have $105,000 of expenses in a settlement where

12   there was no litigation"?  No deposition

13   transcripts.  You know, Cindy does this today.  This

14   will cost $800,000.  None of that.  No expert

15   witnesses, nothing.

16             Today can you tell me what that expense

17   is?

18        A    I cannot.

19        Q    You permitted that money to be taken from

20   your client, the estate.  You signed the document.

21   And we'll show you where you admitted that those

22   were proper expenses and that money came from my

23   clients' recovery for their mother's death.  And

24   nobody ever explained that to you, what those

25   expenses were?

1    A    No, sir.

2    Q    And it never, like, dawned on you to say,

3  how is that possible, that amount of money for

4  expenses?

5    A    No, sir.

6    Q    Do you remember, at the settlement

7  conferences with Judge Mullen, somebody would have

8  to make a representation as to what the

9  disbursements would be.  Who did that?

10    A    Cory.

11    Q    And the December 19th hearing -- and we'll

12  go into detail -- he would have said, "I have

13  $10,500 of expenses"?

14    A    I don't remember.

15    Q    Do you remember if May 13th he would have

16  said, "Judge Mullen, I have $105,000 of expenses"?

17    A    I don't remember if he said that exactly.

18  No.

19    Q    Do you remember Judge Mullen saying, "How

20  is that possible?  How are these numbers possible?"

21    A    No, sir.

22    Q    Do you remember Judge Mullen saying,

23  "Where is your fee agreement, Mr. Fleming?  How are

24  you entitled to 33 and a third percent?"

25    A    No.

CHAD WESTENDORF - ROUGH DRAFT

1      Q      Did she ever say to you, "Mr. Fleming, how

2  are you entitled to $30,000 as a PR fee when the

3  statute says your money comes from a percentage of

4  the survival settlement?"

5      A      Never was mentioned.

6      Q      So the survival settlement was $50,000.

7  5 percent of that is $2,500.

8             Did you ever ask Cory Fleming, "How is it

9  that I'm getting $30,000 when the statute says I'm

10  only supposed to get $2,500?"

11     A      No, sir.

12     Q      Did Judge Mullen ever ask, "How is it that

13  you're getting 30,000?  Do you have a fee agreement,

14  Mr. Westendorf?"

15            Did she ever ask that?

16     A      No, sir.

17            MR. BLAND:  Okay.  All right.  I am not

18            going to use Exhibit Number 7 -- or Number 8.

19            Actually, I'll renumber.  Strike that.

20            Number 8.

21                          - - -

22            (Description          marked

23            PARTYEXB                      Exhibit

24            Number          for identification.)

25                          - - -

1    BY MR. BLAND:

2         Q    This is a letter from Cory Fleming to his

3    paralegal on November 28th.  And it says:  I need

4    the I-9 for this, and the check is to Chad

5    Westendorf as personal representative of the Estate

6    of Gloria Satterfield.

7              So on November 28th, an I-9 is being

8    given -- it's actually a W9, it's supposed to be,

9    not an I-9.  But they're cutting a check for you as

10   personal representative, and you were not even the

11   PR yet.

12        A    No.

13        Q    Did you have any idea this was going on --

14        A    No, sir.

15        Q    -- at the time?

16        A    First time I've ever seen that.

17        Q    So you said, before Thanksgiving, which

18   would have been November 26th, Alec had asked you

19   and you said yes.

20        A    It was actually around the 21st.

21        Q    21st.  Sorry.  But it was before

22   Thanksgiving.

23        A    Yes.  He had contacted me that Wednesday,

24   but that's the first I've seen of this.

25        Q    And you went to Russ, and Russ said,

1    "Sure, you can do it."  Right?

2       A    Russell and Mr. Laffitte, yes.

3       Q    And then you went back and told Alec, "We

4    can do it -- I can do it"?

5       A    Yes.

6            MR. BLAND:  The next one is exhibit number

7       9 (handing).

8                      - - -

9            (Description          marked

10           PARTYEXB                     Exhibit

11           Number          for identification.)

12                      - - -

13   BY MR. BLAND:

14      Q    And this is from Tanya King to, I guess,

15   the lawyer at the law firm that was paying the

16   505,000.  It says:  Attached is our firm's W9, and

17   the payee instructions are as follows.  Chad

18   Westendorf as PR and Moss Kuhn & Fleming.

19           Do you see that?  But on November 30th,

20   did you know this had been sent?

21      A    No, sir.

22      Q    Okay.

23      A    And I don't believe I agreed by then.

24      Q    Huh?

25      A    I don't think I had agreed to be the PR by

1    then.

2        Q     By November 30th?

3        A     I don't think so.

4              MR. BLAND:  Okay.  Next is Exhibit Number

5        10 (handing).

6                        - - -

7              (Description          marked

8        PARTYEXB                         Exhibit

9        Number            for identification.)

10                       - - -

11   BY MR. BLAND:

12       Q     This is December 6th, and this is a letter

13   to Cory from Scott Wallinger saying:  "Enclosed is a

14   check made payable for 505,000, made payable to Chad

15   Westendorf as PR of Gloria Satterfield and Moss,

16   Kuhn & Fleming."

17             Do you see that?

18       A     Yes, sir.

19       Q     Were you aware that on December 6th, the

20   actual settlement check had been paid?

21       A     No, sir.

22       Q     When did you become aware that there was a

23   settlement check?

24       A     The 19th.

25       Q     At the 19th.

CHAD WESTENDORF - ROUGH DRAFT

1       A       December 19th.  Excuse me.

2       Q       Okay.  So on December 19th, when you

3    became aware, did you think that I need to call my

4    clients and tell them, hey, guys, there was a

5    settlement for $505,000?

6       A       I thought Cory was in touch with them.

7       Q       But who --

8       A       I mean --

9       Q       Who were your clients?

10      A       My clients were the boys, now that I

11   understand that.

12      Q       Well, did you -- when you say, "I thought

13   that Cory was in touch with them," what made you

14   think that Cory was in touch with them?

15      A       Because I was told at that first meeting

16   that Cory was the attorney for the estate, and I

17   thought --

18      Q       But nobody told you -- like, Cory didn't

19   tell you, "Hey, I'm going to keep the boys abreast"?

20      A       No, sir.

21      Q       And you certainly didn't see a letter from

22   Cory to the boys saying, hey, by the way, I just

23   settled Chad -- Chad and I settled the initial claim

24   for $505,000.

25              You never saw that?

1        A    I never saw that, no.

2        Q    Do you realize that the boys are real,

3    live people?

4        A    Sure.

5        Q    And that they have a right to know, if

6    money's recovered in connection with their mother's

7    death, what that amount was, right?

8        A    Certainly.

9        Q    And that duty would either be -- would

10   come to you.  You understand that?

11       A    I understand that.

12       Q    Because your lawyer is going to tell you

13   that Cory Fleming is going to say, "My client was

14   Chad.  My client wasn't the estate."

15            Now, we disagree with that and we think

16   the law has a foreseeability angle to it that, you

17   know, you've got to look past the PR downstream to

18   the estate.

19            But Cory's going to say, you know, "I

20   represented Chad.  And it's Chad's obligation, as

21   the PR, to keep his estate informed."

22            So you were unaware that the boys were

23   unaware?

24       A    Yes, sir.

25       Q    Okay.

1          MR. BLAND:  That's a funny thing to say,

2     isn't it?

3          All right.  Let's do the next exhibit as

4     what, Scott?

5          MR. MONGILLO:  11.

6          MR. BLAND:  Exhibit Number 11.

7               - - -

8          (Description          marked

9          PARTYEXB                    Exhibit

10         Number          for identification.)

11              - - -

12    BY MR. BLAND:

13    Q    This is the actual check for the first

14    settlement (handing), and it's dated 12/4/2018.  And

15    it's made payable to Chad Westendorf, PR, of the

16    estate of Gloria Satterfield and Moss

17    Kuhn & Fleming.  And you executed this as Chad

18    Westendorf, as PR of the Estate of Gloria

19    Satterfield.

20         Do you remember when you would have

21    executed this check?

22    A    The 19th.

23    Q    The 19th.  Okay.

24    A    That's what I remember.

25    Q    And you did this in chambers?  Did you

 1   execute it there?

 2       A    Yes.

 3       Q    Or did you execute it before being in

 4   chambers?

 5       A    We were in the room, in the courthouse.  I

 6   don't remember if Judge Mullen was in yet when I

 7   signed this document, but yeah, that's where it was

 8   because that's the only time I met with Cory.

 9       Q    Have you ever been in court before where

10   there was a stenographer, like Cindy --

11       A    No, sir.

12       Q    -- taking down?  But there was no

13   stenographer when you were there on the 19th; is

14   that correct?

15       A    No, sir.

16            MR. LYDON:  I would just -- you asked it

17        in the negative, and he answered it in the

18        negative, just for the record.

19   BY MR. BLAND:

20       Q    There was a court reporter?

21       A    There was no court reporter present.

22       Q    Right.  There was no court reporter

23   present.

24            And that didn't strike you as unusual?

25       A    I had no clue.

1      Q      Right --

2      A      I had never been in the situation.

3      Q      Based on lack of experience?

4      A      Yes, sir.

5      Q      And that settlement conference was

6    attended by Alec, by Cory --

7      A      Myself.

8      Q      -- and her --

9      A      And Judge Mullen.

10     Q      And a law clerk?

11     A      I guess there was a clerk.  She was a

12   young lady with the judge.

13     Q      And that conference happened before

14   Mallory Beach's untimely death in February of 2019.

15   Are you aware of that timeline?

16     A      Yes.

17     Q      Okay.  So who -- who presented the

18   settlement to Judge Mullen?

19     A      Cory.

20     Q      Did Alec speak?

21     A      Yes.

22     Q      What did Alec say?

23     A      He gave background about the fall --

24     Q      Okay.

25     A      -- and the situation.  And that's when he

CHAD WESTENDORF - ROUGH DRAFT

1  talked about the boys, or wanted to help take care

2  of them.

3      Q    And do you remember asking yourself or

4  wondering why Alec didn't have his attorneys there

5  with him?

6      A    No.

7      Q    Did you know at the time that he had two

8  attorneys, Scott Wallinger and John Grantland?

9      A    No, sir.

10     Q    So it wouldn't have struck you funny that

11 defense lawyers who, you know, represent Alex and

12 these insurance companies are paying checks aren't

13 at a settlement conference?

14     A    I wouldn't have known.

15     Q    How long did it last?

16     A    I would say, if I had to guess, we were

17 there 30 minutes, 45 minutes tops, maybe.

18     Q    Okay.

19     A    If I remember right.

20          MR. BLAND:  And so I'm going to show you

21     Exhibit Number 12 right now (handing).

22                    - - -

23          (Description          marked

24          PARTYEXB                     Exhibit

25          Number          for identification.)

1                           - - -

2    BY MR. BLAND:

3         Q    So tell me everything that happened there.

4    I mean, did Judge Mullen say, "I think this is a

5    good settlement"?

6              You know, did Cory say, "This is just the

7    first part of it.  We're going to make claims

8    against an excess carrier"?

9              Tell me what was said.

10        A    I believe there was a statement in there

11   that there was being an excess carrier, to go by

12   your words, and that we were going to file that; and

13   that this was the first suit; and that he was going

14   to pay some medical out of there; and --

15        Q    Who was going to --

16        A    Cory was going to pay some of the medical.

17        Q    Do you remember him saying what the

18   medical bills were?

19        A    No, sir, I do not.

20        Q    Okay.  Did you -- did Alex say, "Hey, it

21   was my responsibility for her death"?

22        A    I can't recall.

23        Q    Did he say, "Look, you know, it was my

24   dogs.  They got out of hand; they got unruly and

25   caused her to fall.  And I feel like I'm

1   responsible"?

2       A    He went into that, that she was on the

3   stairs; the dogs were jumping up and caused her to

4   fall.

5       Q    Did Judge Mullen ask you, "Do you think

6   this is a fair settlement?"

7       A    She did not.

8       Q    Did she ask you, "Are you satisfied with

9   the services of your attorney?"

10      A    I don't believe so.

11      Q    Meaning Cory Fleming.

12      A    I don't believe -- I don't remember much

13  conversation between Judge Mullen and myself.

14      Q    She didn't ask you, "Do you think this is

15  in the best interest of the estate to agree to this

16  settlement?"

17      A    I don't recall that.

18      Q    Okay.  Did she say to you, or somebody,

19  "Look, I need an order.  We'll get this order signed

20  and get it filed."

21           Do you remember any of that kind of

22  conversation?

23      A    No.

24      Q    Do you remember anything, you know -- I'm

25  told that it took almost 30 or 45 minutes, the

1    settlement conference.

2        A    Right.

3        Q    Do you remember any other conversations

4    about the settlement?

5        A    No.

6        Q    Do you remember --

7        A    That was -- there was some personal talk,

8    like, right when she came in.  I mean, you could

9    tell that they were acquaintances, and asked how

10   everybody was doing, but other than that...

11       Q    At that settlement conference, were there

12   any discussions about a structured settlement?

13       A    I had heard "Forge" for the first time

14   that day.

15       Q    On December 19th --

16       A    Yes.

17       Q    -- you heard the word "Forge"?

18       A    Yes, because they said they were sending

19   the money for the boys to Forge.

20       Q    Who said that?

21       A    Cory.

22       Q    And did you ask, "What is Forge?"

23       A    I did.

24       Q    And what did they say?

25       A    It was an annuity investor or a structured

1  settlement, what I found out later.  But basically

2  what I understood that day was it was an annuity

3  financial company.

4       Q    Right.

5       A    I had never heard of it before that.  I

6  didn't know what that was.

7       Q    Okay.  And one of the things I'm curious

8  about is:  Did Judge Mullen approve that there was

9  going to be a structure to Forge?

10      A    Not that I'm aware of.

11      Q    But there was discussion in front of

12  her --

13      A    Yes.

14      Q    -- that there was going to be a structure?

15      A    I guess.  I mean, yeah, I was sitting

16  there in her chambers and we discussed.  That was

17  the first time I heard "Forge."

18      Q    What was the structure supposed to be?

19      A    I have no idea.

20      Q    What was the structure supposed to be for

21  Tony?

22      A    I don't know.

23      Q    What was the structure supposed to be for

24  Brian?

25      A    I don't know.

CHAD WESTENDORF - ROUGH DRAFT

1      Q      Well, you saw checks going to Forge.

2      A      I did not.

3      Q      At various times, did you not --

4      A      I did not see those.

5      Q      You never saw any checks going to Forge?

6      A      I never saw a check going to Forge.

7      Q      But if a structure was being -- we're told

8      that you were brought on because Alec told Tony that

9      there were going to be business issues with some

10     settlements coming in, and it would be better for

11     somebody like you, Mr. Westendorf, who has a

12     business background, to handle that.

13            Is that something that you remember

14     hearing?

15     A      No, sir.

16     Q      Did you ever ask why I'm coming onboard

17     and why Tony is going out?

18     A      I did not.

19     Q      Okay.  So when you heard "Forge," did you

20     not say to yourself, hey, what structure is going --

21     there's two boys here.  Is there a structure for one

22     and not the other, or both?  Did you ever ask that?

23     A      I did not.

24     Q      Did anybody ever tell you, on

25     December 18th, that one of your heirs, that was an

CHAD WESTENDORF - ROUGH DRAFT

1  heir of the estate, was a vulnerable adult?

2      A      On the 19th, they did.

3      Q      Who told you?

4      A      Alec mentioned that.

5      Q      To whom?  Judge Mullen?

6      A      The conversation in there that day.

7      Q      What did he say?

8      A      He said that -- like you said, he was a --

9  I don't know.  I can't remember exact words, so I

10  don't want to say, but he made it aware that he had

11  special needs.

12      Q      Special needs.

13      A      Yeah.

14      Q      Was there ever talk that he should have a

15  conservator?

16      A      No, sir.

17      Q      Do you know whether Tony's needs are

18  different than Brian's needs?  Brian, by the way, is

19  the special-needs kid.

20      A      Yes, sir.

21      Q      Did you ever, you know, inquire as to what

22  are Tony's needs as opposed to Brian's needs?

23      A      I did not.

24      Q      Did you ever ask, "Why is there a

25  structure?"

1      A      No, sir.

2      Q      What's the reason for a structure when

3   people are over 18 years old, in their 30s?

4      A      I have no idea.  I can't answer that.

5      Q      Were you aware that structures are usually

6   for people who are, like, minors or people who are

7   incapacitated and they'll need medical -- you know,

8   medical needs throughout their life, so you want the

9   money to last?  Did you have any --

10     A      No, sir.

11     Q      -- any reason to ask why we're doing a

12  structure as opposed to disbursing the money?

13     A      I didn't.

14            MR. BLAND:  I'm going to show you Exhibit

15        Number 12 -- 13.  Okay.  13.

16            MR. LYDON:  I think it's 12.

17            THE WITNESS:  The last one I have is 11.

18            MR. BLAND:  So it is 12.

19            THE WITNESS:  You put something down on

20        the floor.

21            MR. BLAND:  This isn't it.  Here it is, 12

22        (handing).

23                        - - -

24            (Description          marked

25            PARTYEXB                    Exhibit

 1          Number            for identification.)

 2                          - - -

 3    BY MR. BLAND:

 4       Q     So this is you on the 18th -- or -- excuse

 5    me.

 6              This is -- Chad, the dates are actually

 7    wrong at the front, if you look at it.

 8       A     Yeah.

 9       Q     It's not March 28th.  They used the same

10    date for Tony when he became the PR.  But there are

11    correct dates at the bottom where Sheila Odom

12    signed.

13              So you became the PR on December 18th.  Is

14    that correct?

15       A     That is correct.

16       Q     And that's when you assumed your duties?

17       A     Yes, sir.

18       Q     And you put on here that you were vice

19    president of the bank, and you gave your banking

20    address as opposed to your home address, if you look

21    in the back.

22       A     Where is that?

23       Q     On page 3, on the back.  You gave your

24    banking address as being the address you wanted mail

25    from the court.

1          So did the probate court ever send you

2     mail?

3          A    No, sir.

4          Q    So you never got any mail there at all?

5          A    No, no.  And I did type that, just to let

6     you know.

7          Q    And if you look, Kristi Jarrell was a

8     notary for some of that.  Did you ever find out who

9     Kristi Jarrell was?

10         A    I assume she was the paralegal for Alec or

11    worked for Alec, the secretary.

12         Q    That's fine.  And so that next day, after

13    you become PR --

14              MR. BLAND:  The next exhibit is 13

15         (handing).

16                        - - -

17              (Description          marked

18              PARTYEXB                    Exhibit

19              Number          for identification.)

20                        - - -

21    BY MR. BLAND:

22         Q    -- a petition is filed to approve a

23    wrongful death settlement.  And you sign the

24    petition as PR for the Estate of Gloria Satterfield.

25         A    Yes, sir.

1      Q      Who's Margaret Grill, the notary?

2      A      She works at the courthouse.

3      Q      She works at the courthouse.

4      A      Or used to.

5      Q      And you were seeking approval on behalf of

6    whom?

7      A      Tony and Brian.

8      Q      For 505,000, right?

9      A      Correct.

10      Q      And the caption was now you suing on

11   behalf of the estate as PR versus Alex Murdaugh.

12      A      Correct.

13      Q      And that's the first time we've ever seen

14   a caption in this case.

15             You understand when I use the word

16   "caption," meaning a court caption?

17      A      No.  No, I didn't know that.

18      Q      And so going forward, the caption in the

19   courthouse -- because this was filed on

20   December 19th.  You see right there (indicating)?

21      A      Yeah.

22      Q      That's the caption.  And the court term is

23   now 2012-CP-25-00298.  Do you see that?

24      A      Yes, sir.

25      Q      So that's the Court of Common Pleas

1  caption.  And that's the case number that it's going

2  to have.

3          And you were seeking approval of a

4  settlement, right?

5      A   Yes, sir.

6      Q   And you told me that after Cory spoke and

7  Alec spoke -- did you actually speak at all?

8      A   No, sir.

9      Q   Never spoke?

10     A   No, sir.

11     Q   You weren't asked any questions or

12  anything?  It was approved?

13     A   Yes.

14     Q   Do you remember whether an order was

15  signed at that hearing?

16     A   I don't.

17     Q   Okay.  Did Mr. Laffitte ever -- Russ

18  Laffitte ever tell you about his experiences of

19  being a PR and what it entailed and what it should

20  have done?

21     A   No, sir.

22     Q   Did he give you any advice or rules of the

23  road?

24     A   No, sir.

25     Q   Did he encourage you to do it or not to do

1    it?  Did he say, "Hey, this is a good thing.  You

2    can make some side money"?

3         A    No, sir.

4         Q    Did the bank let you keep the money to be

5    PR?

6         A    Yes, sir.

7         Q    Okay.  So you didn't view this as anything

8    but a one-off?  This wasn't something you were

9    thinking, like, I am going to start now being a

10   cottage industry, being a PR?

11        A    No, sir.

12             MR. BLAND:  Okay.  So my next exhibit for

13        you is 14 (handing).

14                       - - -

15             (Description            marked

16        PARTYEXB                      Exhibit

17        Number            for identification.)

18                       - - -

19   BY MR. BLAND:

20        Q    And this is a check from Moss

21   Kuhn & Fleming made payable to Forge for $403,500.

22   You see that?

23        A    Yes, sir.

24        Q    When was this approved to be paid to

25   Forge?

1      A    I believe the disbursement settlement

2  statement I signed was January 7.

3      Q    And it said it was going to go to Forge?

4      A    I think so.

5      Q    Okay.  So from the $505,000, 403,500 was

6  supposed to go to Forge?

7      A    Yes, sir.

8      Q    Okay.  What was the contingency fee that

9  Cory Fleming was operating under?

10      A    I don't know.

11      Q    A third?

12      A    I have no idea.

13      Q    40 percent?  If it was a third, he didn't

14  take as much fee as he should have from that, is

15  there?  He didn't take -- if it was a third, 166,000

16  or some odd dollars should have been taken off the

17  top, right?

18      A    Yes, sir.

19      Q    But $403,500, which should have left about

20  101,000 -- $101,500, that's what should have been

21  left.  Did you ever try to get an accounting of all

22  that?

23      A    I did not.

24      Q    Was it your responsibility to have an

25  accounting for the estate?

CHAD WESTENDORF - ROUGH DRAFT

1       A     Yes, sir.

2       Q     So this check was written, right?  Is it

3   endorsed?

4       A     I don't know.  Looks like it says "deposit

5   only" to me.

6       Q     Is that an endorsement?

7       A     I wouldn't think so.

8       Q     You're a banker.

9       A     Yeah, I wouldn't --

10      Q     If you are the payor bank, and Lydon

11  National Bank presents a check from one of its

12  customers, Cindy, and says, "We want you as the

13  payor bank to pay the funds," and you saw that, you

14  would send it back to Lydon National Bank and say,

15  "Can I get an endorsement," right?

16      A     I guess, yeah.  Sometimes it is -- I would

17  say you could see them going through like that, but

18  usually the account number is attached to it or

19  whatnot.

20      Q     Have you ever, in your experience, seen a

21  check be sent back to a collecting bank and say,

22  "Look, we need an endorsement on it.  We can't honor

23  the check"?

24      A     No, I haven't, but I'm -- I don't deal

25  with that.  I don't normally deal with checks.

1    Q    So before you became the big honcho, you

2  never were a lower honcho?  Before you became

3  executive VP, you weren't a teller?

4    A    I was a teller way back at a different

5  bank.  I've never been a teller at Palmetto State

6  Bank.

7    Q    All right.  But it's important to have

8  endorsement, right?

9    A    It's very important, yes, sir.

10    To go back to it, like, when I endorsed

11  the check as Chad Westendorf as PR for Gloria

12  Satterfield's estate, I --

13    Q    You wrote it out.

14    A    -- did it exactly how it was written on

15  the payee, yes.

16    Q    The payee determines who should endorse.

17  Okay.

18    MR. BLAND:  So the next exhibit is 15.

19               - - -

20    (Description         marked

21    PARTYEXB                 Exhibit

22    Number         for identification.)

23               - - -

24  BY MR. BLAND:

25    Q    This is the disbursement sheet that you

1   signed (handing).

2       A    Yes.

3       Q    And you are correct, you signed it like

4   you said --

5       A    Yes, sir.

6       Q    -- Chad Westendorf as PR of the estate,

7   right?

8       A    Yes, sir.

9       Q    And you signed it on January 7th?

10      A    Yes, sir.  In my office.

11      Q    In your office.  Tell me how you signed

12  this settlement statement like that, with those kind

13  of disbursements.  What did they mean?

14      A    I don't know.

15      Q    Well, the settlement was for $505,000, and

16  you signed a settlement statement saying the

17  settlement was for 475,000.

18          You saw a check come in for $505,000.  You

19  endorsed it.  You told the judge, on December 19th,

20  that the settlement was $505,000.

21          Who prepared this disbursement sheet?

22      A    I don't know.

23      Q    Did Alex prepare it?

24      A    He brought it.

25      Q    He brought it to you?

1          A      Yes.

2          Q      Where, at the bank?

3          A      Yeah, at the bank.

4          Q      So Alex brought you this document.

5                 Did you not read it and say, "Hey,

6     Mr. Alec, the settlement is $505,000"?

7          A      No, I did not.

8          Q      You didn't?  Okay.

9                 Did you see that it had only $50,000 of

10    attorneys' fees?

11         A      Yeah.

12         Q      Did you ask, "What's that in reference to?

13    What percentage?  How did you arrive at that?"

14         A      I did not.

15         Q      And it said you get $10,000.

16         A      Yes, sir.

17         Q      How was that determined?

18         A      I don't know.

19         Q      And you did get $10,000.

20         A      Yes, sir.

21         Q      I saw it --

22         A      Yes, sir.

23         Q      You did?

24         A      Yeah.

25         Q      And then it says there was prosecution

1    expenses of $11,500.  And it says:  "I understand

2    and fully approve the above disbursement.  I

3    acknowledge the receipt of the above amount in a

4    copy of this statement."

5          So you -- you're approving $11,500 of

6    expenses.  What did you base that on?

7       A   I don't know.  I didn't have any proof.

8       Q   Did you sign and give this to Alec or did

9    you provide this to Cory?

10       A   I gave it to Alec.

11       Q   And you signed it?

12       A   Yes, sir.

13       Q   And so it says that from that, $403,500 is

14    going to Forge.

15       A   Yes.

16       Q   And we saw that check, right?

17       A   Yes, sir.

18       Q   Can you tell me where the other $30,000

19    went to?

20       A   No, sir.

21       Q   That's $30,000 that belongs to my client.

22    Right?

23       A   Yes, sir.

24       Q   And Alec and Cory are representing to the

25    court in these papers that it's a $505,000

1    settlement, yet you're signing a disbursement sheet

2    that it's only a $475,000 settlement.

3         A    Yes, sir.

4         Q    Do you owe an apology today to my clients?

5         A    I'm sorry this happened to them.  Yes, I

6    do.

7         Q    I appreciate that and I know you they're

8    going to appreciate that.

9         A    And I'm sorry they lost their mother more

10   than anything.

11        Q    And I know they're going to appreciate

12   that, too.  And I thank you for that.

13             The date of the injury is February 28th,

14   2018.  What date's that?  She fell on February 2nd.

15   She died on February 26th.  What -- what is

16   February 28th?  Don't know?

17        A    Don't know.

18             MR. BLAND:  Our next exhibit is 16.

19                      - - -

20             (Description          marked

21             PARTYEXB                  Exhibit

22             Number          for identification.)

23                      - - -

24   BY MR. BLAND:

25        Q    And this is you writing -- this is one of

1   the only e-mails that I've seen you write.  And you

2   sent it on your e-mail at Palmetto State Bank.  And

3   you wrote it to Cory and you said:  "Good morning,

4   Cory.  Hope all is well.  Could you please send me a

5   copy of the document that we signed with the judge

6   the other day.  Just want to keep a copy."

7           Do you see that?

8   A    Yes, sir.

9   Q    What made you want to write that on

10  January 14th?

11  A    It was after the 7th, and we signed that.

12  And I never received any of the documents from the

13  19th meeting.  And I was wanting to get -- to keep

14  them.

15  Q    Okay.  Did he ever send you any?

16  A    Yeah, I got those.

17  Q    He did?

18  A    Yes, sir.

19  Q    Hold on here for a second.

20          What did you get?

21  A    It was a copy of the agreement disburse --

22  the one you had earlier.

23  Q    I'll show you.  I gave you that

24  disbursement, but hold on.

25  A    No.  It was --

CHAD WESTENDORF - ROUGH DRAFT

1     Q     I'm going to show you something right

2   here.

3     A     Okay.

4         MR. BLAND:  So Exhibit Number 17

5     (handing).

6                 - - -

7         (Description          marked

8     PARTYEXB                    Exhibit

9     Number          for identification.)

10                 - - -

11  BY MR. BLAND:

12    Q     This is the order approving the wrongful

13  death and survival settlement from that hearing.

14  And I'm really concerned because I've never seen a

15  signed copy.  All I've ever seen is an unsigned

16  copy.

17         Did you ever see a signed copy by Judge

18  Mullen?

19    A     No, sir.

20    Q     From that settlement?

21    A     No, sir.

22    Q     So the document you were asking was

23  probably --

24    A     The one I --

25    Q     -- the disbursement sheet from January --

1    or the petition?

2          A    The petition, yes, sir.

3          Q    So you signed the petition, and you wanted

4    a copy of the petition.

5          A    Yes.

6          Q    If we go back to the petition -- I'll take

7    you back there real quick.  It's Exhibit Number --

8               MR. LYDON:  13.

9    BY MR. BLAND:

10         Q    -- 13, yep.  It says there's a $505,000

11   settlement, doesn't it?

12         A    Yes, sir.

13         Q    The order that was drafted says only it

14   was $475,000.  So do you know how -- when the change

15   came from 505 to 475?

16         A    No, sir.

17         Q    And to your knowledge, did you ever see a

18   signed Judge Mullen order from the first one?

19         A    This was the first --

20         Q    Yeah.

21         A    No, sir.

22         Q    No.  Okay.  So the structure is discussed,

23   but you don't see the check going to Forge, right?

24         A    No, sir.

25         Q    And you never communicated with Forge,

CHAD WESTENDORF - ROUGH DRAFT

1  right?

2      A    No, sir.

3      Q    And you never saw an insurance policy,

4  right, an annuity policy, right?

5      A    (Shakes head.)

6      Q    Okay.  And you would agree with me that

7  Alex was the one that talked to you about a

8  structure, right?  You heard Alex --

9      A    He was in there in the meeting with Cory

10 and Alex.

11     Q    They talked about a structure?

12     A    They talked about Forge.  The money was

13 going to Forge is what I heard.

14     Q    And you didn't ask who's getting what --

15     A    I did not.

16     Q    -- what the terms of an annuity would be,

17 how long it would go, how it's funded, how it would

18 be paid.  You would agree with me that that's a

19 business decision that you should have weighed in on

20 for your heirs, right?

21     A    I understand that.

22          MR. LYDON:  Object to the form.

23 BY MR. BLAND:

24     Q    Because the heirs are entitled to their

25 money that the court orders when they're over the

1   18 -- age of 18, right?

2       A    I understand that.

3       Q    When you're over 18, you get your money --

4       A    Okay.

5       Q    -- as an intestate heir.  Gloria died

6   without a will.  Do you understand that?

7       A    I do not.

8       Q    Do you know the difference between testate

9   and intestate?

10      A    I do not.

11      Q    Do you know now?

12      A    No, sir.

13      Q    Okay.  So she died without a will makes it

14  intestate.  So the law would say that if she had a

15  husband and two children, husband gets 50 percent,

16  kids get 50 percent.  But she died without a

17  husband, so all the money went to the kids.

18           You knew that they were the heirs of her

19  estate, right?

20      A    Yes, sir.

21      Q    You just didn't know whether they were

22  heirs based on a will or based on intestacy,

23  right -- intestate?

24      A    Right.

25      Q    So if you're permitting money to go into

1   annuity, you would have had to have had discussions

2   with the children, the boys, who are 30 years old

3   and older:  You don't want the cash now.  You're

4   going to put it in a structured annuity.

5           Did you have those discussions?

6       A    I did not.

7       Q    Did Cory tell you you should have those

8   discussions?

9       A    He did not.

10      Q    Okay.  So when -- what's the next thing

11  that happened after -- you got your $10,000.  That's

12  the only thing you really knew about.  You didn't

13  even know the 403,500 was sent to Forge.

14      A    I did not.

15      Q    You weren't copied on a cover letter that

16  Cory sent to Forge depositing, you know -- sending

17  the check?

18      A    No, sir.

19      Q    If I told you that Cory just put that

20  check in an envelope and sent it to a P.O. Box in

21  Hampton, would that surprise you?

22      A    Very much.

23      Q    Addressed to Forge.  And there wasn't a

24  cover letter.  So if there really is a Forge, which

25  there is, Forge Consulting -- and so the Forge check

 1   goes to Forge -- what's Forge supposed to do with a

 2   Forge check?  It doesn't say on the bottom the

 3   Satterfield kids or -- I'll show you the check

 4   again.

 5        A    Sure.  How would they know?  I agree.

 6        Q    I mean, if I sent $10 million to Zurich

 7   Insurance Company today, who -- how are they going

 8   to apply it?  Where does it go?

 9             And in this case, there's two boys.  On

10   the bottom it should have two account numbers, you

11   know, to say, look, split the proceeds.  Something.

12             And you heard Cory Fleming through his

13   lawyers say, "I was duped."  You've heard that,

14   right?  Have you heard that Cory Fleming, through

15   his attorneys -- Cory hasn't spoken, but Cory's

16   attorneys have said he was a victim; he was

17   victimized by Alec.  Alec hoodooed him; that he was

18   unwary or ignorant that Alex wasn't actually doing

19   anything with Forge.  There wasn't a Forge.

20             I mean, the whole concept -- think about

21   this, that you're letting the defendant, Alec

22   Murdaugh, have these discussions with supposedly

23   Forge and setting up the structure when he's the

24   defendant.  Doesn't that strike you as a conflict of

25   interest or crazy?

1       A    It should.

2       Q    It should.  Okay.  It didn't.

3            Did they ever say where Forge was located

4    in the hearing in front of Judge Mullen?  Did they

5    say it's located in Georgia or in Hampton --

6       A    No, I did not --

7       Q    Or Columbia, South Carolina?

8       A    -- hear that, no.

9       Q    So you get the 10,000.  You don't know

10   about how Cory disbursed it.  You don't know about

11   that there's $30,000 that's unaccounted for.  You

12   only get a petition that you signed.

13           So at this point, you have your signed

14   petition that was filed with the court on the 19th.

15   Did you get a copy of the disbursement sheet that

16   you signed?

17      A    I made a copy, yes.

18      Q    Okay.  So those are the two documents that

19   you have, along with when you became PR on the 18th.

20      A    Yes.

21      Q    Okay.  So that's kind of your file at that

22   point.

23      A    At that point, yeah.  I did -- yes.

24      Q    So what happened, like, during the rest of

25   January and February?  Were you getting ready for --

CHAD WESTENDORF - ROUGH DRAFT

```
 1        A      The next I received was a letter stating

 2   that they requested me at a mediation.

 3        Q      Mediation.

 4        A      And I believe the mediation date would

 5   have been March 21st, something like that.  I'm not

 6   going to swear to that.

 7        Q      Yeah, the end of March.

 8        A      And I should --

 9        Q      And you were out of town.

10        A      No.  There should have been some e-mails

11   to Cory that the bank was running low on people and

12   I wasn't going to be able to come in person.  I said

13   I could show up on Saturday.  He said, "No.  Let's

14   do it over the phone."

15        Q      Okay.  I've never seen those e-mails, but

16   I trust you that they're in existence.  I didn't see

17   them in your file and I didn't see them in Cory's

18   file.

19        A      Okay.  It was just I could not make it.

20        Q      Right.

21        A      I'm having trouble at the bank -- not

22   trouble.

23        Q      They were short on staff.

24        A      Short on staff, and I need to remain

25   there.
```

1      Q    Okay.  So did you have preparation for the

2    mediation?

3      A    No, sir.

4      Q    Did you ever think, I need to start

5    talking to the boys to figure out what's going to

6    happen to all this money; are they satisfied; what

7    state they're in.

8           You know, somebody says I'm going to buy

9    an annuity for these boys, you know, don't you have

10   an obligation the find out whether the boys may need

11   the money today?  What if Brian had cancer and he

12   needed the money?  What if Tony needed dental work,

13   which he does?  Did you have any of those

14   discussions?

15     A    No, sir.

16          MR. BLAND:  Okay.  So the next exhibit is

17          18 (handing).

18                   - - -

19               (Description          marked

20          PARTYEXB                    Exhibit

21          Number           for identification.)

22                   - - -

23   BY MR. BLAND:

24     Q    So now we know we're going into a

25   mediation.  The mediation actually settled for

1    $3.8 million.  And you were on the phone -- or were

2    you available by phone?

3        A    I was available.  I was on several times

4    during that day, and I was told the day of the

5    mediation that no settlement was reached.

6        Q    Okay.

7        A    And then I got a call later, a couple days

8    later, to let me know that it was --

9        Q    3.8?

10       A    -- offered; and that if I was okay with

11   him accepting it.

12       Q    I'm sure you gulped when you saw 3.8.

13       A    Yes.  I thought it was a very...

14       Q    I will tell you this.  Obviously Ronnie,

15   Scott, and I represent Gloria.  And we've learned a

16   lot about Gloria, a wonderful person.  But where we

17   practice, that's an extraordinary settlement of

18   $4.3 million for a 57-year-old lady that basically

19   earns $11.  Not to minimize her life, what she's

20   worth.  It's priceless.  But from lawyers -- and he

21   does defense work -- economically, you say, Okay.

22   There were $600,000 of medical bills.  She had this

23   much of lost income.  Maybe you could get 1.5 to

24   $2 million settlement.  But $4.3 million is just

25   extraordinary.  And I'm sure you felt the same way.

1       A       Yeah.

2       Q       And you're not even a lawyer.

3       A       No.

4       Q       And you're not even a guy that's aware of

5  this.  I'm just telling you, we were flabbergasted

6  and impressed with Cory Fleming, to be honest with

7  you.

8               Now, we do have a little more information

9  than we initially did, which was that Alec was

10  pressing the hammer on his own insurance companies

11  and saying, "Look, if you don't settle this, there's

12  going to be an excess verdict.  It could be more

13  than the $5 million of coverage, or whatever the

14  excess is.  And if that's the case, it comes against

15  me personally.  I'm going to sue you guys for bad

16  faith."

17              Did you ever hear those kind of terms?

18      A       No.

19      Q       And Alex kind of told the carriers, "Look,

20  this is going to be tried in Hampton County, my

21  county, my jurors."  I've seen this in the insurance

22  file, just to let you know.  "And that I'm going to

23  stand up in front of this jury and say, 'It's my

24  responsibility that this woman died.  It's my

25  fault.'"

1          And so the analysis of the insurance

2    company was they're very scared of Alex in front of

3    a Hampton County jury.  And that's why they made the

4    decision to settle for $3.8 million.

5          So you get called on the phone and you're

6    like, "Yeah, it's a good number.  Take it."  It's

7    not like -- you didn't come back and say, "Well,

8    Cory, do you think you can get 5 million?"  You

9    didn't say that, did you?

10    A     No.  I'm just curious why everybody

11   involved is on here and they don't include me.  I

12   mean, if they know I'm the personal representative,

13   I'm supposed to be in this stuff.

14    Q     So when you're at this mediation, you're

15   aware, because you're in Hampton County, that

16   Mallory Beach died?

17    A     Sure.

18    Q     And the whole landscape started to change

19   because reporters, both statewide and nationally,

20   started to descend on, you know, this beautiful

21   county.  Yesterday I actually was in Hampton.  I've

22   never been there before.  Never been there before.

23   I ate at Coconut's.  It was quiet.  But I'm sure at

24   different times, it wasn't quiet in that town, that

25   there were a lot of reporters and cameras there and

1    everything.

2          Did you get an impression at the mediation

3    that the Mallory Beach death had an impact on this

4    in any way, shape, or form?

5    A    Not at that time, I wasn't.  It wasn't

6    brought up.

7    Q    Okay.  If you look at 18, this third

8    sentence -- third paragraph says:  "John Grantland

9    says my office will work on the court approval

10   documents ASAP.  And the agreements we prepare will

11   all have, B" -- doesn't make sense -- "the In Re:

12   Gloria Satterfield caption."

13         Do you see that?

14   A    Yes, sir.

15   Q    It says, "Cory, if you want to structure

16   some of the proceeds of the settlement, please let

17   me know and I'll be happy to put the PR in touch

18   with the structured settlement broker."

19         Do you see that?

20   A    Yeah.

21   Q    So John Grantland thinks you're involved

22   in the structure.  He thinks because you, as the PR,

23   are the people for the estate, you have to speak to

24   the structure people.  You see that?

25   A    I see that, yeah.

CHAD WESTENDORF - ROUGH DRAFT

1      Q     Okay.  Do you know how a structure works?

2      A     No, sir.

3      Q     Do you know how a plaintiff's attorney

4   interfaces with the insurance companies who do the

5   structure?

6      A     No, sir.

7      Q     Okay.  Do you know if the attorney, the

8   plaintiff's attorney, receives the check and it's in

9   his possession, whether you can do a structure?

10     A     I do not.

11     Q     Do you know that Cory Fleming -- and I'm

12  going to show you an exhibit -- about a year and a

13  half before this actually received from Forge

14  Consultants an e-mail that said:  Cory, this is how

15  a structure works.  If the money touches your hands,

16  the settlement proceeds, you can't structure.  The

17  only way a structure works is the payor insurance

18  company sends the check to the structured insurance

19  company.  They buy the structure, the annuity, and

20  then whatever the net proceeds are supposed to go to

21  the attorney for his fees, or net proceeds to the

22  beneficiaries, that they're supposed to get from the

23  settlement, the structure company settles it.

24         Did you know that's how it works?

25     A     No, sir.

CHAD WESTENDORF - ROUGH DRAFT

1      Q     So that's how John Grantland knows how it

2   works, because he's putting you in touch with the

3   structure broker, not Cory.  He's not saying, "Cory,

4   I'm going to put you in touch with the structure

5   insurance company."  He's saying, "I'm going to put

6   Chad Westendorf in touch."  But you had no idea

7   about that.

8      A     No idea.

9      Q     If you read the third paragraph, it says,

10  "We're going to change the caption."

11         Do you remember having those discussions

12  at the mediation?

13     A     No, sir.

14     Q     You weren't there -- you weren't on the

15  phone or nobody called you?

16     A     No, sir.

17     Q     Now, I showed you the caption before.

18     A     Yes, sir.

19     Q     It was the Estate of Gloria Satterfield

20  versus Alex Murdaugh.  And you're the PR -- it says

21  the PR -- excuse me -- of the estate.  You're the

22  plaintiff.

23         Did you consent for your caption, you

24  being the plaintiff, to be changed to In Re: Gloria

25  Satterfield?

1      A    No, sir.  And I don't know what that

2  means.

3      Q    Do you understand -- in re: is just a term

4  that estate lawyers like Tommy use.  It means, you

5  know, in the name of.

6           But it doesn't even say decedent now.  Now

7  it gets a little bit squirrely because it doesn't

8  say, In Re: Gloria Satterfield, decedent.  It jus

9  says, In Re: Gloria Satterfield.  And that can mean

10  a person that's incapacitated because they're in the

11  hospital.

12           You didn't consent for that caption to be

13  changed, did you?

14      A    No, sir.

15      Q    Nobody asked you?

16      A    Nobody asked me.

17      Q    And if you were asked, would you take your

18  name off as a plaintiff on that caption for the

19  estate?

20      A    No, sir.

21      Q    Did you ever hear that the reason they're

22  changing the caption -- and whose name got taken off

23  that?  Your name, right?

24      A    Yes.

25      Q    And now the guy on the other side of the V

1   was who?  Alec?

2        A    Alec.

3        Q    His name was taken off.

4        A    Was it?

5        Q    Yeah.  Well, now it's In Re: Gloria

6   Satterfield.

7             So did you ever find out that the reason

8   they wanted to take the caption off was because Alec

9   didn't want Mark Tinsley, who was representing

10  Mallory Beach, to find out he was settling a case

11  and paying a lot of money?  Did you ever hear that

12  discussion?

13       A    Repeat your question, please.

14       Q    Ever hear that discussion that the reason

15  Alec's name was being taken off that caption was he

16  didn't want Mark Tinsley, who was suing him, suing

17  his son for the Mallory Beach boating accident, he

18  didn't want anybody to find out in public record

19  that this kind of money was being paid from his

20  homeowners insurance carrier?

21       A    The only time I heard that was --

22       Q    Was in chambers?

23       A    -- in chambers, yes.

24       Q    At the second settlement conference?

25       A    Yes.  And that's where --

1    Q    And Alec wasn't even there.

2    A    He wasn't there.

3    Q    And that was said to Judge Mullen.

4    A    From Cory, yes, sir.

5    Q    And Judge Mullen says, "I understand."

6    A    "I understand."

7    Q    And Judge Mullen, did you know, had

8  recused herself a month before from the BUI

9  lawsuit -- BUI meaning boating under the influence.

10   A    Sure.

11   Q    I'm going to show you an order that a

12 month before you had your hearing, she recused

13 herself from hearing anything having to do with Alex

14 Murdaugh in Mallory Beach's death.

15   A    I did not.

16   Q    Did she discuss that to you?  Did she say

17 to you, "Mr. Westendorf, you're the PR for this

18 estate.  And I need to disclose to you that I have

19 recused myself one month before from having to do

20 anything with Alex Murdaugh in the Mallory Beach

21 death"?

22   A    No, sir.

23   Q    Okay.  So you didn't see this e-mail where

24 they're going to change the caption?

25   A    No, sir.

1          MR. BLAND:  Okay.  So the next document is

2     19 (handing).  This is the settlement

3     agreement.

4                    - - -

5          (Description          marked

6     PARTYEXB                    Exhibit

7     Number          for identification.)

8                    - - -

9          MR. LYDON:  Do you have another one here?

10         MR. BLAND:  I'm sorry (handing).

11         MR. LYDON:  Thank you.

12   BY MR. BLAND:

13     Q    Do you remember signing this settlement

14   agreement?

15     A    No, sir.

16     Q    Okay.  Do you remember seeing this

17   settlement agreement, that it said --

18     A    I don't remember seeing this.  No, I don't

19   remember seeing it.

20          I'm sorry.  He told me to speak up.

21     Q    Do you remember the statement at the

22   bottom, right before the bottom, it says on the

23   front page:  "The settlement petition and order

24   shall not have an adversarial caption."

25          Do you remember seeing that language?

CHAD WESTENDORF - ROUGH DRAFT

1     A    No, sir.  And I don't know what that

2  means.

3     Q    Okay.  Well, obviously --

4     A    I know now.

5     Q    -- it's a V.

6     A    Yeah.

7     Q    Chad versus Eric.

8          Now it's going to say, In Re: Gloria

9  Satterfield.

10          MR. BLAND:  Let's take a five-minute

11      break.

12          THE VIDEOGRAPHER:  This is the end of

13      media 1.  The time is 11:32 a.m.  We are off

14      the record.

15               (Whereupon there was a recess in the

16           proceedings from 11:32 a.m. to 11:37 a.m.)

17          THE VIDEOGRAPHER:  The time is 11:37 a.m.

18      This is the beginning of media 2.  We are back

19      on the record.

20                    - - -

21           (Description          marked

22           PARTYEXB                    Exhibit

23           Number          for identification.)

24                    - - -

25  BY MR. BLAND:

1     Q     So I'm showing you Exhibit Number 20.

2  This is where Judge Mullen, on April -- I think it

3  was the 4th -- yeah, April 4th -- or April 10th.

4  Excuse me.  She recused herself.  Judge Mullen has

5  recused herself from hearing all matters related to

6  this case and forwarded to justice for reassignment.

7  So this is the Mallory Beach case versus Gregory

8  Parker.  And et al. means that there's other

9  defendants.

10          And you were unaware of that when you went

11  into that hearing.

12     A     Yeah.

13     Q     So when you went into the hearing on

14  April 13th, it was just you, Cory --

15     A     May 13th.

16     Q     May 13th.  You and Cory.

17     A     Yes, sir, and Judge Mullen.

18     Q     And Judge Mullen.  And, again, that was

19  not on court record and it was not in a courtroom?

20     A     No, sir.  It was in a room off there.

21     Q     A room off there.  Okay.

22          And did it strike you funny when Judge

23  Mullen said, "We're going to change the caption and

24  take Alex's name off"?

25     A     I didn't know that happened until you just

1    told me.

2         Q    Well, you said there was a discussion in

3    front of --

4         A    Not about taking the caption off.  The

5    only discussion we had was he claimed -- or he told

6    Judge Mullen that he would -- that Alec's attorneys

7    would appreciate it or would not want her to file

8    the order at this time.

9              I didn't know anything about a caption.

10        Q    Okay.

11        A    They asked -- they asked not to file

12   because of the --

13        Q    The Mallory?

14        A    -- the recent boating accident.

15        Q    The recent boating accident --

16        A    Yes.

17        Q    -- and he was being sued?

18        A    Well, I didn't know about being sued, but

19   she just said, "the publicity over the recent

20   boating accident."

21        Q    And that's why she said, "I'm going to

22   sign the order, but don't file it"?

23        A    Yes; it wasn't filed.

24        Q    She said, "Don't file it."

25        A    Cory asked if it couldn't -- "I'm going to

1    file this later."

2           I don't remember the judge saying, "Don't

3    file it," but Cory said, "We want to file this

4    later."

5           Q    Well, we're not -- it was never filed.

6           A    I don't know how it all works.  Okay.

7           Q    It was never filed.

8           A    Okay.

9           Q    So he told her, "We're not going to file

10   it because of the publicity over the boating

11   accident," and she said, "Okay."

12          A    Yes.

13          Q    And then signed the order?

14          A    She signed something.  I cannot say that

15   was the exact thing she signed, but I was in there

16   when she agreed to it.

17          MR. BLAND:  Okay.  So the next document is

18       21, which is a Release that you actually did

19       sign (handing).

20          THE WITNESS:  Yes, sir.

21                         - - -

22          (Description          marked

23          PARTYEXB                     Exhibit

24          Number          for identification.)

25                         - - -

CHAD WESTENDORF - ROUGH DRAFT

1    BY MR. BLAND:

2        Q    And you signed as Chad Westendorf,

3    personal representative of Gloria Satterfield, on

4    the 11th of April.

5        A    Yes, sir.

6        Q    And this is where you're agreeing to

7    release these insurance companies for the payment of

8    $4.3 million.

9        A    Yes, sir.

10                        - - -

11                (Description          marked

12                PARTYEXB                    Exhibit

13                Number          for identification.)

14                        - - -

15    BY MR. BLAND:

16        Q    Okay.  And so then on April 22nd, Exhibit

17    Number 22 (handing), the check is actually sent in

18    the amount of $3.8 million.  And it's made payable

19    to you and to Moss Kuhn & Fleming as the attorneys,

20    correct?

21        A    Yes, sir.

22        Q    And you signed the check?

23        A    Yes, sir.

24        Q    You endorsed it?

25        A    Yes, sir.

CHAD WESTENDORF - ROUGH DRAFT

1      Q      You didn't put "for deposit only."  You

2   put "Chad Westendorf as personal representative of

3   the Estate of Gloria Satterfield."

4      A      Yes, sir.

5      Q      Do you see an endorsement by Moss

6   Kuhn & Fleming on there?

7      A      I do not.

8      Q      Okay.  So that check wasn't even correct.

9      A      Well, this was for me.

10      Q      Right.

11      A      I made a copy of this.  So I don't know --

12   if I may.

13      Q      You don't know if, when he took the check,

14   that he may have put --

15      A      Yeah.  His investigator brought this check

16   to the bank for me to sign.  That's how I had copies

17   of these and I sent them to you.

18      Q      Now, this is to Cory Fleming.

19      A      Yes.

20      Q      And you see the second sentence, it says:

21   "Please hold these settlement funds in trust until

22   the petition and the order approving the settlement

23   have been signed and filed at the probate court

24   settlement hearing."

25      A      Yes, sir.

1      Q    Now, you just told me that you were aware

2    that there were discussions between Cory and Judge

3    Mullen where they agreed not to file this.  And you

4    got a copy of this letter.

5           Did it strike you as strange, when you're

6    in the settlement conference and they're discussing

7    not filing it of record, when the man who sent the

8    money said, "Look, this is to be hold in trust until

9    it's actually signed and filed, the order."  You

10   never thought of that?

11     A    I thought he would hold it until it was

12   filed.  I mean, my interpretation of -- never mind.

13     Q    Right.  All you heard was that he -- he

14   asked Judge Mullen --

15     A    To wait.

16     Q    -- to wait to sign it, and we're not going

17   to file it.  And she said, "Okay."

18     A    Yes, sir.

19                     - - -

20              (Description          marked

21              PARTYEXB                     Exhibit

22              Number          for identification.)

23                     - - -

24   BY MR. BLAND:

25     Q    Then the next document that I want to show

CHAD WESTENDORF - ROUGH DRAFT

1   you is 23, which is the petition (handing).  And,

2   again, you're not a lawyer, but you will see that

3   the caption now is just In Re: Gloria Satterfield.

4        A    Yeah.

5        Q    It's not Chad Westendorf as personal

6   representative for the Estate of Gloria Satterfield

7   versus Alex Murdaugh.  It's not even In Re: Gloria

8   Satterfield Estate.  It's not even Decedent.  It

9   doesn't even tell the world she's dead, right?

10       A    If that's what you say.  I don't know what

11  that means, I've told you.

12       Q    Well, Gloria Satterfield.

13       A    That's all.  That's all it means.

14       Q    I can't look at the name Gloria

15  Satterfield and know that she's dead.

16       A    I understand that.

17       Q    Because it usually says decedent or

18  estate.

19       A    I gotcha.

20       Q    And there's no docket number, right?

21            So when you walked into the chambers with

22  this petition, which you signed --

23       A    Yes, sir.

24       Q    -- as Chad Westendorf, you signed the

25  Verification, and you signed as PR.

1      A    Yes, sir.

2      Q    When you walked into the chambers, did

3  Judge Mullen not say to Cory Fleming, "Where is the

4  petition that I'm supposed to rule on that's filed

5  of court record?  How is this caption the new

6  caption when the caption that's filed of record is

7  Chad Westendorf versus the -- versus Richard Alex

8  Murdaugh?"

9           Did she not say, "Mr. Fleming, what are

10  you doing with this caption?  Where is this?

11  There's no order."

12           You understand that if a caption -- you

13  probably understand now.

14      A    Yeah.

15      Q    You have a court caption.  It's in the

16  court record.  So the Clerk of Court will type up a

17  caption and it will come up.

18           If you're going to change the caption, a

19  judge has got to approve that so that the Clerk of

20  Court can change the caption.  There's got to be a

21  way to search records and file stuff that it gets

22  filed right.

23      A    Yes, sir.

24      Q    Did not Judge Mullen say, "Mr. Fleming,

25  what are you doing bringing this caption in here?  I

1  don't understand.  It's not even filed, this

2  petition."

3          She didn't say that?

4      A    I don't remember anything even discussing

5  that.  Like I said, that's the first I heard of it,

6  today.

7                      - - -

8          (Description          marked

9          PARTYEXB                Exhibit

10         Number          for identification.)

11                      - - -

12  BY MR. BLAND:

13     Q    So the next document is 24 (handing).

14  This is the actual order that she initialed and

15  signed, right?

16     A    She signed something.  Like I said --

17     Q    Right.

18     A    -- I wasn't standing over her shoulder,

19  but we were discussing it and everybody had

20  paperwork.  Yes.

21     Q    Okay.  So this was filed in December, if

22  it's -- she didn't file it.  The filing on there is

23  December 2021 in another court filing.

24     A    Yes.

25     Q    This was never filed of record.  And you

CHAD WESTENDORF - ROUGH DRAFT

1    signed the disbursement sheet.

2        A    Yes, sir.

3        Q    And this is now a combined disbursement

4    sheet.  There's $505,000 that was the Lloyd's first

5    settlement, right?

6        A    Yes, sir.

7        Q    There the 3.8 million, which was the

8    Nautilus settlement.

9        A    Yes, sir.

10       Q    Attorneys' fees from the first one are

11   $168,333.33 from Lloyd's and 1.2 million from the

12   Nautilus settlement.  Right?

13       A    Yes, sir.

14       Q    But we already went through the

15   disbursement sheet that you signed on January 7th.

16       A    Yeah.

17       Q    And that wasn't a settlement of 505.  It

18   was a settlement of 475.  You didn't catch the

19   difference?

20       A    I did not catch that.

21       Q    And $403,500 was already sent to Forge.

22   We saw that check.

23       A    Yes, sir.

24       Q    Which leaves $101,500.  Where was the

25   $168,000 of attorneys' fees going to come from?

CHAD WESTENDORF - ROUGH DRAFT

1        A    (Shakes head.)

2        Q    Then you signed and approved $105,000 of

3   prosecution expenses.  And you're saying, "I fully

4   understand and approve the above disbursements."

5             What did you do to avail yourself that

6   there was $105,000 of expenses?

7        A    I didn't.

8        Q    And if you approved 11,500 -- I know it's

9   embarrassing for you, and it's painful, but if you

10  approved the 11,500 on January 7th, right --

11       A    Yes.

12       Q    -- of expenses --

13       A    Yes, sir.

14       Q    -- how was there an additional 105,000

15  between January of 2019 and the May 13th, 2019,

16  hearing?

17       A    No idea.

18       Q    It's not credible.

19       A    It's not.

20       Q    There wasn't -- there wasn't ongoing

21  litigation.  There wasn't depositions.  The estate

22  wasn't paying Cory by the hour.  He was taking a

23  contingency fee up top.  You see his contingency

24  fee.

25       A    Yes, sir.

1      Q    And where -- where does that -- how does
2  that make sense other than it's just Cory stealing?
3      A    It doesn't make sense.
4      Q    So the net, it says, that you're going to
5  oversee that's going to go to my clients is
6  $2,765,000.  You're going to oversee that.  You're
7  going to make sure that this gets disbursed this
8  way.
9           And you understand, when Judge Mullen
10  signs this order and she sees this disbursement
11  sheet, she expects that it's going to be disbursed
12  exactly how it was presented to her by you on this
13  sheet.  Okay?
14      A    Yeah.
15           MR. BLAND:  So then we have another
16       disbursement sheet.  And this is Exhibit 25
17       (handing).
18                      - - -
19           (Description           marked
20       PARTYEXB                       Exhibit
21       Number            for identification.)
22                      - - -
23  BY MR. BLAND:
24      Q    And now it shows the same settlements,
25  505, 3.8 up top.  Do you see that?

CHAD WESTENDORF - ROUGH DRAFT

1      A    Yes, sir.

2      Q    But now it's saying from the Lloyd's

3  portion, they're only going to take $50,000 of

4  settlement money.  Do you see that?

5      A    Yes, sir.

6      Q    The previous document, they were going to

7  take --

8      A    160-something.

9      Q    168.  And now they're saying they're only

10  going to take 600,000 from Nautilus, where the

11  previous document they told the court they were

12  going to take 1266.  Do you see that?

13      A    Yes, sir.

14      Q    And now the prosecution expenses are --

15  there's a mediation for $1,500.  That pays the

16  mediator.  And then you got paid another $20,000.

17  You see that?

18      A    Yes.

19      Q    For a total of 30.

20      A    Yes, sir.

21      Q    How is that determined?

22      A    I have no idea.

23      Q    And then the only other expenses are a

24  55.59, and then there's two, $8,000 and 8,500,

25  expense checks.  And you never figured out what they

1  are for.

2      A    No.

3      Q    And then prosecution remaining in trust,

4  $191,000.  Do you see that?

5      A    Yes, sir.

6      Q    And they have these Forge checks here.

7  You see those?

8      A    Yes, sir.

9      Q    But this was never signed by you.

10     A    No, sir.  I never saw it.

11     Q    You never approved it?

12     A    No.

13     Q    The only one you approved was the one you

14  signed.  But somehow this document was created, as

15  well.  Okay?

16          MR. BLAND:  So the next document is

17          Exhibit Number 26.  And I had promised you I

18          was going to share this with you.

19                       - - -

20          (Description          marked

21          PARTYEXB                      Exhibit

22          Number          for identification.)

23                       - - -

24  BY MR. BLAND:

25     Q    This is the document that Michael Gunn --

1   and I'll represent to you he's the guy from Forge

2   Consulting, LLC.  He says to you:  Because it's a

3   minor, I'm assuming you'll need certain court

4   approval which can avoid probate.  I would recommend

5   we do a minors pool trust -- da, da, da, da --

6   during the years of minority, it can pay -- and then

7   we have the balance that's invested or whatever.

8           But he said:  Because the receipt of the

9   funds into your trust account has already occurred,

10  a traditional structured settlement is not possible

11  unless you want to send back the funds to the

12  defendant and have them reissue the checks and

13  change the release.

14          So Cory is already told -- and this is in

15  December of 2017, a year and a half before all this

16  takes place -- you cannot receive these moneys in

17  your account.  If you do, there's no structure.  The

18  structure can only take place if the checks go from

19  the payor insurance company to the annuity insurance

20  company.  So he's already on notice.

21          So when he's writing checks to Forge after

22  he gets your endorsement on the check and deposits

23  it into his trust account, he knows that it can't be

24  a structure.  And he's telling the world in this --

25  through his lawyers here that he was duped by Alex;

CHAD WESTENDORF - ROUGH DRAFT

1  he didn't know what was going on; he thought that

2  Alex was buying a structure, whatever.

3        But the threshold thing is he's already

4  been told by Forge, the company that's supposedly

5  going to write the thing, you cannot take possession

6  of those funds and put it in there.

7        This is not your fault.  I'm just telling

8  you.

9      A    I appreciate it.

10     Q    On the people that you were dealing with.

11          MR. BLAND:  So the next exhibit that I'm

12          going to show you is 27 (handing).

13                    - - -

14          (Description          marked

15          PARTYEXB                    Exhibit

16          Number          for identification.)

17                    - - -

18  BY MR. BLAND:

19     Q    We're almost done.

20          So on 27, the check is made payable to --

21  the same day as the hearing that you had, May 13th,

22  2019, Cory writes a check to Forge for $2.9 million.

23  And your signed disbursement that he was supposed to

24  write it to was my clients and your client was

25  supposed to get $2.7 million.

CHAD WESTENDORF - ROUGH DRAFT

1          Did Cory ever tell you, "We need to go

2    back to Judge Mullen to get her to approve this

3    disbursement this way"?

4          A    No, sir.

5          Q    And you didn't even know that he was

6    sending that check.

7          A    I didn't.

8          Q    He didn't provide you with a copy of that

9    check.

10         A    No, sir.

11         Q    And again it's sent to Forge without any

12   remitter at the bottom telling it this is the

13   Satterfield structure; this is for Brian or Tony;

14   half goes to Tony or 60 percent goes to Brian.

15         What is Forge?  If there's a real Forge,

16   what are they supposed to do with this check?

17         Now, this was endorsed properly.  It says

18   Alex Murdaugh, d/b/a Forge.  Now, we know that Forge

19   was a fake because Alex was not in the structured

20   annuity business, but he opened this account.  But

21   this is a correct endorsement, assuming that the

22   check was legitimate.  So that if it went back to

23   BB&T, the payor bank, they would have to honor it

24   because there's a disbursement -- an endorsement, as

25   long as there were funds in the account.

1      A    Yes.

2           MR. BLAND:  Okay.  So the next check is

3      30 -- no -- is 28.  Excuse me.

4                       - - -

5           (Description          marked

6           PARTYEXB                    Exhibit

7           Number          for identification.)

8                       - - -

9   BY MR. BLAND:

10      Q    And this is -- yeah.  This is for

11   $600,000.  And that's not what was supposed to be on

12   the attorneys' fee disbursement that you had.  It

13   was supposed to be for $1.2 million that they were

14   supposed to get.

15           And, again, you didn't see this check,

16   right?

17      A    No, sir.

18      Q    And it doesn't say in the reference, hey,

19   this is for the Satterfield money.  Okay.

20           MR. BLAND:  So the next document is

21      Exhibit Number 29 (handing).

22                       - - -

23           (Description          marked

24           PARTYEXB                    Exhibit

25           Number          for identification.)

1                              - - -

2    BY MR. BLAND:

3        Q    And this is where they're withdrawing

4    their statement for $95, Michael Sartip.  Do you see

5    this?  This is a creditor's claim.

6            Now, he didn't withdraw the $665,000

7    creditor claim.  He withdrew a $95 one.  Did you get

8    a copy of this?

9        A    I did not.

10       Q    And it was sent to the Hampton County

11   court.  And, again, it's in the probate court.  And

12   you never got a copy of it?

13       A    No, sir.

14           MR. BLAND:  So the next document I'm going

15       to show you is Exhibit Number 30 (handing).

16                          - - -

17           (Description          marked

18           PARTYEXB                    Exhibit

19           Number          for identification.)

20                          - - -

21   BY MR. BLAND:

22       Q    And now it starts to get really crazy.

23           This is a Stipulation of Dismissal, and

24   it's signed by Cory and Alex.  Did you know that

25   Cory signed this document a year and a half later,

1     on October 5th of 2020, on your behalf?

2        A     No, I did not.

3        Q     Did he get your permission to sign this

4     document?

5        A     No, sir.

6        Q     And Alex signed this document on his

7     behalf without any lawyers.  Do you see that?

8        A     I see that, yes.

9        Q     And this is the dismissal of the only

10    caption that exists in the courthouse, the one that

11    started when you started on December 19th, 2018.  It

12    was Chad versus Alex Murdaugh.  And there's the

13    court term and number up top.

14       A     But that wasn't on the other one.

15       Q     Where is the dismissal of that?  Where is

16    the In Re: Gloria Satterfield?  It doesn't exist,

17    does it?

18             And so the very next day --

19             MR. BLAND:  I'm going to show you Exhibit

20         Number 31 (handing).

21                      - - -

22             (Description          marked

23         PARTYEXB                      Exhibit

24         Number          for identification.)

25                      - - -

CHAD WESTENDORF - ROUGH DRAFT

1    BY MR. BLAND:

2        Q    Cory writes Forge again, $118,000.  No

3    reference.  Doesn't say it's pursuant to the

4    Satterfield.  It doesn't allocate between Brian and

5    Tony.  And this -- that account was supposed to be

6    zeroed out.  If you look at your disbursement sheet

7    that you signed on May 13th, everything was supposed

8    to be written out and there would be zero dollars.

9            The 2.7 goes to the client.  You get your

10   fees.  The attorneys' fees -- there wasn't supposed

11   to be any money left over.  Yet almost a year and a

12   half later, there's another $118,000 that Cory is

13   writing to Forge without any court order.  There's

14   never an approval either by you or by Judge Mullen

15   or any judge saying another $118,000 can be written

16   to Forge.

17           And he didn't call you on the phone and

18   ask your permission.

19       A    No, sir.

20       Q    Did you assume, in October of 2020, that

21   all the money had been disbursed and there was

22   nothing left?

23       A    I did.

24       Q    Right.  And you don't get a copy of this.

25   You're not told of this.

1      A     No, sir.

2      Q     And Cory represents you.  And you'll see

3  this doesn't have an endorsement on it, does it?

4      A     It's deposit only.

5      Q     It says "deposit only."

6            And so the dismissal is done the day

7  before.  And it looks like somebody's trying to zero

8  out an escrow account, because 118,000 goes to

9  Forge.  Did you ever see a Forge insurance policy?

10     A     No, sir.

11     Q     A Forge annuity?

12     A     No, sir.

13     Q     And we already said you never discussed

14  this with the boys or talked to the boys.

15           And then you learned something at the

16  mediation that we had in September, that even after

17  Cory wrote that $118,000, he still had another

18  $113,800 in his trust account.  When you heard that

19  that day, were you shocked?

20     A     Yeah.  I thought it was all over, I mean.

21     Q     And what was the -- what was the 113,000

22  still doing in his escrow account?  There was no

23  more defendants?  There was no more people to

24  prosecute.  We -- they exhausted the primary.  They

25  settled with the excess.  And it's just -- it's just

1   a real shame, I think, when you see how all this --

2   this happened.

3           MR. BLAND:  So now I'm going to show you

4       Exhibit Number 32 (handing).

5                       - - -

6           (Description         marked

7           PARTYEXB                    Exhibit

8           Number          for identification.)

9                       - - -

10  BY MR. BLAND:

11      Q    Here is you getting your first 10, right?

12      A    Yes, sir.

13      Q    You endorsed it.  It was written on

14  January 7th, right?

15      A    Yes, sir.

16          MR. BLAND:  Okay.  And then I'm going to

17      show you Exhibit Number 33 (handing).

18                      - - -

19          (Description         marked

20          PARTYEXB                    Exhibit

21          Number          for identification.)

22                      - - -

23  BY MR. BLAND:

24      Q    33.  And you wrote these for me, right?

25      A    Yes, sir.

1      Q     And you acknowledge that you had been

2    paid -- that you're going to return the $33,000?

3      A     Yes, sir.

4      Q     And that you actually went to Russ and --

5    contrary to what the bank said, or initially said

6    they were unaware of it, you actually gave a

7    statement on October 1st, saying that you had gone

8    to Russ and told him that you would be a PR, or

9    asked him, and he said you could be, right?

10     A     Yes, sir.

11           MR. BLAND:  Okay.  So now my next exhibit

12        that I'm going to show you is 34 (handing).

13                        - - -

14           (Description          marked

15           PARTYEXB                      Exhibit

16           Number          for identification.)

17                        - - -

18    BY MR. BLAND:

19     Q     This is Cory writing himself a check for

20    $8,000 on January 17th, on this escrow account

21    and -- for 10 -- for $8,000.  Do you know on what he

22    would have spent $8,000?

23     A     I do not.

24           MR. BLAND:  Okay.  The next exhibit is 35

25        (handing).

1                          - - -

2                    (Description          marked

3           PARTYEXB                      Exhibit

4           Number          for identification.)

5                          - - -

6    BY MR. BLAND:

7         Q    And you filed this on September 21st to no

8    longer be the administrator of the estate; is that

9    correct?

10        A    Yes, sir.

11                         - - -

12                   (Description          marked

13          PARTYEXB                      Exhibit

14          Number          for identification.)

15                         - - -

16   BY MR. BLAND:

17        Q    Okay.  And then on 36, you filed your

18   final accounting that we discussed earlier

19   (handing).

20        A    Yes, sir.

21        Q    And it's the same 26,000 that existed,

22   right?

23        A    Yes, sir.

24        Q    And we already discussed that you never

25   got ahold of the 50,000 that should have gone to the

1   probate court, right?

2       A    That is correct.

3            MR. BLAND:  Okay.  And then Exhibit Number

4       39 -- 37.  Sorry.  (Handing.)

5                           - - -

6            (Description          marked

7            PARTYEXB                    Exhibit

8            Number          for identification.)

9   BY MR. BLAND:

10      Q    Is you agreeing, pursuant to our

11  agreement, you sent back the moneys, the $30,000.

12      A    Yes, sir.

13      Q    Is that correct?

14      A    Yes, sir.

15      Q    And that discords you of all the fees that

16  you made, right?

17      A    Correct.

18           MR. BLAND:  And then 38 (handing).

19                          - - -

20           (Description          marked

21           PARTYEXB                     Exhibit

22           Number          for identification.)

23                          - - -

24  BY MR. BLAND:

25      Q    38 is the 113,800 that still remained in

1   the escrow account, right?

2        A    Yes, sir.

3        Q    And we have no explanation for that,

4   right?

5        A    I have no clue.

6             MR. BLAND:  And then 39 (handing).

7                      - - -

8             (Description         marked

9             PARTYEXB                  Exhibit

10            Number          for identification.)

11                     - - -

12   BY MR. BLAND:

13       Q    This is -- this tells the story.  So this

14   is the escrow analysis account of the moneys.  So it

15   shows $505,000 coming in on December 19th, the day

16   after you were appointed.  Then on January 7th,

17   403,500 was paid to Forge, right?

18       A    Yes, sir.

19       Q    Then 10,000 was paid to you, which we

20   already showed.  Then 8,000 was paid to Cory

21   Fleming, which we showed.  And we have no idea what

22   that 8,000 represents.

23            Moss Fleming got 50,000.  But under the

24   order from Judge Mullen, they were supposed to get

25   $166,000.  Then Cory Fleming takes another $8,500.

1  Do you see that?

2      A    I see that.

3      Q    On April 3rd, did you know what that was

4  for?

5      A    I do not.

6      Q    The only legitimate cost was the mediator

7  that was 1,512, which is John Austin.  Then the

8  3.8 million is deposited.  2,961,000 goes to Forge,

9  which we already saw.  You got your 20,000, which

10  we've already seen.  And 600 went to Moss Kuhn when

11  it was supposed to be 1,266,000.

12     A    Yes.

13     Q    And then another 9,700 went to Cory

14  Fleming.  Do you know what that was for?

15     A    No, sir.

16     Q    So we have almost $27,000 worth of checks

17  written to Cory from this account for personal

18  expenses which never existed, which is pure theft.

19          And then there was the $118,000.  I showed

20  you that check that was written on October 6th,

21  which left $113,800, which was wired to my account.

22  So that is the saga of this.

23          And you are still employed by the bank; is

24  that correct?

25     A    That is correct.

CHAD WESTENDORF - ROUGH DRAFT

1      Q    Are you still the president of the banking

2  association?

3      A    That is correct.

4      Q    Okay.  So you're not allowed to tell me,

5  but have you testified before a grand jury?

6      A    I'm not allowed to tell you what?

7      Q    The substance of it.  But have you

8  testified?

9      A    Yes.

10      Q    And outside of testifying before a grand

11  jury, have you also been interviewed by SLED?

12      A    Yes.

13      Q    And gave a statement to SLED?

14      A    Yes.

15      Q    And you gave a 302 -- have you been

16  interviewed by the FBI?

17      A    They were with SLED.

18      Q    So that is not privileged as is the grand

19  jury testimony.

20           So I was told that in your statement --

21  you made a similar statement about Judge Mullen,

22  that Judge Mullen knew that the order was not going

23  to be filed.

24      A    Yes, sir.

25      Q    Is there anything else that you have said

CHAD WESTENDORF - ROUGH DRAFT

1  that you said in there about the two hearings of

2  Judge Mullen that's different than what you said

3  today?

4      A    I don't recall anything different.

5      Q    Do you think that judge -- based on your

6  personal observation, do you think that Cory Fleming

7  hoodooed Judge Mullen?

8      A    I don't know.

9      Q    Judge Mullen knew that that order was not

10  going to be filed.

11      A    Yeah.

12      Q    And the reason was because of the Mallory

13  Beach case, because of the public scrutiny that was

14  attached to it at that time, and Mark Tinsley suing

15  Alec and Paul -- Paul had not died yet -- and the

16  convenience store, Parker's, and some other people;

17  is that correct?

18      A    I believe so.

19      Q    Okay.  I have had some other people

20  consult me, obviously, other than the Satterfields,

21  as this all has unfolded.  And I'm noticing in a lot

22  of the files, let's say, for Jinks, Jordan Jinks,

23  and I'm noticing in Sandra Manning, that after they

24  signed up with the Murdaugh firm, they would come to

25  your bank and borrow money.

1          Are you aware of that, that loans --

2     A     Can you --

3     Q     -- that loans would be done?  So for

4  Sandra Manning, I have her borrowing a total of

5  $1,500.

6     A     Okay.

7     Q     $500 three separate times.  And the

8  interest rate on her loans was 29 percent.

9     A     Okay.

10    Q     Did you ever do those loans?

11    A     I used to.  Several years back, I did.

12    Q     For the Murdaugh firm?

13    A     And there was other firms, too.

14    Q     Other firms?

15    A     Yeah.

16    Q     Okay.  How would interest rates be

17  determined?  Would they be negotiated with the

18  customer?  Would Alex negotiate them or the attorney

19  for the law firm, or you just would set the interest

20  rate?

21    A     I was hired 23 years ago.  When we came

22  there, they explained to me -- we called them lawyer

23  loans.

24    Q     Right.

25    A     They were done with people having cases,

1  and they would be paid out of the case.

2      Q    Right?

3      A    18 percent across the board is what they

4  were.  It must be an APR that you were looking at

5  for 29, but most of them were a set rate of

6  18 percent and they were done for one year at a

7  time.

8      Q    And then like Jordan Jinks, I had his --

9  his are 22 percent.

10     A    It must have just been the APR.  All of

11 them -- from my recollection, every one I did was

12 18 percent.  That was a fixed rate on those.  And I

13 don't know how that was set, what the policy was.

14     Q    Is there a default interest rate other

15 than the regular interest rate, if they go in

16 default, if you know?

17     A    I don't know.

18     Q    A different rate?

19     A    Yeah, I don't know.

20     Q    To your knowledge, you know, what happens

21 if they weren't repaid?  Did you guys ever go after

22 the client or you would just write off the loan?

23     A    I don't know.

24     Q    In your experience, the loans that you

25 wrote, were they all paid?

CHAD WESTENDORF - ROUGH DRAFT

1      A      They were all paid.  I don't know --

2      Q      They do a pretty good job -- Murdaugh does

3   a pretty good job of collecting money.

4      A      Well, I mean, yeah.

5      Q      Because you're paid from the settlement

6   proceeds.

7      A      That's correct.

8      Q      And then it's calculated based on when the

9   loan started to when the repayment happens.

10     A      Correct.

11     Q      You know, this is new to us in the

12  Midlands about lawyers taking clients to a bank and

13  getting them -- loaning money.  It's done for, I

14  guess, Gooding & Gooding firm and all those other

15  firms down there.  They do that.

16            Why do the customers need the money?  Is

17  it just normal living expenses?

18     A      I have no idea.

19     Q      I see loans like 1,000, 1,500, 500.  I

20  mean, was that kind of the area -- you weren't

21  loaning like 100 grand to somebody on a case, where

22  you?

23     A      I never did.  All that I ever did -- and

24  usually around Christmas, they were bigger.  Not

25  bigger, but more coming in.

CHAD WESTENDORF - ROUGH DRAFT

1     Q     They could come back and reup and get more

2  loans?

3     A     That's right.

4           MR. BLAND:  That's all I have.  Thank you

5     very much.

6           MR. LYDON:  Great.

7           MR. BLAND:  I appreciate it.

8           THE VIDEOGRAPHER:  This --

9           THE WITNESS:  Will I be able -- I'm sorry.

10          THE VIDEOGRAPHER:  This concludes the

11     deposition of Chad Westendorf, media number 2.

12     The time is 12:14 p.m.  We are off the record.

13               (The following discussion was held

14          off the video record:)

15          MR. LYDON:  We will read and sign.

16          THE COURT REPORTER:  And I'll send you a

17     copy of the transcript?

18          MR. LYDON:  I don't need a copy because

19     we're out of the case.

20                    - - -

21               (Witness excused.)

22                    - - -

23     (Deposition was concluded at 12:14 p.m.)

24                    - - -

25

SIGNATURE OF DEPONENT

I, the undersigned, CHAD WESTENDORF, do hereby certify that I have read the foregoing deposition transcript and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

| PAGE | LINE | CHANGE |
|------|------|--------|
| 65 | 15 | did "NOT", Page 3 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

3/28/2022
DATE

CHAD WESTENDORF