# EXHIBIT "4"

```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT SOUTH CAROLINA
                       CHARLESTON DIVISION


                          DEPOSITION OF H. FRED KUHN, JR.
                          30(b)(6) MOSS & KUHN, P.A.


   NAUTILUS INSURANCE COMPANY,


                     Plaintiff,


          vs.              CASE NO. 2:22-cv-1307-RMG


   RICHARD ALEXANDER MURDAUGH, SR.; CORY FLEMING;
   MOSS & KUHN, P.A.; CHAD WESTENDORF; and PALMETTO
   STATE BANK,


                     Defendants.
   _____


   DEPONENT:          H. FRED KUHN, JR.

   DATE:              JULY 21, 2023

   TIME:              10:01 A.M.

   LOCATION:          PENDARVIS LAW OFFICES, PC
                      BEAUFORT, SC


   REPORTED BY:       KELLY B. BAEKELANDT, RPR,
                      CSR (GA)
                      CLARK BOLEN
                      CHARLESTON, SC  29405
                      843-762-6294
                        WWW.CLARKBOLEN.COM
```

¹ if we can get through this a little quicker.
² Sorry, everybody thought they were getting ready
³ to go home super early, but hopefully I won't
⁴ take too long.
⁵     Do you -- have you been able to identify
⁶ any information or any evidence of a written fee
⁷ agreement between your firm and Chad Westendorf?
⁸     A.  I'm not aware of any, but I have not
⁹ looked for that.  And my role with the physical
¹⁰ Satterfield file was making sure it was complied,
¹¹ compiled, preserved, put together, and sent to
¹² the appropriate authorities, ODC, state grand
¹³ jury, that type of thing.
¹⁴     Q.  So if no written fee agreement has been
¹⁵ produced, then you're not aware that there is
¹⁶ one?
¹⁷     A.  I do not recall seeing one, but I have
¹⁸ not -- I did not go through the Satterfield file.
¹⁹ I did not look through it.
²⁰     Q.  Okay.  I'm just asking you if -- if it's
²¹ not in there, you don't have any information that
²² there is one?
²³     A.  Oh, if it's not in there, then, no, I
²⁴ would have no other information.  That's correct.
²⁵     Q.  Okay.  Is it -- was it your firm's

1  practice to have written fee agreements?

2       A.  With clients, yes.

3       Q.  Okay.  Do you have any information other
4  than what's in the files that you've referenced
5  to about how the amount of attorney's fees were
6  determined and -- with regard to the estate of
7  Satterfield representation?

8       A.  No.

9       Q.  Do you have any information regarding
10 how it was determined how much Chad Westendorf
11 was going to be paid as the personal
12 representative?

13      A.  No.

14      Q.  Let me show you what I've got as
15 Exhibit 1 that I sent to the court reporter.  I
16 don't know if you can see it or not.  Let me try
17 to share my screen.  I thought we were totally
18 virtual today, but I guess not.  Let's see here.

19          All right.  I got a document that's been
20 marked as Exhibit 1, Defendant Exhibit 1.
21 That -- we're going to just -- you can -- I can
22 scan it.  I don't know if you have it in front of
23 you other than my shared screen.  I'll go through
24 it and I've got just a couple of quick questions.
25 This is an email from Tanya King.  I think that

1  give him a second to scan through them.
2              MR. HOOD:  Right.
3              MS. ALLEN:  I don't --
4              MR. HOOD:  I mean are they Bates
5  stamped?  If they're Bates stamped, I can pull
6  them up on my computer.  That's why I'm asking.
7              MS. ALLEN:  It might -- it may not
8  all be -- oh, yeah.  Let me -- can I just take a
9  minute break.
10             And then, Bobby, how about I just
11 email you the whole -- just the whole set.
12             MR. HOOD:  That's fine.
13             MS. ALLEN:  Can we take a minute
14 break and let's do it that way so this will go a
15 little quicker?  Thank you.
16             We'll go off the record.
17             (A recess transpired.)
18     Q.  Okay.  Mr. Kuhn, like I said, there is
19 22 pages of this exhibit and they are what I
20 believe to be all the communications between Chad
21 Westendorf and Cory Fleming that were produced as
22 part of either Cory Fleming's or Moss, Kuhn &
23 Fleming's files or Chad Westendorf's files for
24 that matter.
25             So the first exchange looks like a

request from Chad Westendorf to Cory in January of 2019 requesting copies of a document that was signed with the judge. I think it would have been the first settlement approval hearing. Next one is a letter dated March 14th from Cory to Chad advising him that there was going to be a mediation on March 22nd in the Satterfield matter.

The next exchange is March 19th prior to the mediation. There is an exchange between Chad and Cory about Chad not being able to attend the mediation in person because he has staff out. And there's a couple emails about how to reach him by phone.

Then the next one is April 25th, 2015, so after the mediation. It looks like Cory emails and says, will you be in the office. I need to send my investigator to get the check endorsed. The time of that would be the second settlement check paid by Nautilus. And he responds, yes, but I'll be out tomorrow.

Do you know who Cory's investigator was?

A. Yes. Mostly likely it would have been Barton J. Adams.

Q. Okay. Is that BJ, is that how he's

1  related to that.  Do you know of any other
2  communications other than these?
3       A.  I do not know of any.  Bear in mind, I
4  have not studied that file, but --
5       Q.  Okay.
6       A.  -- I don't know of any others.
7       Q.  Okay.  And just skimming through these,
8  you agree that there's nothing about terms of any
9  representation agreement?
10      A.  That's what it appears, yes.
11      Q.  There's nothing about how attorney fees
12 are going to be charged?
13      A.  I did not see that.
14      Q.  Nothing about whatever Chad Westendorf
15 would be paid, a fee or how much?
16      A.  No, I didn't see that in there.
17      Q.  There was no indication in these
18 communications that Cory explained any of the
19 responsibilities of being a personal
20 representative to Chad Westendorf, is there?
21      A.  That's correct.
22      Q.  Do you have any information that anybody
23 at the law firm explained any responsibilities of
24 being a PR to Chad Westendorf?
25      A.  No.

1    Q.  Okay.  Do you have any indication that
2 anybody at the firm provided copies of any of
3 Gloria Satterfield's medical records to Chad
4 Westendorf?
5    A.  No.  I was not involved with this file
6 at all.
7    Q.  Okay.  No indication that the firm
8 provided Chad information about the -- like, I
9 think, Trident Hospital made a claim for $600,000
10 in costs.  Any information that Chad was provided
11 any information about that claim?
12    A.  No.  Bear in mind, when I say I don't
13 that doesn't mean that Cory didn't do that, just
14 I wouldn't have --
15    Q.  I understand.
16    A.  -- been there.  If it happened --
17    Q.  You're --
18    A.  -- I would not have been there.  So, to
19 my knowledge, no --
20    Q.  You're --
21    A.  -- I don't have any information.
22    Q.  -- here for the firm --
23        MR. HOOD:  Yeah.  Christy, these
24 aren't topics --
25    Q.  I'm just --

1             MR. HOOD:  These aren't topic that
2   were noticed and, I mean, so you're asking him
3   his personal knowledge as opposed to the firm
4   and --
5             MS. ALLEN:  Oh, I don't mean his
6   personal -- I'm not asking his personal
7   knowledge, I'm asking him you as the law firm.
8   And I do think they're covered by the topics.
9             MR. HOOD:  Well, I mean, the
10  problem is is that the firm can only answer what
11  they know absent talking to Cory because he's
12  taking the Fifth and we're unable to speak with
13  him.  So --
14            MS. ALLEN:  I understand.
15            MR. HOOD:  Okay.
16            MS. ALLEN:  I understand that.
17       Q.   And when I say you, I mean the firm.
18       A.   Okay.  Well, since Cory was partner --
19  if that was done, it would have been done by
20  Cory.
21       Q.   I understand.
22       A.   And since I wasn't there --
23       Q.   So I'm asking if you as the firm have
24  any information other than what we've seen here.
25  And my understanding, the answer is no?

1   A. The answer's no. But just to keep it
2 clear, if the firm did it, it would have been
3 done by Cory. So he's the only one --
4   Q. Right. But he --
5   A. -- who can answer that question. Since
6 to my knowledge --
7   Q. Right. But he's not here --
8   A. -- neither I --
9   Q. -- he's not designated as a 30(b)(6)
10 person to testify.
11   A. That's correct.
12   Q. Okay. I don't think we are
13 misunderstanding each other. I understand you've
14 got the firm -- the file and that -- and I'm just
15 trying to confirm that's the entire amount of
16 information the person who is here representing
17 the law firm has as far as answering these
18 questions.
19   A. That is correct. Know absolutely
20 nothing about it --
21   Q. Okay.
22   A. -- other than what's in the file.
23   Q. All right. Understanding Exhibit 2 is
24 the communications -- I represented that are the
25 only communications that I see in the file

between Cory and Chad, you agree that there's no indication that Cory provided Chad any, like, draft pleadings, there's no communications about what was going on, no indication that he sought Chad's approval in advance of any hearing petition that was signed, right?

    A.   That is not reflected in Exhibit 2, that's correct.

    Q.   Okay.  Does -- do you know, and I say you, the firm know if any person at the law firm even drafted the pleadings, the petitions as it relates to the Gloria Satterfield settlement?

    A.   I -- the only one who could answer that would be Cory.  I have no idea who drafted the pleadings.

    Q.   Okay. Any indication in Exhibit 2 that Cory and Chad communicated prior to the Gloria Satterfield mediation --

         MR. HOOD:  You broke --

    Q.   -- about the mediation itself.

    A.   One second --

         MR. HOOD:  You broke up a little bit.

    A.   Can you repeat that?

    Q.   Yeah.  Let me rephrase that.  In

1  firm, I believe that's the same number as your
2  firm.
3              (Dft. Exhibit No. 4 marked for
4  identification.)
5      A.  Yes, it is.
6      Q.  Do you see that?  So that's not Chad's.
7              And then just to kind of familiarize you
8  with this email.  After that, that's when Cory
9  responds and says, no, we need to add Moss,
10 Kuhn & Fleming, you see that.
11             Do you have any -- I mean, would you
12 agree that Cory acting on behalf of your firm
13 affirmatively had Moss, Kuhn & Fleming added to
14 that check?
15     A.  Yes.
16     Q.  And do you have any information that
17 Chad Westendorf was involved in that decision in
18 any way?
19     A.  I don't know one way or the other, so
20 no.
21     Q.  Okay.
22             MR. PENDARVIS:  I just got kicked
23 out of Zoom.  I don't know whether the rest did.
24             I'm back in.
25     Q.  There was reference to Forge Consulting

1  in this file.  I think I heard you say earlier
2  you had not heard of Forge until this came up; is
3  that right?
4       A.   That is correct.
5       Q.   Okay.  And so you, meaning the firm,
6  other than what's in the files that have been
7  produced, you don't have any information that
8  Cory obtained any documentation from Forge
9  Consulting as it relates to a structured
10 settlement --
11      A.   That's correct.
12      Q.   -- right?
13      A.   Yes.
14      Q.   Okay.  If we look at what's been marked
15 as Exhibit 5.  Do you see that?  I think it's an
16 October 6th, 2020, email?
17           (Dft. Exhibit No. 5 marked for
18 identification.)
19      A.   Yes.
20      Q.   This is an email from October 6th of
21 2020 between Tanya and Cory and it talks about
22 the prior check for 2.9 million that was sent to
23 Forge and there being 231,000 left in the trust
24 account.  And, then, the bottom email it looks
25 like Cory communicates that we are now able to

1  send money to Forge -- additional money to Forge
2  in this case.
3          Any indication that Cory or anybody at
4  your firm communicated with Chad Westendorf in
5  any way about monies going to Forge either the
6  first check or even the second one in 2020?
7       A.  All I would -- I don't -- all I would
8  know would be what was in the file.  And I don't
9  know what all --
10      Q.  Okay.
11      A.  -- is in the file, so no.
12      Q.  Okay.  Well, Exhibit 2 I've referenced
13  all the communication in the file between the two
14  of them and there wasn't anything with regard to
15  Forge in it, right?
16      A.  I cannot recall if there was a reference
17  to Forge in that or not.
18      Q.  Okay.  You don't have -- do you have any
19  information that Cory or anybody at the firm
20  communicated to Chad in October of 2020 that
21  there was still money left in the estate law firm
22  trust account?
23      A.  Not that I'm aware of.
24      Q.  Okay.  Any indication that Cory or
25  anybody at the firm communicated with Chad about

1   the stipulation of dismissal that was ultimately
2   signed by Cory and Alec in October of 2020?
3        A.   Yes, there's an indication.  There could
4   be something in the file since I'm not familiar
5   with the file.  But to my knowledge, there is
6   not.
7        Q.   Okay.
8        A.   I have not seen anything that would --
9        Q.   Other than --
10       A.   -- show that.  Yeah.
11       Q.   Other than what may be in the documents
12  that have been produced, you as the law firm
13  don't have any additional information about that?
14       A.   That is correct.
15       Q.   Okay.  Do you have any information that
16  Chad Westendorf had any knowledge whatsoever of
17  any scheme to misappropriate any of the Gloria
18  Satterfield settlement funds?
19       A.   No.
20       Q.   Do you have any information to support
21  the allegation that Cory made any agreement with
22  Chad to misappropriate any funds from the
23  Satterfield settlement fund?
24       A.   No.
25       Q.   Assuming Cory misappropriated funds from

1 the Satterfield settlement monies, do you have
2 any information that Chad Westendorf participated
3 in that misappropriation in any way?
4     A.  No.
5     Q.  Do you have any information to indicate
6 that Cory Fleming ever disclosed to Chad
7 Westendorf that he had misappropriated monies
8 from the Satterfield settlement account?
9     A.  No.
10    Q.  Give me one second, let me see what else
11 I've got and I might be almost done.
12        Okay.  I've just got a few more.  Let me
13 show you what's been marked as Exhibit Number 7.
14            (Dft. Exhibit No. 6 not identified
15 for the record.)
16            (Dft. Exhibit No. 7 marked for
17 identification.)
18    Q.  Okay.  Mr. Kuhn, this is an October 7th,
19 2021, letter from Tommy Lydon who originally was
20 representing Mr. Westendorf to Thomas Pendarvis
21 and David Overstreet who I understand were your
22 firm lawyers at the time.  Take a second to look
23 at it and I just have a couple questions.
24        First of all, do you recall receiving
25 this letter?