UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY, )<br>  )<br>  Petitioner, )<br>  )<br>vs. )<br>  )<br>  )<br>  )<br>RICHARD ALEXANDER MURDAUGH, SR., )<br>CORY FLEMING, MOSS & KUHN, P.A., CHAD )<br>WESTENDORF, PALMETTO STATE BANK, )<br>and THE UNITED STATES OF AMERICA, )<br>  )<br>  Respondents. ) | Case No.: 2:22-cv-1307-RMG<br><br>**PSB'S REPLY<br>TO NAUTILUS'S RESPONSE<br>IN OPPOSITION<br>(ECF ENTRY NO. 132)<br>TO PSB'S MOTION FOR<br>PROTECTIVE ORDER<br>(ECF ENTRY NO. 124)** |

Defendant Palmetto State Bank ("PSB") hereby submits this Reply to Plaintiff Nautilus's Response, (ECF Entry No. 132), to the Motion for Protective Order, (ECF Entry No. 134), which regards an instruction given by PSB's counsel not to answer a single question at the deposition of PSB's Rule 30(b)(6) designee, Jan Malinowski.

During the deposition of Mr. Malinowski, as PSB's Rule 30(b)(6) designee on June 30, 2023, PSB's counsel instructed Mr. Malinowski not to answer the following question:

> Q: This is where there will be an objection, so let me go ahead and just ask the question: Did the Bank have discussions with counsel about its potential exposure to any parties relating anybody's service as a fiduciary in connection with Alex Murdaugh?

Before instructing the witness not to answer, PSB's counsel objected to the question on multiple grounds, including that the information sought in the question was protected from disclosure by the attorney-client privilege and work product doctrine. PSB then filed the instant Motion for Protective Order seven days later, on Friday, July 7, 2023 (See ECF Entry No. 124).

In the Motion, PSB established that the instruction was proper for two main reasons. First, the attorney-client privilege protects the information sought by the question from disclosure

because it would reveal the substance of communications between a client and its professional legal advisor acting in his capacity as such. (ECF Entry No. 124 at 7). Second, the work product doctrine protects the information elicited by the question from disclosure because it would disclose the mental impressions of PSB's attorney. (ECF Entry No. 124 at 7-8). Nautilus fails to rebut either of these positions in its Response.

      A.      **The Instruction Not to Answer Was Proper Because the Question Sought Information Clearly Protected from Disclosure by the Attorney-Client Privilege.**

Nautilus appears to argue that objectionable question did not seek privileged information because it "was a mere yes or no question." (ECF 132 at 6). Of course, whether the question was leading or open-ended is not the issue. The issue is whether the question sought the disclosure of information meeting the test for an attorney-client privileged communication. As PSB explained in its Motion, the question did seek privileged information. (See ECF 124 at 6-7).

The question called for the witness to disclose not only the existence of communications between PSB and its legal question, but also their substance, i.e., what was discussed. The attorney-client privilege clearly applies, and it was properly invoked to protect the content of confidential communications between PSB and its legal counsel where PSB sought legal advice. See, e.g., Peeples v. Herrnstein Auto Grp., LLC, No. CV 9:20-4463-RMG, 2022 WL 1198075, at *6 (D.S.C. Apr. 22, 2022) (citing Wellin v. Wellin, No. 2:13-CV-1831-DCN, 2016 WL 7626536, at *10 (D.S.C. Mar. 8, 2016) ("Dr. Plum was asked to identify the substance of her conversations with her mother and potentially her mother's counsel with regard to the statements in her affidavit and her views concerning Lester Schwartz. I conclude that these questions are protected from discovery under the attorney-client and work product privileges.")).

  **B.**  **None of the Testimony Cited by Nautilus Constitutes a Distinct and Unequivocal Waiver of PSB's Attorney-Client Privilege over Communications with Legal Counsel Regarding Potential Liability Exposure.**

Nautilus argues that PSB has waived the attorney-client privilege. (ECF Entry No. 132 at 7-12). Its argument is based on certain testimony of the following four individuals: Jan Malinowski, (ECF Entry No. 132 at 7-8); Becky Laffitte (ECF Entry No. 132 at 8-10); Henry Lucius Laffitte, (ECF Entry No. 132 at 10-11); and Russell Laffitte, (ECF Entry No. 132 at 11-12). None of these individuals waived PSB's privilege.

"[A]s the sole owner of the attorney-client privilege," the client, in this case PSB, "can waive the privilege." In re Mt. Hawley Ins. Co., 427 S.C. 159, 168, 829 S.E.2d 707, 712 (2019) (quoting State v. Thompson, 329 S.C. 72, 76–77, 495 S.E.2d 437, 439 (1998)). Any waiver, however, "must be 'distinct and unequivocal.'" Id. (quoting Thompson, 329 S.C. at 76-77, 495 S.E.2d at 439). Accordingly, "when a party asserts an implied waiver of privilege, 'caution must be exercised, for waiver will not be implied from doubtful acts.'" Id. (quoting Thompson, 329 S.C. at 77, 495 S.E.2d at 439).

  *1.*  ***PSB's CEO did not waive the bank's privilege when he testified at the trial of Russell Laffitte that PSB hired attorneys.***

The testimony of Jan Malinowski cited by Nautilus does not constitute a distinct and unequivocal waiver of PSB's privilege over communications with its counsel where PSB sought legal advice. Nautilus cites the following testimony of Mr. Malinowski as grounds for waiver:

  Q: So what did the bank do to assess its liability?

  A: It hired attorneys.

(ECF Entry No. 132 at 7). Mr. Malinowski, the CEO of PSB, was compelled by subpoena to provide this testimony at the trial of Russell Laffitte, the bank's former executive.

The answer by Mr. Malinowski has no impact on PSB's attorney-client privilege. The attorney-client privilege does not protect from disclosure the fact that the bank retained attorneys. That act is not a communication between a client and lawyer. To be more precise, hiring a lawyer is an act, not a communication. Moreover, even if the act were a communication, PSB did not intend for the fact that it hired the attorneys to be held in confidence. It was made known to third parties. The disclosure of the hiring does not implicate PSB's privilege. Further, disclosing that the bank hired attorneys is also different than disclosing the substance of a privileged communication with those attorneys. Ultimately, Mr. Malinowski's acknowledgment that the bank hired attorneys is not a distinct and unequivocal waiver of the PSB's privilege over any confidential communications with its attorneys about liability.

> **2.** *Witness Becky Laffitte did not distinctly and unequivocally waive PSB's privilege over confidential communication with its counsel about liability.*

Similar to Mr. Malinowski, Becky Laffitte's testimony during the trial did not distinctly and unequivocally waive PSB's privilege. In arguing to the contrary, Nautilus cites an exchange where Mr. Daniels read to Mrs. Laffitte excerpts of a transcript made from the clandestine audio recording of a PSB board meeting. This Court is familiar with the recording, the transcript, and the circumstances surrounding their creation, all of which were the subject of pre-trial motion practice in that case. The recording captures PSB's counsel discussing a $680,000 payment that Russell Laffitte made to Alex Murdaugh's former law firm. This Court's rulings remain under seal. See United States v. R. Laffitte, 9:22-cr-00658-RMG, ECF Entry No. 110 at 4 and No. 162 at 2 (D.S.C.) (SEALED).

Ultimately, Mrs. Laffitte's responses did not disclose any privileged information in response to Mr. Daniel's questioning or his reading of the transcript into the record. Her testimony

4

provides no basis for finding a distinct and unequivocal waiver by PSB of its privilege over communications with counsel regarding liability.

> **3.    The trial testimony of witness Dr. Henry Laffitte did not constitute a distinct and unequivocal waiver of PSB's privilege over communications with its counsel.**

Nautilus further cites trial testimony of Dr. Henry Lucius Laffitte as grounds for waiver. In the testimony of Dr. Laffitte that Nautilus cites on page 10 of its Response, Dr. Laffitte did not disclose the content of any confidential communications between PSB and its legal counsel where PSB sought legal advice. Instead, Dr. Laffitte was asked the question, "So what did you do to gain more information about this Hakeem Pinckney situation?" In response, he disclosed that, at some point in time, he looked up publicly available information about the Pinckney matter. Dr. Laffitte's testimony is a far cry from a distinct and unequivocal waiver of PSB's privilege over any communications with its legal counsel regarding liability exposure.

A second excerpt of Dr. Laffitte's testimony cited by Nautilus is no closer to a distinct and unequivocal waiver of PSB's privilege than the first. (See ECF Enty No. 132 at 10).  The testimony is part of the same aforementioned exchange with defense counsel, who asked: "So you took the information you found on the public record and you shared it with the attorneys y'all had retained to assess the liability and conduct an internal investigation?" Dr. Laffitte made two statements in response:

1. "I gave it to the original attorneys who were involved with the Satterfields."
2. "And at the next meeting, the emergency meeting, we hired the group because the original attorneys said they were not criminal attorneys, we needed to get expertise in that field, along with the FDIC attorney."

The giving of publicly available information to an attorney does not constitute a confidential communication. It also does not disclose any legal advice. The first statement does not implicate the privilege, accordingly.

Dr. Laffitte's second statement revealed his opinion as to why PSB hired certain attorneys. Dr. Laffitte recalled other attorneys who were originally retained by PSB saying "they were not criminal attorneys[.]" The statement of a lawyer that he or she does not practice criminal law is not a communication made in confidence for the purpose of providing legal advice. The statement contains no legal advice at all.

Dr. Laffitte subsequently stated ". . . we needed to get expertise in that field, along with the FDIC attorney." From Dr. Laffitte's remark, it is not clear whether he was testifying to his own opinion about what PSB needed or recalling what an attorney said. In any event, stating whether one attorney referred PSB to another attorney is hardly a distinct and unequivocal waiver of PSB's privilege. And such a statement is not responsive to the objectionable question, which asked the witness to reveal whether PSB and its counsel discussed liability. That question is the subject of this Motion. It was the reason why PSB's counsel instructed the witness not to answer. Dr. Laffitte's testimony does not even touch on the issue, and it certainly does not constitute a distinct and unequivocal waiver of PSB's privilege.

Nautilus next points to Dr. Laffitte's trial testimony regarding the $680,000 payment in the Badger matter. (See ECF Entry No. 132 at 11). After being asked whether the $680,000 payment had been "paused," Dr. Laffitte volunteered, "I think what you are referring to is our attorney was concerned about an indemnification that the Murdaugh law firm would then not sue us if that money never got to the other victim." This testimony reveals Dr. Laffitte's understanding of mental impressions of PSB's counsel. It is not clear from the testimony how Dr. Laffitte arrived at his understanding. Nevertheless, the testimony is not a distinct and unequivocal waiver of PSB's privilege over any confidential communication with its counsel. Similar to the exchange discussed

above with Mrs. Becky Laffitte, this testimony of Dr. Laffitte is certainly not grounds for finding waiver broad enough to include the information sought in the objectionable question.[1]

### 4. As a former employee, Russell Laffitte could not waive PSB's attorney-client privilege when he testified before the Office of Disciplinary Counsel.

As grounds for waiver, Nautilus also relies on a transcript, dated June 23-24, 2022, of testimony that Russell Laffitte gave to the Office of Disciplinary Counsel. (ECF Entry No. 132 at 11-12). The portion of the transcript that Nautilus cites includes Mr. Laffitte's recollection of a statement he contends that PSB's counsel made pertaining to the $680,000 payment in the Badger matter. PSB was not present when Mr. Laffitte testified before the ODC. In fact, the first time undersigned counsel became aware of this testimony was June 30, 2023, the date PSB was deposed in this case.

More importantly, Mr. Laffitte was no longer a PSB employee when he gave the testimony. PSB had terminated his employment five months earlier, in January 2022. As PSB explained in its Motion, Mr. Laffitte did not have authority as a former employee to waive PSB's attorney-client privilege. (See ECF Entry No. 124 at 8). In its response, Nautilus does not address, much less rebut, PSB's position that Mr. Laffitte was unable to waive PSB's privilege.

Instead, Nautilus argues that PSB has waived its privilege by not moving to seal the transcript as a trial exhibit in the criminal case to which PSB was not a party. It also faults PSB for not redacting information from a transcript that it never handled of an ODC proceeding to which it was not a party. In any event, regardless of what Mr. Laffitte said, or whether PSB could have

---

[1] The waiver doctrine is intended to prevent a client from using the attorney-client privilege as both a sword and a shield. None of the testimony that Nautilus cites, from witnesses who were compelled to testify, shows that PSB abused the privilege in any such way.

suppressed it, the fact remains that he was a former employee when he said it. He did not hold PSB's privilege and could not waive it.

      **C.    The Objectionable Question Sought the Disclosure of Work Product, Including Mental Impressions of Counsel, which Nautilus Fails to Rebut.**

In its Motion, PSB established that the objectionable question sought information that, in addition to being privileged, was protected from disclosure by the work product doctrine. (See ECF Entry No. 124 at 7). PSB explained that the work product doctrine specifically applies to the mental impressions of an attorney and, more generally, creates a zone of privacy in which the attorney can candidly evaluate a client's case, including aspects like potential liability, and prepare legal theories. Here, the question posed would have revealed the mental impressions of PSB's attorney regarding the liability exposure, if any, facing his client and invaded the zone of privacy required for a lawyer to candidly evaluate such matters with the client. For that reason, PSB's counsel properly invoked the protection of the work product doctrine when he instructed the witness not to answer whether PSB ever had "discussions with counsel about its potential exposure to any parties relating to anybody's service as a fiduciary in connection with Alex Murdaugh."

Nautilus relegates its response to this argument to a footnote. (See ECF Entry No. 132 at 6, n. 6). There, Nautilus does not so much as contest that the question sought work product. It simply concludes PSB has failed to establish that the doctrine applies. PSB is incorrect.

      **D.    Nautilus Conflates Issues by Discussing whether Murdaugh Caused Funds He Stole from the Satterfield Sons to End up at PSB, Without any Direction by or Knowledge of PSB.**

Whether Alex Murdaugh ever caused any of the funds he stole from the Satterfield sons to pass through or end up in an account at PSB is not germane to the privilege issue. Yet, because Nautilus dedicates much of its response to the topic, (see ECF Entry No. 132 at 2), a reply seems warranted on this subject.

8

In recent motion practice, PSB has explained *ad nauseum* that the funds paid by Nautilus and stolen by Murdaugh originated from Nautilus's account at Wells Fargo. From Wells Fargo, the funds were transferred to BB&T, where Fleming's former law firm maintained its IOLTA account. The theft occurred after Nautilus had paid, when the funds intended for the Satterfield sons left the account at BB&T. Murdaugh diverted those funds using his "Forge" account, which he maintained at Bank of America.

Again, this issue is not relevant to the privilege analysis. Nevertheless, Nautilus's response includes testimony given by Carson Burney, an accountant, during the murder trial of Alex Murdaugh. The cited testimony suggests that, after being stolen by Murdaugh and deposited into his Bank of America account, Murdaugh transferred at least some of the funds to accounts at PSB. If this is accurate, the fact still remains that the funds were not held in an account at PSB before Murdaugh stole them. To the extent Murdaugh transferred any of the funds to an account at PSB after his theft, there also remains no proof that PSB ever knew about the theft or that any funds subsequently transferred by Murdaugh had been stolen. In any event, Nautilus is conflating issues. This has nothing to do with the fact that PSB's counsel gave a proper instruction to its designee not to answer a question based on privilege and work product grounds – the subject of this Motion.

## **CONCLUSION**

Considering the foregoing, PSB respectfully requests that this Court grant its Motion and issue an Order:

1. Affirming counsel for PSB's objections and the instruction not to answer that he gave to its 30(b)(6) designee; and

2. Precluding Nautilus from reconvening the deposition to ask the question that prompted the instruction not to answer.

Respectfully submitted,

*/s/James W. Clement*
**G. Trenholm Walker (Fed ID# 4487)**
Email:  Walker@WGLFIRM.com
**Thomas P. Gressette, Jr. (Fed ID# 7261)**
Email:  Gressette@WGLFIRM.com
**James W. Clement (Fed ID# 12720)**
Email:  Clement@WGLFIRM.com


**WALKER GRESSETTE & LINTON, LLC**
Mail:    P.O. Drawer 22167, Charleston, SC 29413
Office:  66 Hasell Street, Charleston, SC 29401
Phone:  (843) 727-2200

***ATTORNEYS FOR PALMETTO STATE BANK***

July 28, 2023
Charleston, South Carolina