**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>               Plaintiff,<br><br>v.<br><br>RICHARD ALEXANDER MURDAUGH, SR., CORY FLEMING, MOSS & KUHN, P.A., CHAD WESTENDORF, and PALMETTO STATE BANK,<br><br>               Defendants. | Case No. 2:22-cv-1307-RMG |

## PLAINTIFF NAUTILUS INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO (1) DEFENDANT PALMETTO STATE BANK'S MOTION FOR SUMMARY JUDGMENT [ECF NO 131]; and (2) DEFENDANT CHAD WESTENDORF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 135]

Nautilus Insurance Company ("Nautilus") opposes the Motion for Summary Judgment filed by Defendant Palmetto State Bank ("PSB") [ECF No. 131] ("PSB Motion") and the Motion for Summary Judgment filed by Defendant Chad Westendorf ("Westendorf") [ECF No. 135] ("Westendorf Motion") as follows.

The crux of both PSB's and Westendorf's Motions (collectively, "the Motions") is that Nautilus' effort to resolve the Satterfield matter was unreasonable based on the circumstances, was the proximate cause of Nautilus' losses, and was unrelated to PSB or Westendorf. While these assertions are inaccurate as discussed below, the Court need not reach these questions—and therefore should deny the Motions—because the "settlement" of the Satterfield matter is void because it complies with neither (i) the requirements for the settlement of a wrongful death/survivorship action nor (ii) the South Carolina Rules of Civil Procedure. *Infra* Parts I, II. Because there is no settlement, the reasonableness thereof is not a defense behind which PSB and Westendorf are entitled.

Secondly, the Motions should be denied as premature, as the consent scheduling order [ECF No. 112] provides for discovery through November 28, 2023, and discovery remains ongoing. Summary judgment is disfavored in the Fourth Circuit prior to the close of discovery. *Infra* Part III.

Thirdly, should the Court reach the merits of the Motions, questions of fact exist that preclude summary judgment, and the contentions by PSB and Westendorf that the elements of Nautilus' causes of action in its Amended Complaint[1] cannot be proven is erroneous. *Infra* Part IV.

Finally, should this Court grant the Motions, dismissal of PSB and Westendorf would not be proper as Nautilus' declaratory judgment cause of action remains pending as to all Defendants. *Infra*, Part V.

---

[1] Nautilus has moved for leave to file a Second Amended Complaint and assert additional causes of action against all Defendants, including PSB. ECF No. 134.

**I.** **Before the Merits of the Summary Judgment Motions Can Be Reached, It Must Be Determined Whether the Underlying Settlement is Void.**

At their core, the Motions[2] expressly or necessarily rely upon an erroneous premise that: (i) Nautilus bound itself to a settlement requiring it to pay a "questionable" claim for coverage under an insurance policy it issued to Murdaugh; and (ii) that, but for assuming and paying that purported obligation, Nautilus would not have been damaged. In other words, the primary argument advanced in the Motions is that Nautilus agreed to a settlement that it shouldn't have, so any conduct of PSB and its officers or agents is irrelevant because Nautilus was contractually obligated to pay the funds. That PSB and Westendorf heavily rely on this flawed theory is evident throughout the Motions. By way of example, PSB argues:

- "It is undisputed, based on the discovery to date, that Nautilus did not enter the settlement naively, unadvisedly, or without significant question as to whether the facts supported the claim asserted. Nautilus had a team of professionals evaluate the claim before deciding to settle in late March 2019. . . .[W]ith all its doubts, Nautilus still made the business decision to settle the claim." ECF No. 134 at 4;

- "*A state court later approved [the] settlement including Nautilus's contribution of $3,800,00.00.*" *Id.* at 6 (emphasis added);

- "Murdaugh's subsequent theft of the money has nothing to do with the reason that Nautilus entered the settlement. *Nautilus's decision to settle was the proximate cause of it paying $3.8 million. Had the money not been stolen, Nautilus would have still paid the $3.8 million.*" *Id.* at 8 (emphasis added);

- "A lawsuit was not filed at the time of settlement. . . . While Fleming paid Westendorf a fee for serving as personal representative, the fee was neither unlawful nor disbursed covertly. It was court approved." *Id.* at 12 n.6;

- "Nautilus's calculated decision to settle 'seriously questionable' claims, despite suspecting, if not knowing, them to be fraudulent, was the proximate cause of its claimed damages." *Id.* at 12; and,

- Nautilus's loss was the result of its informed decision to settle the Satterfield claims, for less than policy limits, to end the exposure to it and its insured." *Id.* at 14.

As an initial matter, this case is not a contract dispute. This case involves a conspiracy and

---

[2] While Westendorf's Motion proffers a few additional allegations of fact and supplements certain arguments, he largely joins in the Motion of PSB, his employer.

pattern of unfair practices by PSB, its officers and agents (including Westendorf), and one of its biggest clients, whereby it was covertly agreed that PSB's officers would serve as fiduciaries at the direction of their client—who was consistently and severely indebted to PSB—for the purpose of enriching themselves and also satisfying debts owed by the client to PSB, all to the harm of Nautilus, which—like many others before it—had no knowledge of the scheme. Accordingly, the Motions' latter conclusion as to the irrelevance of what happened to the Nautilus funds is flawed, as it ignores the nature of the claims before it, which seek relief on account of PSB's and Westendorf's clandestine, tortious conduct.

However, the Court need not reach that issue because the primary assertion upon which the Motions rely—i.e., that Nautilus's damage, if any, is that it bound itself to pay funds to settle a questionably covered claim—is incorrect. Specifically, because the Motions' arguments rely on a void settlement agreement as a shield to liability, the Court must first resolve this issue before reaching the remainder of the Motions' arguments.

## II. The Underlying Settlement Is Void.

### A. Factual Background

#### 1. Gloria Satterfield's Death and Insurance Claims

Gloria Satterfield ("Satterfield") died intestate on February 26, 2018, following a fall that occurred at the residence of Alex Murdaugh ("Murdaugh") and Maggie Murdaugh—for whom Satterfield worked as a housekeeper—on February 2, 2018. Satterfield's sole legal heirs upon her death were Michael Anthony Satterfield ("Tony") and Brian Harriot ("Brian"). After Satterfield's death, Murdaugh told Tony and Brian (collectively, the "Satterfield Sons") that he was going to take them to see an attorney he knew who would represent them in making claims against him, because he was purportedly responsible since his dogs caused Satterfield's death. **Exh. 1**. On May 1, 2023, however, Murdaugh admitted via his answer to Nautilus' Amended Complaint that he lied and fabricated the

story about the dogs and why Satterfield was at his house when she fell so as to create coverage. ECF No. 113.

### 2. Cory Fleming Is Retained

At some point between February 26, 2018 and March 8, 2018, Murdaugh introduced Tony to Cory Fleming ("Fleming")—who at the time was a law partner at Moss, Kuhn & Fleming, P.A. *n/k/a* Moss & Kuhn, P.A. ("M&K")—and encouraged the Satterfield Sons to retain Fleming to bring claims against Murdaugh in connection with Satterfield's death. ECF No. 113 at ¶ 5.b. Although it appears that no engagement agreement was ever drafted, Fleming sent Murdaugh a letter dated March 8, 2018 to "advise[]" Murdaugh that Fleming represented the Estate of Gloria Satterfield (the "Estate"). **Exh. 2**. In his letter, Fleming further represented that he and his client were "proceeding with a wrongful death claim on behalf of the [E]state." *Id.*

### 3. The Satterfield Probate Matter Is Filed

On or around March 28, 2018, an intestate probate matter was initiated in the Probate Court for Hampton County, SC under the caption *Estate of Gloria Ann Satterfield* and bearing case number 2018 ES250056 (the "Probate Matter"). The Probate Matter was initiated by the filing of various documents which were purportedly signed by the Satterfield Sons. **Exh. 3**. Notably, although Fleming was allegedly representing the Estate, on May 24, 2018, Murdaugh's office sent a letter to the Records Custodian for Trident Anesthesia Group seeking Gloria's medical records and confirmed their representation of Tony as PR of the Estate in the letter. **Exh. 4** at 1 ("As you know, this office represents Michael Satterfield as PR for the Estate of Gloria Satterfield . . . .").

### 4. Chad Westendorf's Appointment as Successor PR of the Estate

In the fall of 2018, it was decided that Chad Westendorf should serve as personal representative for the Estate. **Exh. 5** ("He is the VP of the bank and we want him to be the PR to manage the money."). In order for Westendorf to be appointed as the Successor PR of the Estate, Tony had to resign as the

original PR and Brian had to renounce his own priority right to serve in the event of Tony's resignation. Therefore, on October 31, 2018, Brian signed a second "Renunciation of Right to Administration and/or Nomination and/or Waiver of Bond" at Murdaugh's office. **Exh. 6**. Thereafter, on November 16, 2018, Tony signed his own "Renunciation of Right to Administration and/or Nomination and/or Waiver of Bond" at Murdaugh's office. **Exh. 7**. Notably, while both forms indicate a waiver of PR rights in favor of Westendorf, neither form checked the box indicating that they agreed to a waiver of a PR bond. *See* **Exhs. 6**, **7**. Nevertheless, when the Probate Court appointed Westendorf as the Successor PR, it did so without requiring a bond, presumably because the Probate Court considered Westendorf to be the "bank" (i.e., PSB), which would be exempted from putting up a bond. *See* **Exh. 8** at 2; *see* S.C. Code Ann. § 62-3-603(A)(3) (". . . a personal representative is not required to file a bond if: . . . the personal representative is a state agency, bank, or trust company . . . ."). This would not be surprising, given that Westendorf represented to the Probate Court in his application that the "Current Personal Representative desires bank Vice President to serve as Personal Representative – sole other heir concurs." *See* **Exh. 8** at 1.[3] Judge Odom testified that she relied on Laffitte's and Westendorf's positions as bank officers and gave credence and credibility to their requests as a result. **Exh. 9** at 26:16–27:6.

### 5. *The Lloyd's Settlement*

On December 6, 2018, while Westendorf's appointment by the Probate Court remained pending, the Lloyds settlement check in the amount of $505,000.00 was delivered to Fleming. **Exh. 10**. Because Tony was still the PR at that time and Fleming did not want to disclose the settlement to Tony, Fleming instructed his staff to hold the check until Westendorf was appointed as the Successor PR of the Estate. *See* **Exh. 11** at 1. After his appointment on December 18, 2018 (**Exh. 12**), Westendorf

---

[3] This language or similar language was used by Russell Laffitte ("Laffitte") when applying as a conservator and/or PR for Murdaugh's other clients. **Exh. 13**.

signed a petition for the approval of the "partial" wrongful death and survival action settlement involving the Lloyd's funds—bearing the caption *Chad Westendorf as Personal Representative of the Estate of Gloria Satterfield v. Richard A. Murdaugh*—which was formally filed together with a disbursement sheet. **Exh. 14**. That petition was signed by Westendorf in Judge Mullen's courtroom the day of the conference with Judge Mullen. **Exh. 15** at 54:11–15.[4] Present at this "hearing" were Fleming, Westendorf, and Murdaugh. **Exh. 15** at 55:14–21. However, Murdaugh's appearance is not noted in the unsigned order (**Exh. 16**), and there is no transcript of the proceedings.

The subsequent disbursement of the Lloyd's funds was not in accordance with the submitted petition and disbursement sheet. Despite the absence of a signed and filed order from the circuit court or the approval by the probate court of the disbursement and settlement of the survival action ($25,000 of the $505,000 was allocated to the survival claim), Fleming disbursed money to his firm, Forge (Murdaugh's subterfuge account), and a personal representative fee to Westendorf totaling $30,000.

### 6. The Nautilus "Settlement," No Filed Order Approving, & Ultimate Dismissal

The Nautilus "settlement" suffers much the same irregularities as the Lloyd's settlement. The settlement was confirmed via e-mail on March 25, 2019 with a mediation settlement agreement signed only by Fleming and Murphy Grantland.[5] **Exh. 17**. Funds were tendered by Murphy Grantland on April 22, 2019 with instructions to hold the funds in escrow until an order was filed. **Exh. 18**.

No filing relating to this "settlement" (*e.g.,* the unfiled petition for approval of the settlement) contains any docketing number or time stamp indicating it was filed with the court. The unfiled petition to approve the "settlement" was captioned *In re Gloria Satterfield* and contained a disbursement

---

[4] Westendorf has conceded myriad failings in his role as fiduciary. While many are discussed in this brief, the two depositions he has given are more revealing still as to these failures, and thus they are attached in their entirety as exhibits.

[5] Despite having recused herself from all other matters involving Murdaugh, Judge Mullen continued to handle these settlement matters, apparently at Fleming's request.

schedule and embraced not just Nautilus' funds but also those paid by Lloyd's (even though that money had already been disbursed). **Exh. 19**. $50,000.00 was allocated to the survival action claim which requires probate court approval of the disbursement (since the proceeds would be Estate funds) (**Exh. 19**), but the Probate Court was never notified about the civil actions until on or around September 29, 2021. **Exh. 20** at 1 ("[T]his Court had no knowledge of a Civil Action having been filed . . .")

The "hearing" to approve the Nautilus "settlement" occurred on May 13, 2019. It took place in Judge Mullen's chambers with only Fleming and Westendorf in attendance; there is no transcript or case record of the hearing. **Exh. 15** at 98:24–99:4. Judge Mullen signed an order approving the settlement, but Fleming requested that the order not be filed to avoid publicity for Murdaugh. **Exh. 15** at 100:17–19. The petition, disbursement schedule, and order were all signed on May 13, 2019 (**Exhs. 19**, **21**, **22**) and funds were disbursed on May 13, 2019 to Forge and May 14, 2019 to Fleming. **Exh. 23**. The order signed by Judge Mullen was never filed.[6]

As no order approving the settlement was ever filed, in 2020, the case appeared on a trial roster. Fleming received notice and wrote to the court to say the case had settled and could be taken off the roster. **Exh. 24**. The Court replied that a stipulation of dismissal needed to be filed. *Id.* A stipulation of dismissal with prejudice of the suit captioned *Chad Westendorf, as Personal Representative of the Estate of Gloria Satterfield v. Richard A. Murdaugh* was filed on October 6, 2020, signed only by Fleming and Murdaugh. **Exh. 25**. In other words, Murdaugh was acting as his own attorney at this point. As no other case had been filed, this ended the court proceedings relating to the claims purportedly on behalf of the Estate of Gloria Satterfield.

---

[6] As an exhibit to his Motion, Westendorf attaches a version of the signed order that was filed as an exhibit in a separate matter that did not begin until 2021, *Satterfield v. Murdaugh*, No. 2021-CP-25-00298, Ct. of Common Pleas, Hampton County. As this order was never filed in the matter it applied to, it never became effective. *See infra* Part II.B.a.

### 7. *Denial of Coverage*

Following Murdaugh's admission that he defrauded Nautilus, Nautilus informed Murdaugh that it was denying coverage for the underlying claim. **Exh. 26**.

### B. **Arguments and Applicable Law**

#### 1. ***The Settlement Is Void and Unenforceable Because it Was Not Approved by the Court in Compliance with S.C. Code Ann. §§ 15-51-41 and 15-51-42 and Related Laws.***

In South Carolina, wrongful death and survival actions are statutory claims governed by the provisions of Article 1 ("Death by Wrongful Act") of Chapter 51, Title 15 of the South Carolina Code of Laws. Because they are not common law claims, they must be construed in accordance with the plain language adopted by the legislature in creating such claims. Importantly, S.C. Code Ann. § 15-51-41 requires that "[a]ny settlement of a wrongful death or survival action must be approved by either a probate court, circuit court, or United States District Court, as provided in Section 15-51-42." As set forth below, the proposed settlement in this matter did not comply with the provisions of S.C. Code Ann. § 15-51-42 in numerous respects.

#### a. **Failure to Comply with S.C. Code Ann. § 15-51-42(B)**

S.C. Code Ann. § 15-51-42(B) provides that "[i]f no action is pending, the personal representative shall petition either the probate or the circuit court of this State seeking approval of a proposed settlement." The petition must be verified, "filed," and it must set forth specific content necessary to supporting the request for approval of the proposed settlement. *Id.* With respect to the approval process, § 15-51-42(B) requires that "[t]he court shall schedule a hearing and receive into evidence those facts that the court considers necessary and proper to evaluate the settlement," and that, "[a]fter conducting this inquiry, the court shall issue its order either approving or disapproving the proposed settlement." *Id.*

Here, the proposed settlement did not comply with S.C. Code Ann. § 15-51-42(B) in several

ways.  <u>First</u>, the petition related to the Nautilus funds was never "filed" with the Court, Fleming having specifically requested that Judge Mullen *not* file it.  <u>Second</u>, even if the petition had been filed, it failed to include all the content required by the Probate Code.  *Compare* S.C. Code Ann. § 15-51-42(B) *with* **Exh. 19**.

<u>Third</u>, the unrecorded in-chambers hearing was not proper under South Carolina law.  As an initial matter, the Court should not have heard the matter because the petition relating to Nautilus had never been filed and no action had ever been filed with the caption provided to Judge Mullen.  *See, e.g.*, SCRCP 79(c) ("Entry Required. No jury or nonjury action . . . whether for interlocutory action or final disposition, shall be heard by the court until the action has been first entered in the file book and all pleadings in the action filed with the clerk of court.").  Furthermore, because there was no case number, the hearing could not have been properly scheduled by the clerk of court.  *See, e.g.*, SCRCP Rule 79(e) ("Motion Calendar.  The clerk of court shall place on the motion calendar all pending . . . matters requiring a summary hearing before the judge.  *The motion calendar shall contain the case number*, date of request, name of the action, attorneys involved and the nature of the motion to be presented.") (emphasis added).

<u>Fourth</u>, even if the hearing could have potentially been scheduled under the existing civil case number, there is no record of the Court receiving into evidence any of the facts which would have been necessary and proper to evaluate the settlement and conduct the inquiry required of it under the Wrongful Death Act.  Simply put, the informal nature of the hearing—which had no court reporter or transcript and where no one appeared on behalf of the defendant—was improper.  In a decision issued this year, this Court noted that a "<u>public</u>" hearing is required for the approval of wrongful death settlements.  *Seltzer v. Squires*, No. 2:19-CV-1712-RMG, 2023 WL 1097819, at *2 (D.S.C. Jan. 30, 2023) ("[U]nder S.C. Code Ann. § 15-51-42 *the Court is required to **publicly** approve settlements in wrongful death and survival actions*.") (emphasis added).

Finally, although Judge Mullen signed a proposed order approving the Nautilus settlement, that order was never filed nor entered, Fleming having requested it not be. In fact, there was no action that had been filed under the caption contained in the proposed order, so there was no matching action within which the signed order could have been filed. For this same reason, as captioned and signed, it would have presumably been rejected by the clerk of court if the parties had attempted to file it under the civil action that was pending, given the different caption. Ultimately, because no order was filed, there was no final, binding order approving the "settlement" as required under S.C. Code Ann. § 15-51-42(B).[7] *See, e.g.*, *Brailsford v. Brailsford*, 380 S.C. 443, 451–52, 669 S.E.2d 342, 346 (Ct. App. 2008) ("The South Carolina Supreme Court has held that under Rule 58 'the written order is the trial judge's final order' and *until entry of the written order the judge is free to change his mind. . . .* An oral order of the court is not final and binding until reduced to writing, signed by the judge, *and delivered for recordation.*" (emphasis added)). *First Union Nat'l Bank v. Hitman, Inc.*, 306 S.C. 327, 329, 411 S.E.2d 681, 682 (Ct. App. 1991) ("No order is final until it is written and entered."), *aff'd*, 308 S.C. 421, 418 S.E.2d 545 (1992).

### b. Failure to Comply with S.C. Code Ann. § 15-51-42(C)

S.C. Code Ann. § 15-51-42(C) provides that "[i]f the settlement is approved by the court, the personal representative has the power to conclude the settlement, including the execution of those documents as the settlement terms contemplate."

Here, Westendorf's actions to "conclude" the settlement were without effect because they did not comply with S.C. Code Ann. § 15-51-42(C). Specifically, the "release" purportedly given on behalf of the Estate and beneficiaries—which would have been the main consideration flowing to Nautilus

---

[7] Even if the undefined statutory term "issue" could somehow be interpreted so as to encompass a signed but unfiled order, the order would still be unenforceable under other applicable law, as set forth below.

under the proposed settlement—was executed by Westendorf before any settlement was "approved" by the Court in compliance with the statute.[8] Additionally, Westendorf endorsed the Nautilus settlement check and released the check to M&K and Fleming—thereby allowing the funds to be prematurely disbursed without his fiduciary oversight as the PR—before any settlement was ever "approved" by the Court in compliance with the statute. *See, e.g.*, **Exh. 18** ("Please hold these settlement funds in trust until the Petition and Order Approving Settlement have been signed and filed at the Probate Court settlement hearing."); **Exh. 27**; **Exh. 21**; **Exh. 23**.[9]

### c. Failure to Comply with S.C. Code Ann. § 15-51-42(F)

S.C. Code Ann. § 15-51-42(F) requires that "[a]ny person bringing a wrongful death or survival action in a court other than the probate court must notify the probate court of this action within ten days after the filing of the action." Here, Westendorf violated the settlement provisions of S.C. Code Ann. § 15-51-41(F) because he failed to notify the Probate Court of the wrongful death and survival action(s) he purported to bring in circuit court as the personal representative of the Estate within ten days of filing the action. *See* **Exh. 20** at 1 ("[T]his Court had no knowledge of a Civil Action having been filed . . .").

### d. Failure to Comply with S.C. Code Ann. § 15-51-42(G)

S.C. Code Ann. § 15-51-42(G) requires that "[t]he attorney for the personal representative must notify the probate court immediately upon completion of the survival action and furnish the court with a copy of the order approving settlement or a copy of the judgment, whichever is appropriate."

Here, Fleming violated the settlement provisions of S.C. Code Ann. § 15-51-42(G) because he

---

[8] In fact, Defendant Westendorf executed the purported release before Judge Mullen even signed the proposed order in her chambers.

[9] Of course, the proposed settlement funds were also disbursed in complete disregard of the instructions and schedule set forth in the proposed order signed by Judge Mullen, such that under no circumstance would Defendant Westendorf have ever had the power to authorize such disbursements.

failed to notify the Probate Court immediately upon completion of the survival action and failed to furnish the court with a copy of the order purportedly "approving" the settlement. *See* **Exh. 20** at 1 ("[T]his Court had no knowledge of . . . the subsequent actions.").

> **2.** **Because The Statutory Requirements for Wrongful Death and Survival Action Settlements Were Violated, and Because the Proposed Order Purportedly Approving the Settlement Was Never Entered by the Court, the Settlement is an Unenforceable Nullity.**

As set forth above, the Settlement did not comply with the statutory requirements for wrongful death and survival settlements in many ways. However, it is axiomatic that no order can have legal effect unless and until it is entered into the record. *See, e.g., First Union Nat'l Bank v. Hitman, Inc.*, 306 S.C. 327, 329, 411 S.E.2d 681, 682 (Ct. App. 1991) ("***No order is final until it is*** written and ***entered***.") (emphasis added); *see also Archer v. Long*, 46 S.C. 292, 24 S.E. 83, 84 (1896) ("Until the paper has been delivered by the judge to the clerk of the court, to be filed by him as an order in the case, it is subject to the control of the judge, and may by him be withdrawn at any time before such delivery.").

Relevant here, the Supreme Court of South Carolina has also ordered that the state-wide "Pilot Program for the Electronic Filing (E-Filing) of documents in the Court of Common Pleas . . . is expanded to include Hampton County . . . [e]ffective January 17, 2017." Order 2016-12-15-02 *RE: Expansion of Electronic Filing Pilot Program - Court of Common Pleas*, Appellate Case No. 2015-002439. Thus, under the applicable electronic filing policies and guidelines, "[a]ll court orders or judgments where one or more parties are proceeding in the E-Filing System will be entered electronically," and the "[e]lectronic entry constitutes entry of the order or judgment in accordance with Rules 58 and 77, SCRCP." *In re S.C. Elec. Filing Pol'ys & Guidelines*, 415 S.C. 1, 10, 780 S.E.2d 600, 604-05 (2015). Here, the only civil action opened was initiated by the electronically filed petition relating to the Lloyd's settlement, which was presumably e-filed by Fleming. *See* **Exh. 14**. As a result, because at least one party was proceeding in the E-Filing System, all court orders were required to be

entered electronically. *See In re S.C. Elec. Filing Pol'ys & Guidelines*, 415 S.C. at 10, 780 S.E.2d at 604-05. There is no dispute that Judge Mullen's order was not entered electronically in the record. Accordingly, the order was neither final nor binding, and it remains unenforceable.

Furthermore, South Carolina courts support a strict view that unfiled rulings of (or on behalf of) the Court are not enforceable orders. In *Spartanburg Buddhist Ctr. of S.C. v. Ork*, the South Carolina Court of Appeals found that an e-mail from a circuit court clerk purporting to enjoin the parties did not constitute a filed (and, thus, effective) order:

> On May 2, the circuit court's clerk emailed the parties' attorneys (the May 2 email) stating the court believed the disputed funds should be placed into a new joint account with attorneys from each party serving as signatories. Additionally, the email purported to enjoin both parties from encumbering the Center's assets or entering into contracts on the Center's behalf without the court's permission.

417 S.C. 601, 604, 790 S.E.2d 430, 432 (Ct. App. 2016). However, the Court held that "the May 2 email did not have the effect of a filed order," and that, "[a]lthough the circuit court correctly noted our judiciary's increasing reliance on new technology, our rules concerning final orders have not changed." *Id.* at 607, 790 S.E.2d at 433-34.[10] Similarly, in *Maness v. Ginotoli*, the South Carolina Court of Appeals found that a letter from a judge's office did not constitute an enforceable order because it was not entered in the record, explaining that:

> On March 15, 2005, a letter from the office of Judge J. Cordell Maddox indicated that upon review, Judge Maddox determined that this action should be in federal court, not state court. . . . [I]n the event the letter may be interpreted as a pronouncement from the circuit court, we would still dismiss because it was not entered.

No. 2006-UP-242, 2006 WL 7285987, at *1 (S.C. Ct. App. May 15, 2006).

Here, with no order entered, and numerous deviations from statutory requirements, the

---

[10] In support of its conclusion, the Court cited to, *inter alia*, SCRCP 58 for the proposition that "a judgment is not effective until entered in the record." *Spartanburg Buddhist Ctr. of S.C.*, 417 S.C. at 607–08, 790 S.E.2d 430, at 433–34.

proposed Settlement is an unenforceable nullity. *Cf. Berkebile v. Outen*, 311 S.C. 50, 53–54, 426 S.E.2d 760, 762 (1993) ("We have repeatedly held that there is a presumption that the legislature intended to accomplish something with a statute rather than to engage in a futile exercise."); *Mason v. Mason*, 412 S.C. 28, 56–57, 770 S.E.2d 405, 420 (Ct. App. 2015) ("The court 'will not lend its assistance to carry out the terms of a contract that violates statutory law or public policy.'") (quoting *Ward v. W. Oil Co.*, 387 S.C. 268, 274, 692 S.E.2d 516, 519 (2010)).

### 3. The Proposed Settlement is Not Binding Because it Did Not Comply with Rule 43(k) of the South Carolina Rules of Civil Procedure ("SCRCP").

It is well established that SCRCP 43(k) applies to settlement agreements related to a case pending in South Carolina's state courts. *S.C. Hum. Affs. Comm'n v. Zeyi Chen*, 430 S.C. 509, 519, 846 S.E.2d 861, 866 (2020) (citing *Ashfort Corp. v. Palmetto Constr. Grp., Inc.*, 318 S.C. 492, 494, 458 S.E.2d 533, 535 (1995)). As explained more fully below, none of the proposed "settlement" documents comply with SCRCP 43(k), and courts in South Carolina will not enforce a settlement which fails to comply with this rule. Therefore, in addition to the arguments above, the proposed settlement documents are also not binding because they fail to comply with SCRCP 43(k).

Prior to May 1, 2022, SCRCP 43(k) read, in pertinent part, as follows:

> **Agreements of Counsel**. No agreement between counsel affecting the proceedings in an action shall be binding unless reduced to the form of a consent order or written stipulation signed by counsel and entered in the record, or unless made in open court and noted upon the record, or reduced to writing and signed by the parties and their counsel. . . .

As the proposed "settlement" documents in this matter are dated between March 25, 2019 and October 6, 2020, the above version of SCRCP 43(k) governs the enforceability of the documents at issue in this matter. Pursuant to this language, there are three ways in which a settlement can be binding under SCRCP 43(k).

First, a settlement can be binding if it is "reduced to the form of a consent order or written stipulation signed by counsel ***and entered in the record***." *Id.* (emphasis added). However, "the order

14

or written stipulation must [also] set forth the terms of the settlement to comply with Rule 43(k)." *Ashfort Corp.*, 318 S.C. at 495, 458 S.E.2d at 535.  <u>Second</u>, a settlement can be binding if it is "made in open court and noted upon the record."  *Id.*  <u>Third</u>, a settlement can be binding if it is "reduced to writing and signed by the parties and their counsel."

As explained below, none of the proposed settlement documents relating to Nautilus in the Satterfield matter (at least the versions that have been produced) comply with Rule 43(k):

- The March 25, 2019 mediation settlement agreement including Nautilus funds was not filed and was only signed by Fleming and Murphy Grantland.[11]  Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by the parties" (i.e., Murdaugh and Westendorf), this agreement does not comply with SCRCP 43(k);

- The April 11, 2019 Release including issues related to Nautilus was not filed and was only signed by Westendorf.[12]  Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by [all of] the parties and their counsel" (i.e., Murdaugh, Fleming, and Murphy Grantland), this agreement does not comply with SCRCP 43(k);

- The May 13, 2019 Petition for approval of the proposed settlement involving the Nautilus funds was not filed and was only signed by Westendorf and Fleming.[13]  Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by [all of] the parties and [each of] their counsel" (i.e., Murdaugh and Murphy Grantland), this agreement does not comply with SCRCP 43(k);

- The May 13, 2019 Proposed Order purportedly approving the settlement which included Nautilus funds was not filed and was only signed by Judge Mullen.[14]  Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by the parties and their counsel" (i.e., Westendorf, Murdaugh, Fleming, and Murphy Grantland), this agreement does not comply with SCRCP 43(k);

- The October 6, 2020 Stipulation of Dismissal of the *Westendorf, as PR of the Estate v. Murdaugh* action was filed but was only signed by Murdaugh and Fleming.[15]  This stipulation fails to meet the requirements of the second and third options of SCRCP 43(k) because it was

---

[11] *See* **Exh. 28**.  Notably, this agreement purports to satisfy SCRCP 43(k), stating that "[t]his agreement is deemed to comply with Rule 43(k) and is binding, *subject to court approval*."  *Id.* at 2, 3 (emphasis added).  However, not only did the court not formally approve the settlement by entering an enforceable order, but this statement is incorrect in that the agreement fails to comply with SCRCP 43(k), as explained herein.

[12] *See* **Exh. 29**.

[13] *See* **Exh. 19**.

[14] *See* **Exh. 21**.

[15] *See* **Exh. 25**.

not "made in open court and noted upon the record," or "signed by [all of] the parties and [each of] their counsel" (i.e., Westendorf and Murphy Grantland). As to option one of SCRCP 43(k), while the document is a written stipulation signed by counsel and entered in the record, it merely states that "[i]t has been made to appear to the Court that the parties hereto have settled their differences and this matter is no longer at issue." **Exh. 25** at 1. This type of language has been found to be insufficient to comply with SCRCP 43(k). *See, e.g.*, *Ashfort Corp.*, 318 S.C. at 495, 458 S.E.2d at 535 ("The only order which has been entered in this matter merely shows the action is dismissed with the notation 'court advised case settled.' This is insufficient since the order or written stipulation must set forth the terms of the settlement to comply with Rule 43(k).'").

### 4. South Carolina Courts Require Strict Compliance with SCRCP 43(k).

South Carolina Courts have required strict compliance with SCRCP 43(k). For example, in

*S.C. Hum. Affs. Comm'n*, the Supreme Court of South Carolina recently held:

> [SCRCP 43(k)'s] terms are mandatory, which **precludes a party from turning to contract or equitable principles** (or counter public policy arguments) **to vitiate those terms**. Substantial compliance is not sufficient.

430 S.C. at 519, 846 S.E.2d at 866-67 (emphasis added).[16] Simply put, no settlement is binding unless

there is full compliance with SCRCP 43(k). *See, e.g.*, *Farnsworth v. Davis Heating & Air Conditioning,*

*Inc.*, 367 S.C. 634, 637-38, 627 S.E.2d 724, 725-26 (2006) ("Rule 43(k) provides that '[n]o agreement

... shall be binding unless' one of the three conditions listed above is met. In other words, an agreement

is non-binding until a condition is satisfied. Until a party is bound, she is entitled to withdraw her

assent."). Parties' intent or attempted compliance is irrelevant where the Rule's requirements are not

satisfied. *See, e.g.*, *Young v. Cooler*, 347 S.C. 362, 365-66, 555 S.E.2d 410, 412 (Ct. App. 2001)

("[E]ven if the Youngs intended to be bound and attempted to announce to the court that a settlement

had been reached, the requirements of 43(k) were not met. . . . We need not reach the question of

---

[16] In *S.C. Hum. Affs. Comm'n*, the Supreme Court of South Carolina affirmed the denial of motion to compel enforcement of a settlement agreement where the parties admitted to signing the agreement in the presence of counsel, but respondent's counsel had not actually signed the agreement and respondents thereafter withdrew their assent before the entry of any consent order embodying the agreement. 430 S.C. at 519, 846 S.E.2d at 866-67.

whether the agreement is subject to rescission based on mutual mistake because we do not find an enforceable agreement.").

In *S.C. Hum. Affs. Comm'n*, the Supreme Court of South Carolina reiterated that "Rule 43(k) is applicable even if the agreement has been admitted." 430 S.C. at 519, 846 S.E.2d at 866-67. This has long been the law. *See, e.g.*, *Farnsworth*, 367 S.C. at 637-38, 627 S.E.2d at 725-26 ("Davis claims that compliance with Rule 43(k) is not required in this scenario, because Rule 43(k) does not apply to a written settlement agreement that the parties admit was duly executed. We disagree."). The District Court of South Carolina has also suggested that the payment of settlement funds in accordance with the terms of a demand would not make a binding settlement. *See Founders Ins. Co. v. Richard Ruth's Bar & Grill LLC*, No. 2:13-CV-03035-DCN, 2016 WL 3219538, at *7 (D.S.C. June 8, 2016) ("[E]ven if Founders had tendered the policy limits prior to the expiration of the demand letter, the settlement would not be binding until it was entered into the record or reduced to writing and signed by the parties and their counsel.").[17]

## C. Summary & Legal Effect

As the settlement was never consummated by an effective (filed) order approving the settlement as required under South Carolina law, and as the settlement agreement does not comply with Rule 43(k), S.C.R.C.P., the settlement is an unenforceable nullity. And as the underlying suit has been dismissed, the defects can never be remedied, and the settlement and all agreements related thereto are

---

[17] It is unclear how Nautilus could even admit an agreement when the terms of the proposed agreement were not those carried out by Defendants, and where the funds were disbursed in violation of John Grantland's instructions to hold them in trust until an order was filed. *See Vessell v. DPS Assocs. of Charleston, Inc.*, 148 F.3d 407, 410 (4th Cir. 1998) ("The meeting of the minds cannot be based on 'secret purpose or intention on the part of one of the parties, stored away in his mind and not brought to the attention of the other party.'" (quoting *Player v. Chandler*, 299 S.C. 101, 382 S.E.2d 891, 894 (1989))); *id.* at 411 ("Even were we to find that Gibbons had actual or apparent authority to bind Re/Max to the contract, and that Vessell and Re/Max were mutually obligated to perform the terms of the contract, the fraudulent underpinnings of the contract would defeat its enforceability."); **Exh. 18**.

void.

Per the law in South Carolina, there is no defense, equitable or otherwise, to the voidness of a settlement agreement when it fails to comply with Rule 43(k).  *S.C. Hum. Affs. Comm'n*, 430 S.C. 509, 519, 846 S.E.2d 861, 866–67 (2020) ("[SCRCP 43(k)'s] terms are mandatory, which precludes a party from turning to contract or equitable principles (or counter public policy arguments) to vitiate those terms.  Substantial compliance  is not sufficient.").  It is simply unenforceable.

The effect of the voidness of the settlement here[18] is, as a matter of law, as described by the South Carolina Supreme Court in *Anderson County v. Preston*.[19]  In that case, the Anderson County Council entered into a Severance Agreement with its county administrator and made payments to the administrator pursuant to the terms of the agreement.  The agreement was subsequently declared void by the Supreme Court for want of a proper quorum when the agreement was authorized by the County Council, and the funds were ordered to be repaid.  The Court stated:

> Because we hold the Services Agreement is void, it is clear Preston realized a benefit that would be inequitable for him to retain in the absence of the agreement.  Thus, we must address the appropriate remedy. . . . [T]he County shall recover the total amount the County paid in cash to Preston pursuant to the Severance Agreement. . . ."

*Anderson Cnty. v. Preston*, 427 S.C. 529, 543–44 (2019).

## III.     The Motions for Summary Judgment Are Premature.

PSB and Westendorf filed their Motions four months prior to the end of discovery as set forth in the scheduling order.  ECF No. 112 (setting November 28, 2023 as the discovery deadline).  In the

---

[18]  Certain issues underlying the Motions, including this one, may be decided as a matter of law as part of deciding the summary judgment motions.  However, Nautilus expressly does not elect a remedy at this time, as it intends to pursue additional causes of action and damages against Defendants that are distinct and cumulative to Nautilus' entitlement to the return of its money, including treble damages, interest, and attorneys' fees.

[19]   427 S.C. 529 (2019).

Fourth Circuit, summary judgment is disfavored prior to the close of discovery. *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011) (summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery"); *Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016) (per curiam) (reversing grant of summary judgment prior to discovery); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2014) ("Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask."). Other circuits agree. *See Snook v. Trust Co. of Ga. Bank of Savannah*, 859 F.2d 865, 870 (11th Cir. 1988) ("Generally summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests."); *Murrell v. Bennett*, 615 F.2d 306, 310 (5th Cir. 1980) ("summary judgment normally should not be granted before discovery is completed").

This is especially true in the context of a conspiracy claim. As noted in *Central Weslyan College v. W.R. Grace & Co.*:

> The allegations made by the Plaintiff in this regard are not frivolous on the face of the complaint, nor does the Court feel that the allegations are of such a nature that the court would be inclined to adjudicate the issue presented on a motion to dismiss. The Court has already indicated that the record is not complete concerning the existence or contours of such a conspiracy. Since this court does not feel that this is an issue it would dismiss on the pleadings, the Court is not prepared to grant summary judgment on the issues presented prior to completion of discovery.

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 646 (D.S.C. 1992), *aff'd,* 6 F.3d 177 (4th Cir. 1993).

Here, not only is discovery not closed, but PSB has actively sought to prevent Nautilus from discovering information it seeks to prove its conspiracy claim. *See* ECF Nos. 118, 122. PSB has, for example, contended that anything occurring prior to 2018 is irrelevant. However, it has been established that Murdaugh was at the center of a highly complex, sophisticated scheme to enrich himself and recover his desperate financial situation. The scheme dates back to at least 2011. It is

complex and difficult to unravel, it could not have been accomplished without substantial assistance from others, and it foreseeably and proximately harmed others, including Nautilus.

Pending discovery bears directly on these issues, and Nautilus expects future discovery will reveal additional information bearing on Defendants' culpability. *See* **Exh. 32** (Rule 56(d) affidavit). The scheduling order provides four additional months in which Nautilus can conduct further discovery into this scheme. Nautilus requests it be permitted that time to further discover the conspiracy's contours. Accordingly, Nautilus respectfully requests that the Motions be denied as premature.

## IV.     The Motions for Summary Judgment Fail on the Merits.

### A.     Legal Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. See *id*. Therefore, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990).

Applying this standard, even if they are not premature, the Motions must be denied as discussed

below.

## B. Evidence in the Record Supports Nautilus' Conspiracy Cause of Action.

Viewed in the light most favorable to Nautilus, there can be no question that evidence exists to support each element of a claim for conspiracy against PSB and Westendorf. As to the first three elements—(i) a combination or agreement of two or more persons (ii) to commit an unlawful act or a lawful act by unlawful means and (iii) the commission of an overt act in furtherance of the agreement— evidence has been adduced that:

- Chad Westendorf, Vice President at PSB, agreed to serve as personal representative for the Estate of Gloria Satterfield at Alex Murdaugh's request (**Exh. 15** at 10:19–23);

- that he was selected for this role because he was a Vice President at Palmetto State Bank (**Exh. 5**);

- that he listed the bank's address and telephone number on his application to be appointed personal representative (**Exh. 8** at 2);

- that PSB's senior management authorized Westendorf to serve as personal representative (**Exh. 15** at 10:24–11:4);

- that Westendorf used his bank office, bank telephone, and bank email to perform the role of personal representative (**Exh. 15** at 13:16–14:1);

- that Westendorf endorsed the check delivered by Nautilus to Moss & Kuhn, from where it was sent to Alex Murdaugh (**Exh. 27**);

- that Westendorf was paid $30,000 for serving in this role, (**Exh. 30** at 16:1–5); and

- that Russell Laffitte had served on numerous occasions as a fiduciary at Alex Murdaugh's request while he was COO, executive Vice President, and Hampton branch manager for PSB (**Exh. 31** at 34:14–23).

It is also now known from public proceedings that Murdaugh's and Laffitte's dealings involved the repeated theft of money that was placed in conservatorship accounts at PSB under Laffitte's control, with Laffitte and the bank serving to conceal the theft from those to whom the funds properly belonged. Further, Russell Laffite orchestrated the movement of monies among multiple account holders'/victims' accounts, Murdaugh's account, and the bank's Loans-Not-On-System account; each of these transactions he was able to undertake because he was the COO, and each of the transgressions

are money laundering and are the actions of the bank.[20]

As to the fourth element—damages proximately resulting to Nautilus—the following evidence has been adduced:

- that Nautilus was defrauded into paying $3.8m which Murdaugh intended to steal (*see* ECF No. 113); and

- that, without fiduciary preventing the Satterfields from learning of the settlement, the scheme to defraud Nautilus could not have occurred, as PSB admitted (**Exh. 31** at 88:24–89:6), and Nautilus would not have been damaged.

These facts and inferences suffice to at least create a genuine dispute of material fact as to the four elements of civil conspiracy.

Both PSB and Westendorf argue further that without an intent to harm Nautilus specifically, they cannot be liable for civil conspiracy. While it is true that civil conspiracy "requir[es] a specific intent to accomplish the contemplated wrong," *Paradis v. Chas. Cnty. Sch. Dist.*, 433 S.C. 562, 574 n.9 (2021), PSB's argument seems to be that other people within the bank did not know what Laffitte knew about the schemes involving Murdaugh, and therefore the bank could not have formed the requisite intent. That others at the bank did not know strains credulity. But as a matter of law, that which Laffitte knew, the bank knew. *Citizens' Bank v. Heyward*, 135 S.C. 190, 133 S.E. 709, 716 (1925) (Featherstone, J., concurring) ("The record shows that no other officer of the bank had anything to do with making the contract. In so far as the transaction was concerned, the president was the bank and his knowledge must be imputed to the bank."). By the same token, what Westendorf knew as Vice President of PSB, the bank knew.[21] Murdaugh has admitted defrauding Nautilus and stealing the money (ECF No. 113); Fleming has admitted an awareness of Murdaugh's plan (**Exh. 1** at, *e.g.*, 30). Laffitte

---

[20]  Laffitte was convicted of these very acts, and in the context of this civil action, they are imputable to the bank.

[21]  And, what Fleming knew in his representation of Westendorf, Westendorf knew, and thus the bank knew. *See infra* Part IV.D.

has been convicted of conspiring with Murdaugh by acting as a sham fiduciary, stealing money, and concealing it. Laffitte approved Westendorf to serve as a sham fiduciary in the same way to enable Murdaugh to steal money and conceal it. PSB's responsibility for the actions of Laffitte, Westendorf, and Fleming is a further reason to deny summary judgment, as it renders them liable as a matter of law.

Though discovery is not yet complete, and though PSB has sought to thwart Nautilus' discovery efforts, there is ample circumstantial evidence from which the trier of fact could find the requisite knowledge and intent. For example:

- PSB knew that Murdaugh's financial situation was desperate and that he was deeply indebted to PSB, but approved Westendorf serving as a PR at *Murdaugh's* request in a purported claim *against* Murdaugh brought by the estate of a different customer at the bank (**Exh. 15** at 11:2–4);

- Westendorf, and thus PSB, knew the funds delivered by Nautilus were to be held in trust until an order approving the "settlement" was filed (*id.* at 103:3–7);

- Westendorf, and thus PSB, knew that Westendorf's lawyer, Fleming, requested that Judge Mullen *not* file the order approving the settlement (*id.* at 100:8–20);

- Westendorf, sitting in his office at PSB, endorsed the Nautilus check to Moss & Kuhn, thereafter asking no questions about the disbursement of the funds to an Estate to which he owed a fiduciary duty (*id.* at 102:4–23);

- Westendorf, and thus PSB, knew that the funds delivered by Nautilus were released from trust without a filed order because Westendorf received $20,000 from the funds, for a total of $30,000 for virtually no work (*id.* at 40:14–20);

- PSB knew that Laffitte had repeatedly served as a fiduciary for Murdaugh's clients on account of his being a bank executive, and Laffitte's knowledge of that service— including converting checks, routing money through the bank, and using PSB accounts to disguise the origin, intended destination, and actual destination of funds—are, as a matter of law, the actions of PSB;

- PSB benefitted from the "settlement" in that approximately $1.5m of the funds diverted to Murdaugh's "Forge" account at Bank of America were transferred back to PSB, with approximately $1.1m being applied to PSB loan numbers 6991524 and 6987336; *see* **Exh. 33** (tracing Murdaugh's transfers of funds); and

- Laffitte, and therefore PSB, knew that Nautilus' funds were being distributed to pay bank debt, as evidenced by the check for $400,000 dated March 4, 2019 that reads "per Russell" in the top left corner (**Exh. 34**).

Further, Palmetto State Bank approved Westendorf to serve as PR without taking any steps to ensure he understood what was required of a fiduciary. Westendorf was approved by the probate court as a successor personal representative on the basis that the previous personal representative, Tony Satterfield, "desires bank Vice President to serve as Personal Representative." **Exh. 8**. The application lists Westendorf's address and phone number as those of PSB's Hampton branch. *Id.* PSB is responsible for Westendorf's actions and failings as personal representative, which include:

- agreeing to serve as personal representative for a party purported to be adverse to Murdaugh at the request of Murdaugh, a significant bank client (**Exh. 15** at 27:1–28:7);

- taking no steps to understand what his responsibilities were as a personal representative, including owing a fiduciary duty to the estate and, as an officer of the court, having a responsibility to ensure representations to the court were true and accurate (*e.g.*, *id.* at 18:13–19:1, 35:15–21; 38:4–15);

- signing incorrect disbursement statements submitted to the court and making no effort to verify the same (*id.* at 72:13–75:17);

- failing to enter into a fee agreement with the estate for his compensation as personal representative (*id.* at 14:4–10);

- Making no accounting to the estate, including of the $30,000 he accepted as personal representative fee and deposited into his PSB account(s) (*id.* at 70:6–13);

- failure to sign a fee agreement with Fleming and Moss & Kuhn (*id.* at 38:20–22);

- failure to verify the amount of legal fees, costs, expenses, and reimbursements taken by Fleming and Moss & Kuhn (*id.* at 40:21–41:11);

Taking these facts and related inferences in the light most favorable to Nautilus, a reasonable factfinder could conclude that Westendorf and PSB understood their role in Murdaugh's scheme and acted with the specific intent to further that scheme for their own benefit and to the detriment of Nautilus. Accordingly, genuine disputes of material fact exist with regard to each element of civil conspiracy, and the Motions should be denied as to that claim.

**C.    Evidence in the Record Supports Nautilus' Unfair Trade Practices Claim.**

In its Motion, PSB (and by adoption, Westendorf) asserts that "[t]here is [] no genuine dispute

of material fact as to the second claim against PSB, for purportedly violating the South Carolina Unfair Trade Practices Act ("SCUTPA"). ECF No. 131 at 13. PSB (and Westendorf) argue that: (1) "Nautilus cannot show that PSB engaged in trade or commerce, by advertising, selling, offering to sell, or distributing goods or services, with Nautilus," such that "nothing that PSB did can be considered unfair or deceptive as to Nautilus," and (2) "it is beyond genuine dispute that PSB did not proximately cause the damages alleged by Nautilus." *Id.* at 14. For the reasons below, the Motions' arguments fail.

### 1. PSB and Westendorf[22] Engaged in Unfair and Deceptive Acts in the Conduct of Trade or Commerce.

"The UTPA declares 'unfair or deceptive acts or practices *in the conduct **of any** trade or commerce* . . . unlawful.'" *Wright v. Craft*, 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct. App. 2006) (emphasis added) (quoting S.C. Code Ann. § 39–5–20(a)). "*The provision of **any service*** constitutes commerce within the meaning of the UTPA." *Taylor v. Medenica*, 324 S.C. 200, 217, 479 S.E.2d 35, 44 (1996) (emphasis added). To assert a civil right of "action under the UTPA, the plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." *Wright*, 372 S.C. at 23, 640 S.E.2d at 498 (citations omitted).

An act is unfair when it is offensive to public policy, immoral, unethical, or oppressive, or has the tendency to deceive, even if a truthful statement. *Bessinger v. BI–LO, Inc.*, 366 S.C. 426, 432, 622 S.E.2d 564, 567 (Ct. App. 2005); *Wright*, 372 S.C. at 26, 640 S.E.2d at 500); *Wogan v. Kunze*, 366 S.C. 583, 606, 623 S.E.2d 107, 120 (Ct. App. 2005).

---

[22]  A corporate officer or director who participates in unfair or deceptive acts is jointly and severally liable with the corporation. *See, e.g.*, *Eastern Star, Inc. v. Union Bldg. Materials Corp.*, 6 Haw. App. 125, 712 P.2d 1148 (1985); *see also Plowman v. Bagnal*, 316 S.C. 283, 286, 450 S.E.2d 36, 38 (1994) (citing *Eastern Star* as persuasive law), *adhered to on reh'g* (Oct. 19, 1994).

Through the course of discovery, Nautilus has obtained evidence that PSB repeatedly and knowingly allowed its officers to represent in numerous public court filings that they were serving in their capacities as officers for PSB as fiduciaries.  **Exh. 35**.  These representations were given as the *sole* basis for appointment, and the Court's acceptance of these representations is evidenced by (i) the orders of appointment issued thereupon and (ii) the fact that no bond was required in the subject appointments, as banks are excepted from bond requirements.  *See* S.C. Code § 62-3-603(a)(3); *see also Reynolds v. Witte*, 13 S.C. 5, 10 (1880) ("In our case the action of the agents was the result of the powers with which plaintiff had clothed them, and he is responsible.").  Indeed, Palmetto State Bank is one of only a handful of state-chartered banks which can conduct trust business in South Carolina. Representing themselves as PSB officers, they then served as sham fiduciaries, enabling and concealing the theft of funds, including from those they had a duty to protect.

Furthermore, the statements of Westendorf as an officer of PSB are binding upon him *and* upon PSB, which had actual or constructive knowledge of them.  The sworn application was filed in the public record and was substantively identical to the sworn statements previously used numerous times by Russell Laffitte—whose knowledge was imputed to PSB and who, as the COO and branch manager at the time, approved Westendorf to serve for Murdaugh knowing that he had always included that same representation in his prior court filings.  As explained by the South Carolina Court of Appeals:

> At common law actual knowledge is not necessary to hold a principal liable, if misrepresentations are made by the agent while acting within the scope of his agency. . . . The Act should not be construed to increase the plaintiff's burden of proving liability. Its purpose is to give additional protection to the victims of unfair trade practices, not to make a case harder to prove than it would be under common law principles. Consistent with this policy, the federal courts hold that actual knowledge of the principal is not necessary to hold him liable for the acts of his agent committed within the scope of authority.
>
> C & L authorized Wayne Cooper to sell lots in Green Briar.  Wayne Cooper in turn authorized the salesmen to assist him.  The misrepresentations were made during negotiations for sale of the lots and thus were made while the salesmen were acting within the scope of the

> salesmen's and Wayne Cooper's actual authority.  As principals, both C
> & L and Wayne Cooper, are liable regardless of their knowledge.

*State ex rel. McLeod v. C & L Corp.*, 280 S.C. 519, 527–28, 313 S.E.2d 334, 339 (Ct. App. 1984) (internal citations omitted), *abrogated on other grounds by Murphy v. Owens-Corning Fiberglas Corp.*, 346 S.C. 37, 550 S.E.2d 589 (Ct. App. 2001).   Importantly, PSB also ratified its officers' statements by profiting off of funds derived from the Satterfield matter after the checks were released by its officer, as it had done in several matters before, despite not disclosing that it would be receiving such funds. **Exh**. **33**; *see also State ex rel. McLeod*, 280 S.C. at 527, 313 S.E.2d at 339 ("C & L [] argues that because it had no knowledge of the misrepresentations, it cannot be held liable under the theory of ratification. Th[is] argument[] ha[s] no merit.").   However, even if ratification had not occurred, the result would the same. *Id.* at  528, 313 S.E.2d at 339–40.

Finally, PSB argues that it did not enter into any agreement with Nautilus.  This is a red herring, as there no requirement that a representation be made within the context of a binding contract for there to be a viable UTPA claim.  *See, e.g., Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship*, 331 S.C. 385, 393, 503 S.E.2d 184, 188 (Ct. App. 1998).[23]  Here, PSB authorized its officers to serve as fiduciaries for Murdaugh, using their capacity as officers as the qualification for appointment as PRs, ultimately resulting in a benefit to them and their officers through fiduciary fees and subsequent diversion of funds entrusted to PSB's officers which were used to pay off Murdaugh's debts to PSB.  **Exh. 33**.  It is of no consequence that Nautilus was not a party to that application; what *is* of consequence is that PSB's representations through its officers--resulting in improper benefits (which they ratified and accepted) to them and to PSB--were unfair and deceptive acts represented through the courts of justice.

In addition to skirting past otherwise applicable bond requirements, the statements of PSB's

---

[23]   "If, as the Club alleges, the Partnership used the schedule to solicit business and then simply abrogated the terms of the schedule, a jury may determine these representations were prohibited by the UTPA because they were 'unfair and deceptive acts.'"

officers carry with them a representation of a certain trust and confidence to the public. As recognized by PSB's own Conflict of Interest policy, PSB officers are influential and trustworthy members of society and are in fact sought out by PSB for those reasons. **Exh. 36**. That a fiduciary is serving as an officer of a bank is a compelling circumstance in that a third party would be more inclined to issue a check in their name and care, and to hold $3.8M funds in trust pursuant to instructions accompanying such funds. Had it not been a bank officer authorized to conduct trade business, but instead a carpenter, a palm reader, or some other position outside of the financial industry and without any approved and state-chartered bank behind it, the reasonableness of a third-party's reliance may well be subject to doubt. However, despite PSB's efforts to downplay the approved fiduciary service of its officers, as if it were akin to, say, a bank employee volunteering as an assistant coach for a youth sports team whose head coach lost the team's tournament entrance fee, those circumstances are far divorced from the reality of the "sophisticated" financial and business matters involved in this case. While the level of impact attributable to Westendorf's representation and the extent to which PSB ratified those representations by retaining benefits which were derived from the Nautilus funds may ultimately be an issue for the jury to decide, there is ample evidence supporting Nautilus' claim of deceptive and unfair trade practices by PSB and Westendorf. *See e.g.*, *Williams v. Com. Cas. Ins. Co.*, 159 S.C. 301, 156 S.E. 871, 872 (1931) ("Ordinarily, the question whether a given act was or was not such as to be within the agent's scope of authority is one for determination by the jury.").

### 2. *PSB's and Westendorf's Acts Affected Public Interest.*

The second element of a UTPA claim requires that "the unfair or deceptive act affected public interest," *Wright*, 372 S.C. at 23, 640 S.E.2d at 498, which may be shown "if the acts or practices have the potential for repetition." *Singleton v. Stokes Motors, Inc.*, 358 S.C. 369, 379, 595 S.E.2d 461, 466 (2004). "The potential for repetition may be demonstrated in either of two ways: (1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent

28

deterrence; or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." *Wright v. Craft*, 372 S.C. 1, 30, 640 S.E.2d 486, 502 (Ct. App. 2006) (citations omitted). [24]

PSB's omission of any argument regarding the public interest in its Motion for Summary Judgment is both telling and unsurprising, in that there is can be no dispute about this topic, and were PSB to address the issue, it would undermine its own arguments that conduct pre-dating 2018 is irrelevant as part of its efforts to prevent Nautilus from discovering additional facts and documents related thereto. *See, e.g.*, ECF No. 118. The potential for repetition of PSB's unfair and deceptive acts is clear because the same kind of actions occurred numerous times over the past decade. Laffitte, then-vice-president of PSB, consistently represented in publicly filed applications to the Probate Court—and, thereby, not only to that Court and the various persons and entities involved in the claims subject to his fiduciary appointment, but also to the public—that he his qualification for appointment was that he was the vice president of PSB. **Exh. 35**. Based on the representation in those applications, which mirrored that of Westendorf's (*compare* **Exh. 35** *with* **Exh. 8**), the Probate Court accepted those representations and issued orders of appointment. **Exh. 37**; *see also* **Exh. 9** at 27:2–21.[25] The probate judge involved in several of those matters believed that PSB was involved in Laffitte's and Westendorf's service as fiduciaries based upon their representations. *Id.* at 26:16–24. In sum, the same kind of actions occurred numerous times over a considerable period of time.

---

[24] "These two ways are not the only means for showing the potential for repetition or public impact, and each case must be evaluated on its own merits to determine what a plaintiff must show to satisfy the potential for repetition/public impact prong of the UTPA." *Wright v. Craft*, 372 S.C. 1, 30, 640 S.E.2d 486, 502 (Ct. App. 2006) (citing *Daisy*, 322 S.C. at 497, 473 S.E.2d at 51).

[25] "Q. And did the Court rely on that inherent credibility that you've got the vice president of the bank in – in approving him to serve as conservator in this case? A. Wholeheartedly. Q. And – and also, did that position as vice president of Palmetto State Bank maybe influence the amount of scrutiny that was made of Russell Laffitte at the time? A. Absolutely. [. . .] Q. And the reason he wouldn't have been scrutinized is, again, because of his position with Palmetto State Bank. MR. WALKER: Object to the form. A. Exactly."

In addition, the company's procedures also created (and continue to create) a potential for repetition of the unfair and deceptive acts. *See, e.g.*, *Wright v. Craft*, 372 S.C. 1, 30, 640 S.E.2d 486, 502 (Ct. App. 2006) (citations omitted). PSB retains the right to control its officers' service as fiduciaries in its Conflict of Interest policy. **Exh. 36**. Specifically, PSB's guidelines instruct officers that they should generally decline fiduciary appointments, and that any fiduciary service must first be approved by the officers' superiors at PSB in accordance with PSB's conflict of interest policies. *Id.* This policy was followed in connection with Westendorf's appointment, at least in the sense that PSB's "senior management in Hampton" authorized Westendorf to serve as a personal representative for the estate of Satterfield at the request of Murdaugh (an essential PSB client). **Exh. 31** at 61:16–62:2. PSB's procedures failed to provide proper controls to ensure that the very danger that its Conflict of Interest policy expressly purported to protect against did not infect the process through which such danger was to be evaluated. It was Laffitte—the very same officer that was previously appointment as a fiduciary on the basis of his being a vice-president of PSB and that knowingly diverted funds in manners that were different than those upon which such funds were conditioned upon when sent—who approved Westendorf to serve as a fiduciary at the direction of PSB's client, Murdaugh—the very same person Laffitte worked with in the past when they covertly diverted funds belonging to others through accounts at PSB. PSB's policies failed. Unfortunately, PSB's policies remain the same today as they did during much of Laffitte's fiduciary appointments and during Westendorf's approval and service, demonstrating the potential for repetition.

### 3. Nautilus Suffered Monetary Loss as a Result of the Defendants' Unfair or Deceptive Act(s).

As to the third element of damages, PSB argues that "Nautilus's loss was the result of its informed decision to settle the Satterfield claims, for less than policy limits, to end the exposure to it and its insured," that "Nautilus made its decision based on its investigation and in reliance on the evaluation of its team of professionals," and that "PSB played no role in Nautilus's decision." ECF

No. 131 at 14.  Even were it to be ignored that these are questions of material fact, these arguments fail.

"A SCUTPA cause of action may be asserted by any 'person' who suffers an ascertainable loss of money or property as a result of a defendant's unfair or deceptive trade practice,[26] and "there is no requirement that the parties be in privity of contract . . . ."[27]  Relevant here, "[t]he UTPA allows for the recovery of actual damages," which "under the UTPA include special or consequential damages that are a natural and proximate result of deceptive conduct." *Wright v. Craft*, 372 S.C. 1, 24, 640 S.E.2d 486, 499 (Ct. App. 2006) (internal quotation omitted)).

PSC concedes the existence of "Nautilus's loss" and instead focuses its argument on a purported lack of "proximate[] cause." ECF No. 131 at 14.  PSB further concedes that Nautilus could not have been defrauded had a "fiduciary" not hid the existence of Nautilus' delivery of funds from the Satterfields.  **Exh. 31** at 88:24-86:6.  However, as previously explained in Parts I-II *supra*, PSB's arguments as to proximate cause must fail because they rely upon the erroneous premise that Nautilus entered into an enforceable settlement agreement fully informed.  Murdaugh's scheme to defraud Nautilus and obtain insurance proceeds could not have succeeded without Westendorf's role as fiduciary.  PSB's officers held themselves out as fiduciaries in their capacities as officers for PSB; PSB allowed that practice to continue and allowed third-parties to entrust their funds to the hands of their servant, and the consistent result was a misappropriation of funds in violation of court directives or instructions of the persons placing such funds in their care.  This Court should deny PSB's and Westendorf's attempt to evade their liability under SCUTPA and deny the Motions.

---

[26]  *City of Charleston, SC v. Hotels.com, LP*, 487 F. Supp. 2d 676, 680 n.1 (D.S.C. 2007).

[27]  *McLawhorn v. Ocwen Loan Servicing, LLC*, No. 4:14-CV-02745-RBH, 2017 WL 624530, at *7 (D.S.C. Feb. 15, 2017)

**D.** **Cory Fleming's Actions Are Attributable to and Binding on Westendorf.**

Westendorf advances three arguments for why he is entitled to summary judgment:

    i.     no evidence has been adduced to satisfy each element of the civil conspiracy claim;

    ii.    the Unfair Trade Practices Act claim fails because Westendorf was not engaged in trade or commerce with Nautilus and was not the proximate cause of Nautilus' harm; and

    iii.   Fleming's actions are not attributable to his client, Chad Westendorf.

As to the first two arguments, they are the same as those raised by PSB and are addressed *supra*. *See* Parts IV.B–C. As to the third, it is entirely understandable why Westendorf would wish to distance himself from Fleming as much as possible given Fleming's irrefutable and admitted culpability. However, because the "the law presumes that an attorney communicates notice of any matter within the scope of representation to the client," *Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295, 303 (4th Cir. 2017) (citing *Rogers v. Palmer*, 102 U.S. 263, 267–68 (1880)), a client is "considered to have notice of all facts, notice of which can be charged upon the attorney." *Link v. Wabash R. Co.*, 370 U.S. 626, 634, 82 S. Ct. 1386, 1390 (1962); *see also Pioneer Inv. Servs., Co.* v. *Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396, 113 S. Ct. 1489, 1499 (1993) (listing cases holding "clients must be held accountable for the acts and omissions of their attorneys").

Westendorf's argument that Fleming's actions were fraudulent and thus not imputable to Westendorf is not persuasive. First, Nautilus alleges Mr. Westendorf was a co-conspirator in the fraud. Second, Mr. Westendorf was not harmed by the underlying fraud against Nautilus; indeed, he earned $30,000 for his participation. Third, had Mr. Westendorf properly performed the job of a fiduciary, there would have been no way for Murdaugh to steal the money, and he would not have undertaken the fraud. Fourth, ignorance of the law is no defense; to the extent Mr. Westendorf's fiduciary failings are due to his ignorance of his duties, this does not absolve him from his breaches of those duties which, had he undertaken, would have revealed the scheme to defraud Nautilus prior to any money being delivered by Nautilus. *See supra*, Part IV.B.

In addition, Westendorf was a payee on the Nautilus check, and the money could not have been misdirected without his signing it over to Fleming. This he did, unconditionally. All Fleming's acts of distribution that follow are imputable to Westendorf, separate and apart from the fact that Fleming was Westendorf's lawyer.

Further, even were the fraud exception to apply, at least the following acts nevertheless fall within the normal course of Fleming's and Moss & Kuhn's representation and handling of the Satterfield matter such that they are imputed to Westendorf:

 i. The submitting of untruthful disbursement statements attached to the petitions to approve the "settlements";

 ii. the request to Judge Mullen that the order approving the "settlement" not be filed;

 iii. the disbursement of funds prior to an order approving the "settlement" being filed as required by Nautilus;

 iv. the knowledge that the funds received from the "settlement" would not be structured, as structures cannot be funded by plaintiff's counsel but must come from the settling defendant;

Instructive to the question of an agent's actions being imputed to the principal is *Reynolds v. Witte*, in which the South Carolina Supreme Court explained:

> It cannot properly be restricted to what the parties intended in the creation of the agency, for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. The question cannot be determined by the authority intended to be conferred by the principal. We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed. Tested by reference to the intention of the principal, neither negligence nor fraud is within "the scope of the agency;" but tested by the connection of the act with the property and business of the agency, fraud in taking the very property is as much "within the scope of the agency" as negligence in allowing others to take it. The proper inquiry is, whether the act was done in the course of the agency and by virtue of the authority as agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent. Here the fraudulent act was the appropriation of the very property of the agency-without which agency they would not have had possession of the property and could not have done the act.

13 S.C. 5, 16 (1880).  Finally, not only are the actions of Fleming binding on Westendorf, they are also binding on PSB, for whom Fleming was a subagent:

> Regardless of any subsequent ratification, a principal is liable to third persons for the frauds, deceits, concealments, misrepresentations, negligences and other malfeasances and omissions of duty of his agent acting within the scope of his agency, although the principal did not authorize, participate in, or know of such misconduct. . . . ***The same rule is applicable to the misrepresentations of subagents***.

*State ex rel. McLeod v. C & L Corp.*, 280 S.C. 519, 528, 313 S.E.2d 334, 339–40 (Ct. App. 1984) (internal citations omitted).  And while PSB and Westendorf argue they did not ratify the conduct, they obtained benefits as a result.

## V.      Declaratory Judgment

Even were the Court to rule in PSB's and Westendorf's favor as to the civil conspiracy and SCUTPA claims, PSB and Westendorf would remain as Defendants to the action because of the declaratory judgment cause of action in Nautilus' Amended Complaint.  *See* ECF No. 8, ¶¶ 42–50.  While the declaratory relief as to the grand jury subpoena became moot and the United States was dismissed as a party, the amended complaint also requested the Court:

> declare the rights and obligations of Nautilus, Murdaugh, and the other Conspirators regarding the Irregularities, including that Murdaugh and the other Conspirators, through fraudulent and misleading statements and actions upon which Nautilus reasonably relied, caused Nautilus to contribute funds under the Policy to a sham settlement intended to enrich Murdaugh and his coconspirators, and Nautilus' entitlement to recover those funds.

*Id.* at ¶ 50.  Further, the prayer for relief requests the Court "declare the rights and obligations of the Parties arising out of the Irregularities regarding the coverage and the claim . . . ."  As PSB and Westendorf are identified in the Amended Complaint as among Murdaugh's conspirators, (*id.* at ¶ 15), they would remain parties to this action even were summary judgment granted to them on the conspiracy and unfair trade practices claims.

34

## VI.    **Conclusion**

Nautilus respectfully requests this Court decline to reach the merits of the Motions for Summary Judgment because the underlying settlement upon which they are predicated is void and the funds delivered thereunder should, by operation of law, remain constructively in escrow.[28]  Should the Court reject this argument, Nautilus respectfully requests the Court deny the Motions for the reasons stated herein.

**Respectfully submitted:**

This 4th day of August, 2023          */s/ Jaan Rannik*
Charleston, South Carolina             EPTING & RANNIK, LLC
                                       Jaan G. Rannik (Fed. ID No. 12621)
                                       Clinton T. Magill (Fed. ID No. 12459)
                                       46A State Street
                                       Charleston, SC 29401
                                       P: (843) 377-1871
                                       F: (843) 377-1310
                                       jgr@epting-law.com
                                       ctm@epting-law.com

                                       COUNSEL FOR NAUTILUS INSURANCE COMPANY

---

[28]  As noted *supra*, Nautilus expressly does not  elect a remedy at this time.