1               UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
2                  CHARLESTON DIVISION

3
             DEPOSITION OF CHAD WESTENDORF
4

5     NAUTILUS INSURANCE COMPANY,

6                    Plaintiff,

7        vs.            CASE NO. 2:22-cv-1307-RMG

8     RICHARD ALEXANDER MURDAUGH, SR., CORY FLEMING,
      MOSS & KUHN, P.A., CHAD WESTENDORF, and
9     PALMETTO STATE BANK,

10                   Defendants.

11    _____

12    DEPONENT:    CHAD WESTENDORF

13
      DATE:        JUNE 30, 2023
14

15    TIME:        1:57 P.M.

16
      LOCATION:    WALKER GRESSETTE FREEMAN & LINTON
17                 CHARLESTON, SC

18
      REPORTED BY: RUTH L. MOTT, RPR, CRR
19                 CLARK BOLEN
                   P.O. BOX 73129
20                 CHARLESTON, SC 29422
                   843-762-6294
21                 WWW.CLARKBOLEN.COM

22

23

24

25

```
1        A P P E A R A N C E S

2

         ON BEHALF OF PLAINTIFF:
3
             EPTING & RANNIK
4            BY:  JAAN G. RANNIK
             BY:  CLINTON MAGILL
5            46A State Street
             Charleston, SC 29401
6            jgr@epting-law.com
             ctm@epting-law.com
7
         ON BEHALF OF CORY FLEMING (BY ZOOM):
8
             PENDARVIS LAW OFFICES
9            BY:  THOMAS A. PENDARVIS
             710 Boundary Street
10           Suite A-1
             Beaufort, SC 29902
11           thomas@pendarvislaw.com

12       ON BEHALF OF MOSS & KUHN, PA (BY ZOOM):

13           HOOD LAW FIRM, LLC
             BY:  ROBERT H. HOOD, JR.
14           172 Meeting Street
             Charleston, SC 29401
15           bobbyjr.hood@hoodlaw.com

16       ON BEHALF OF CHAD WESTENDORF:

17           WILLS MASSALON & ALLEN
             BY:  CHRISTY FORD ALLEN
18           97 Broad Street
             Charleston, SC 29401
19           callen@wmalawfirm.net

20       ON BEHALF OF PALMETTO STATE BANK:

21           WALKER GRESSETTE FREEMAN & LINTON
             BY:  THOMAS P. GRESSETTE, JR.
22           BY:  JAMES W. CLEMENT
             66 Hasell Street
23           Charleston, SC 29401
             gressette@wglfirm.com
24           clement@wglfirm.com

25       ALSO PRESENT:  JONATHAN RALEY
```

```
 1                    I N D E X

 2

 3    WITNESS                                    PAGE

 4    CHAD WESTENDORF

 5       BY MR. RANNIK                              4
         CERTIFICATE OF REPORTER                   31
 6       DEPONENT CORRECTION SHEET                 32

 7

 8              CHAD WESTENDORF - EXHIBITS

 9    EXHIBIT          DESCRIPTION              PAGE

10    EXHIBIT NO. 01  2/22/22 DEPOSITION AND       6
                      EXHIBITS
11
      EXHIBIT NO. 02  APPLICATION FOR SUCCESSOR   12
12                    PERSONAL REPRESENTATIVE

13    EXHIBIT NO. 03  1/18/19 BANK STATEMENT      18

14    EXHIBIT NO. 04  TRANSFER RECORD             19

15    EXHIBIT NO. 05  EXCEPTION SHEET             20

16    EXHIBIT NO. 06  ENVIRONMENTAL CHECKLIST     22

17    EXHIBIT NO. 07  DOCUMENTS RELATING TO       25
                      SETTLEMENT OF SATTERFIELD
18                    CASE

19

20

21                       - - -

22

23

24

25
```

```
 1                      CHAD WESTENDORF,

 2        being first duly sworn, testified as follows:

 3                         EXAMINATION

 4        BY MR. RANNIK:

 5             Q.  Good afternoon, Mr. Westendorf.  We've

 6        chatted a little bit today, but my name's Jaan

 7        Rannik.  I represent Nautilus Insurance Company

 8        in this case.

 9                  I understand you've been deposed before,

10        correct?

11             A.  That is correct.

12             Q.  Just the one time?

13             A.  Yes, sir.

14             Q.  Okay.  Let me just quickly go over the

15        rules of the deposition.  I know you heard them

16        this morning.

17                  But if you need a break at any time, let

18        me know, and we'll take one.  I don't think this

19        is going to be very long.  If you don't

20        understand a question that I ask, please let me

21        know that, and I will rephrase it.  If you have

22        any doubts about what I'm asking, direct that

23        question to me.  Because if you answer a

24        question, I'm going to assume you've understood

25        it; is that fair?
```

1           A.  Yes, sir.

2           Q.  You may hear your attorney object to a

3    question.  You still have to answer the question

4    unless you're instructed not to.  Please --

5    you're already doing a great job of this, giving

6    verbal answers, yeses and nos, as opposed to head

7    nods and head shakes.  The court reporter will

8    thank you.  And let's make sure that we speak one

9    at a time, also, to hopefully make her life a

10   little bit easier.

11              Now, Mr. Westendorf, I want to just very

12   briefly ask you about the previous deposition

13   that you've given relating to your service as

14   personal representative for the Estate of Gloria

15   Satterfield.

16              That testimony was under oath, right?

17           A.  Yes, sir.

18           Q.  And you told the truth?

19           A.  Yes, sir.

20           Q.  And you had the opportunity to review

21   the transcript after you testified?

22           A.  Yes, sir.

23           Q.  And correct any errors?

24           A.  Yes, sir.

25           Q.  Did you correct any errors?  Were there

1     any?

2         A.  I made one correction in there.

3         Q.  Okay.  What I'd like to do -- and I

4     think we can probably save an awful lot of

5     time -- is mark as Exhibit 1 a copy of that

6     transcript and the exhibits to it.

7                 (Exhibit No. 01 marked for

8     identification.)

9         Q.  I'm just going to ask you -- well, let

10    me represent to you that this is your testimony

11    in that prior deposition.  Will you just have a

12    quick look at it and tell me if you agree.

13        A.  I mean, it matches up with the number of

14    pages and everything.  I mean, it looks like it's

15    it.  Without reading it, I mean --

16        Q.  Of course.

17                MS. ALLEN:  Mr. Westendorf just

18    mentioned that he made one correction.  Is that

19    document in this one?

20                MR. RANNIK:  And actually, it's

21    not, no.  I didn't have the errata page.  And so

22    we will need to, of course, make a note on the

23    record here that this is not the final transcript

24    because there's been a correction.

25                MS. ALLEN:  Okay.  And can I

1      supplement the exhibit with the errata page?

2                    MR. RANNIK:  Yes, please.

3                    MS. ALLEN:  Okay.  I'll do that

4      after the deposition.  Thank you.

5           Q.  Mr. Westendorf, am I right that you

6      stand by the testimony you gave in that

7      deposition as you sit here today?

8           A.  Yes, sir.

9           Q.  And if I asked you the same questions,

10     I'd probably get the same information?

11          A.  Yes, sir.

12          Q.  What did you do to prepare for today's

13     deposition?

14          A.  Just consulted with Christy.

15          Q.  Didn't talk to anybody else?

16          A.  No, sir.

17          Q.  Did you review any documents?

18          A.  I looked back over my deposition.

19          Q.  I want to ask you some questions about

20     serving as a PR.

21               Based on what you know today, would you

22     agree that someone who serves as a conservator or

23     a PR has a responsibility to the person or the

24     estate that they're serving for?

25          A.  As of today, yes, sir.

1          Q.  And you'd agree that it's wrong for

2     someone serving as a PR to loan money to

3     themselves from the money they're supposed to be

4     safeguarding, correct?

5          A.  I would assume so, yes.

6          Q.  And it would be wrong, of course, to

7     steal money from those accounts?

8          A.  Of course.

9          Q.  It's wrong to withhold money from the

10    person you're serving for when they're entitled

11    to that money?

12         A.  That's correct.

13         Q.  Is it wrong to use the money from one

14    person you're serving as PR for to pay back money

15    that was stolen from another person you were

16    serving as PR for?

17         A.  Yes, sir.

18         Q.  Wrong to misrepresent to the court that

19    someone who's under 18 -- sorry.  Strike that.

20              Is it wrong to misrepresent to the court

21    that someone is under the age of 18 and,

22    therefore, needs a conservator account when you

23    know that they're over the age of 18?

24              MS. ALLEN:  Object to the form.

25         A.  Could you just say that one more time,

1       please.

2               Q.  Of course.  Would it be wrong to tell a

3       court that someone is under 18 years old and,

4       therefore, they need a conservator account when

5       you know that they're actually over the age of

6       18?

7                       MS. ALLEN:  Same objection.

8               A.  Yes.

9               Q.  Would it be wrong to represent to the

10      court that someone lives in Hampton County when,

11      in fact, you know they live in Columbia?

12                      MS. ALLEN:  Object to the form.

13              A.  Say that one more time.

14              Q.  Sure.  Would it be wrong to, on a

15      conservatorship or PR application, represent to

16      the court that the person or the estate is in

17      Hampton, South Carolina, when, in fact, you know

18      that they're in Columbus, South Carolina?

19              A.  Yes, sir, that would be wrong.

20                      MS. ALLEN:  Same objection.

21              Q.  Would it be wrong to do all of these

22      things that we've just talked about even if Alex

23      Murdaugh told you to do it?

24              A.  Yes.

25              Q.  Let's say that someone knew about all

1      the instances of wrongdoing.  Let's say they

2      happened and someone knew about it.  And let's

3      say that it had happened every single time Alex

4      Murdaugh had asked someone to serve as a PR.

5            In that situation, do you think it's

6      reasonable to expect that something -- more

7      wrongdoing would occur if you serve as a PR for

8      Alex Murdaugh in the future?

9                  MS. ALLEN:  Object to the form.

10                 MR. GRESSETTE:  Objection.

11     A.  You could assume that, yes.

12     Q.  Are you aware that Mr. Laffitte has been

13     convicted of much of the things that we just

14     described in federal court?

15     A.  Yes, sir.

16     Q.  And would you agree that Mr. Laffitte

17     should have known that serving as a PR for

18     Mr. Murdaugh would lead to more wrongdoing?

19                 MS. ALLEN:  Object to the form.

20     A.  I don't know.  I can't answer that.

21     Q.   If Mr. Laffitte's work as a conservator

22     or a PR for Mr. Murdaugh had involved wrongdoing

23     every time, you would expect by 2018 that

24     Mr. Laffitte would have understood that was the

25     gig, right?

1          A.  I would assume.

2          Q.  When you were asked to serve as PR for

3    the Estate of Gloria Satterfield, you ran that

4    request by Mr. -- by Russell Laffitte, correct?

5          A.  That is correct.

6          Q.  Did he tell you anything about any of

7    the wrongdoing associated with serving as a

8    fiduciary for Alex Murdaugh when you asked?

9               MR. GRESSETTE:  Objection.

10         A.  No, sir.

11         Q.  Did he tell you that Murdaugh had

12   substantial overdrafts?

13         A.  No, sir.

14         Q.  Did Mr. Laffitte tell you that when he

15   was a vice president like you were, he had caused

16   PSB to issue illegal loans to Alex Murdaugh from

17   a conservatorship account?

18               MS. ALLEN:  Objection to the form.

19               MR. GRESSETTE:  Objection.

20         A.  He did not.

21         Q.  Did he tell you that funds had been

22   disbursed in prior conservatorships in violation

23   of the disbursement statements approved by the

24   court?

25         A.  He did not.

1          Q.  He should have informed you of these

2      things, though, right?

3                  MR. GRESSETTE:  Objection.

4          A.  I would hope so.

5          Q.  You would have liked to know?

6          A.  Yes, sir.

7          Q.  If you had known these things in 2018,

8      would you have agreed to serve as a PR for the

9      Estate of Gloria Satterfield?

10         A.  No, sir.

11         Q.  Would you have signed the application

12     for the appointment to be made a PR when Murdaugh

13     brought it to your office?

14         A.  If I knew those things, no, sir, I

15     wouldn't have.

16         Q.  Let me show you that or a document and

17     ask if you recognize it.

18                  (Exhibit No. 02 marked for

19     identification.)

20         Q.  Do you recognize this document?

21         A.  Yes, sir.

22         Q.  And what is this document?

23         A.  Application for successor personal

24     representative.

25         Q.  Now, can you please read for us --

1    there's an X through one of the boxes on the

2    first page at the bottom there.  It says:

3    "Priority for appointment of the successor

4    personal representative is, other, describe."

5         Do you see where I'm talking about?

6         A.  Yes, sir.

7         Q.  What does that say?

8         A.  "Current personal representative desires

9    bank vice president to serve as personal

10   representative.  Sole other heir concurs."

11        Q.  Okay.  And then if I can get you to turn

12   to the next page.  At the top right, there's a

13   verification.

14        Is that your signature?

15        A.  That is.

16        Q.  What is the address that's provided

17   there?

18        A.  601 First Street West -- First Street --

19   excuse me -- Hampton, South Carolina 29924.

20        Q.  And what's at that bank?

21        A.  The bank, Palmetto State Bank.

22        Q.  The telephone number, what telephone

23   number is that?

24        A.  (803) 943-2671.

25        Q.  And is that a bank phone number?

1          A.  Yes, sir.  That's the correction I made

2     on the deposition, if I may say that.

3          Q.  You may.

4          A.  I did not type that and that's what I

5     told -- that it was already there.

6          Q.  As part of serving as PR for the Estate

7     of Gloria Satterfield, you endorsed a check from

8     Nautilus, correct?

9          A.  Yes, sir.

10         Q.  I think you were at your office when you

11    did that?

12         A.  That's correct.

13         Q.  Did you receive a letter with that

14    check?

15         A.  Yes, sir.

16         Q.  And did that letter say these funds are

17    to be held in trust until an order approving the

18    settlement has been filed?

19         A.  Yes, sir.

20         Q.  If you had known of Alex Murdaugh's

21    wrongdoing in the past, would you have

22    endorsed -- well, let me ask you this.  I'm

23    sorry.  Did you do anything to ensure that an

24    order approving the settlement was filed before

25    the funds were distributed?

1          A.  No, sir.

2          Q.  Because you trusted Cory Fleming, right?

3          A.  That's correct.

4          Q.  If you had known about Alex Murdaugh's

5     prior wrongdoing and you were in this position,

6     you probably would have checked more things,

7     right?

8          A.  Correct.

9          Q.  So let me ask you a little bit about

10    your employment or your work now with PSB.

11               So Mr. Malinowski told us about it and

12    that you're now an independent contractor.  And

13    it sounded to me like you do sort of general

14    consulting work for the bank.

15         A.  Yes, sir.

16         Q.  Why the change from your prior role?

17         A.  I was unable to be bonded under the

18    bank's bond.

19         Q.  I see.  Okay.  Okay.

20               And that was as a result of the mess

21    with the Estate of Gloria Satterfield?

22         A.  I assume so, yes, sir.

23         Q.  And the bond that you were under, this

24    is the fidelity bond for the bank?

25         A.  I would assume so.  I don't know.

1              Q.  Now, you heard us also talk a little bit

2        earlier about the PR fee that you were paid?

3              A.  Yes, sir.

4              Q.  And that was $30,000?

5              A.  That's correct.

6              Q.  And you refunded that to the

7        Satterfields or you paid that to the Bland

8        Richter firm?

9              A.  Yes, sir, immediately.

10             Q.  And that was -- did that come out of

11       your Palmetto State Bank account?

12             A.  I borrowed the money.

13             Q.  Okay.

14             A.  I have a loan right now I'm paying back

15       for it.

16             Q.  Okay.  With Palmetto State Bank?

17             A.  Yes, sir.

18             Q.  When you were first contacted about

19       serving as the PR for the Estate of Gloria

20       Satterfield, I think you said it was right before

21       Thanksgiving and you were out of the office; is

22       that right?

23             A.  Yes, sir.

24             Q.  So it was a call you got on your cell

25       phone?

1          A.   That is correct.

2          Q.   Is that a personal cell phone or one

3     that's provided to you by the bank?

4          A.   Personal.

5          Q.   Does the bank ever reimburse you for

6     cell phone expenses?

7          A.   No, sir.

8          Q.   It was a number that you had previously

9     before you worked at the bank?

10         A.   No, sir.

11         Q.   But it had nothing to do -- it was just

12    your private phone?

13         A.   It's my private phone, yes, sir.

14         Q.   Okay.  Were you reimbursed for any

15    expenses incurred acting as the PR for the Estate

16    of Gloria Satterfield?

17         A.   From who?

18         Q.   From the bank.

19         A.   They've been paying my legal fees.

20         Q.   When you were the PR for the estate, did

21    the probate court require any kind of bond to be

22    posted?

23         A.   Not that I'm aware.

24         Q.   Did you know that Gloria Satterfield had

25    a bank account, or bank accounts, at PSB when she

1       died?

2              A.  I didn't.

3              Q.  You did?

4              A.  I did not.

5              Q.  Did not.  Okay.

6              A.  Excuse me.

7              Q.  Because those were not included as part

8       of the estate, right?

9              A.  I guess, yes.

10             Q.  And the funds didn't show up on the

11      final accounting for the estate?

12             A.  That's right.

13             Q.  I'd like to show you just a couple of

14      documents.

15                    (Exhibit No. 03 marked for

16      identification.)

17             Q.  This is a document, I'll represent to

18      you, that was produced in this litigation.  Can

19      you tell from looking at it what this is?

20             A.  Looks like a checking account for

21      Ms. Gloria Satterfield.

22             Q.  And it shows that the balance is getting

23      zeroed out in January of 2019?

24             A.  That's right.

25             Q.  In January of 2019 you were already

1    serving as the PR for the estate; is that

2    correct?

3         A.   That is correct.

4         Q.   If you look at the second page, which

5    you are, at the signature line there, what does

6    that say?

7         A.   It looks like it says Michael

8    Satterfield, personal rep.

9         Q.   Okay.  But at this time, he was not the

10   personal rep; is that correct?

11        A.   Not by my documents, no.

12        Q.   Okay.  I'd like to show you another

13   document produced in this case.

14             (Exhibit No. 04 marked for

15   identification.)

16        Q.   And ask you if you can tell what this

17   is.  I know it's not a lot to go on.

18        A.   It looks like it's where I transferred

19   money from one account of Alec's to another per

20   Russell's request.

21        Q.   And I was going to ask what your

22   involvement was.  So you would have been the one

23   who effected the transfer?

24        A.   Yes, sir.

25        Q.   Did that happen often?

1          A.  If Russell wasn't at the office, I would

2     get a call from him and say, would you move that

3     from an account, line of credit, whatever, to a

4     checking account.

5          Q.  Okay.  Got it.

6              Do you happen to -- I don't know why you

7     would, but do you happen to recognize what those

8     two account numbers are on the left-hand side

9     there?

10         A.  Not really.

11         Q.  Yeah, no worries.

12             (Exhibit No. 05 marked for

13     identification.)

14             MS. ALLEN:  Can I take a second to

15     look at this one?  Because I haven't seen it.

16             MR. RANNIK:  Of course, you can.

17     And, Christy, let me give you one more that's

18     coming.

19             MS. ALLEN:  Okay.  Let's step out

20     for a second.

21             (Brief recess.)

22         Q.  So we're looking at Exhibit 5.  What is

23     this document?

24         A.  This is an exception sheet.  This is

25     done on loans when -- by the loan officer when

1    they're done.  And if there was any exceptions to

2    the loan -- which on this one, you can see it's

3    got a Y by credit score.  So obviously, that

4    tells me the credit score was under 600.  So

5    there was an exception there.

6         Q.  And sorry.  So we're clear, you're

7    talking about the beacon score being less than

8    600?

9         A.  Correct.

10        Q.  Beacon score is a credit score?

11        A.  Yes, sir.

12            And then on line -- Code 30 would have

13   been loan terms outside guidelines.  And that was

14   checked yes.  So obviously, the term of that

15   loan, submitted by Russell as the loan officer,

16   and it just comes to another loan officer to sign

17   as a dual.

18        Q.  Got it.  Got it.

19            Was there any discussion with

20   Mr. Laffitte about this loan --

21        A.  No, sir.

22        Q.  -- at this time?

23            Okay.  There's also -- if I can get you

24   to look at Code No. 22 on there.

25        A.  Yes, sir.

1        Q.  It says:  "Debt service coverage ratio

2        less than 1.2 percent."

3             What does that mean?

4        A.  Debt service coverage ratio is what we

5        use like our commercial loans to -- debt to

6        income, basically.  And obviously, it was less

7        than that.

8        Q.  Got it.

9             MR. RANNIK:  All right.  If we

10       could mark this as Exhibit 6, please.

11            (Exhibit No. 06 marked for

12       identification.)

13       Q.  Mr. Westendorf, same question, what's

14       this document?

15       A.  Environmental checklist is something

16       that's done on our renewals of our real estate

17       loans and basically says that it's an improved

18       property.  And if there is any environmental

19       problems, you would check yes down there.  It's

20       not my writing, though, so...

21       Q.  Gotcha.

22            So you're listed as the inspecting

23       officer --

24            (Reporter clarification.)

25       Q.  So you're listed as the inspecting

1    officer, but you didn't fill out this form?

2         A.   I did not.

3         Q.   Okay.

4         A.   But all the information looks right.

5         Q.   Okay.  Mr. Westendorf, another thing

6    that you heard Mr. Malinowski testify to is that

7    if you incur any business expenses that you want

8    reimbursed by the bank, you should submit an

9    expense form.

10             Have you ever done that?

11        A.   Yes.

12        Q.   Often?

13        A.   Usually about once a year, I was

14   fortunate to go to a bankers convention.  I was

15   involved with the bankers association before all

16   this.  And the bank was nice enough to let me go

17   and they would reimburse me for my fees.

18        Q.   Anything else you remember being on

19   any --

20        A.   Maybe some gas, but other than that, I

21   can't remember any.

22             MR. RANNIK:  Okay.  All right.

23   Will you give me a moment to confer with counsel.

24             (Brief recess.)

25        Q.   Just a few more questions.

1          A.   Sure.

2          Q.   Did you ever submit a conflict of

3     interest report to the bank?

4          A.   I did not.

5          Q.   Okay.  I'm going to show you what we

6     marked in the previous exhibit as Bank Exhibit 3.

7               Have you ever seen this document?

8          A.   No, sir.

9          Q.   Okay.  And if you flip to the last page,

10    did you ever fill this out and submit it to the

11    bank?

12         A.   No, sir.

13         Q.   Thank you.

14              When you were approached about being PR,

15    I asked you if you had run that by Russell

16    Laffitte.

17              Is there anybody else at the bank you

18    ran that past?

19         A.   When I went and spoke to Russell, I

20    asked him if I could serve as a PR in a case that

21    Alec was involved in.  I didn't know what the

22    case was at that time.  I asked him if he could

23    do it.  He said, Let me talk to my dad.  So both

24    him and Mr. Laffitte said I could do it.

25         Q.   Okay.  Did you ask anybody else?  Did

1          you ask the bank president?  I think it was

2          Mr. Malinowski at that time.

3                A.  I did not.

4                Q.  All right.  I'd like to quickly show

5          you --

6                     MR. RANNIK:  And, Christy, these

7          are some of the -- these are the settlement

8          document exhibits from the prior deposition.

9          These are copies, and I just want to go through

10         and authenticate them.

11                    MS. ALLEN:  Okay.  Just give me a

12         second.

13                    MR. RANNIK:  Of course.

14                    MS. ALLEN:  Okay.  Thank you.

15                    MR. RANNIK:  I'd like to mark this

16         collection of documents as Exhibit 7, please.

17                    (Exhibit No. 07 marked for

18         identification.)

19               Q.  Mr. Malinowski --

20               A.  Westendorf.

21               Q.  Mr. Westendorf.  Sorry.  Old habits.

22               A.  Yes.

23               Q.  So I've handed you Exhibit 7, which I

24         believe are the various documents relating to the

25         settlement of the case involving the Estate of

1    Gloria Satterfield.

2              Do you recognize these documents?

3         A.  All but 19.  I didn't see 19 until I was

4    at my deposition with Eric Bland.

5         Q.  Okay.  So let's go one at a time.  The

6    one -- the first page of this exhibit, which is

7    marked with a 30 on it, you recognize that, and

8    that's your signature?

9         A.  No.  I recognize this from being shown

10   over time.  That was after -- let's say after

11   Labor Day '21, I saw this.  I never saw that

12   before that.

13        Q.  Got it.  Got it.

14        A.  And that's Cory Fleming's signature.

15        Q.  It is.  I saw a C.  Sorry.  Jumping

16   ahead of myself.

17             All right.  The next document is marked

18   Exhibit 24 to your previous deposition.  Do you

19   recognize this?

20        A.  Yes, sir.

21        Q.  And is this an accurate copy of the

22   order approving settlement and the settlement

23   statement that you signed?

24        A.  Yes, sir.  I signed this in Judge

25   Mullen's chamber on the 13th of May, 2019.

1          Q.  Okay.

2          A.  And she -- that's her on the -- on that

3     one.

4          Q.  Right.  You mean at the bottom of each

5     page?

6          A.  Yes, and the final signature under

7     presiding judge.

8          Q.  Okay.  The next one, which was

9     Exhibit 23 to your previous deposition, do you

10    recognize this document?

11         A.  Yes, sir.

12         Q.  And is this a correct -- true and

13    correct copy of the petition for the approval of

14    that settlement?

15         A.  It looks to be, yes, sir.

16         Q.  And that's your signature on the pages 5

17    and 6?

18         A.  Yes, sir.

19         Q.  And the next is Exhibit 21 to your

20    previous deposition and this is a release of

21    claims against various parties.

22              Do you recognize this document?

23         A.  Yes, sir.

24         Q.  And is that your signature on the last

25    page?

```
 1           A.  Yes, sir.

 2           Q.  And then I believe you told me 19 is one

 3      that you had not seen until your first

 4      deposition?

 5           A.  Yes, sir.

 6           Q.  Okay.  And there's no signature by you

 7      anywhere on this document, right?

 8           A.  No.

 9           Q.  All right.  I asked you a bunch of

10      questions about what Mr. Laffitte did or did not

11      tell you when you asked if you could serve as PR

12      for the Estate of Gloria Satterfield.  I forgot

13      one.

14               Did he tell you that he had been asked

15      to serve as the PR for the estate?

16           A.  He did not.

17           Q.  Did he tell you -- I assume he didn't,

18      therefore, tell you why he was not serving as the

19      PR?

20           A.  He did not.

21           Q.  Okay.  Another bit of cleanup, if we

22      could go back to -- which exhibit was this?

23           A.  No. 3.

24           Q.  Right there, No. 3.  Just to clarify,

25      this withdrawal, you didn't approve this
```

```
1        withdrawal as personal representative for the

2        Estate of Gloria Satterfield, correct?

3             A.  No, sir.

4             Q.  And the first time you knew anything

5        about this was probably at today's deposition?

6             A.  That is correct.

7             Q.  Did you ever have to submit a business

8        development proposal to the bank?

9             A.  What do you mean by that?

10            Q.  I mean sort of a plan of these -- I'm

11       going to try and bring in X amount of business or

12       these are the kinds of customers I'm going to try

13       and target or anything like that?

14            A.  No.  We used to have what was called a

15       call -- not a call report, but a call list.  And

16       we'd try to go out couple times a month and just

17       visit people.  And I'd turn that in to

18       Mr. Laffitte, but that's been 15, 20 years ago,

19       so...

20            Q.  Okay.

21            A.  That would be the only business

22       development I would have done.

23                 MR. RANNIK:  All right.  Thank you

24       very much, Mr. Westendorf.  That's all I've got

25       for you.
```

1                    MR. PENDARVIS:  No questions on

2          behalf of Mr. Fleming.

3                    MR. HOOD:  This is Bobby Hood.  I

4          have no questions.

5                    MR. GRESSETTE:  None for the bank.

6                    (Deposition concluded at 2:36 p.m.)

7                          -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25