**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

NAUTILUS INSURANCE COMPANY,

                Petitioner,

v.

RICHARD ALEXANDER MURDAUGH,
Sr., CORY FLEMING, MOSS & KUHN,
P.A., CHAD WESTENDORF, and
PALMETTO STATE BANK,

                Respondents.

Case No. 2:22-cv-1307-RMG

**SECOND AMENDED COMPLAINT**

COMES NOW Nautilus Insurance Company ("Nautilus"), amending its pleading pursuant to Rule 15(a)(2) and complaining of and seeking relief from all Defendants named above. Nautilus' grounds are as follows.

**PARTIES AND JURISDICTION**

1.   Nautilus is an insurer organized under the laws of Arizona and with its principal place of business in Scottsdale, Arizona.

2.   Richard Alexander Murdaugh, Sr. ("Murdaugh") is a citizen and resident of Colleton County, South Carolina and at all times relevant hereto was an attorney licensed to practice law in South Carolina.

3.   Cory Fleming ("Fleming") is a citizen and resident of Beaufort County, South Carolina, and at all times relevant hereto was an attorney licensed to practice law in the State of South Carolina.

4.   Moss & Kuhn, P.A., formerly known as Moss, Kuhn & Fleming, P.A. ("MKF") is a South Carolina professional association, with its principal place of business located in Beaufort, South Carolina, and of which Fleming was a named shareholder at all times relevant hereto.

5.   Chad Westendorf ("Westendorf") is a citizen and resident of Hampton County, South Carolina.

1

6.  Palmetto State Bank ("Palmetto") is a South Carolina corporation and chartered banking institution, with its principal place of business in Hampton County, South Carolina, and of which Westendorf was a Vice President and Murdaugh was a client at all times relevant hereto.

7.  This Court has jurisdiction pursuant to pursuant to 28 U.S. Code § 1332, inasmuch as the plaintiff is a citizen of a different state than each of the defendants , and the amount in controversy exceeds $75,000.

8.  The Court has jurisdiction over the plaintiff's declaratory judgment claim under 28 U.S. Code § 2201, and over the plaintiff's remaining claims under 28 U.S. Code § 1367 and 18 U.S.C. § 1964.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

10. Nautilus issued umbrella policy PU386804 to Murdaugh ("the Policy"), providing $5,000,000 in umbrella coverage to Murdaugh subject to the policy terms.  A copy of the Policy is attached as **Exhibit A**.

11. On February 2, 2018, Gloria Satterfield fell.  She died on February 26, 2018.

12. Murdaugh made a claim for coverage under the Policy with regard to claims against him purportedly on behalf of the estate of Ms. Satterfield ("the Claims").

13. Westendorf, a Vice President at Palmetto, was appointed as successor personal representative for the estate of Ms. Satterfield, a client of Palmetto's at the time of her death, on account of his being an Officer of Palmetto and with knowledge and authorization of Palmetto and its senior management, including then-COO and Hampton branch manager Russell Laffitte ("Laffitte"), and Westendorf's service as personal representative was within Palmetto's control and performed during Palmetto's business hours and on its premises.

14. Nautilus provided defense counsel for Murdaugh, and ultimately paid $3,800,000 to resolve what it then believed to be claims by the Satterfield Estate.

15. Beginning in July 2021 and continuing through the filing of this amended pleading, Nautilus became—and has continued to become—aware for the first time of certain

2

previously concealed facts regarding the Satterfield claims, allegations of insurance fraud, conspiracy to commit insurance and banking fraud, and allegations of criminal conduct ("the Irregularities").  The Irregularities include:

a.  That Murdaugh approached the Satterfield family after the death of Gloria Satterfield and offered to help them sue him and collect from his insurance companies, including Nautilus.

b.  That Murdaugh, Fleming, MKF, and others arranged for Fleming (Murdaugh's college roommate, former law partner, and longtime close friend) and MKF to represent the Satterfield family in bringing a claim purportedly against Murdaugh, but in actuality as a ploy to fraudulently obtain insurance proceeds from Nautilus to cover debts as part of a Ponzi scheme by which monies were moved between multiple accounts, including within Palmetto and within MKF and Murdaugh's firm, to conceal illicit financial activity.

c.  That Murdaugh and Fleming arranged for Westendorf to serve as the personal representative of the estate of Gloria Satterfield in exchange for a fee, as they had previously done in similar fashion with other officers and directors at Palmetto including Laffitte, effectively removing the Satterfield family from the proceedings and making it possible for the Defendants to conceal the existence of the fraudulently obtained funds from what was represented to be a settlement of claims by the Satterfields, a key component to the scheme to defraud Nautilus without which the scheme could not have been effected.

d.  That Palmetto, through its senior management including Laffitte, authorized its Vice President, Westendorf, to serve as the personal representative for the Satterfields, a role that Laffitte had served in and abused multiple times in the past in connection with Alex Murdaugh and that PSB benefitted from for over a decade.

e.  That, unbeknownst to Nautilus, Murdaugh was not a bona fide insured seeking coverage, but rather was coordinating the handling of the claim with Fleming—including communicating with Fleming about the claim, sending correspondence related to the case on Murdaugh's firm's letterhead, and preparing and delivering disbursement sheets to be signed by Westendorf—such that Fleming and Murdaugh were effectively co-counsel.

f.  That the monies conditionally contributed by Nautilus (as a result of the foregoing fraud) in a then-pending settlement of the claims purportedly brought on behalf of the Satterfield family were deposited by Fleming into MKF's trust account, but were prematurely and fraudulently disbursed therefrom and never received by the Satterfield family; instead, after Westendorf received the $3.8M Nautilus check at his Palmetto office—as well as a copy of the letter from counsel hired by Nautilus to defend Murdaugh setting forth as a condition of receipt that the funds be held in trust until an order approving the settlement was signed and filed— knowingly, voluntarily, and immediately endorsed the funds over to Fleming and/or MKF, Fleming and/or MKF disbursed the funds (minus fees of over $600,000) to a bank account created and controlled by Murdaugh in the name of "Forge," with knowledge that Murdaugh intended to steal the money.

g.  That Fleming and/or MKF did so despite having previously received (i) the instructions from the counsel hired by Nautilus to hold the funds in trust until an order approving the settlement had been signed and filed and (ii) correspondence from the real Forge Consulting, LLC—a Georgia company providing structured settlement services—that funds are eligible for a structured settlement only if received by Forge Consulting, LLC directly from defense counsel (and not from the trust account of the plaintiff's law firm).

h. That, nevertheless, Fleming and/or MKF sent the funds paid by Nautilus from MKF's trust account to "Forge" at a post office box in Hampton County, South Carolina, with no instructions as to how the funds should be handled or for whose benefit they were being sent.

i. That no effort was made by Westendorf (as the Vice President of Palmetto), Fleming, or MKF to ensure that the funds intended for the Satterfield family were received by the Satterfield family in compliance with any valid court order, violating their fiduciary obligations to both Nautilus, the courts, and the intended beneficiaries regarding escrow funds and their disbursement.

j. That Fleming made a second disbursement to Forge from the Nautilus funds in MKF's trust account on or around September 2020 in the amount of approximately $118,000, also with no instructions as to how the funds should be handled or for whose benefit they were disbursed.

k. That Fleming and/or M&K did so prior to an order approving the settlement being filed and entered as required by law.

l. That approximately $113,800 of funds from Nautilus remained in MKF's trust account as of late 2021.

m. That Murdaugh had previously engaged in the theft of money paid in settlement of claims with the assistance, coordination, and involvement of Laffitte and others from Palmetto serving as conservators or personal representatives of the intended beneficiaries (for a fee), to conceal the theft.

n. That Murdaugh sent numerous clients to Palmetto to obtain loans at exorbitant interest rates, loans that would be repaid from the eventual settlement of their claim, allowing Palmetto to benefit from funds that should have inured to Murdaugh's clients' benefit.

o. That, upon information and belief, over $1.6m of the Nautilus funds Murdaugh obtained as part of his scheme to defraud Nautilus made their

way into at least three of Murdaugh's accounts at PSB, from where over $1.1 of the funds were used to pay down loan obligations Murdaugh had to Palmetto.

p.   That, upon information and belief, just two months prior to Nautilus writing its check, the same pattern in the flow of settlement funds from the Lloyd's portion of the Satterfield "settlement" occurred, likewise making their way into Murdaugh's accounts at Palmetto and of which roughly $350,000 was used to pay down loan obligations Murdaugh had to Palmetto.

q.   That the Defendants engaged in a series of schemes of this type and pattern beginning as early as 2011 to provide funds for the benefit of Palmetto, Murdaugh, and Fleming, when the Defendants knew that funds being used were taken from other innocent third parties and clients of Murdaugh and Palmetto, contrary to federal and state laws.

r.   That Laffitte was indicted in May 2022 for his agreement to, participation in, and assistance in the effecting of these schemes with Murdaugh and was found guilty a by a federal jury in November 2022.

s.   That Fleming pled guilty to an Information in federal court in May 2023 for his involvement in the scheme.

16.   Through the Irregularities and other actions, Murdaugh and others—including Fleming, MKF, Westendorf, and Palmetto (collectively, "the Co-conspirators")—coordinated efforts to use the legal process and their influence in Hampton County to intentionally, fraudulently, and illegally manipulate bank accounts and/or obtain and misappropriate funds for their personal benefit, causing damage to multiple parties including Nautilus.

17.   The Irregularities led to Murdaugh and Fleming being suspended from the practice of law and indicted.

18.    The Irregularities were intended to mislead, obscure, and dissemble, and they shone a different light on material facts and circumstances surrounding the Claims, including:

a.    That, immediately following Gloria Satterfield's fall on February 2, 2018, Murdaugh rushed to the scene, arriving before EMS.  On March 29, 2018, Murdaugh stated that Ms. Satterfield briefly regained consciousness during which time she stated that Murdaugh's dogs had caused her to fall. This statement was heard by no one else and is contradicted by Ms. Satterfield's later statement to both the emergency responders and hospital staff that she had no idea what made her fall.

b.    That, on March 29, 2018, Murdaugh claimed Ms. Satterfield was at his property, not to perform work for Murdaugh and his family, but to collect a check for work performed for someone else, thus avoiding a worker's compensation defense.

c.    That Murdaugh stated to multiple third parties in Hampton County that he was liable for Gloria Satterfield's fall and ultimate death, an admission against interest that all but ensured that there could be no challenge to liability, and securing his ability to force Nautilus to contribute settlement funds that Murdaugh and the Co-conspirators intended to and did steal.

d.    That Murdaugh pressured Nautilus to settle the Claims, threatening a suit for bad faith against Nautilus if it refused to pay policy limits.

e.    That Murdaugh was abusive toward the Nautilus adjuster handling the claim and demanded Nautilus pay its full policy limits, threatening that if the case against him were filed and went to trial, he would admit liability and the judgment would be substantial and that he would sue Nautilus for bad faith.

19.    Murdaugh filed a proposed confession of judgment on March 24, 2022 in case number 2019-CP-25-00111 in state court in South Carolina.  **Exh. B**.

## FOR A FIRST CAUSE OF ACTION
### (Fraud – Murdaugh)

20.     The foregoing paragraphs are incorporated as if fully restated herein.

21.     Nautilus believed the Claims were brought at the behest of the Satterfield family. The scope of Murdaugh's depravity is without precedent in Western jurisprudence. He and his Co-conspirators disguised that they were making the Claims for their own benefit.

22.     In the events as aforesaid, Murdaugh knowingly made numerous false statements to Nautilus.  To wit:

    a.  On March 22, 2018, Murdaugh represented to the Nautilus's claims adjuster that he sought coverage under the Policy in order to protect himself from losses to the Satterfield estate in the Action and that he was liable to the Satterfield estate for policy limits.  In fact, it was he himself who sought to and ultimately did obtain payment of the insurance funds in the Action, diverting the funds to himself and his Co-conspirators rather than using them to satisfy the estate's claims.

    b.  On or about March 22, 2018, Murdaugh stated to an independent adjuster—with the intent that Nautilus would rely on his representation—that shortly after the purported fall, he heard Ms. Satterfield say that Murdaugh's dogs had caused her to fall.  Ms. Satterfield made no such statement and later told hospital staff she did not know why she had fallen.

        i.  Murdaugh repeated the statement on March 29, 2018 during an interview with Bryant McGowan, an insurance investigator, again with the intent that Nautilus would rely on the representation.

    c.  On March 29, 2018, Murdaugh stated to Bryant McGowan that, on the day of the purported fall, Ms. Satterfield was at his property not to perform work for Murdaugh and his family, but to collect a check for work performed for someone else.  In fact, she was there to perform work herself and so her exclusive remedy was worker's compensation. Murdaugh intended that Nautilus would rely on this representation.

23.     On or about April 2, 2019, Murdaugh represented to counsel appointed by Nautilus for his defense that Nautilus should disburse funds for the settlement of the action to Westendorf and MFK, and that the funds so disbursed would be distributed to the Satterfield estate.  In fact, he intended for the funds so disbursed to be distributed to himself and his Co-conspirators, and the funds ultimately were so distributed.

Murdaugh made these false statements knowing they were false and intending that Nautilus would rely on them. Specifically, he sought to mislead Nautilus and force it to contribute to a "settlement" that was not real.

24. Nautilus relied on Murdaugh's false statements and pretenses to its detriment and conditionally disbursed funds under the Policy for the "settlement" based upon the fraud and deceit, directly and proximately causing damage to Nautilus.

25. Nautilus is entitled to punitive damages.

26. Nautilus requests the Court adjudicate whether Murdaugh defrauded and deceived Nautilus by his actions. This loss is unique to Nautilus and has not and could not have been brought by any other person or entity.

### FOR A SECOND CAUSE OF ACTION
**(Conspiracy– All Defendants)**

27. The foregoing paragraphs are incorporated as if fully restated herein.

28. Murdaugh and the Co-conspirators agreed to a scheme to deceive Nautilus into paying insurance proceeds purportedly to settle claims arising out of the death of Ms. Satterfield by falsely representing to Nautilus the existence of an arm's-length lawsuit against Murdaugh by the Satterfields, covertly steering the lawsuit for the furtherance of their unlawful agreement, and covertly distributing the insurance proceeds amongst themselves.

29. The Defendants, through a course of conduct beginning at least as early as 2011, participated in a scheme to steal funds of others and disguised their wrongful and illicit financial dealings by engaging in a Ponzi scheme and taking monies from other third-parties, ultimately requiring them to defraud Nautilus in an attempt to pay back others.

30. The conspiracy to defraud Nautilus resulted from, grew out of, and was an extension of conspiracies to manipulate banking regulations and other laws to enrich the conspirators. This conspiracy damaged Nautilus, and but for the conduct of Defendants and their actions to cover up their conduct, Nautilus would not have been damaged.

31. As a direct and proximate result of the conspiracy, of Murdaugh's and the Co-conspirators' acts in furtherance thereof, and of their aiding and abetting of each other's actions, Nautilus contributed to a "settlement," proximately causing damage to Nautilus.

32. Defendants are directly and/or vicariously liable to Nautilus.

33. Nautilus is entitled to punitive damages.

34. This loss is unique to Nautilus and has not and could not have been brought by any other person or entity.

### FOR A THIRD CAUSE OF ACTION
**(Negligence – Palmetto)**

35. The foregoing paragraphs are incorporated as if fully restated herein.

36. Palmetto knew and/or was in a position to discover and alert the authorities and all those involved in the Satterfield matters to Murdaugh's and its officers' pervasive illegal and improper conduct in fiduciary and legal settings.

37. Instead, Palmetto enabled and participated with Murdaugh in this conduct for its own benefit, including in order to retain an important and lucrative customer.

38. Upon information and belief, Palmetto turned a blind eye to evidence of financial fraud and money laundering over more than a decade because of Murdaugh's financial footprint and the clients he brought and promised to bring to the bank.

39. Palmetto's decisions were advocated and approved at the senior levels of Palmetto management, including by the former chief operating officer and chief executive officer, Russell Laffite, whose inappropriate relationship with Murdaugh should have been apparent to other senior officers in the bank.

40. Palmetto repeatedly ignored serious red flags that, taken together, indicated a pattern of illegal conduct and increasing financial distress that should have prompted action by Palmetto. These red flags include:

    a. that Murdaugh repeatedly requested and received loans from conservatorship accounts at Palmetto belonging to his clients and

administered by Laffitte, who Murdaugh had appointed as conservator or personal representative for the clients;

b.  that in or around February 2015, Murdaugh used funds loaned by Palmetto for "farming"—a loan that Palmetto ultimately charged off—for an entirely different purpose: to cover illegal loans he and Laffitte had taken from the conservatorship account of Hannah Plyler;

c.  that there were numerous unexplained payments to Curtis Eddie Smith totaling over $135,000 between May 1, 2017 and May 1, 2019 alone;

d.  that Murdaugh regularly directed settlement funds belonging to his clients be deposited into Palmetto's Loans Not on System account—an account that obscures the source and destination of funds—and converted into multiple checks to pay off existing obligations;

e.  that Murdaugh repeatedly engaged in cash transactions just below the $10,000 threshold that triggers a reporting requirement intended to protect the public and prevent money laundering;

f.  that Murdaugh was overdrawn for 1,206 days (3.3 years) over a period of 11.7 years in his account at Palmetto ending in 6092, more than 25% of the time for over a decade;

41.  Despite these red flags, Palmetto continued to issue loans to and collect interest payments from Murdaugh, ultimately collecting over $4m in interest from Murdaugh.

42.  Palmetto failed to demonstrate even basic due diligence and continued its relationship with Murdaugh for over a decade, despite myriad indications of criminal activity and lack of creditworthiness.

43.  Palmetto owed a duty to Nautilus and to the public to properly supervise its employees and members to ensure they abided by bank policy and the law.

44.  Given its knowledge of Murdaugh's illegal and improper activities, Palmetto's duties included to (i) discover the extent of its involvement in or enabling of those illegal and improper activities, (ii) cease all involvement in or enabling of those illegal and improper activities, and (iii) make Murdaugh's illegal and improper activities known to the authorities and the public to prevent future, foreseeable harm to others.

11

45.    PSB breached these duties, directly and proximately causing harm to Nautilus.

46.    PSB is directly or vicarious liable to Nautilus.

47.    Nautilus is entitled to actual and punitive damages.

## FOR A FOURTH CAUSE OF ACTION
### (South Carolina Unfair Trade Practices Act – All Defendants)

48.    The foregoing paragraphs are incorporated as if fully restated herein.

49.    The conduct of Murdaugh and the Co-conspirators as aforesaid was oft-repeated, immoral, unethical, oppressive, and/or offensive to public policy.

50.    Nautilus suffered actual and ascertainable damages on account of Murdaugh's and the Co-conspirators' unlawful trade practices in the form of its contribution to the Satterfield settlement.

51.    Murdaugh's and the Co-conspirators' unlawful trade practices adversely impact the public interest by bringing systems of justice and public institutions into disrepute and decreasing public confidence therein.

52.    Murdaugh's and the Co-conspirators' unlawful actions were in violation of the South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10 *et seq.*

53.    Defendants are directly and/or vicariously liable to Nautilus.

54.    Nautilus is entitled to treble damages and attorneys' fees.

## FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – Fleming, MKF, Westendorf, and Palmetto)

55.    The foregoing paragraphs are incorporated as if fully restated herein.

56.    On or about April 22, 2019, Fleming & MKF received a check from counsel hired by Nautilus in settlement of the purported Claims against Murdaugh.

57.    The check was made payable to "Chad Westendorf, as personal representative for the Estate of Gloria Satterfield, and Moss Kuhn & Fleming."

58.    A letter accompanied the check, stating that the funds should not be disbursed until an order approving the "settlement" had been signed and filed which was and is customary professional conduct.

59. The requirement that the funds not be disbursed until the order was signed and filed was critical in order to ensure that the settlement was made public and subjected to proper court review.

60. A fiduciary duty was owed by Fleming, MKF, Westendorf, and Palmetto to Nautilus, on account of the deposit of funds paid by Nautilus for the benefit of the Satterfield Estate into MKF's trust account by Fleming, to ensure the funds were distributed to the intended beneficiaries only after an order approving the settlement had been signed and filed.

61. Fleming, MKF, Westendorf, and Palmetto breached this duty by disbursing, or allowing the disbursement of, the funds to Murdaugh through his fictitious entity "Forge" via check delivered to a PO Box in Hampton County, and doing so without an order approving the settlement having been filed.

62. The breach of this duty prevented Nautilus from discovering the fraud perpetrated against it and directly and proximately caused harm to Nautilus.

63. These Defendants are directly and/or vicariously liable to Nautilus.

64. Nautilus is entitled to actual damages and punitive damages.

### FOR A SIXTH CAUSE OF ACTION
**(Breach of Agreement – Fleming, MKF, Westendorf, and Palmetto)**

65. The foregoing paragraphs are incorporated as if fully restated herein.

66. By depositing the "settlement" funds in escrow, these Defendants agreed to the condition accompanying the check for those funds that the funds would not be disbursed until after the order approving the settlement was signed and filed.

67. The funds were disbursed without the condition being satisfied.

68. These Defendants breached the agreement, causing damage to Nautilus.

69. These Defendants are directly and/or vicariously liable to Nautilus.

70. Nautilus is entitled to relief.

### FOR A SEVENTH CAUSE OF ACTION
**(Aiding and Abetting Breach of Fiduciary Duty – Murdaugh, Westendorf, and Palmetto)**

71. The foregoing paragraphs are incorporated as if fully restated herein.

72. As Co-conspirators participating in a scheme to fraudulently obtain insurance proceeds for their personal benefit, Murdaugh, Westendorf, and Palmetto

participated in the breach of fiduciary duty by Fleming and MKF, including in the following particulars:

    a. As to Westendorf and Palmetto, knowingly or through willful ignorance failing to take any step to ensure or verify that the funds were disbursed to the Satterfield heirs or that the terms of the disbursement had been complied with;

    b. As to Murdaugh, in directing the funds be sent to him via his "Forge" account.

73. These Defendants are directly and/or vicariously liable to Nautilus.

74. Nautilus was harmed and is entitled to damages.

### FOR AN EIGHTH CAUSE OF ACTION
**(Aiding and Abetting Fraud – Fleming, MKF, Westendorf, and Palmetto)**

75. The foregoing paragraphs are incorporated as if fully restated herein.

76. Each of these Defendants, whether knowingly or due to willful ignorance, took affirmative steps to aid and abet Murdaugh's scheme to obtain insurance monies under false and fraudulent pretense and concealed a pattern of transfers within and among various accounts that allowed these Defendants to benefit from the wrongful conduct.

77. Without the assistance of these Defendants, Murdaugh would not have been able to effectuate his scheme to defraud Nautilus into contributing insurance monies he intended to steal, and Nautilus would not have been harmed.

78. Nautilus was damaged by the actions of these Defendants.

79. These Defendants are directly and/or vicariously liable to Nautilus.

80. Nautilus is entitled to damages.

### FOR A NINTH CAUSE OF ACTION
**(Money Had and Received/Unjust Enrichment – Murdaugh, Fleming, MKF, Westendorf, Palmetto)**

81. The foregoing paragraphs are incorporated as if fully restated herein.

82. Nautilus sent to Fleming and MKF $3.8m it believed was to be sent to the Satterfield heirs.

83. Some portion of the funds paid by Nautilus remain in MKF's trust account under Fleming's control.

84.    The settlement agreement pursuant to which the funds were paid by Nautilus is unenforceable under the South Carolina Rules of Civil Procedure, the South Carolina Code of Laws, and South Carolina case law and is void because, *inter alia*:

   a.    The settlement agreement was not (i) filed on the record, (ii) placed on the record in open court, or (iii) signed by both counsel and the parties as required by Rule 43(k);

   b.    Wrongful death and survivor settlements must be approved by court order in order to be effective, and court orders are only valid once filed;  no order approving the sham settlement was ever filed, and because the case was dismissed in 2020, none ever can be.

85.    Given the scheme to fraudulently obtain and convert insurance monies from Nautilus, equity and good conscience requires that the funds paid by Nautilus be paid back to Nautilus.

86.    These Defendants are directly and/or vicariously liable to Nautilus for the return of these funds.

## **FOR A TENTH CAUSE OF ACTION**
### **(Conversion – All Defendants)**

87.    The foregoing paragraphs are incorporated as if fully restated herein.

88.    Nautilus delivered a check for $3.8m to Fleming, made payable to "Chad Westendorf as personal representative of the Estate of Gloria Satterfield and Moss Kuhn & Fleming As Attorney."

89.    The check was delivered with instructions that the funds should be held in escrow until an order approving the settlement was signed and filed.

90.    The check was endorsed by Westendorf, Vice President of Palmetto, and the funds were deposited into MKF's trust account.

91.    An order approving the "settlement" was signed but never filed.

92.    Fleming and/or MKF disbursed the funds to "Forge" without an order approving the settlement being filed.

93. As the case in which the order would have been filed has been dismissed with prejudice, such order can never be filed.

94. Murdaugh deposited the Nautilus funds in his "Forge" account.

95. Because the funds were disbursed contrary to Nautilus' express instructions and were then misappropriated by Murdaugh (with the knowledge and assistance of Fleming and MKF and enabled by Westendorf, and to the benefit of all Defendants), these Defendants are directly and/or vicariously liable to Nautilus for conversion and must return the funds to Nautilus.

96. Nautilus is entitled to actual and punitive damages.

## FOR AN ELEVENTH CAUSE OF ACTION
### (Breach of Contract - Murdaugh)

97. The foregoing paragraphs are incorporated as if fully restated herein.

98. Murdaugh made material misrepresentations of fact to Nautilus and failed to honor his obligations under the Policy, in at least the following ways:

   a. Misrepresenting that Gloria Satterfield was at his property on February 2, 2018 to collect a check for work performed at a different property for a different client, thus removing the Claims from the workers' compensation framework;

   b. Misrepresenting that Gloria Satterfield claimed it was Mr. Murdaugh's dogs that caused her to fall;

   c. "Admitting" liability to third parties in Hampton County, effectively removing the possibility that there could be a finding of no liability if the matter went to trial and increasing the pressure on his insurer to settle the Claims;

99. These material misrepresentations and "admissions" against interest were intentional, were intended to force Nautilus into contributing to a settlement, and were in violation of the contract of insurance.

100. These material misrepresentations and "admissions" against interest caused Nautilus to contribute funds it otherwise would have had no obligation to contribute.

101. Nautilus was damaged and is entitled to recover the funds it paid.

### FOR A TWELFTH CAUSE OF ACTION
**(Violation of the Racketeer Influenced and Corrupt Organizations Act  (18 U.S.C. §§ 1962(a)–(d) – All Defendants)**

102. The foregoing paragraphs are incorporated as if fully restated herein.

103. Plaintiffs allege that Defendants have each and as a group violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO").

104. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

105. At all relevant times, Fleming was an employee, agent, officer, and/or owner of MKF.

106. Over a period of years, Defendants, either directly or through their employees, agents, officers, employees, or owners, knowingly and intentionally engaged in an association in fact or an enterprise within the meaning of 18 U.S.C. §§ 1961(4) & 1962(a), (b), and (c), using their influence to abuse and manipulate, as well as conspiring to abuse and manipulate, the legal process in Hampton County to achieve fraudulent and illegal ends, including the establishment of an environment in which to extort defendants for personal benefit, transmuting a system designed to *right* legal wrongs into a legal wrong in and of itself.

107. Defendants have conducted and/or participated in the conduct of affairs by an enterprise engaged in a pattern of "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) in which false information and representations in furtherance of the fraudulent scheme described in paragraph 76 above were transmitted in interstate commerce via the United States mail, telecommunications, and/or internet in violation of 18 U.S.C. §§ 1341 and/or 1343, and bank funds were

stolen, embezzled, or misapplied by bank officers or employees in violation of 18 U.S.C. § 1957[1] including:

a. Telephone calls by Murdaugh and Fleming to recruit Westendorf to serve as a puppet Personal Representative of the Satterfield estate;

b. Use of the United States mail on multiple occasions by Fleming and MKF to divert funds belonging to Murdaugh's clients to Alex Murdaugh, including via his account entitled "Forge";

c. Telephone calls and/or emails between Murdaugh and Laffitte, then-COO of Palmetto and branch manager of Palmetto's Hampton branch, regarding service as a conservator or Personal Representative for clients of Murdaugh;

d. Telephone calls and/or emails between Murdaugh and Laffitte regarding the loaning of the funds of Murdaugh's personal injury clients to themselves (in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 656), including in order to cover hundreds of thousands of dollars in overdrafts and fees on Murdaugh's personal account;

e. Telephone calls and/or emails between Murdaugh and Laffitte regarding Murdaugh's repayment of those personal loans using funds stolen from other of his clients (in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 656);

f. Telephone calls and/or emails between Murdaugh and Nautilus, whether directly or through a third party, relaying false information in violation of 18 U.S.C. § 1341 and/or § 1341, intended to bring Murdaugh's false and fraudulent claim within coverage in an attempt to mislead Nautilus into contributing to the "settlement" of a claim he fabricated against himself, money that he intended to steal to cover his financial troubles;

g. Issuance of loans from funds held in conservator accounts at Palmetto by Laffitte (a Palmetto loan officer in addition to his duties as COO and branch

---

[1] Pertaining to transactions derived from "specified unlawful activity" as defined in 18 U.S.C. § 1956 (c)(7)(D), including concealment of assets (18 U.S.C. § 152) and theft, embezzlement, or misapplication by bank officer or employee (18 U.S.C. § 656).

manager of the Hampton branch) to Murdaugh and Laffitte that were unsecured and at interest rates well below the market rate and less than a quarter of the rate Palmetto charged the beneficial owners of these funds for "litigation loans", for example:

    i. a $90,000 unsecured loan to Murdaugh from the conservatorship account of Hannah Plyler (at Palmetto) at a rate of 5% in September 2011;

    ii. a $50,000 unsecured loan to Murdaugh from the conservatorship account of Hannah Plyler (at Palmetto) at a rate of 4.5% interest in December 2011;

    iii. a $100,000 unsecured loan to Murdaugh from the conservatorship account of Hannah Plyler (at Palmetto) at a rate of 3.5% interest in September 2012;

    iv. a $70,000 unsecured loan to Murdaugh from the conservatorship account of Hannah Plyler (at Palmetto) in October 2013 to cover a $64,643.95 overdraft in Murdaugh's PSB accounts for the benefit of Palmetto;

h.  Use of funds from one conservatorship account at Palmetto to pay off illegal loans to Murdaugh taken from another conservatorship account at Palmetto in order to keep the scheme above, for example:

    i. transferring $151,726.05 from the conservatorship account for Arthur Badger to the conservatorship account for Hannah Plyler on February 8, 2013 to pay off illegal loans made to Murdaugh in December 2011 and September 2012.

108.    Murdaugh, Fleming, and Laffitte face and/or have pled guilty to or been found guilty of numerous indictments for mail and wire fraud or conspiracy to commit the same relating to the scheme described herein.

109.    Palmetto benefitted from the scheme described above in the form of the establishment of depositor accounts at Palmetto, the issuance of high-rate litigation loans, and the maintenance and strengthening of its relationship with Murdaugh, from whom Palmetto made over $4m in loan interest.

110.     Defendants MKF and Palmetto participated in multiple racketeering acts in conjunction with Murdaugh, Fleming, and Laffitte through their employees/shareholders/officers, and knew through their employees/shareholders/officers the general status of the conspiracy and that the association in fact or enterprise extended beyond their individual roles in it.

111.     In the course of this association of fact or enterprise, Defendants obtained and misappropriated funds belonging to others to enrich themselves and cover debts, effecting a Ponzi scheme by which funds stolen from one client in conservatorship were used to pay back portions of funds stolen from another.  As the Ponzi scheme neared collapse, additional sources of funds were required to cover stolen funds that had become due, and Nautilus became a victim of this enterprise.

112.     Nautilus was damaged by the above.

113.     Defendants' conduct constitutes a violation or violations of 18 U.S.C. §§ 1962(a)-(c).

114.     Defendants conspired to violate 18 U.S.C. §§ 1962(a), (b), and/or (c), in violation of 18 U.S.C. § 1962(d).

115.     Defendants are directly and/or vicariously liable to Nautilus.

116.     Nautilus is entitled to treble damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### FOR AN THIRTEENTH CAUSE OF ACTION
**(Negligence – MKF)**

117. The foregoing paragraphs are incorporated as if fully restated herein.

118. The relationship between MFK and Fleming on one hand and Murdaugh on the other went beyond merely a professional relationship between lawyers of the same bar association, as Murdaugh previously worked for MFK and Fleming and Murdaugh themselves were close and personal friends, a fact which was well known to MFK and its partners and/or members.

119. Upon information and belief, prior to the Satterfield matter, Fleming and MKF provided legal representation for others at the request of Murdaugh which resulted in

the misappropriation of funds at the hands of Fleming, Murdaugh, and others, and including through the use of MKF's trust account.

120. Despite its knowledge of the relationship and the prior malfeasance with Murdaugh, Fleming remained a partner, member, and/or similar designation of the professional association MFK at all relevant times hereto and had actual and apparent authority to act for MFK in connection with purportedly advancing claims against Murdaugh in the Satterfield matter.

121. At all relevant times, Fleming also had actual and apparent authority to endorse and sign the Nautilus check on behalf of MFK, to act for MFK in depositing funds into MFK's trust account, to withdraw, transfer, disburse, or otherwise hold in trust for MFK the funds in its trust account, as may be required as a condition to the receipt of funds or otherwise.

122. At all relevant times, MKF knew or should have known, was in a position to discover, and was involved in and/or enabled Murdaugh's and the other Defendants' illegal and improper conduct, including the conduct alleged herein and culminating in the defrauding of Nautilus.

123. The monies paid by Lloyds and conditionally by Nautilus under the pretense of a "settlement" of the "claims" being advanced through Fleming and MKF on behalf of the Estate of Gloria Satterfield were received and deposited in MKF's trust account, and MKF was a payee on the Nautilus check.

124. When MFK and its partner/member Fleming received the Nautilus check, it was accompanied by a letter conditioning its receipt on the funds being held in trust until an order approving the purported settlement was signed and filed by the Probate Court.

125. By accepting and depositing the Nautilus check on behalf on MFK, Fleming and MFK assumed a duty as an escrow agent that is independent of an attorney's status as a lawyer and distinct from duties that arise out of an attorney/client relationship.

126. No order was ever signed and filed, and yet with the actual and apparent authority bestowed upon him by MFK, Fleming wrongfully disbursed the monies from MFK's

trust account belonging to Nautilus, and MFK is liable for Fleming's misappropriation and in addition to its own negligence in supervising him and its trust account.

127. MKF receives monthly bank statements for its trust account that include images of each check that has been written from the trust account and deposited by another party.

128. The monies paid by Nautilus in the Satterfield matter were sent to "Forge" and the check was endorsed by "Alex Murdaugh d/b/a Forge."

129. This check image appeared in MKF's bank statement for May 2019.

130. MKF failed to notify *anyone* about unauthorized, unlawful, and wrongful disbursement of the monies paid by Nautilus,.

131. MKF owed a duty to Nautilus, as the originator of the funds it held in escrow, to disclose the theft, and MKF breached that duty.

132. Nautilus was directly and proximately damaged by the breach.

133. Nautilus is entitled to actual and punitive damages.

## FOR A FOURTEENTH CAUSE OF ACTION
### (Declaratory Judgment)

134. The foregoing paragraphs are incorporated as if fully restated herein.

135. Nautilus requests this Court declare the rights and obligations of Nautilus, Murdaugh, and the Co-conspirators regarding the Irregularities and cover up, including that Murdaugh and the Co-conspirators, through fraudulent and misleading statements and concealment, and actions upon which Nautilus reasonably relied, caused Nautilus to contribute funds under the Policy to a sham settlement intended to enrich Murdaugh and his co-conspirators, and Nautilus' entitlement to recover those funds.

**WHEREFORE**, Nautilus requests this Court declare the rights and obligations of the parties arising out of the Irregularities regarding the coverage and the claim. Nautilus further requests

an award of actual damages, treble damages, punitive damages, attorneys' fees, prejudgment interest, and any additional relief that is just and proper based upon the facts as they shall be established during these proceedings.

**Respectfully submitted:**

This 15th day of August, 2023          */s/ Jaan Rannik*
Charleston, South Carolina            EPTING & RANNIK, LLC
                                      Jaan G. Rannik (Fed I.D. No. 12621)
                                      Clinton T. Magill (Fed. I.D. No. 12459)
                                      46A State Street
                                      Charleston, SC 29401
                                      P: (843) 377-1871
                                      F: (843) 377-1310
                                      jgr@epting-law.com
                                      ctm@epting-law.com

                                      COUNSEL FOR NAUTILUS INSURANCE COMPANY