```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
                    CHARLESTON DIVISION


NAUTILUS INSURANCE COMPANY,    )
          Plaintiff,           )      August 15, 2023
                               )
     -versus-                  )      2:22-1307
                               )
                               )      Charleston, SC
RICHARD ALEXANDER MURDAUGH,    )
SR., CORY FLEMING, MOSS &      )
KUHN, PA, CHAD WESTENDORF,     )
PALMETTO STATE BANK,           )
          Respondents.         )


              TRANSCRIPT OF STATUS CONFERENCE

          BEFORE THE HONORABLE RICHARD M. GERGEL
            UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Plaintiff:  JAAN G. RANNIK, ESQ.
                    CLINTON T. MAGILL, ESQ.
                    Epting and Rannik LLC
                    46-A State Street
                    Charleston, SC 29401

For Respondent Murdaugh:
                    PHILLIP D. BARBER, ESQ.
                    Richard A. Harpootlian PA
                    1410 Laurel Street
                    Columbia, SC 29201

For Respondent Fleming:
                    THOMAS A. PENDARVIS, ESQ.
                    Pendarvis Law Office
                    500 Carteret Street, Suite A
                    Beaufort, SC 29902

For Respondent Moss & Kuhn PA:
                    MARYROSE P. WILLIAMSON, ESQ.
                    Hood Law Firm
                    172 Meeting Street
                    Charleston, SC 29401
```

Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

For Respondent Westendorf:
                        CHRISTY F. ALLEN, ESQ.
                        Wills Massalon and Allen
                        PO Box 859
                        Charleston, SC 29402

For Respondent Palmetto State Bank:
                        G. TRENHOLM WALKER, ESQ.
                        THOMAS P. GRESSETTE, JR., ESQ.
                        Walker Gressette and Linton LLC
                        66 Hasell Street
                        Charleston, SC 29401

For Intervenor Satterfield and Harriott:
                        RONALD L. RICHTER, JR., ESQ.
                        Bland Richter
                        18 Broad Street, Mezzanine
                        Charleston, SC 29401

Court Reporter:     KAREN E. MARTIN, RMR, CRR
                        PO Box 835
                        Charleston, SC 29402

     Proceedings reported by stenographic court reporter.
     Transcript produced with computer-aided transcription
                        software.

3

```
1                    Tuesday, August 15, 2023
2          (WHEREUPON, court was called to order at 10:03 AM.)
3               THE COURT:  Good morning.  Please be seated.
4               Okay.  We're in the matter of Nautilus Insurance
5      Company vs. Murdaugh, and others, 2:22-1307.  Let me kind
6      of run a lineup here and see who is here with us.
7               Counsel for Plaintiff Nautilus?
8               MR. RANNIK:  Good morning, Your Honor.  Jaan
9      Rannik for Nautilus.  And with me here is Clinton Magill.
10              THE COURT:  Very good.
11              Counsel for Murdaugh?
12              MR. BARBER:  Your Honor, Phillip Barber here for
13     Mr. Murdaugh.
14              THE COURT:  Very good.
15              Counsel for Defendant Fleming?
16              MR. PENDARVIS:  Thomas Pendarvis and Chris
17     Lempesis here, Your Honor.
18              THE COURT:  Thank you.
19              Counsel for Defendant Moss & Kuhn?
20              MS. WILLIAMSON:  Maryrose Williamson, Your
21     Honor, for Moss & Kuhn.
22              THE COURT:  Very good.
23              Counsel for Defendant Westendorf?
24              MS. ALLEN:  Christy Allen for Defendant
25     Westendorf.
```

1          THE COURT:  Very good.

2          Counsel for Palmetto State Bank?

3          MR. WALKER:  Good morning, Your Honor.  Trenholm

4     Walker.  And with me is my partner, Tom Gressette.

5          MR. GRESSETTE:  Morning, Your Honor.

6          THE COURT:  Good to have you here.

7          And for Intervenor Satterfield?

8          MR. RICHTER:  Ronnie Richter here for the

9     Satterfields, Your Honor.

10          THE COURT:  Thank you very much.

11          Let me just start at the outset and say that,

12     you know, I have on my docket about 500 civil and criminal

13     cases.  And then I have foolishly undertaken an MDL with

14     20,000 plaintiff claims.  So I'm busy.

15          And, fortunately, most cases sort of

16     self-manage.  This one is not one of those.  Okay?  And we

17     have a little bit of a run-away train here.  Because if I

18     count it right, we have nine pending motions.  In my

19     category, that's a blizzard of filings.  And looking at it

20     has indicated to me that this is one of those cases that

21     needs close case management on my part.  So you folks are

22     going to be seeing more of me.  And we're going to

23     organize this case in a way that's logical and coherent

24     and not chaotic.

25          So with that, let me first say that among the

1    last of those nine filings is a motion to amend the

2    complaint.  And of course, under Rule 15, district courts

3    are admonished to liberally construe those provisions.

4    Under the scheduling order, I think July 28th was the

5    deadline for filing, and on that day the plaintiff filed a

6    motion to amend.  So it was a timely filing under the

7    scheduling order.

8         At least one defendant has asked me to strike

9    the answer as being either untimely or futile.  In the

10   world of judging, futility -- making a ruling on futility

11   without allowing the motion to amend is a fairly serious

12   act.  And it's normally reserved to situations like

13   there's plainly a statute of limitations problem or other

14   issue which is sort of simple, direct, obvious, and is

15   futile.  I wouldn't say the complaint falls in that

16   category.

17        So to simplify things, let me just say I'm

18   granting the motion to amend.  Okay?  Now, there are a lot

19   of implications to that.

20        Number one, all these blizzard of filings was

21   primarily focused upon the original complaint.  Many of

22   those, frankly, in my view had merit because the discovery

23   and other efforts were well beyond what appeared to be the

24   face of the pleadings.  And I'll in an order I will detail

25   those.  But those are all moot now because we have an

1  amended complaint.

2          And something tells me that there'll be motions

3  to dismiss in response to the amended complaint.  Might be

4  a lucky guess on my part.  And I'm going to guess that

5  some of those claims are going to go away on a motion to

6  dismiss.  But we'll deal with that.

7          We'll then have to determine those that survive

8  a plan for discovery.  And we're not having unregulated

9  discovery in this case.  We're not going to bury

10 defendants in an avalanche of documents in which there's

11 not plainly a basis in the case to do that.

12         So here's how we're going to do it.  There's a

13 threshold question.  And this primarily focuses on the

14 potential liability of Palmetto State Bank; that is, did

15 the bank do anything in the Satterfield matter to which it

16 is legally culpable?  And if it didn't, all that other

17 stuff about connected to Laffitte and Murdaugh becomes an

18 academic question.  So my first effort is going to be

19 doing discovery focused on the issue is there any basis

20 for Palmetto State Bank's liability?  Okay?  Regarding

21 Satterfield.  And we're going to focus on Satterfield.

22 We're not going off --

23         Listen, folks I've had more to do with this case

24 than I ever wanted to do.  Okay?  And apparently, the

25 entire bar of South Carolina is employed in this effort.

1    Congratulations.  I'm going to get the same salary.  You

2    guys at least make a dollar.  I'm glad for everybody.

3         And I know a good bit about the case that I

4    wouldn't normally know.  I tried the Laffitte case for two

5    weeks.  And I've counseled Mr. Fleming, know I'm

6    sentencing him today.  So I've had a considerable amount

7    of information related to this case.

8         But there might be information that we'll

9    discover and will be disclosed in discovery, I don't know.

10   And that might make some of the plaintiff's claims more

11   plausible than they appear to me right now based on what I

12   know.  Hopefully, that's why we do discovery.  We try to

13   figure out what in fact -- you know, what can the

14   plaintiff actually establish?  Pleading -- making

15   pleadings on a complaint is the easy part.  Actually

16   proving it is another challenge.

17        So let's talk a little bit about how we're going

18   to manage this initial stage of discovery on Palmetto

19   State Bank's potential culpability.  There are allegation

20   in the complaint, Mr. Rannik, that, for instance, that

21   Westendorf's service as a personal representative was

22   within Palmetto's control.  Okay.  If true, that would be

23   an important fact.  Okay?  That's Paragraph 13 of the

24   complaint.  There are, obviously, witnesses who could

25   potentially prove or disprove that allegation.  Their

1    depositions need to be taken.  If there are documents

2    associated with that allegation, fine.

3            I'm talking about some of these, you'll have

4    others but these are ones that have gotten my attention.

5    Let me find a couple of these that were...

6            In the conspiracy count, Murdaugh and the

7    co-conspirators agreed to a scheme.  I want to know who

8    were these people?  We need to have them deposed.  That's

9    a piece of information I don't have.  I'd like to know if

10   there's any merit to that.

11           Murdaugh and co-conspirators agreed to a scheme

12   to deceive Nautilus into paying insurance proceeds.  Did

13   Palmetto State Bank or Westendorf even know about

14   Nautilus.  Nautilus was an excess carrier.  Did they even

15   know about them?  Maybe they did.  I don't know.

16           Falsely representing to Nautilus the existence

17   of an arm's length lawsuit.  Who made that representation?

18   Westendorf?  Palmetto State Bank?  Who did that?  Were

19   they co-conspirators?  Did they join, did they have a

20   common scheme?  What was that common scheme or plan?  What

21   was that agreed upon conspiracy?

22           There are allegations that the bank had a

23   fiduciary duty to Nautilus.  Where did that come from?

24   Had a duty to Nautilus, where did that duty derive from?

25           Those are the kind of facts I want sorted out

1  before we go any further about looking beyond the

2  Satterfield scheme.  And if Palmetto State Bank and/or

3  Westendorf didn't do anything wrong regarding having no

4  civil liability, then the fact that there were other

5  frauds committed by other persons who had a tie to

6  Palmetto State Bank then becomes, in my view, a legal

7  irrelevance.

8        So we're going to control, we're going to narrow

9  in and focus the initial round of litigation and discovery

10  on those issues.

11        Mr. Rannik, tell me what kind of deponents you

12  envision to prove this?  And which ones have you deposed

13  and which ones do you need to depose?

14        **MR. RANNIK:**  Thank you, Your Honor.  Certainly,

15  we've already deposed a 30(b)(6) at Palmetto State Bank,

16  which was Mr. Malinowski.  And we've deposed Chad

17  Westendorf.  We've also taken the 30(b)(6) deposition of

18  Moss & Kuhn.  Your Honor, there will be others we would

19  like to depose.  We would like to depose Mr. Murdaugh.  I

20  don't know if we're going to manage that.

21        **THE COURT:**  I'll help you.

22        **MR. RANNIK:**  Thank you, Your Honor.

23        **THE COURT:**  I think he's kind of at the end of

24  his line here on the Fifth Amendment, but we'll see.  And

25  who else?

1          MR. RANNIK:  We'd like to depose Mr. Fleming.

2     He's also currently pleading the Fifth Amendment.

3          THE COURT:  Well, he's going to have until his

4     state charges are addressed, and I think he goes to trial

5     in September.  So do you -- anyone else?

6          MR. RANNIK:  Understanding the Court's

7     admonishment and recognizing the validity of it, we would

8     also like to take Mr. Laffitte's deposition.

9          THE COURT:  I will limit it to the issues

10    related to the Satterfield case.

11         MR. RANNIK:  Of course.

12         THE COURT:  And to the extent you can show, A,

13    there was some civil liability and, B, it has some

14    plausible connection to these others, then I'm going to

15    let you do that.  But that will be Stage No. 2.  You've

16    got to get through the first one.  And then I'm going to

17    let the bank and Westendorf file motion for summary

18    judgment on that issue.  If that ends the case, to the

19    extent they don't survive or, for instance, if there's

20    some kind of a negligence claim that survives, that

21    wouldn't be part of a conspiracy, you see.

22         But I'm trying to get some control.  So what

23    documents, if any, are -- might be relevant to this

24    Satterfield matter?

25         MR. RANNIK:  Certainly, we've been working well

1  with counsel for Palmetto State Bank on certain emails,

2  Mr. Laffitte's and Mr. Westendorf's emails from 2018

3  onward to see if there was any discussion of Satterfield,

4  of Murdaugh, of Nautilus, any of this.

5          THE COURT:  Was there?

6          MR. RANNIK:  I don't know.

7          Tom, have we fully resolved that?

8          MR. GRESSETTE:  Yes, sir.  There is no document

9  email that references it.  We've run multiple electronic

10  searches.  I've reviewed them all.  There are not any.

11          THE COURT:  That doesn't really surprise me.

12  What I've learned, it may not be complete, Mr. Rannik,

13  about Mr. Westendorf's role, which appears in this scheme

14  to have been very different from Laffitte's role.  Did not

15  engage the bank.  Did not involve bank loans.  Did not

16  involve borrowing from accounts in the bank.  None of that

17  is present.  It's very -- what I have been provided up to

18  now and seen up to now is very different.  It doesn't mean

19  your theory isn't right.  It's just what I know right now

20  about this and what I think is available to you, the

21  discovery.

22          There was a public trial.  You got a lot of the

23  documents.  I don't think I remember Satterfield being

24  even mentioned in the trial.  If it was, it was only in

25  passing.  So it seems to be a very distinct different

1    scheme.

2              And let me share with you a little insight I

3    have, Mr. Rannik, about these criminal acts.  In all of

4    them, Mr. Murdaugh appears to have been the train

5    conductor.  And people joined the crew and were complicit

6    in that.  And they probably did things they wouldn't

7    normally have done following the lead of the conductor.

8    And they did things that are criminal and they are

9    suffering the consequence.  So the common theme here is

10   Murdaugh.

11             I think you should depose Mr. Laffitte, if

12   you're able to.  But I think you'll likely find he had

13   nothing to do with the Satterfield case other than to say

14   I'm too busy.  He testified in trial, I believe he said I

15   was too busy.  I didn't have time to do it and I suggested

16   Westendorf.  Okay.  That doesn't sound too much like a

17   criminal act to me or a civil liability act to me.  But

18   there might be more to that.  That's what discovery is all

19   about.  I want to give you a chance to do that.

20             But are there documents, other than your talking

21   about emails that apparently don't exist, doesn't surprise

22   me at all, anything else?

23        **MR. RANNIK:**  Yes, Your Honor.  For example, one

24   of our theories is that the monies that Mr. Murdaugh

25   misappropriated in various instances eventually made their

1    way back to PSB in the form of paying down loans.

2              THE COURT:  Yeah, but let me say that we're not

3    getting into that.  I'm not impressed that that's part --

4    that's taking the loot from a theft elsewhere and paying

5    down loans, that isn't going to get you very far.  You're

6    going to have to connect the bank more than that.  I'm

7    going to tell you right now, I don't think that's a basis

8    for liability.  Someone pays a loan with money, unless

9    they knew it was stolen money from the Satterfield case,

10   that doesn't impress me as having any kind of bridge to

11   it.  So what else?

12             MR. RANNIK:  Okay.

13             THE COURT:  I'm hoping I'm giving you a little

14   guidance here.  I'm trying to rein in what we're looking

15   at here.

16             MR. RANNIK:  Thank you, Your Honor.  There's a

17   conflict of interest policy that we have that discusses

18   the bank's policy on people serving as fiduciaries.  There

19   are certain compliance docs that have been represented to

20   us that exist about what folks can do within that role and

21   employee guidelines that they're given about serving in

22   that role.  We would like to have those documents.

23             THE COURT:  Mr. Walker, have you got any problem

24   giving those documents?

25             MR. WALKER:  None whatsoever.

1          **THE COURT:**  I thought so.

2          Okay.  That's given.  What else?  What's next?

3          **MR. RANNIK:**  Your Honor, off the top of my head

4     as I sit here, those are what come to mind.  I'm sure that

5     there will be --

6          **THE COURT:**  I can't think of many that -- you

7     know, basically you're going to have to prove it through

8     witnesses that there was some conduct.

9          The bank's view, reading in these documents, is

10    that Westendorf was a kind of straw man.  That he

11    basically brought in some check to endorse and he

12    basically had no involvement, didn't know about Nautilus,

13    didn't know about the scheme.

14         Mr. Fleming says he didn't know of the Nautilus

15    scheme.  I don't know about that.  I don't know.  He

16    certainly seems closer to the game than Mr. Westendorf

17    does.

18         But, you know, you're going to have to -- you've

19    got some allegations in the complaint that if they're

20    true, the bank has got a problem.  But you've got to prove

21    them.  And these are facts I've become aware of.  And who

22    do you say were -- you say there were these conversations,

23    agreed to this scheme?  Did they meet?  Did they converse

24    with each other?  How did they come up with this scheme?

25         **MR. RANNIK:**  Well, Judge --

1          THE COURT:  I'm talking about Paragraph 28 of

2    the conspiracy count.

3          MR. RANNIK:  Sure, and Judge, to be discovered.

4          THE COURT:  Well, no, no.  What you do in a

5    complaint, if you don't know, you say upon information and

6    belief.  That's not what it says.  It says they agreed to

7    a scheme.  You signed it, Mr. Rannik.  I expect you to

8    have some evidence, not to say I think that might have

9    happened.  But you didn't say upon information and belief.

10         MR. RANNIK:  And Judge, our basis here and our

11   theory is that this was a pretty sophisticated scheme

12   against Nautilus in our view.  And it could not have been

13   done by Mr. Murdaugh alone.  It required the involvement

14   of others.  And that the others would all be unwilling

15   participants seems, to us, extremely unlikely.

16         THE COURT:  That's a theory.  What Mr. Fleming

17   asserts, and I've got this in the criminal case, is that

18   he did very little communicating with Nautilus.  That

19   Mr. Murdaugh was the guy browbeating your adjustor and

20   intimidating the adjustor.  There's some allegation of

21   blocking an entrance, the woman couldn't even leave the

22   room.

23         Mr. Murdaugh was not an employee of the bank.

24   Okay?  And whether any -- whether the bank or

25   Mr. Westendorf had a role in that, you know, I did the

1    kind of work where I've dealt with carriers, and umbrella

2    carriers, and excess carriers.  They are often very remote

3    to people who aren't inside the game.  I mean, people

4    don't even know they exist.  They're not the defendant.

5    And they're not even the primary carrier, they're the

6    excess carrier.

7            So I think you're going to need to demonstrate

8    that, A, people even knew they existed, and B, they

9    engaged in this scheme.  So the question is do you have at

10   this point any evidence that anyone agreed with

11   Mr. Murdaugh to engage in a scheme to falsely represent to

12   Nautilus it was an arm's length lawsuit?  Who else

13   communicated with Nautilus?

14           **MR. RANNIK:**  So, Your Honor, at the meet -- this

15   would have been at the mediation.  Also there was

16   Mr. Fleming and Mr. Murdaugh were actually in the same

17   room with Mr. Westendorf on the phone.

18           **THE COURT:**  Right.  I understand that Murdaugh

19   was sending hand signals to Mr. Fleming about what to do,

20   which is a little odd when he's the defendant.  But

21   there's nothing about this case that surprises me anymore,

22   so I can't really say.

23           **MR. RANNIK:**  And then --

24           **THE COURT:**  But other -- I'm right now trying to

25   focus because this is where the blizzard of motions has

1  come between you and Palmetto State Bank is just what

2  evidence is there that there's culpability there?  And

3  even if there's potential culpability of Westendorf, does

4  it extend to the bank; that is, was it a moonlighting job?

5  Or, as you allege, was he out operating under the control

6  of his senior people in the bank?  Who were those people,

7  Mr. Rannik?

8          **MR. RANNIK:**  They were Mr. Laffitte and Charlie

9  Laffitte, who are the two that --

10          **THE COURT:**  Do you want to depose Charlie

11  Laffitte?

12          **MR. RANNIK:**  Actually, yes, please, Your Honor,

13  that would be --

14          **THE COURT:**  And I can't tell you people aren't

15  going to assert the Fifth.  But, you know, beyond saying

16  it's okay to moonlight, do this, were they -- did they

17  even know Nautilus existed?

18          You know, Mr. Rannik, I've never heard of a slip

19  and fall being paid $3.8 million.  Okay?  I've never heard

20  of that.  And, you know, I'm sure the company has to look

21  a little internally regarding its own decision and its own

22  advice it got here.  And trying to blame people who aren't

23  really responsible is not going to get you very far.  Now,

24  whether they are and if they were part of the conspiracy,

25  have at them, Mr. Rannik, have at them.  The bank says it

1    was unaware of Nautilus, didn't have any scheme or plan.

2    If that's true, they walk.  Don't you agree on that?

3            MR. RANNIK:  Your Honor, I would think to some

4    extent that they know there is an insurance company out

5    here who is available -- able to pay a judgment and they

6    are going to be involved.  If they don't know the exact

7    identity of that insurance company, I don't know that that

8    would free them of liability.

9            THE COURT:  Do they know that there's a scheme

10   to basically commit a fraud on the insurance company?

11   That's what happened here, right?  There was a fraud on

12   the company.  Murdaugh now acknowledges that it was a

13   fraud.  Okay.  Fine.  But you've got to link it to the

14   bank that the bank had some knowledge that -- Cory Fleming

15   denies that he was aware that the dog didn't trip

16   Ms. Satterfield.  I mean, he says he didn't know it

17   himself.  This was all Murdaugh.  Maybe that's not true.

18   Maybe they all were in it.  But I'm going to press you to

19   the details here to prove, to connect the dots, did

20   Mr. Westendorf -- you've deposed Mr. Westendorf.  What

21   does he say?

22           MR. RANNIK:  He says he did exactly what

23   Mr. Fleming and Mr. Murdaugh told him to do.

24           THE COURT:  And did he know about Nautilus?

25           MR. RANNIK:  He knew about them to the extent

1    that, again, he was part of the mediation and they were

2    the only party left standing, so to speak.  He also did

3    sign the documents.  So when the Nautilus check came

4    through --

5              THE COURT:  Well, of course, that's his duty.

6    He's a court officer.  He's the PR.  My question is was he

7    aware of the scheme to commit this fraud?

8              MR. RANNIK:  And, Your Honor, he says, no, he

9    was not.

10             THE COURT:  Do you have evidence that that

11   wasn't true?

12             MR. RANNIK:  As to Mr. Westendorf, no, I don't

13   think that we do.

14             THE COURT:  I'm just, you know -- listen,

15   this -- you know, you've got to vigorously represent your

16   client.  Your client was a victim of a fraud.  And you're

17   looking for people capable of compensating your client for

18   its injuries.  I fully respect that.

19             But it's not an open anybody you can find.  And

20   we're not going to bury defendants in discovery on -- and

21   I thought some of the early discovery requests of the bank

22   were way over the top.  I would have sustained their

23   motions.  But right now, I'm trying to bring you in

24   because I want to give you a chance to prove the gravamen

25   of your claims.  Because if they are, have at them.  If

1    not, tell them good-bye.  Okay?  I mean, basically -- and

2    I want to do that early so we don't spend a lot of money

3    and time on issues that aren't particularly important.

4         So we're going to be meeting.  I want y'all to

5    confer to see if you can agree on an initial stage of

6    discovery.  I want you to share it with me.  If you can't,

7    y'all both share with me what you want to do and I will

8    enter an order, basically, what I think is the right thing

9    to do.  But I'm trying to stage this discovery.  Okay?

10        Among the blizzard of filings, someone raised

11   the waiver of attorney/client privilege and then there was

12   a response.  But it was done as sort of an after the fact,

13   kind of -- it wasn't done in a coherent way.  What was the

14   privilege, scope of any waiver, et cetera.

15        Mr. Rannik, if you believe that Palmetto State

16   Bank has waived its attorney/client privilege, you need to

17   file a specific motion and identify the basis of that.  I

18   will have the bank respond.  And I will -- but this kind

19   of doing it in a reply brief or response is just not the

20   way we're going to have a coherent presentation of this

21   issue.  What I've read so far, I'm pretty skeptical that

22   that's a basis for an attorney/client waiver.  But I want

23   to give you a full chance to brief it.  And perhaps you

24   can, with that opportunity in a coherent way, you can

25   present it more carefully.

1          The party claiming the privilege has a duty to

2    prove it, right?  It's a privilege that hasn't been

3    waived.  But you've got a burden to attack it.  You've got

4    to go in and say -- and what you provided -- of course, I

5    was present during the trial.  I didn't think any of that

6    waived the attorney/client privilege.  And to the extent

7    that, you know, that there is any waiver, you've got to go

8    to the question of what the scope of that waiver was,

9    because you can have a limited waiver, right?

10         So if you want to do it, you need to start over

11   and do it in a straight up brief with attack it detailing

12   the issue.  Let the bank respond.  And then we'll sort it

13   out.  Okay?

14         **MR. RANNIK:**  Thank you, Your Honor.  Thank you.

15         **THE COURT:**  So right now, I'm mooting all those

16   issues so we're not going to address it.  There's some

17   briefing on it, but it's not comprehensive so I want to do

18   it that way.

19         Mr. Walker, anything about the plan I have suit

20   you?  Any concerns you have?

21         **MR. WALKER:**  I welcome it.  And as I understand

22   it, we're going to take these discovery motions, put them

23   on the shelf.  We're going to see if Nautilus can connect

24   the dots.  And if they do, you may give them the green

25   light to go.

1    THE COURT:  You've got it.  Stage One has got to

2    be threshold liability.  And if there's not threshold

3    liability, Laffitte and Murdaugh are irrelevant players.

4    MR. WALKER:  Motion to amend granted.  We will

5    withdraw our motion for summary judgment or you can moot

6    it.

7    THE COURT:  I am going to moot it before you get

8    back to your office.

9    MR. WALKER:  And just so we can be on the same

10   page and facilitate this, rather than file motions to

11   dismiss, I anticipate we will agree to this discovery so

12   that Nautilus can take the depositions they want and then

13   we'll move for summary judgment.

14   THE COURT:  You can do it either way.  Some

15   issues could potentially go away by way of a motion to

16   dismiss.  But some lawyers wait until summary judgment to

17   have a full record so they don't on a technicality on

18   motions to dismiss.  So I will tell you, not -- the whole

19   case is not going to go away on a motion to dismiss.

20   MR. WALKER:  I didn't think so.

21   THE COURT:  It may be more suitable to dispose

22   of everything.  You're not waiving anything by not filing

23   a motion to dismiss.  And I would put you on a pretty

24   tight schedule for doing it.  The problem is some of these

25   witnesses may not be immediately available to you.

1          **MR. WALKER:**  Understand.

2          **THE COURT:**  We've got to sort it out.

3          Mr. Rannik, I want to help you with this.  I'm

4     glad to issue orders --

5          **MR. RANNIK:**  Thank you.

6          **THE COURT:**  -- directing these prisoners, for

7     instance, to be made available.  I can't control if they

8     assert the Fifth or not.  But some of them, I think it

9     might be a fair question about whether they've already

10     been convicted of this, whether there are any Fifth

11     Amendment immunity left.  And I'm prepared to deal with

12     that.

13          And to the extent you encounter objections, you

14     need to file motions to enforce your subpoenas.  And I

15     will determine whether there's some merit to whatever

16     defenses they have.  But again, even if I require them to

17     appear, every citizen has a right to assert the Fifth

18     Amendment, as you will likely encounter in some of these.

19          But I think you need to pursue the case.  You

20     know, both Mr. Fleming and Mr. Murdaugh still face state

21     charges related to this.  So that -- I think it would be

22     unlikely their lawyers would allow them to testify.  But

23     once, for instance with Fleming, if his -- I'm told he's

24     planning to plead in state court and that would be likely

25     in September.  I'm not sure there would be any Fifth

24

1    Amendment immunity left after that.  So we'll give you the

2    time to do it.  And whatever schedule we have, if you

3    encounter problems, I want to give you a chance to do your

4    best.  Some people may just -- who aren't charged can

5    assert the Fifth and you can't make them testify.  For

6    those who are parties to this case, in a civil case that's

7    an inference against the witness.

8           Let me turn, if I -- so, basically, what I'm

9    doing is I'm granting the motion to amend and mooting all

10   those motions.  They are denied without prejudice as moot

11   all to be raised again, if necessary.

12          There is this motion by Mr. Murdaugh that the

13   Satterfields are a necessary party.  Mr. Barber, is that

14   your idea?

15          **MR. BARBER:**  Well, Your Honor, that is our

16   position is that there's a judgment against him for

17   stealing the exact same money that Nautilus says, no, was

18   in fact stolen from us and not them.

19          **THE COURT:**  Yeah.  The problem here is a

20   plaintiff is the master of his complaint.  Okay?  He gets

21   to choose who he sues.  And I don't think it's a necessary

22   party and I'm going to deny your motion.  And I don't --

23   and I think Mr. Murdaugh's role in this is a kind of

24   dubious voice for this issue anyway.  But, you know, if

25   Nautilus wanted to pursue that, that's something Nautilus

1    could potentially do.  But it's not up to Mr. Murdaugh.

2    They are not a necessary party.  This case can be

3    addressed without them.  And I will enter an order today

4    denying that motion.

5         Okay.  Are there other matters I need to address

6    now?  Mr. Rannik?

7         **MR. RANNIK:**  Judge, I don't think any additional

8    matters.  I would like to, if I may, just clarify one

9    thing that I said earlier.  Of course, so much of the

10   difficulty in Nautilus' proving of its case is that

11   witnesses won't testify, witnesses won't admit they, you

12   know --

13        **THE COURT:**  Let me give you one that really

14   stuns you.  Witnesses sometimes don't tell the truth.

15   Amazing, isn't it?  It happens.  Okay?

16        **MR. RANNIK:**  And the difficulty then is we're

17   forced to prove with circumstantial evidence what it is

18   we're alleging.  So when I said that Mr. Westendorf, we

19   don't have evidence that he was involved in, you know, a

20   conspiracy, we don't have direct evidence.  He hasn't

21   admitted it.  I would contend we have circumstantial

22   evidence that his failures were so gross that it tests

23   credulity as to whether he didn't know that there was

24   something more afoot.

25        **THE COURT:**  I'm glad at summary judgment to

26

1    address that issue.

2         MR. RANNIK:  Exactly.  I just wanted to say that

3    for the record.  Thank you, Your Honor.

4         THE COURT:  And we've got to see what other

5    evidence, sometimes the circumstantial evidence points in

6    a more direct way even in the absence of it.  I do

7    recognize your problem.  But the absence of evidence may

8    be that your theory isn't right.  That's another theory.

9    Okay?  But I want to give you every chance to develop it.

10   And I'll work with you to help you to help facilitate

11   that.  And then we'll have a fulsome record on the

12   potential bank liability.  And either they're in or not.

13   Right?

14        Mr. Walker, anything further?

15        MR. WALKER:  Nothing from the bank, Your Honor.

16   Thank you very much for channeling this case.

17        THE COURT:  Well, I'm going to do my best.

18   We'll see.  I've got to pay more attention to it.

19        Sometimes, you know, some very dutiful judges

20   every morning go into the office and look at filings.  I

21   am not among those.

22        And considering in my MDL I have about a hundred

23   filings a day, it would be impossible to do.  So every

24   once in a while, I have -- I get snake bit when I have

25   seven or eight motions pending.  I usually rule on

```
 1   motions.  And I discover that a number of them still
 2   haven't been fully briefed, they're coming in, the
 3   extensions, it's crazy.
 4          But I'm not going to let that happen again in
 5   this case.  I'm going to stay on top of it.  To the extent
 6   it's necessary, we will get together.  And this is going
 7   to be a significant case-managed litigation.
 8          Okay.  Other counsel?  Y'all are earning money.
 9   Mr. Barber?
10          MR. BARBER:  Thank you.
11          THE COURT:  I'm not sure you're earning your
12   money, but go ahead.
13          MR. BARBER:  I just wanted to alert the Court
14   for case management purposes that in response to the
15   second amend complaint that Mr. Murdaugh is going to
16   assert statute of limitations defense.  And that it may be
17   best if that's addressed in an early stage because it's a
18   straightforward, dispositive issue.
19          THE COURT:  Okay.  I think fair enough.  Are you
20   alleging that they knew about the fraud beyond, what is
21   it, three years?
22          MR. BARBER:  Exactly, Your Honor.  The current
23   complaint says -- uses the phrase irregularities
24   throughout July, that they became aware of them in July of
25   '21.  The discovery indicates that the plaintiff's file,
```

1   they were aware of the irregularities from the beginning.

2   And there does not appear to be any basis to apply the

3   discovery rule.

4          **THE COURT:**  Okay.  We'll -- Mr. Rannik, on

5   notice.  Here it comes.  It won't be the last motion you

6   get.  Very good.

7          Any other counsel have anything they want to

8   bring to my attention?

9      (There was no response.)

10         **THE COURT:**  Crickets.  I'd keep my head down,

11  too, if I were y'all.

12         Okay.  Folks, we will continue to talk.  I look

13  forward to these filings.

14         Mr. Rannik, today will you file your amended

15  complaint?

16         **MR. RANNIK:**  Thank you.

17         **THE COURT:**  And let's get moving.

18         This hearing is adjourned.  Thank you.

19         **MR. RANNIK:**  Thank you, Your Honor.

20         **MR. WALKER:**  Thank you, Your Honor.

21     (WHEREUPON, court was adjourned at 10:39 AM.)

22                            * * *

23  I certify that the foregoing is a correct transcript from

24  the record of proceedings in the above-entitled matter.

25     s/Karen E. Martin                    8/21/2023
    Karen E. Martin, RMR, CRR           Date