**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>                    Plaintiff,<br>    v.<br><br>RICHARD ALEXANDER MURDAUGH, SR., CORY FLEMING, MOSS & KUHN, P.A., CHAD WESTENDORF, and PALMETTO STATE BANK,<br><br>                    Defendants. | Case No.: 2:22-cv-1307-RMG<br><br>**PLAINTIFF NAUTILUS INSURANCE COMPANY'S MOTION FOR CLARIFICATION** |

Nautilus Insurance Company ("Plaintiff") respectfully moves the Court for guidance as to whether certain evidence adduced to date suffices to meet the threshold identified by the Court in the August 15 motions hearing and its August 16, 2023 Order.[1]  (ECF No. 155.)

**I.      Introduction**

The specific purpose of this Motion is to: (1) provide context for Plaintiff's scheduling positions by supplementing its prior reasoning as to Defendants' potential liability in this case—and in particular, that of Defendants PSB and Westendorf; and (2) to seek the Court's guidance as to whether the evidence adduced may already be sufficient to establish the relevance and justification for broader, but targeted, discovery in relation to the claims contained within Plaintiff's recently filed Second Amended Complaint. (ECF 154.)

---

[1]  This Motion may be in contemplated under the Court's August 16 Order, which only references dispositive motions by Defendants following the first phase of discovery.  However, in the interest of judicial economy, Nautilus respectfully submits the evidence in this Motion in case the Court considers it sufficient to permit broader discovery.

1

II.     **Evidence Adduced to Date**

To date, substantial evidence has been adduced in this matter that supports Nautilus' theory of PSB's liability, much of which is summarized below (with citations to prior filings[2] for the sake of brevity).

   A.   **Evidence as to Westendorf's Liability Regarding the Payment by Plaintiff of the Claim Arising out of the Death of Gloria Satterfield.**

In his May 13, 2019 Petition for Approval of Settlement, Mr. Westendorf verified, under oath, that "[a]ll persons required to be notified of these proceedings have been notified." **Exh. 1**. This statement, included in the final, signed verification and numerous drafts shared with counsel for Nautilus, is untrue. As discussed *infra*, Mr. Westendorf admits he never at any time spoke with the beneficiaries of the Estate of Gloria Satterfield, let alone notified them of the terms or even the existence of the settlement. (ECF No. 142-15 at 51:8–52:14.) Instead, he accepted $30,000 in exchange for acting as a sham fiduciary, a crucial element in Mr. Murdaugh's scheme to defraud Nautilus, at best constituting the aiding and abetting of that scheme. (ECF No. 142-30 at 16:1–5.)

Further, he has acknowledged receiving the express conditions delivered with the Nautilus check—that the funds must be held in trust unless and until an order approving the settlement was signed and filed. (ECF No. 142-30 at 14:13–19.) Mr. Westendorf endorsed the check for the Nautilus funds to Moss Kuhn and Fleming, but took no steps to ensure that the Nautilus funds were retained in escrow according to Nautilus' instructions (ECF No. 142-30 at 14:23–15:1), as he acknowledged he was obliged to do:

> **Q.** Okay. You realize you signed documents regarding the disbursement of those checks?
>
> **A.** Yes, sir.

---

[2] Primarily, Nautilus' Opposition to Palmetto State Bank's Motion for Summary Judgment (ECF No. 142).

> **Q.** So when you signed a document, wasn't it incumbent upon you to make sure the checks were disbursed properly?
>
> **A.** Yes.

(ECF No. 142-15 at 43:15–21.)

Fleming, Westendorf's counsel, disbursed the funds contrary to Nautilus instructions, an action imputed to Westendorf.[3] (ECF No. 142 at 32 (citing *Pioneer Inv. Servs., Co.* v. *Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396, 113 S. Ct. 1489, 1499 (1993) (listing cases holding "clients must be held accountable for the acts and omissions of their attorneys"))). Westendorf subsequently accepted a check for $20,000.00 from Moss & Kuhn for his second PR "fee," which he then deposited without having verified that an order had been filed approving the settlement from which his funds were to come.

In addition to these direct breaches, conversions, and unlawful receipt of benefits, Mr. Westendorf's broader liability is demonstrated by his acknowledgements under oath as to numerous misrepresentations and false pretenses which infected the Satterfield matter from the start but were never disclosed to the courts or to Plaintiff, including that:

1. He agreed to serve as a personal representative for a party adverse to Alex Murdaugh—i.e., Nautilus' insured—*at Alex Murdaugh's request*; (ECF No. 142-15 at 10:19–23)

2. He was paid $30,000.00 for signing various documents, appearing by phone at a mediation, and attending two meetings in chambers with a circuit court judge; (ECF No. 142-30 at 16:1–5)

3. In connection with that work, he:

---

[3] Nautilus contends the actions of Fleming in this regard are binding not only on Westendorf, but also on PSB, for whom Fleming was a subagent. (ECF No. 142 at 33-35.)
.

3

a.  took no steps to understand what his responsibilities were as a personal representative; (ECF No. 142-15 at, *e.g.*, 13:15–14 ("What was your job? As PR, tell me what you were supposed to do.  A.  I don't know."), 18:13–19:1, 35:15–21; 38:4–15)

b.  took no steps to understand what the claims the Estate of Gloria Satterfield was purportedly asserting against Murdaugh; (ECF No. 142-15 at 14:11–15:8)

c.  failed to inform the beneficiaries of the Estate of Gloria Satterfield of the settlement of the claims or the payment of money by Lloyds and Nautilus; (ECF No. 142-15 at 51:8–52:14)

d.  never once even spoke with the beneficiaries of the Estate of Gloria Satterfield; (ECF No. 142-15 at 8:20–25)

e.  did not know what the term "fiduciary" meant while serving as the fiduciary for the Estate of Gloria Satterfield; (ECF No. 142-15 at 11:15–18)

f.  signed incorrect disbursement statements in submissions to the court; (ECF No. 142-15 at 74:14–75:1)

g.  failed to enter into a fee agreement with the Estate for his compensation as personal representative;  (ECF No. 142-15 at 14:4–7)

h.  failed to verify the legal fees, costs, and expenses claimed by Moss & Kuhn and Cory Fleming before representing the same to the Court; (ECF No. 142-15 at 40:21–41:11)

Instead, he accepted a sum of money—a sum too large not to reasonably raise suspicion in connection with the menial tasks he performed—in exchange for allowing himself and his title as Vice President of PSB to be used for nefarious and illegal ends.  In so doing, he performed a function crucial to the success of the scheme devised by Mr. Murdaugh to defraud Nautilus and steal the money, as conceded by PSB in its 30(b)(6) deposition:

> **Q.** Does PSB agree that Mr. Murdaugh could not have defrauded Nautilus and stolen the money and kept it concealed if the Satterfield family had been aware of the settlement?
>
> **Mr. Gressette:**  Objection.  Scope.
>
> **Mr. Pendarvis:**  Objection.
>
> **A**. Yes.

(ECF No. 142-31 at 88:24–89:6.)

4

B. **PSB's Liability Regarding the Payment by Plaintiff of the Claim Arising out of the Death of Gloria Satterfield.**

That Mr. Westendorf's conduct is imputable to PSB is supported by the following evidence.

1. *The Bank Controlled the Ability of its Personnel to Serve as Fiduciaries.*

   - PSB's Conflict of Interest policy requires employees to obtain authorization prior to serving as a fiduciary (ECF No. 142 at 30; ECF No. 142-36.)

   - Westendorf sought and obtained approval from "senior bank management," namely his immediate supervisor, Russell Laffitte. (ECF No. 142 at 30; ECF No. 142-31 at 61:16–62:6.)

   - Laffitte, who had served as a fiduciary at Murdaugh's request numerous times and participated in Murdaugh's schemes to improperly and fraudulently obtain funds of others, approved on PSB's behalf[4] Westendorf's request in consultation with his father, Charlie Laffitte, the chairman of the Board of Directors. (ECF No. 142 at 30; ECF No. 142-31 at 61:16–62:6.)

   - The "duties" performed by Westendorf relating to the Satterfield matter were performed during working hours, on bank premises, and using bank instrumentalities. (ECF No. 142 at 21; ECF No. 142-15 at 10:24–11:4.)

2. *Westendorf (and Laffitte before him) Represented that his Service as Fiduciary Was on the Basis of his Role as Bank Officer.*

   - Laffitte and Westendorf identified themselves as PSB Vice Presidents on their applications to the Probate Court to be appointed as conservator or personal representative. (ECF No. 142 at 21; ECF No. 142-8; ECF No. 142-35.)

   - Westendorf and Laffitte gave the bank address and telephone number as their contact information on their applications to the Probate Court to be appointed as fiduciaries. (ECF No. 142-8; ECF No. 142-35 at 13, 16.)

---

[4] *See, e.g.*, *S.C. L. Enf't Div.*, 284 S.C. 368, 370, 327 S.E.2d 327, 328 (1985) ("If Bryant the corporate officer had delivered the boat to John Doe knowing that John Doe was going to smuggle marijuana, it could be hardly argued that the corporation was an innocent owner. In the same fashion, when Bryant, the corporate officer, turned the boat over to Bryant, the drug smuggler, Bryant, the corporate officer, was not innocent and, in turn, the corporation was not innocent. If Bryant was not acting on behalf of the corporation when he hauled the marijuana, he was certainly an officer of the corporation when he surrendered it to himself as a drug smuggler. . . . In reality, it might be just as forceably argued that since Bryant had the knowledge, the corporation had the knowledge and that accordingly, the corporation had actual knowledge.").

5

- Cory Fleming stated in an email that he and Murdaugh needed a bank officer to be appointed as personal representative in Satterfield "to manage the money." (ECF No. 142 at 4; ECF No.142-5.)

- Westendorf asked Fleming whether he should open an account for the Estate at PSB. (ECF No. 142-15 at 13:24–14:3.)

- Judge Odom of the Hampton County Probate Court testified that she relied on the fact that Laffitte and Westendorf were serving on behalf of PSB in appointing them and approving their submissions. (ECF No. 142 at 5; ECF No. 142-9 at 26:16–27:6.)

### 3. *Defendant PSB is Deemed to Have Knowledge of What its Officers and Directors Know.*

- Westendorf's and Laffitte's knowledge is PSB's knowledge as a matter of law. (ECF No. 142 at 22 (citing *Citizens' Bank v. Heyward*, 135 S.C. 190, 133 S.E. 709, 716 (1925) (Featherstone, J., concurring) ("In so far as the transaction was concerned, the president was the bank and his knowledge must be imputed to the bank."))).

- Laffitte knew of decade-long conspiracy involving Murdaugh stealing money while his debt continued to spiral and, in his capacity as a bank officer at PSB, participated in that conspiracy. (ECF No. 142 at 23.)[5]

- PSB directly benefitted from Laffitte's and Westendorf's involvement with Murdaugh and the thefts of funds in that they (i) kept an important client happy, one who brought a substantial amount of business and off of whom PSB made over $4m from loan interest, and (ii) the funds Murdaugh stole from Nautilus were used to pay back PSB loans and overdrafts. (ECF No. 142 at 23; ECF No. 142-33.)

### III.     Phase One and Phase Two Discovery Both Go to the Elements of Nautilus' Claims.

In its August 16 Order, this Court categorized discovery into Phase One Discovery and Phase Two Discovery. The focus of Phase One Discovery is "the liability of the Defendants regarding the payment by Plaintiff of the claim arising out of the death of Gloria Satterfield,"

---

[5] *See supra*, note 4.

whereas the Phase Two Discovery is described as "additional discovery that may be needed regarding any alleged liability of Defendants for conduct or actions which preceded the Satterfield payment." (ECF No. 155 at 2-3.)

Nautilus has sought discovery into actions preceding the Satterfield payment, not for the purpose of proving Defendants' liability to others for their past actions, but rather because they concern material issues which will be used to establish various elements of the claims in Plaintiff's Second Amended Complaint. By way of example, to establish liability on its pending claim under the South Carolina Unfair Trade Practices Act, one element that Plaintiff is required to show is that "the unfair or deceptive act affected the public interest," S.C. Code Ann. § 39-5-10-560. This prong may be satisfied by presenting proof of "facts demonstrating the potential for repetition of the defendant's actions," *Daisy Outdoor Adver. Co., Inc. v. Abbott*, 322 S.C. 489, 493, 473 S.E.2d 47, 49 (1996), including "by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence." *Estate of Carr ex rel. Bolton v. Circle S Enterprises, Inc.*, 664 S.E.2d 83, 89, 379 S.C. 31, 43–44 (S.C. App. 2008). Without discovery into whether "the same kind of actions occurred in the past," Plaintiff would be prevented from obtaining material evidence of this element of the claim:

> Evidence of similar acts, transactions, or happenings is admissible where there is some special relation between them which would tend to prove or disprove some fact in dispute. *Reed v. Clark*, 277 S.C. 310, 286 S.E.2d 384 (1982); *Pittman v. Galloway*, 281 S.C. 70, 313 S.E.2d 632 (Ct. App. 1984). We hold that there is a special relation between the proffered testimony and Barnes' action under the U.T.P.A. We hold this because in an action under the U.T.P.A., a material issue to be proved is that the unfair practice or act affects persons other than the parties to the transaction. *Noack Enterprises, Inc. v. Country Corner Interiors of Hilton Head Island, Inc*. 290 S.C. 475, 351 S.E.2d 347, 349, 350 (Ct. App. 1986). **"Manifest injustice" would then result if Barnes were not allowed to introduce evidence of similar acts because of the relevance of**

7

> **these acts to the cause of action for the violation of the U.T.P.A.;
> we so hold.**

*Barnes v. Jones Chevrolet Co.*, 292 S.C. 607, 612–13, 358 S.E.2d 156, 159 (Ct. App. 1987) (emphasis added).

As to foreseeability of harm, which is relevant to proving proximate cause, Plaintiff intends to show that damage to Nautilus was foreseeable when PSB approved and empowered Westendorf to serve as a fiduciary at the direction of Murdaugh *because the same type of arrangement* had damaged third parties in the past.[6] Indeed, the harm to Nautilus was foreseeable even if some Defendants were unaware Nautilus was the carrier in that specific instance:

> [T]he only part of the alleged harm that was unforeseeable was the exact identity of the people to whom it would come. . . .[However, s]ince the alleged injury in this case was foreseen (and to at least some extent, specifically planned), even though it may not have been the ultimate object of the alleged conspiracy, the court concludes that plaintiffs have satisfied this pleading requirement.

*LaBelle v. Brown & Williamson Tobacco Corp.*, No. 2:98-3235-23, 1999 WL 33591435, at *12–13 (D.S.C. Mar. 18, 1999); *see also PCS Nitrogen, Inc. v. Ross Dev. Corp.*, No. 2:09-cv-3171, 2010 WL 3893619, at *11 (D.S.C. Sept. 30, 2010) ("[T]he court finds [the *LaBelle court's*] reasoning persuasive.").

A.  **The Lloyd's "Settlement" is Further Illustrative of the Need for Discovery Into Pre-2018 Conduct.**

The conduct and urgency surrounding the Lloyd's settlement in December 2018 demonstrates the relevance of the discovery sought by Nautilus. The evidence adduced to date demonstrates:

---

[6] *See, e.g.*, Rule 404(b), FRE ("[E]vidence [of other crimes, wrongs, or acts] may be admissible for . . . proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

- Lloyd's issued a check for its policy limits on December 6, 2018; (ECF No. 142-10.)

- As of that date, Tony Satterfield was still the personal representative for the Estate of Gloria Satterfield; (ECF No. 142-11.)

- Mr. Fleming and Mr. Murdaugh determined a PSB fiduciary needed to be appointed prior to the disbursement of the funds tendered by Lloyds in order to "manage the money"; (ECF No. 142-5.)

- Mr. Murdaugh asked Mr. Laffitte to serve as personal representative, but he declined; (*See, e.g.*, ECF No. 132-9 at 18-24.)

- Mr. Murdaugh approached Mr. Westendorf to serve as personal representative, and Mr. Westendorf agreed, despite admittedly being unqualified to serve as a personal representative and having no knowledge of what the role required; *See supra* Part II.A;

- Mr. Westendorf promptly sought and obtained authorization to serve as personal representative from his direct superior at PSB, Russell Laffite; (ECF No. 142 at 30; ECF No. 142-31 at 61:16–62:6.)

- Mr. Westendorf was appointed as successor personal representative on December 18, 2018. (ECF No. 142-12.)

- The Lloyd's settlement was finalized following a December 19, 2018 hearing in the chambers of Judge Mullen. (ECF No. 142-15 at 34:11–22.)

Nautilus believes that the urgency behind getting a sham fiduciary appointed and the Lloyd's settlement concluded was because Mr. Murdaugh had certain loan payments due to PSB and was told by Mr. Laffitte that he needed to make them before the end of 2018. Nautilus further believes that Mr. Laffitte, as Mr. Murdaugh's private banker, allocated the Satterfield settlement funds toward debts to PSB, as evidenced by, *inter alia*:

(1) a $400,000.00 check written by Murdaugh and *payable to PSB*, which at the top in writing states "*per Russell*", that was traced back to the Lloyd's settlement funds by the state attorney general's forensic accountant and which was deposited in Murdaugh's PSB checking account, after which hundreds of thousands of dollars in funds were promptly withdrawn the next day to pay down several of Murdaugh's loans at PSB;

(2) a $600,000.00 check written by Murdaugh and *payable to PSB*, that was traced back to the Nautilus settlement funds by the state attorney general's forensic

9

        accountant and which was deposited into Murdaugh's PSB checking account, after which hundreds of thousands of dollars in funds were promptly withdrawn the same day to pay down Murdaugh's Moselle loan at PSB; and

    (3) numerous additional checks written by Murdaugh to himself, that were traced back to the Nautilus settlement funds by the state attorney general's forensic accountant and which were deposited into Murdaugh's PSB checking account, after which hundreds of thousands of dollars were withdrawn to pay down Murdaugh's loans at PSB.

(*See generally* ECF Nos. 142-33 at 2-20, 142-34.) Nautilus understands this same pattern occurred previously between Mr. Laffitte and Mr. Murdaugh, particularly with checks being written directly to Palmetto State Bank to conceal their source, and from which Mr. Laffitte paid down Mr. Murdaugh's debts to PSB. To prove it, Nautilus seeks discovery into Mr. Murdaugh's prior fraudulent dealings with his private banker at PSB.

## IV.     Conclusion

Nautilus contends there was a pattern of a PSB executive serving as a fiduciary to create a smokescreen behind which Murdaugh could steal funds without the thefts being discovered, ultimately leading to the harm to Nautilus. (ECF No. 154 at ¶¶ 15(m), 15(q), 29, 30.) Nautilus seeks to discover the contours of this pattern.

Nautilus does not seek a ruling as to the ultimate question of liability at this time, but rather requests guidance whether sufficient evidence has been presented in support of Nautilus' theory of liability against PSB such that it may inquire into relevant conduct prior to 2018.

**[signature on following page]**

|  | **Respectfully submitted:** |
|---|---|
| This 22nd day of September, 2023<br>Charleston, South Carolina | */s/ Jaan Rannik*<br>EPTING & RANNIK, LLC<br>Jaan G. Rannik (Fed. ID No. 12621)<br>Clinton T. Magill (Fed. ID No. 12459)<br>46A State Street<br>Charleston, SC 29401<br>P: (843) 377-1871<br>F: (843) 377-1310<br>jgr@epting-law.com<br>ctm@epting-law.com<br><br>COUNSEL FOR PLAINTIFF NAUTILUS INSURANCE COMPANY |

11