**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>　　　　　　Plaintiff,<br>　v.<br><br>RICHARD ALEXANDER MURDAUGH, Sr.,<br>CORY FLEMING, MOSS & KUHN, P.A.,<br>CHAD WESTENDORF, and PALMETTO<br>STATE BANK,<br><br>　　　　　　Defendants. | Case No. 2:22-cv-1307-RMG<br><br>**PLAINTIFF'S MOTION FOR<br>PARTIAL SUMMARY JUDGMENT** |

The underlying settlement to which Nautilus Insurance Company ("Nautilus") conditionally contributed to resolve a claim by the Estate of Gloria Satterfield (the "Estate") is void and unenforceable under South Carolina law.[1]  Before the settlement became effective, Defendant Richard Alexander Murdaugh, Sr. ("Mr. Murdaugh") admitted to defrauding Nautilus in relation to the Satterfield claim, and, as a result, Nautilus denied coverage to Mr. Murdaugh.

Nautilus moves this Court for partial summary judgment as follows.[2]

## I.　　**LEGAL STANDARDS**

### A.　　**FRCP 56**

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Brown v. Brennan*, No. 4:14-CV-00307-RMG, 2015 WL 2452751, at *2 (D.S.C. May 21, 2015) (quoting Fed. R. Civ. P. 56(a)).  Purely legal issues may appropriately be resolved at summary judgment.

---

[1] To the extent any dispositive motions of any Defendant is premised in whole or in part on Nautilus deciding the settle the Satterfield claim, those motions cannot be decided without first determining if there is a settlement at all.

[2]　 The statement of reasons required by Local Rule 6.01 is incorporated into this motion, and a supporting memorandum is not required under Local Rule 7.04 because the reasoning of the motion is set forth herein.

1

*Dupree v. Younger*, 598 U.S. 729, 737 (2023) (observing "a purely legal question is, by definition, one whose answer is independent of disputed facts").

"Only material facts—those 'that might affect the outcome of the suit under the governing law'— will preclude the entry of summary judgment." *Id.* (emphasis added) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute about a material fact is genuine, 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). In reviewing a motion for summary judgment, the court must "construe the evidence, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the nonmoving party." *Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013) (citing *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011)). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Id.* at 311.

## II. <u>ARGUMENT</u>

### A. By Statute, Case Law, and the South Carolina Rules of Civil Procedure, the Underlying Settlement Is Void.

The settlement pursuant to which Nautilus conditionally delivered funds to be held in escrow to settle the claim of the Estate of Gloria Satterfield is void and a legal nullity.

#### 1. Factual Background

##### a. *Gloria Satterfield's Death and Insurance Claims*

Gloria Satterfield ("Satterfield") died intestate on February 26, 2018, following an incident that occurred at the residence of Mr. Murdaugh and Maggie Murdaugh—for whom Satterfield worked as a housekeeper—on February 2, 2018. Satterfield's sole legal heirs upon her death were Michael Anthony Satterfield ("Tony") and Brian Harriot ("Brian"). After Satterfield's death, Mr.

Murdaugh told Tony and Brian (collectively, the "Satterfield Sons") that he was going to take them to see an attorney he knew who would represent them in making claims against him, because his dogs caused her to fall, rendering him legally responsible for her death. **Ex. 1** at 25:14–21. On May 1, 2023, however, Mr. Murdaugh admitted via his answer to Nautilus' Amended Complaint that he fabricated the story about the dogs and lied about why Satterfield was at his house when she fell, for the purpose of manufacturing coverage. *Compare* ECF No. 154 at 16, ¶ 98(a)-(b) *with* ECF No. 158 at 9, ¶ 75.[3]

### b. Cory Fleming Is Retained

Between February 26, 2018 and March 8, 2018, Mr. Murdaugh introduced Tony to Cory Fleming ("Fleming")—who at the time was a law partner at Moss, Kuhn & Fleming, P.A. *n/k/a* Moss & Kuhn, P.A. ("M&K")—and encouraged the Satterfield Sons to retain Fleming to bring claims against Mr. Murdaugh in connection with Satterfield's death. *See, e.g.*, ECF No. 158 at 2-3 ¶¶ 12, 15; *Compare* ECF No. 154 at 3.a. *with* ECF No. 158 at 2, ¶ 11. Although there was never an engagement agreement, Fleming sent Mr. Murdaugh a letter dated March 8, 2018 to "advise[]" Mr. Murdaugh that Fleming represented the Estate. **Ex. 3**. In his letter, Fleming further represented that he and his client were "proceeding with a wrongful death claim on behalf of the [E]state." *Id.*

### c. The Satterfield Probate Matter Is Filed

On March 28, 2018, an intestate probate matter was initiated in the Probate Court for Hampton County, SC under the caption *Estate of Gloria Ann Satterfield* and bearing case number 2018 ES250056 (the "Probate Matter") by the filing of various documents purportedly signed by the Satterfield Sons. **Ex. 4**. Although Fleming was representing the Estate, on May 24, 2018, Mr.

---

[3]  Upon Mr. Murdaugh admitting his fraud in his pleading, Nautilus denied coverage. **Ex. 2**.

Murdaugh's law office sent a letter to the Records Custodian for Trident Anesthesia Group seeking Gloria's medical records and confirmed his firm's representation of Tony as PR of the Estate. **Ex. 5** at 1 ("As you know, this office represents Michael Satterfield as PR for the Estate of Gloria Satterfield . . . .").

### d. Chad Westendorf's Appointment as Successor PR of the Estate

On November 12, 2018, Certain Underwriters at Lloyd's, London ("Lloyd's"), Mr. Murdaugh's primary carrier, tendered their policy limits. **Ex. 6**. Because it was critical to conceal the existence of these funds from the heirs of the Estate, it was decided that Chad Westendorf should serve as personal representative for the Estate in place of the original PR, Tony Satterfield. The justification for Mr. Westendorf serving as PR was his role as an executive of Palmetto State Bank. **Ex. 7** ("He is the VP of the bank and we want him to be the PR to manage the money."); *see also* **Ex. 10** at 1 (Westendorf representing in sworn verification that "Current Personal Representative desires bank Vice President to serve as Personal Representative — sole other heir concurs."); ECF No. 158 at 1-2, ¶ 8 (Murdaugh admitting that Westendorf was appointed "at least in part because he was employed by Palmetto State Bank."). In order for Westendorf to be appointed as the Successor PR of the Estate, Tony had to resign as the original PR and Brian had to renounce his own priority right to serve in the event of Tony's resignation. Therefore, on October 31, 2018, Brian signed a second "Renunciation of Right to Administration and/or Nomination and/or Waiver of Bond" at Mr. Murdaugh's law office. **Ex. 8**. Thereafter, on November 16, 2018, Tony signed his own "Renunciation of Right to Administration and/or Nomination and/or Waiver of Bond" at Mr. Murdaugh's law office.[4] **Ex. 9**.

---

[4]  Notably, while both forms indicate a waiver of PR rights in favor of Westendorf, neither form checked the box indicating that they agreed to a waiver of a PR bond. *See* **Exs. 8**, **9**. Nevertheless, when the Probate Court appointed Westendorf as the Successor PR, it did so without requiring a bond, which makes sense because the Probate Court approved the appointment based on the

### e. *The Lloyd's Settlement*

On December 6, 2018, while Westendorf's appointment by the Probate Court remained pending, the Lloyds settlement check in the amount of $505,000.00 was delivered to Fleming. **Ex. (I) 12**. Because Tony was still the PR at that time and Fleming did not want to disclose the settlement to Tony, Mr. Fleming instructed his staff to hold the check until Westendorf was appointed as the Successor PR of the Estate. *See* **Ex. 13** at 1. After his appointment on December 18, 2018 (**Ex. 14**), Westendorf signed a petition for the approval of the "partial" wrongful death and survival action settlement involving the Lloyd's funds—bearing the caption *Chad Westendorf as Personal Representative of the Estate of Gloria Satterfield v. Richard A. Murdaugh*—which was formally filed together with a disbursement sheet. **Ex. 15**. That petition was signed by Westendorf in Judge Mullen's courtroom the day of a settlement conference with Judge Mullen. **Ex. 16** at 54:11–15.[5] Present at this proceeding were Fleming, Westendorf, and Mr. Murdaugh. **Ex. 16** at 55:14–21. However, Mr. Murdaugh's appearance is not noted in the unsigned order (**Ex. 18**), and there is no transcript of the proceedings, contravening the statutory requirement that a hearing be

---

representation that Westendorf was applying as the "bank" (*i.e.*, PSB) Vice President, and the bank was exempted from providing a bond. *See* **Ex. 10** at 2; S.C. Code Ann. § 62-3-603(A)(3) ("[A] personal representative is not required to file a bond if: . . . the personal representative is a state . . . bank[] or trust company."). This is not surprising either, given that state-chartered banks have to independently bond all of their active officials and employees pursuant to applicable banking statutes. *See, e.g.*, S.C. Code Ann. § 34-3-50 ("All active officials and employees of any State bank shall be bonded. The bonds shall be reviewed and approved or disapproved in writing annually by the board of directors."). Judge Odom previously testified that she relied on Laffitte's position as a PSB officer when he applied to be a fiduciary and gave credence and credibility to those requests as a result. **Ex. 11** at 26:16–27:6; *cf.* S.C. Code Ann. § 34-3-10 ("A person in this State, other than a legalized incorporated banking institution, may not use the word "bank" . . . in connection with a business, calling, or pursuit . . .").

[5] Westendorf has conceded myriad failings in his role as fiduciary. While many are discussed in this brief, the two depositions he has given (one given directly in this action, and the other given in the Satterfield state-court case but adopted and incorporated by him on the record as part of his deposition in this matter) are more revealing still as to these failures, and thus they are attached in their entirety as exhibits. **Exs. 16, 17**.

conducted on the record to approve the settlement. *See infra*, Part II.A.2.

The subsequent disbursement of the Lloyd's funds was not in accordance with the submitted petition and disbursement sheet, **Ex. 19**, and Mr. Fleming admits the representations in those submissions were untruthful. **Ex. 20** at 61:23–62:1. For example, the prosecution of expenses of $11,500.00 were invented, Mr. Fleming admitted "[w]e didn't have them at the time." *Id.* at 62:11–13. And, despite the absence of a signed and filed order from the circuit court or the approval by the probate court of the disbursement and settlement of the survival action ($25,000.00 of the $505,000.00 was allocated to the survival claim), Fleming disbursed money to his firm, to Forge (Mr. Murdaugh's subterfuge account), and to Westendorf as a personal representative fee of $10,000.00. **Ex. 21**.

### f.    The Nautilus "Settlement," No Filed Order Approving the Same, & the Ultimate Dismissal of the Underlying Action

The Nautilus settlement suffered the same irregularities as the Lloyd's settlement.    The settlement was confirmed via e-mail on March 25, 2019 with a mediation settlement agreement signed only by Fleming/Moss & Kuhn and Murphy Grantland. **Ex. 22**.  Funds were tendered to Fleming/Moss & Kuhn by Murphy Grantland on April 22, 2019 with instruction to hold the funds in trust until an order approving the settlement was filed. **Ex. 23**.  South Carolina law required no less.

No such order was ever filed with the court.  A petition to approve the settlement captioned *In re Gloria Satterfield*, was itself not filed, and it contained a disbursement schedule embracing not only Nautilus' funds but also those paid by Lloyd's (even though that money had already been disbursed). **Ex. 24**.  The Probate Court was never notified about the civil actions until on or around September 29, 2021. **Ex. 25** at 1 ("[T]his Court had no knowledge of a Civil Action having been filed . . .").  Again, the disbursement sheet submitted to the court was at variance with the facts.

6

**Ex. 26**.  For example, Mr. Fleming admits the submitted litigation expenses of $105,000.00 were "fluff" and final settlement statement does not account for Mr. Westendorf's $30,000.00 fee.  **Ex. 20** at 63:11–17, 64:8–16.

A "hearing" to approve the Nautilus settlement occurred on May 13, 2019.  It took place in Judge Mullen's chambers with only Fleming and Westendorf in attendance, and there is no transcript or case record of the proceeding.  **Ex. 16** at 98:24–99:4.  In short, there was no public hearing as required by law.  Judge Mullen signed an order approving the settlement, but Fleming requested that the order not be filed to avoid publicity for Mr. Murdaugh.  **Ex. 16** at 100:17–19.  The petition, disbursement schedule, and order were all signed on May 13, 2019.  **Exs. 24**, **27**, **28**.  The funds were disbursed on May 13, 2019 to Forge and May 14, 2019 to Fleming, the order signed by Judge Mullen never having been filed.  **Ex. 21**.[6]

As no order approving the settlement was ever filed, in 2020, the case appeared on a trial roster.  After M&K received notice of the trial rostering, Fleming wrote to the court to say the case had settled (misrepresenting to the court of official that they had filed a settlement order) and could be taken off the roster.  **Ex. 29**.  The Court replied that, as no order ending the case had been filed, a stipulation of dismissal needed to be filed.  *Id*.  A stipulation of dismissal with prejudice of the suit captioned *Chad Westendorf, as Personal Representative of the Estate of Gloria Satterfield v. Richard A. Murdaugh* was filed on October 6, 2020, signed only by Fleming/Moss & Kuhn and Mr. Murdaugh.  **Ex. 30**.  As no other case had been filed, this ended the court proceedings relating to the claims purportedly on behalf of the Estate.

---

[6]  Nor was it *ever* filed in the underlying case.  As an exhibit to his prior motion for summary judgment, Westendorf attached a version of the signed order that was filed as an exhibit in a subsequent suit brought by Bland Richter, *Satterfield v. Murdaugh*, No. 2021-CP-25-00298, Ct. of Common Pleas, Hampton County.  *See* ECF No. 135-11.  However, as this order was never filed in the matter it applied to, it never became effective.  *See infra* Part II.A.3.

### g. *Denial of Coverage*

Following Mr. Murdaugh's admission in his May 1, 2023 pleading that he defrauded Nautilus, Nautilus informed Mr. Murdaugh that it was denying coverage for the underlying claim. **Ex. 2**.

### 2. **Arguments and Applicable Law**

In South Carolina, wrongful death and survival actions are statutory claims governed by the provisions of Article 1 ("Death by Wrongful Act") of Chapter 51, Title 15 of the South Carolina Code of Laws. Because they are not common law claims, they must be construed in accordance with the plain language adopted by the legislature in creating such claims. S.C. Code Ann. § 15-51-41 requires that "[a]ny settlement of a wrongful death or survival action must be approved by either a probate court, circuit court, or United States District Court, as provided in Section 15-51-42."

The proposed settlement is neither binding nor enforceable because it fails to comply with **(i)** S.C. Code Ann. § 15-51-41, **(ii)** S.C. Code Ann. § 15-51-42 and related laws, and **(iii)** Rule 43(k), S.C.R.C.P.[7]

### a. *Failure to Comply With S.C. Code Ann. § 15-51-42(B)*

S.C. Code Ann. § 15-51-42(B) provides that "[i]f no action is pending, the personal representative shall petition either the probate or the circuit court of this State seeking approval of a proposed settlement." The petition must be verified, "filed," and it must set forth specific content necessary to supporting the request for approval of the proposed settlement. *Id.* With respect to

---

[7] *See also Wilson v. Dallas*, 743 S.E.2d 746, 754 (S.C. 2013) ("A compromise agreement is void unless executed in compliance with the governing statute.").

the approval process, § 15-51-42(B) requires that "[t]he court shall schedule a hearing and receive into evidence those facts that the court considers necessary and proper to evaluate the settlement," and that, "[a]fter conducting this inquiry, the court shall issue its order either approving or disapproving the proposed settlement." *Id.*

Here, the proposed settlement did not comply with S.C. Code Ann. § 15-51-42(B) in myriad ways. <u>First</u>, the petition related to the Nautilus funds was never "filed" with the Court, Fleming having specifically requested that Judge Mullen *not* file it. <u>Second</u>, even if the petition had been filed, it failed to include all the content required by the Probate Code. *Compare* S.C. Code Ann. § 15-51-42(B) *with* **Ex. 24**. <u>Third</u>, this disbursement did not comport with the false disbursement schedule provided to the court.

<u>Fourth</u>, the unrecorded in-chambers hearing was not proper under South Carolina law. As an initial matter, the Court should not have heard the matter because the petition relating to Nautilus had never been filed and no action had ever been filed with the caption provided to Judge Mullen. *See, e.g.*, Rule 79(c), S.C.R.C.P. ("Entry Required. No jury or nonjury action . . . whether for interlocutory action or final disposition, shall be heard by the court until the action has been first entered in the file book and all pleadings in the action filed with the clerk of court.").[8] Furthermore, because there was no case number, the hearing could not have been properly scheduled by the clerk of court. *See, e.g.*, Rule 79(e), S.C.R.C.P. ("Motion Calendar. The clerk of court shall place on the motion calendar all pending . . . matters requiring a summary hearing before the judge. *The motion calendar shall contain the case number*, date of request, name of the action, attorneys involved and the nature of the motion to be presented.") (emphasis added).

<u>Fifth</u>, even if the hearing could have been scheduled under the existing civil case number,

---

[8]   The wisdom of this rule is illustrated by the facts of this case.

there is no record of the Court receiving into evidence any of the facts which would have been necessary and proper to evaluate the settlement and conduct the inquiry required of it under the Wrongful Death Act.  Approval of the settlement was sought in chambers with no court reporter, no transcript, and where no one appeared on behalf of the defendant.  In a decision issued last year, this Court noted that a *public* hearing is required for the approval of wrongful death settlements. *Seltzer v. Squires*, No. 2:19-CV-1712-RMG, 2023 WL 1097819, at *2 (D.S.C. Jan. 30, 2023) ("[U]nder S.C. Code Ann. § 15-51-42 the Court is required to *publicly* approve settlements in wrongful death and survival actions." (emphasis added)).

Sixth, although Judge Mullen signed a proposed order approving the Nautilus settlement, that order was never filed nor entered, Fleming apparently having requested it not be.  In fact, there was no action that had been filed under the caption contained in the proposed order, so there was no matching action within which the signed order could have been filed.  For this same reason, as captioned and signed, it would have been rejected by the clerk of court if the parties had attempted to file it under the civil action that was pending.

As there is no order approving the "settlement" as required under S.C. Code Ann. § 15-51-42(B), there is no settlement.  *See, e.g.*, *First Union Nat'l Bank of S.C. v. Hitman, Inc.*, 411 S.E.2d 681, 682 (S.C. Ct. App. 1991) ("No order is final until it is written *and entered*.") (emphasis added and citations omitted), *aff'd*, 418 S.E.2d 545 (S.C. 1992); *see also Brailsford v. Brailsford*, 669 S.E.2d 342, 346 (S.C. Ct. App. 2008) ("The South Carolina Supreme Court has held that under Rule 58 'the written order is the trial judge's final order' and until entry of the written order the judge is free to change his mind. . . . An oral order of the court is not final and binding until reduced to writing, signed by the judge, and delivered for recordation."), *overruled in part on other grounds*

*by Hughes on behalf of Est. of Hughes v. Bank of Am. Nat'l Ass'n*, 898 S.E.2d 102 (S.C. 2024).[9]

### b.  Failure to Comply with S.C. Code Ann. § 15-51-42(C)

S.C. Code Ann. § 15-51-42(C) provides that "[i]f the settlement is approved by the court, the personal representative has the power to conclude the settlement, including the execution of those documents as the settlement terms contemplate."

Here, Westendorf's actions to "conclude" the settlement were without effect because they did not comply with S.C. Code Ann. § 15-51-42(C).  Specifically, the release purportedly given on behalf of the Estate and beneficiaries—which would have been the main consideration flowing to Nautilus under the proposed settlement—was executed by Westendorf without any settlement being approved by the Court in compliance with the statute.[10]  Additionally, Westendorf endorsed the Nautilus settlement check and released the check to M&K and Fleming—thereby allowing the funds to be prematurely disbursed without his fiduciary oversight as the PR—again, without any settlement being approved by the Court in compliance with the statute.  *Compare* **Ex. 23** ("Please hold these settlement funds in trust until the Petition and Order Approving Settlement have been signed and filed at the Probate Court settlement hearing.") *with* **Exs. 31**, **28**.[11]

### c.  Failure to Comply with S.C. Code Ann. § 15-51-42(F)

S.C. Code Ann. § 15-51-42(F) requires that "[a]ny person bringing a wrongful death or

---

[9] The South Carolina Supreme Court overruled Brailsford and certain other cases only "to the extent they hold a fraud cause of action does not survive the death of the alleged victim or the alleged perpetrator".  *Hughes on behalf of Est. of Hughes*, 898 S.E.2d at 102 n.7 (S.C. 2024).

[10] Defendant Westendorf executed the release before Judge Mullen signed the proposed order in her chambers.

[11] The funds were ultimately disbursed contrary to the instructions and schedule set forth in the proposed order signed by Judge Mullen.  **Ex. 21**. As a bank officer, Mr. Westendorf would have been aware of his obligation not to unconditionally indorse a check without ensuring the condition of holding the funds in trust were satisfied, particularly given his knowledge in his capacity as PR of the irregularities relating to the Satterfield claim.

survival action in a court other than the probate court must notify the probate court of this action within ten days after the filing of the action."  Here, Westendorf violated the settlement provisions of S.C. Code Ann. § 15-51-41(F) because he failed to notify the Probate Court of the wrongful death and survival action(s) within ten days of filing the action.  *See* **Ex. 25** at 1 ("[T]his Court had no knowledge of a Civil Action having been filed . . .").

### d.   Failure to Comply with S.C. Code Ann. § 15-51-42(G)

S.C. Code Ann. § 15-51-42(G) provides that "[t]he attorney for the personal representative must notify the probate court immediately upon completion of the survival action and furnish the court with a copy of the order approving settlement or a copy of the judgment, whichever is appropriate."

Here, Fleming violated the settlement provisions of S.C. Code Ann. § 15-51-42(G) because he failed to notify the Probate Court immediately upon completion of the survival action and failed to furnish the court with a copy of an order approving the settlement.  *See* **Ex. 25** at 1 ("[T]his Court had no knowledge of . . . the subsequent actions.").

### e.   Failure to Comply With Rule 43(k), S.C.R.C.P.

It is well established that SCRCP 43(k) applies to settlement agreements resolving cases in South Carolina's state courts.  *S.C. Hum. Affs. Comm'n v. Zeyi Chen*, 846 S.E.2d 861, 866 (S.C. 2020) (citing *Ashfort Corp. v. Palmetto Constr. Grp., Inc.*, 458 S.E.2d 533, 535 (S.C. 1995)).  As explained more fully below, the settlement documents do not comply with SCRCP 43(k).

In order for a settlement to be enforceable, South Carolina Courts require strict compliance with SCRCP 43(k).  For example, in *S.C. Hum. Affs. Comm'n*, the Supreme Court of South Carolina held:

> [SCRCP 43(k)'s] terms are mandatory, which *precludes a party from turning to contract or equitable principles* (or counter public policy

arguments) *to vitiate those terms*.  Substantial compliance is not sufficient.

846 S.E.2d at 866-67 (emphasis added).[12]   No settlement is binding unless there is strict compliance with SCRCP 43(k).  *See, e.g.*, *Farnsworth v. Davis Heating & Air Conditioning, Inc.*, 627 S.E.2d 724, 725-26 (S.C. 2006) ("Rule 43(k) provides that '[n]o agreement . . . shall be binding unless' one of the three conditions listed above is met.  In other words, an agreement is non-binding until a condition is satisfied.  Until a party is bound, she is entitled to withdraw her assent.").  Parties' intent or attempted compliance is irrelevant where the Rule's requirements are not satisfied.  *See, e.g.*, *Young v. Cooler*, 555 S.E.2d 410, 412 (S.C. Ct. App. 2001) ("[E]ven if the Youngs intended to be bound and attempted to announce to the court that a settlement had been reached, the requirements of 43(k) were not met. . . . We need not reach the question of whether the agreement is subject to rescission based on mutual mistake because we do not find an enforceable agreement.").

In *S.C. Hum. Affs. Comm'n*, the Supreme Court of South Carolina reiterated that "Rule 43(k) is applicable even if the agreement has been admitted."  846 S.E.2d at 866-67.  This has long been the law.  *See, e.g.*, *Farnsworth*, 627 S.E.2d at 725-26 ("Davis claims that compliance with Rule 43(k) is not required in this scenario, because Rule 43(k) does not apply to a written settlement agreement that the parties admit was duly executed. We disagree.").  The District Court of South Carolina has also held that the payment of settlement funds in accordance with the terms of a demand would not make a binding settlement.  *See Founders Ins. Co. v. Richard Ruth's Bar*

---

[12] In *S.C. Hum. Affs. Comm'n*, the Supreme Court of South Carolina affirmed the denial of motion to compel enforcement of a settlement agreement where the parties admitted to signing the agreement in the presence of counsel, but respondent's counsel had not actually signed the agreement and respondents thereafter withdrew their assent before the entry of any consent order embodying the agreement.  846 S.E.2d at 866-67.

*& Grill LLC*, No. 2:13-CV-03035-DCN, 2016 WL 3219538, at *7 (D.S.C. June 8, 2016) ("[E]ven if Founders had tendered the policy limits prior to the expiration of the demand letter, the settlement would not be binding until it was entered into the record or reduced to writing and signed by the parties and their counsel.").[13]

Prior to May 1, 2022, SCRCP 43(k) read, in pertinent part, as follows:

> **Agreements of Counsel**. No agreement between counsel affecting the proceedings in an action shall be binding unless reduced to the form of a consent order or written stipulation signed by counsel and entered in the record, or unless made in open court and noted upon the record, or reduced to writing and signed by the parties and their counsel. . . .

As the proposed settlement documents in this matter are dated between March 25, 2019 and October 6, 2020, the above version of SCRCP 43(k) governs the enforceability of the documents at issue in this matter.  Pursuant to this language, there are three ways in which a settlement can be binding under SCRCP 43(k).

First, a settlement can be binding if it is "reduced to the form of a consent order or written stipulation signed by counsel *and entered in the record*."  *Id.*  (emphasis added).  However, "the order or written stipulation must [also] set forth the terms of the settlement to comply with Rule 43(k)."  *Ashfort Corp.*, 458 S.E.2d at 535.  Second, a settlement can be binding if it is "made in open court and noted upon the record."  *Id.*  Third, a settlement can be binding if it is "reduced to writing and signed by the parties and their counsel."

---

[13]Nor could Nautilus be bound to an agreement underpinned by fraud, the terms of which were also not carried out by Defendants, and where the funds were disbursed in violation the conditions pursuant to which they were delivered.  *See Vessell v. DPS Assocs. of Charleston, Inc.*, 148 F.3d 407, 411 (4th Cir. 1998) ("Even were we to find that Gibbons had actual or apparent authority to bind Re/Max to the contract, and that Vessell and Re/Max were mutually obligated to perform the terms of the contract, the fraudulent underpinnings of the contract would defeat its enforceability."); *see also* **Ex. 22**.

As explained below, not one of the proposed settlement documents complies with Rule

43(k), S.C.R.C.P.:

- The March 25, 2019 mediation settlement agreement (**Ex. 32**) including the Nautilus funds was not filed and was only signed by Fleming and Murphy Grantland. Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by the parties" (i.e., Mr. Murdaugh and Westendorf), this document does not comply with SCRCP 43(k);

- The April 11, 2019 Release including issues related to Nautilus was not filed and was only signed by Westendorf. *See* **Ex. 33**. Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by [all of] the parties and their counsel" (i.e., Mr. Murdaugh, Fleming, and Murphy Grantland), this document does not comply with SCRCP 43(k);

- The May 13, 2019 Petition for approval of the proposed settlement involving the Nautilus funds was not filed and was only signed by Westendorf and Fleming. **Ex. 24**. Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by [all of] the parties and [each of] their counsel" (i.e., Mr. Murdaugh and Murphy Grantland), this document does not comply with SCRCP 43(k);

- The May 13, 2019 "Order Approving Settlement" which included Nautilus funds was not filed and was only signed by Judge Mullen. **Ex. 28**. Because it was not "entered in the record," "made in open court and noted upon the record," or "signed by the parties and their counsel" (i.e., Westendorf, Mr. Murdaugh, Fleming, and Murphy Grantland), this document does not comply with SCRCP 43(k).

The October 6, 2020 Stipulation of Dismissal of the *Chad Westendorf, as Personal Representative of the Estate of Gloria Satterfield v. Richard A. Murdaugh* action was filed but was only signed by Mr. Murdaugh and Fleming. *See* **Ex. 30**. This stipulation fails to meet the requirements of the second and third options of SCRCP 43(k) because it was not "made in open court and noted upon the record," or "signed by [all of] the parties and [each of] their counsel" (i.e., Westendorf and Murphy Grantland). As to option one of SCRCP 43(k), while the document is a written stipulation signed by counsel and entered in the record, it merely states that "[i]t has been made to appear to the Court that the parties hereto have settled their differences and this matter is no longer at issue." **Ex. 30** at 1. This type of language has been found to be insufficient

to comply with SCRCP 43(k).  *See, e.g.*, *Ashfort Corp.*, 458 S.E.2d at 535 ("The only order which has been entered in this matter merely shows the action is dismissed with the notation 'court advised case settled.'  This is insufficient since the order or written stipulation must set forth the terms of the settlement to comply with Rule 43(k).'").

### 3. Because the Proposed Order Purportedly Approving the Settlement Was Never Entered by the Court, the Settlement is an Unenforceable Nullity.

As set forth above, the Settlement complied neither with the statutory requirements for wrongful death and survival settlements nor with the South Carolina Rules of Civil Procedure.  Furthermore, it is axiomatic that no order can have legal effect unless and until it is formally entered into the record.  *See, e.g.*, *First Union Nat'l Bank v. Hitman, Inc.*, 411 S.E.2d 681, 682 (S.C. Ct. App. 1991) ("*No order is final until it is* written and *entered.*" (emphasis added)); *see also Archer v. Long*, 24 S.E. 83, 84 (S.C. 1896) ("Until the paper has been delivered by the judge to the clerk of the court, to be filed by him as an order in the case, it is subject to the control of the judge, and may by him be withdrawn at any time before such delivery.").  It is undisputed that Judge Mullen's order was never delivered to the clerk of court and was never filed.  Accordingly, the order was neither final nor binding, and it is an unenforceable nullity.

South Carolina courts support a strict view that unfiled rulings of (or on behalf of) the Court are not enforceable orders.  In *Spartanburg Buddhist Ctr. of S.C. v. Ork*, the South Carolina Court of Appeals found that an e-mail from a circuit court clerk purporting to enjoin the parties did not constitute a filed, effective order.  790 S.E.2d 430, 432 (S.C. Ct. App. 2016).  The Court noted that "the May 2 email did not have the effect of a filed order," and that, "[a]lthough the circuit court correctly noted our judiciary's increasing reliance on new technology, our rules

concerning final orders have not changed." *Id.* at 607, 790 S.E.2d at 433-34.[14, 15]

Here, with no order entered, and numerous deviations from statutory and procedural requirements, the proposed settlement is an unenforceable nullity.[16]

### B.    Legal Effect of Voidness – Nautilus Is Not Bound.

There is *no defense*—equitable or otherwise—to the voidness of a settlement agreement when it fails to comply with Rule 43(k). *S.C. Hum. Affs. Comm'n*, 846 S.E.2d 861, 866–67 (S.C. 2020) ("[SCRCP 43(k)'s] terms are mandatory, which precludes a party from turning to contract or equitable principles (or counter public policy arguments) to vitiate those terms.  Substantial compliance is not sufficient.").  As there is no defense and the settlement is void, Nautilus is not bound:

> Rule 43(k) provides that "[n]o agreement . . . shall be binding unless" one of the three conditions listed above is met.  In other words, an agreement is non-binding until a condition is satisfied.  *Until a party is bound, she is entitled to withdraw her assent.*

*Farnsworth v. Davis Heating & Air Conditioning, Inc.*, 627 S.E.2d 724, 725-26 (S.C. 2006)

---

[14] In support of its conclusion, the Court cited to, *inter alia*, Rule 58, S.C.R.C.P. for the proposition that "a judgment is not effective until entered in the record."  *Spartanburg Buddhist Ctr. of S.C.*, 790 S.E.2d 430, at 433–34.

[15] Similarly, in *Maness v. Ginotoli*, the South Carolina Court of Appeals found that a letter from a judge's office did not constitute an enforceable order because it was not entered in the record:

> On March 15, 2005, a letter from the office of Judge J. Cordell Maddox indicated that upon review, Judge Maddox determined that this action should be in federal court, not state court. . . . [I]n the event the letter may be interpreted as a pronouncement from the circuit court, we would still dismiss because it was not entered.

No. 2006-UP-242, 2006 WL 7285987, at *1 (S.C. Ct. App. May 15, 2006).

[16] *Cf. Berkebile v. Outen*, 426 S.E.2d 760, 762 (S.C. 1993) ("We have repeatedly held that there is a presumption that the legislature intended to accomplish something with a statute rather than to engage in a futile exercise."); *Mason v. Mason*, 770 S.E.2d 405, 420 (S.C. Ct. App. 2015) ("The court 'will not lend its assistance to carry out the terms of a contract that violates statutory law or public policy.'") (quoting *Ward v. W. Oil Co.*, 692 S.E.2d 516, 519 (S.C. 2010)).

(emphasis added)).

As Mr. Murdaugh has admitted to the insurance fraud, Nautilus has no liability to pay under its policy. *Compare* ECF No. 8-1 at 15 ("We do not provide coverage for any 'insured' who had made fraudulent statements or engaged in fraudulent conduct in connection with any 'occurrence' or offense for which coverage is sought under this policy.") *with* ECF No. 158 at 12, ¶ 97. Accordingly, it has withdrawn its assent to the settlement agreement and denied coverage. **Ex. 2**.

### C.    Each Defendant Is at Fault for the Improper Release of Funds.

As release of Nautilus' funds from escrow was conditioned—by law and agreement—upon the settlement being made final and binding by the filing of an order approving its terms, and as that never occurred, the funds should not have been disbursed but should remain in escrow, returnable to Nautilus. As follows, Defendants are at fault for the release of the funds from escrow.

### 1.  Mr. Murdaugh

Mr. Murdaugh has conceded liability in his Answer to Nautilus' Second Amended Complaint, admitting, *inter alia*, that:

- "[H]e arranged for Fleming" "to represent the Satterfield family to bring a claim against him," "communicated with Fleming about the claim before it was settled," "was cooperative with counsel for the party suing him [i.e., Fleming and M&K]," and that there was an "agreement by Fleming to give [Mr. Murdaugh (i.e., the purported defendant)] a portion of the attorney's fees from the settlement," ECF No. 158 at 2–3, 5, ¶¶ 12, 15, 38;

- "[H]e arranged for Westendorf to serve as a successor personal representative of the estate of Ms. Satterfield and that his purpose in doing so was to facilitate theft of the settlement funds," *id.* at 2, ¶ 13;

- "He was not a 'bona fide insured seeking coverage' because he invented the facts giving rise to the claim," *id.* at 3, ¶ 15;

- "Nautilus gave instructions to hold the [insurance] funds in trust until a court approved the settlement," that "payment was conditioned on the funds being held in trust until an approval order was signed and filed," "that [such an] order was

never filed," and that "the settlement agreement was not filed, placed on the record, or signed by all counsel and parties," *id.* at 3, 8 ¶¶ 16-17, 66;

- He "has no knowledge of correspondence between Fleming or MKF and Forge Consulting, LLC," and yet the "settlement funds were paid from MKF's trust fund to a 'Forge' d/b/a account controlled by [Mr. Murdaugh]," and "he did direct [the] funds to be sent to his 'Forge' account," *id.* at 3, 8 ¶¶ 17-18, 60;

- "[H]e made false statements to Nautilus," including that "Ms. Satterfield was not on the property at the time of her fall to perform work for [him]," and he did so to avoid a worker's compensation defense" and that "Nautilus suffered damages due to Defendant's wrongful conduct," *id.* at 6-7, ¶¶ 39, 42, 54;

- "[H]is conduct was 'immoral, unethical, oppressive, and/or offensive to public policy,'" *id.* ECF No. 158 at 7, ¶ 53;

- He "admit[ted] liability to third parties in Hampton County" and further "threat[ened] to confess liability at trial," *id.* at 5, 9, ¶¶ 34, 75;

- "[H]e made telephone calls and sent and received mail . . . in furtherance of his fraud against Nautilus," *id.* at 9, ¶ 81;

- His "fraud caused Plaintiff to part hands with the Satterfield settlement," *id.* at 12, ¶ 97;

- He "was a client [of PSB] at all times relevant []to" the facts alleged in the Second Amended Complaint," *compare* ECF No. 154 at 2, ¶ 6 *with* ECF No. 158 at 1, ¶ 4;

- "Westendorf was a Vice President [of] Palmetto State Bank and . . . was appointed as a successor personal representative for the estate of Ms. Satterfield at least in part because he was employed by Palmetto State Bank," ECF No. 158 at 1-2, ¶ 8;

- He "approached the Satterfield family after the death of Gloria Satterfield and offered to help them sue him and collect from his insurance companies, including Nautilus," *compare* ECF No. 154 at 3, ¶ 15(a) *with* ECF No. 158 at 2, ¶ 11;

- "Fleming made a second disbursement to Forge from the Nautilus funds in MKF's trust account on or around September 2020 in the amount of approximately $118,000," and "[t]hat Fleming and/or M&K did so prior to an order approving the settlement being filed and entered as required by law," *compare* ECF No. 154 at 5, ¶ 15(j)-(k) *with* ECF No. 158 at 4, ¶ 20-21;

- "The Irregularities [set forth in the Second Amended Complaint] led to Murdaugh and Fleming being suspended from the practice of law and indicted," *compare* ECF No. 154 at 6, ¶ 17 *with* ECF No. 158 at 5, ¶ 31;

- He "pressured Nautilus to settle the [Satterfield] Claims" and "demanded Nautilus pay its full policy limits, threatening that if the case against him were filed and went to trial, he would admit liability and the judgment would be substantial and that he would sue Nautilus for bad faith," *compare* ECF No. 154 at 7, ¶ 18(d)-(e) *with* ECF No. 158 at 5, ¶ 36;

- "On or about March 22, 2018, Murdaugh stated to an independent adjuster—with the intent that Nautilus would rely on his representation—that shortly after the purported fall, he heard Ms. Satterfield say that Murdaugh's dogs had caused her to fall," that "Ms. Satterfield made no such statement," and that "Murdaugh repeated the statement on March 29, 2018 during an interview with Bryant McGowan, an insurance investigator, again with the intent that Nautilus would rely on the representation," *compare* ECF No. 154 at 8, ¶ 22(b) *with* ECF No. 158 at 6, ¶ 41;

- "[H]e told counsel appointed by Nautilus for his defense to disburse settlement funds to the personal representative of the plaintiff estate and its lawyer," ECF No. 158 at 6, ¶ 43;

- "Nautilus relied on Murdaugh's false statements and pretenses to its detriment and conditionally disbursed funds under the Policy for the 'settlement' based upon the fraud and deceit, directly and proximately causing damage to Nautilus," *compare* ECF No. 154 at 9, ¶ 24 *with* ECF No. 158 at 6, ¶ 44;

- "Murdaugh made material misrepresentations of fact to Nautilus and failed to honor his obligations under the Policy," including by "[m]isrepresenting that Gloria Satterfield was at his property on February 2, 2018 to collect a check for work performed at a different property for a different client, thus removing the Claims from the workers' compensation framework" and "[m]isrepresenting that Gloria Satterfield claimed it was Mr. Murdaugh's dogs that caused her to fall," *compare* ECF No. 154 at 16, ¶ 98(a)-(b) *with* ECF No. 158 at 9, ¶ 75;

- "Murdaugh deposited the Nautilus funds in his 'Forge' account," *compare* ECF No. 154 at 16, ¶ 94 *with* ECF No. 158 at 9, ¶ 72;

- "The check was delivered with instructions that the funds should be held in escrow until an order approving the settlement was signed and filed," "[t]he check was endorsed by Westendorf, Vice President of Palmetto, and the funds were deposited into MKF's trust account, "[a]n order approving the 'settlement' was signed but never filed," and "Fleming and/or MKF disbursed the funds to 'Forge' without an order approving the settlement being filed," *compare* ECF No. 154 at 15, ¶¶ 89-92 *with* ECF No. 158 at 9, ¶ 70; and

- He made "material misrepresentations and 'admissions' against interest [which] were intentional, were intended to force Nautilus into contributing to a settlement, and were in violation of the contract of insurance," and "[t]hese material misrepresentations and 'admissions' against interest caused Nautilus to contribute funds it otherwise would have had no obligation to contribute," *compare* ECF No. 154 at 16-17, ¶¶ 99-100 *with* ECF No. 158 at 9, ¶ 76.

In addition to these admissions, Mr. Murdaugh also pled guilty to criminal activity related to the Satterfield settlement and further confessed judgment in a separate civil action brought by the Satterfield Sons. **Ex. 34**. He is estopped from denying his liability in this civil action. *See Doe v. Doe*, 551 S.E.2d 257, 258, 259 (S.C. 2001) (holding "once a person has been criminally convicted, he is bound by that adjudication in a subsequent civil proceeding based on the same facts underlying the criminal conviction" and further recognizing that "mutuality is no longer a requirement of collateral estoppel"); *S.C. Prop. & Cas. Ins. Guar. Ass'n v. Wal-Mart Stores, Inc.*, 403 S.E.2d 625, 627 (S.C. 1991) ("Nonmutual collateral estoppel may be asserted unless the party precluded lacked a full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him the opportunity to relitigate the issue.").

Mr. Murdaugh's fault lies both in the fraudulent, deceptive inducing of the conditional payment of funds by Nautilus and in orchestrating the improper release from escrow and theft of those funds.

### 2. Cory Fleming

Mr. Murdaugh could not have, and did not, undertake this scheme alone. Rather, he required the participation of others, including a lawyer to purport to represent the Estate and bring a claim against him. For this purpose, he turned to Cory Fleming.

Mr. Fleming furthered Mr. Murdaugh's fraud thorough his admitted assistance with the Satterfield claim:

- He agreed, at Mr. Murdaugh's request, that he would represent the Estate and advance a wrongful death claim against Mr. Murdaugh in an effort to recover from his insurers,[17] **Ex. 20** at 12:19–16:6, 20:5–20;

- He drafted a letter appearing to be at the request of the Estate, but really at Mr. Murdaugh's request, stating that he represented the Estate and would be pursuing a wrongful death claim against Mr. Murdaugh, *id.* at 16:2-6**; Ex. 3**;

- He did so knowing and intending that, as the stated goal was to induce Mr. Murdaugh's carriers into paying out under their policies, the letter would be delivered to Mr. Murdaugh's insurance carriers, which it was, **Ex. 20** at 20:5–20;

- He knew Mr. Murdaugh intended to take money from the funds recovered, *id.* at 40:24–41:8;

- He misrepresented the terms of the settlements to the court, including inventing legal expenses that were not real, *id.* at 60:9–64:16; **Exs. 19**, **26**;

- He accepted legal fees payable to Moss & Kuhn of $650,055.59 and wrote himself checks for an additional $26,200.00 for his efforts, **Ex. 21**;

- He deposited the funds conditionally delivered by Nautilus into his firm's trust account without objecting to the conditions required by Nautilus, thereby agreeing to abide by those conditions, including holding the funds in trust until an order approving the settlement was filed,[18] **Ex. 20** at 49:5–15; **Ex. 23**;

- Instead, he hand-delivered a check made out to "Forge" to Mr. Murdaugh without any order being filed, **Ex. 20** at 54:18–55:13;

- He never informed the beneficiaries of the Estate that any settlement had been reached or a multi-million dollar recovery had been obtained, *id.* at 43:12–15;

---

[17]   Nor was it the first time he and Mr. Murdaugh had engaged in such a scheme.  In 2012, Mr. Murdaugh filed a suit wherein he represented Mr. Fleming's relative—who was appointed as a guardian ad litem for Fleming's minor son—in a suit against his wife in order to generate a recovery of $120,000.00 (consisting of $25,000.00 in liability and $95,000.00 in UIM payments) from Fleming's own insurance carrier at the time, USAA.  *Fowlkes v. Fleming*, Case No. 2012-CP-07-2826 (S.C. Ct. Comm. Pls. – Beaufort Cnty.).  In that case, Mr. Murdaugh's signature block on the Complaint indicated that he was a lawyer at M&K, even though he was a lawyer with PMPED at the time.  Ultimately, Mr. Murdaugh's alleged $48,000.00 in legal fees for handling the case, which were approved by Court Order of the Honorable Carmen Mullen, were waived, meaning they inured to the benefit of Fleming.  In other words, Mr. Fleming effectively advanced the claim for and against his own family, and he subsequently testified in this case that he may even have signed the pleadings on Mr. Murdaugh's behalf.  **Ex. 20** at 79:6–21.

[18]   By this same conduct, he violated South Carolina law.  *See supra*.

In representing the PR, Fleming willfully or negligently allowed and/or induced the PR to violate his duties and failed to ensure Mr. Westendorf carried out those duties, and he himself violated the duties imposed on him as counsel for the PR and an officer of the court.  *See* **Ex. 20** at 38:11–22;  **Ex. 16** at 10:1–11.  And, as a party responsible for depositing and holding Nautilus' funds in escrow, Fleming owed an additional duty to Nautilus—on behalf of himself, his firm, and the fiduciary he represented—to abide by their escrow instructions and safeguard the funds unless and until they were approved for release, and a duty as an officer of the court to ensure the terms of the statutes and rules were followed in the release of funds.  **Ex. 20** at 49:20–23, 53:20–54:12; *see also Moore v. Weinberg*, 383 S.C. 583, 588, 681 S.E.2d 875, 878 (2009) (recognizing a fiduciary duty that "arises from an attorney's role as an escrow agent [which] is independent of an attorney's status as a lawyer and distinct from duties that arise out of the attorney/client relationship").[19]  Instead, Fleming breached these duties, and improperly disbursed Nautilus' funds when he should have retained the funds in trust until there was a valid, enforceable settlement:

> Respondent admitted that he endorsed the settlement check, deposited it into his trust account, and transferred his legal fees to his operating account.  Clearly, Respondent's actions were in direct violation of the instructions by GEICO that Respondent retain the settlement proceeds in his trust account until the parties signed and returned the Releases.  Even if, as Respondent contends, the settlement check was received prior to the GEICO instruction letter, this would not negate Respondent's misconduct.  Once he received the letter, Respondent should have withdrawn his legal fees from the operating account and transferred them back into his trust account.

---

[19]  The law of other jurisdictions also imposes a fiduciary duty on escrow agents to all parties to a transaction.  *See, e.g.*, *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015) ("Under Illinois law "[a]n escrow agent has a fiduciary duty to the party making the deposit and the party for whose benefit the deposit is made." (quotation omitted));  *Flagstone Dev., LLC v. Joyner*, 545 F. App'x 602 (9th Cir. 2013) (noting Montana law imposes a fiduciary duty on an escrow agent to comply with the conditions placed on the escrow); *Donovan v. Kirchner*, 641 A.2d 961, 969 (Md. Ct. Spec. App.1993), *cert. denied*, 648 A.2d 202 (Md. 1994) (recognizing an escrow agent's fiduciary duty to all  and noting that an instrument placed in escrow will be returned upon "escrow conditions failing to occur").

> Furthermore, Respondent was aware on August 25, 2005 that Client did not intend to sign the GEICO release. Thus, per GEICO's instructions, Respondent should have returned his legal fees to his trust account until the matter was resolved. . . .

*In re White*, 663 S.E.2d 21, 26, *reinstatement granted*, 669 S.E.2d 588 (S.C. 2008).

When charged with criminal conspiracy based on his conduct in the Satterfield matter, Mr. Fleming pled guilty before this Court. Further, Mr. Fleming did not contest the findings of the South Carolina Supreme Court in his disciplinary/disbarment proceedings based upon this conduct. **Ex. 35**; **Ex. 20** at 71:7–15. In that proceeding, the South Carolina Supreme Court found:

> Following Gloria[ Satterfield]'s death, Respondent and Murdaugh conspired together to pressure Murdaugh's two insurance carriers (Carrier 1 and Carrier 2) to settle the wrongful death and survival claims for the full limits of Murdaugh's insurance policies and to steal the proceeds from Gloria's estate (Estate).

> [. . .]

> However, despite these representations, Respondent personally instructed that the settlement check should be made payable to "Chad Westendorf as Personal Representative of the Estate of Gloria Satterfield," which was inconsistent with a structured settlement that must be paid directly to the settlement fund. When Carrier 2 followed-up specifically asking for clarification about the proper payee for the settlement that was ostensibly going to be structured, Respondent stated "I meant to add Moss Kuhn and Fleming on the check. I will need to check with Forge on Monday to double check." Respondent never contacted the legitimate Forge Consulting entity. Rather, the following week, Respondent confirmed in writing "Standard check," made payable to "Chad Westendorf as [PR] and Moss, Kuhn and Fleming attorneys."

> [. . .]

> In furtherance of continuing and concealing his long-standing criminal schemes, Respondent made knowing misrepresentations and intentionally omitted information in his dealings with insurance carriers, opposing counsel, a circuit court judge, his clients, and Gloria Satterfield's heirs. Respondent ignored the sanctity of the lawyer-client relationship by failing to consult with his client regarding offers of settlement, communicating about the litigation with parties known to be represented by counsel, and allowing Murdaugh and his office staff to prepare documents on behalf of

24

> Respondent's client. Additionally, Respondent falsified settlement statements, fabricated expenses, made unauthorized payments from settlement funds, and converted settlement proceeds for his own use. Respondent hand-delivered improperly written checks to Murdaugh rather than forwarding them to the proper payee, thus enabling Murdaugh to convert those proceeds to his own use.

**Ex. 35** at 4, 6, 8.

Mr. Fleming is estopped from taking a position in this matter inconsistent with these prior findings and admissions. *See supra* Part II.C.1. Mr. Fleming is at fault for his role in inducing the Nautilus settlement and for improperly releasing the funds from escrow.

### 3. Moss & Kuhn

Under South Carolina law, a professional corporation is liable for the actions of its member to the same extent that its member is liable. S.C. Code Ann. § 33-19-340(b) ("A domestic or foreign professional corporation whose employees perform professional services within the scope of their employment or of their apparent authority to act for the corporation is liable to the same extent as its employees."). Moss & Kuhn admits the impropriety of the conduct like Mr. Fleming's in the Satterfield matter, including improper diversion of funds in violation of Nautilus' express escrow conditions. **Ex. 36** at 69:2–71:14.

Moss & Kuhn is also directly liable because Mr. Fleming represented Westendorf as Successor PR of the Estate and the Beneficiaries in his capacity as a partner at Moss & Kuhn. *Id.* at 58:2–58:3 ("[I]f the firm did it, it would have been done by Cory."). The firm was one of the two specifically-named payees on the check delivering the Nautilus funds. **Ex. 32**. It was the owner of the escrow account in which the Nautilus check was initially deposited and was responsible by law to those whose funds it held. *See Moore v. Weinberg*, 681 S.E.2d 875, 878 (2009). The firm shared in the profits resulting from the $600,000.00 legal fee taken from Nautilus' funds. **Ex. 36** at 42:5–43:1 (legal fees transferred directly in operating account), 10:1–21 (profits

25

splits between partners determined on ad hoc basis, and the firm unaware of a partner being excluded from profits generated by a case); **Ex. 21**.

Moss & Kuhn is liable coextensively with Mr. Fleming and is at fault for inducing the settlement and improperly releasing the funds from escrow.

### 4. Chad Westendorf

Mr. Westendorf freely admits his absolute and complete failure to perform even the most fundamental and basic functions of a court-appointed fiduciary and personal representative of the Estate. He admits his coordination with Mr. Murdaugh related to the appointment and settlement process, his receipt and specific knowledge of the escrow conditions accompanying the Nautilus funds, his blank indorsement of the check at his PSB office, the un-documented hand-off of the $3,800,000.00 Nautilus check (and, apparently, all fiduciary obligations) to Fleming as his agent, and his subsequent acceptance of a total of $30,000 in unapproved PR fees for his work, including $20,000 disbursed from Nautilus' funds and deposited into his personal PSB account despite no order being filed. More specifically:

- Despite representing to the SC Probate Court in Hampton County that he was qualified to serve as PR since he was the Vice President of PSB, he took no steps to understand what his responsibilities were as a personal representative and as an appointed fiduciary officer of the court, his duties to the Estate, the Beneficiaries, and others, or his responsibility to ensure his representations to the court and all interested parties[20] were true and accurate, *see, e.g.*, **Ex. 16** at 18:13–19:1, 35:15–21; 38:4–15;

- He never spoke to the beneficiaries of the Estate for which he was serving as a fiduciary, *id.* at 8:20–9:9;

---

[20] *See, e.g.*, *Crites, Inc., v. Prudential Ins. Co. of Am.*, 322 U.S. 408, 414–15 (1944) ("The court, as well as all the interested parties, had the right to expect that [appointed] officers [of the court] would not make undisclosed private agreements, fail to reveal any pertinent information or use their official position for their own profit or to further the interests of themselves or any associates.")

26

- He never entered into a fee agreement with the Estate for his compensation as personal representative, *id.* at 14:4–10;

- He permitted Mr. Murdaugh to prepare the application to the Probate Court to be appointed as Personal Representative, which he never disclosed to Nautilus or the court, **Ex. 17** at 24:22–25:8);

- He signed incorrect disbursement statements prepared for him by his purported adversary, Mr. Murdaugh, which were either submitted to the court or contradicted what had been submitted, apparently with no care or effort to verify the contents of same, **Ex. 16** at 72:13–75:17; **Ex. 17** at 72:13–75:17;

- He made no accounting to the Estate, including of the $30,000 he accepted as personal representative fee, **Ex. 16** at 70:6–13;

- He failed to sign a fee agreement with Fleming and Moss & Kuhn, *id.* at 38:20–22;

- He failed to verify the amount of legal fees, costs, expenses, and reimbursements taken by Fleming and Moss & Kuhn, *id.* at 40:21–41:11;

- He received and reviewed the escrow conditions and yet unconditionally indorsed the Nautilus settlement check and released the check to M&K and Fleming—thereby allowing the funds to be prematurely disbursed without his fiduciary oversight as the PR—without an order approving the settlement being filed, *see, e.g.*, **Ex. 23** ("Please hold these settlement funds in trust until the Petition and Order Approving Settlement have been signed and filed at the Probate Court settlement hearing."); **Exs. 31**, **28**, **21**;

- He signed an accounting under oath with the Probate Court in 2021 (notarized by another PSB employee), wherein he represented that no funds had been received by the Estate during his tenure as Successor PR, **Ex. 44**; and

- He accepted payment of $30,000 for his meager efforts. **Ex. 21**.

Mr. Westendorf evidently never questioned the instructions or the coordinated assistance he received from Mr. Murdaugh and Mr. Fleming. Westendorf's utter abdication of his duties and responsibilities as PR allowed the settlement to occur, the funds to be improperly released from escrow, and the wrongs concealed.

Furthermore, when he became PR of the Estate, Mr. Westendorf became a legal client of Mr. Fleming and Moss & Kuhn. Under South Carolina law, a lawyer's or firm's conduct during a litigation is imputable to the client. *See, e.g., In re S.C. NAACP Hous. Advoc. Program*, 897 S.E.2d

691, 696 (2024) ("Lawyers act as fiduciaries, and their representations and advice bind their clients."). Accordingly, as a matter of law, Mr. Westendorf is at fault for the improper release of Nautilus' funds from escrow, not just by his own conduct, but also by the wrongs of his legal and fiduciary agents, Mr. Fleming and Moss & Kuhn.

### 5.  PSB

PSB is answerable for the actions of its officer, Chad Westendorf.  Mr. Westendorf—with the bank's approval (**Ex. 16** at 10:24–11:4)—used his bank title (**Ex. 7** at 1), bank instrumentalities (**Ex. 16** at 13:16–14:1), and bank office space to obtain his appointment as PR, to perform his PR duties, and to indorse Nautilus' check to Mr. Fleming and Moss & Kuhn (**Ex. 31**;  **Ex. 17** at 12:20–14:19), thereby enabling the theft of the Nautilus funds.  Mr. Westendorf's role as a PSB executive was critical to his appointment as PR.  For example, he was a bonded bank employee, a fact which exempted him from posting a surety bond with the probate court pursuant to S.C. Code § 62-3-601, because the Probate Court evidently relied upon PSB's bond as it had previously with Russell Laffitte.  **Ex. 11** at 26:16–27:21; *see also* **Ex. 10** at 2; S.C. Code Ann. § 62-3-603(A)(3) ("[A] personal representative is not required to file a bond if: . . . the personal representative is a state . . . bank[] or trust company.");  S.C. Code Ann. § 34-3-50 ("All active officials and employees of any State bank shall be bonded. The bonds shall be reviewed and approved or disapproved in writing annually by the board of directors.").

But further, PSB is liable because it authorized Mr. Westendorf to serve as PR, with no regard to his complete inability to carry out the attendant fiduciary and legal duties, giving an air of legitimacy to an otherwise irregular proceeding.  The bank acknowledges that, absent a fiduciary preventing the Satterfield Sons from learning of the settlement, the scheme to defraud Nautilus could not have succeeded and Nautilus would not have been damaged.  **Ex. 38** at 88:24–89:6.  The bank's conflict of interest policy establishes that the bank retains the right to control its officers'

service as fiduciaries, instructing officers that they should generally decline fiduciary appointments, and that any fiduciary service must first be approved by the officers' superiors at PSB. **Ex. 37**. It approved Mr. Westendorf to serve as PR despite its knowledge through its CEO, Russell Laffitte, of the attendant duties owed by a fiduciary and of the (now public) nefarious underpinnings of a request by Mr. Murdaugh to serve as a fiduciary.[21] *See, e.g.*, *Degenhart v.*

---

[21] PSB acknowledges that it should not have authorized Mr. Westendorf to serve as PR if it had knowledge of Mr. Murdaugh's prior malfeasance. **Ex. 38** at 90:4–17. Nautilus contends it *did* have such knowledge, but as yet has not been permitted discovery into the bank's knowledge of the prior schemes involving Mr. Murdaugh and Russell Laffitte—PSB's executive, branch manager, COO, CEO, chairman of the board. However, evidence in the public record demonstrates Mr. Laffitte's knowledge—and therefore, the bank's knowledge (*Citizens' Bank v. Heyward*, 135 S.C. 190, 133 S.E. 709, 716 (1925) (Featherstone, J., concurring))—that serving as a fiduciary for Mr. Murdaugh was a fraudulent undertaking resulting in theft and financial loss to third parties, and that it had a duty to prohibit its executives and employees from serving in that capacity and causing foreseeable—inevitable—harm to third parties, *inter alia*:

- Laffitte, then-vice-president of PSB, consistently represented in publicly filed applications to the Probate Court—and, thereby, not only to that Court and the various persons and entities involved in the claims subject to his fiduciary appointment, but also to the public—that he his qualification for appointment was that he was the vice president of PSB, **Ex. 41**;

- Mr. Laffitte issued unsecured loans to Mr. Murdaugh from conservator accounts Mr. Laffitte opened for Mr. Murdaugh's clients, often unsecured, despite Mr. Murdaugh being in regular overdraft, **Ex. 42** at 33:7–34:13;

- Mr. Laffitte issued further unsecured loans as an executive at PSB to pay back the improper loans from conservator accounts, misrepresenting the intended purpose to which the funds would be put (e.g., for "farming"), *id*. at 40:4–7, 41:24–42:5;

- Mr. Laffitte negotiated checks using funds from the estate of Donna Badger (for which Mr. Laffitte was serving as Personal Representative) to pay off loans made from Hannah Plyler's conservator account, *id*. at 42:6–43:7;

- He negotiated checks relating to these fiduciary accounts that were written directly to or by Palmetto State Bank through its general ledger/"loans not on system" account, making it harder to track the source of the funds and harder to discover the money laundering in which Mr. Murdaugh and Mr. Laffitte were engaged, *id*. at 49:11–50:12; **Ex. 43** at 11:7–17, 12:17–24, 45:5–21, 46:18–47:4;

- He, on behalf of Palmetto State Bank, "converted $1,172,945.76 in checks made payable to PSB to numerous other places as part of another stolen case settlement" at Mr. Murdaugh's direction in connection with his service as a fiduciary at Mr. Murdaugh's request, **Ex. 42** at 93:12–20.

*Knights of Columbus*, 309 S.C. 114, 116–17, 420 S.E.2d 495, 496 (1992) (employers may be liable for employee conduct, even conduct outside of the scope of employment, when the conduct is undertaken on the employer's premises, using employer's chattel, and when the employers knows it has the ability to control the employee and should do so); *Hester v. New Amsterdam Cas. Co.*, 412 F.2d 505, 510 (4th Cir. 1969) (a principal placing its authorized agent in a position to commit or assist a fraud renders the principal liable); *see also E.A. Prince & Son, Inc. v. Selective Ins. Co. of Se.*, 818 F. Supp. 910, 914 (D.S.C. 1993) ("the principal is bound by the acts of the agent when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they deal with the agent based on that assumption")

When indorsing Nautilus' check for deposit by Moss & Kuhn (thus ceding his duty to ensure Nautilus' conditions were followed), Mr. Westendorf acted both as PR and with the knowledge of and in the capacity as a bank officer.  PSB appears to recognize this by the fact it is providing Mr. Westendorf a defense (**Ex. 39 (Confidential)**), presumably pursuant to the bank's indemnification obligation set forth in the bank's bylaws.  **Ex. 40** at §§ 5.01, 5.03.

When sued by the Satterfield Sons relating to the very transaction that is an issue in this case, PSB determined it was liable and settled the claim, presumably including for the reasons noted above.  For the same reasons, it is at fault for the release of Nautilus' funds from escrow.

### III.    CONCLUSION AND REQUESTED RELIEF

Nautilus respectfully requests this Court grant Nautilus partial summary judgment and rule (i) that the settlement of the Satterfield claim is void and a nullity; (ii) that the funds conditionally

paid by Nautilus belong in escrow; and (iii) that their disbursement did not comply with Nautilus'

instructions and was contrary to South Carolina law.  Nautilus does not elect a remedy[22] or request

the Court order any Defendant to return the funds to escrow at this time.

**Respectfully submitted:**

This 1st day of April, 2024          /s/ Jaan Rannik
Charleston, South Carolina           EPTING & RANNIK, LLC
                                     Jaan G. Rannik (Fed. ID No. 12621)
                                     Clinton T. Magill (Fed. ID No. 12459)
                                     46A State Street
                                     Charleston, SC 29401
                                     P: (843) 377-1871
                                     F: (843) 377-1310
                                     jgr@epting-law.com
                                     ctm@epting-law.com

                                     COUNSEL FOR NAUTILUS INSURANCE COMPANY

---

[22] *See, e.g.*, *Am. Underground Engineering, Inc. v. City of Syracuse*, 526 F. App'x 37, 39 (2d Cir. 2013) ("AUE's motion for summary judgment addressed liability alone. . . . AUE cannot be deemed to have elected its damages remedy when damages were not at issue on the motion.").