UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>vs.<br><br>Richard Alexander Murdaugh, Sr., Cory Fleming, MOSS & KUHN, P.A., Chad Westendorf, and PALMETTO STATE BANK,<br><br>                              Defendants. | Civil Action No. 2:22-cv-1307-RMG<br><br><br>**DEFENDANT CORY FLEMING'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

YOU WILL PLEASE TAKE NOTICE THAT under LOCAL CIV. RULE 7.04 and 7.05 (D.S.C.), Mr. Fleming respectfully submits this Memorandum of Law supporting his Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENTS

After months of exhausting discovery in this lawsuit, Nautilus has not obtained and cannot present evidence establishing each element of each claim asserted against Mr. Fleming. There simply is no evidence of any "bad acts" by Mr. Fleming before Nautilus made its independent decision to settle the Satterfield Estate's claims against its insured; no evidence that Mr. Fleming breached an independent duty he owed to Nautilus; and no evidence that Mr. Fleming acted in his own personal interest outside of the scope of his representation of his client, the Satterfield Estate.[1] The evidence considered by Nautilus when it decided to settle established to the satisfaction of Nautilus that a Hampton County (or Colleton County) jury would likely find Mr. Murdaugh's dogs

---

[1] *See Stiles v. Onorato*, 457 S.E.2d 601 (S.C. 1995).

caused Ms. Gloria Satterfield to fall and sustain head trauma that was at least a contributing cause of her later death. After thoroughly investigating the claim, with a careful analysis by a host of private investigators, medical experts, South Carolina lawyers, in-house lawyers on coverage issues, and experienced adjusters, Nautilus determined the evidence established a significant risk that a jury would find Mr. Murdaugh liable under the South Carolina dog liability statute that imposes strict liability for injuries caused when a dog "jumps on or pounces upon" the injured person. Nautilus was also concerned that Mr. Murdaugh's testimony consistent with statements he made about his dogs during the investigation (and well before Mr. Fleming's involvement) would be accepted by the jury. Nautilus was also in possession of statements made by Mr. Murdaugh's wife, Maggie Murdaugh, and his son, Paul Murdaugh, about the dogs' involvement in Ms. Satterfield's fall. *There is no evidence showing that Nautilus relied on any statements or other advocacy by Mr. Fleming in making its decision to settle.*

All of Mr. Fleming's "bad acts" occurred after Nautilus had settled with the Satterfield Estate. All of Mr. Fleming's "bad acts" adversely affected only his clients, the Satterfield Estate and its beneficiaries. Mr. Fleming accepted his civil liability for his subsequent "bad acts" and settled with the Satterfield Estate; and also pled guilty to criminal charges for his actions that occurred *after* Nautilus made its decision to settle, obtained a full and complete release from the Satterfield Estate, and issued the settlement proceeds check. John L. Grantland, Esq., the lawyer Nautilus retained to represent Mr. Murdaugh and who was involved with the investigation of the claims by the Satterfield Estate testified in his deposition that no statements, acts, or omissions by Mr. Fleming were involved in the decision Nautilus made to settle the claim. Mr. Grantland also testified that once Nautilus received the binding Release executed on behalf of the Satterfield Estate, Nautilus instructed him to close his file and take no further action on the matter.

Nautilus has not and cannot identify any evidence showing any acts or omissions by Mr. Fleming having any bearing on or causal link to the decision Nautilus made to settle the Satterfield Estate's claims under the South Carolina strict liability dog statute. All of Mr. Fleming's "bad acts" affected only the Satterfield Estate and its beneficiaries and had no consequence on the decisions Nautilus had previously made to settle.

## NAUTILUS' CLAIMS AGAINST MR. FLEMING

In its Second Amended Complaint (Dkt. 154), Nautilus asserted claims against Mr. Fleming for Conspiracy (Second Cause of Action, Dkt. 154, pp. 9-10); for alleged violation of the South Carolina Unfair Trade Practices Act (Fourth Cause of Action, Dkt. 154, p. 12); Breach of Fiduciary Duty (Fifth Cause of Action, Dkt. 154, pp. 12-13); Breach of Agreement (Sixth Cause of Action, Dkt. 154, p. 13); Aiding and Abetting Fraud (Eighth Cause of Action, Dkt. 154, p. 14); Money Had and Received/Unjust Enrichment (Ninth Cause of Action, Dkt. 154, pp. 14-15); Conversion (Tenth Cause of Action, Dkt. 154, pp. 15-16); and an alleged Violation of RICO, 18 U.S.C. §§ 1962(a)-(d) (Twelfth Cause of Action, Dkt. 154, pp. 17-20). Nautilus is attempting to fit a square peg in a round hole with these alleged claims. Mr. Fleming had nothing to do with Nautilus' decision—*following a thorough investigation and risk analysis*—to settle and pay claims threatened against its insured, Defendant, Richard Alexander Murdaugh, Sr. ("Mr. Murdaugh") asserted on behalf of the Estate of Gloria Satterfield ("the Satterfield Estate"). The grounds for Mr. Fleming's Motion for Summary Judgment are that there is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on each claim asserted by Nautilus.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## ESTABLISHED AND UNDISPUTED FACTS

The following table describes the undisputed facts and record support for those undisputed facts, which demonstrate as a matter of law that Nautilus can establish none of the claims asserted against Mr. Fleming in its Second Amended Complaint.

| Date | Established and Undisputed Facts | Record Support |
|------|-------------------------------|----------------|
| 01/06/2018 – 01/06/2019 | Nautilus issued a "Personal Umbrella Liability Policy" to Mr. Murdaugh providing $5,000,000 coverage for each occurrence on claims for personal injury occurring on property owned by Mr. Murdaugh. | Nautilus Cplt., Dkt. 154, Ex. A |
| 02/02/2018 | "Gloria Satterfield, a 57-year-old woman, fell at one of the insured's homes, located at 4147 Moselle Road in Islandton, Colleton County, South Carolina, on 2/2/18." | Nautilus memo, p. 1, NAUTILUS_000771-72; included as Exhibit 1. |
| 02/26/2018 | "[Ms. Satterfield] allegedly sustained a traumatic brain injury and was in ICU until she died 24 days later on 7/26/18 (sic)." | Nautilus memo, p. 1, NAUTILUS_000771-72; included as Exhibit 1. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| 10/02/2018 | Nautilus prepared a memorandum, including the following analysis: "**Liability Analysis**. Mr. Murdaugh stated he received a phone call from his wife stating that Gloria Satterfield was seriously injured and asking him to come home. He got to his home in 10 minutes and found his wife, son (Paul), and employee (Ronnie Freeman), at the residence. There were four dogs present at the time of the incident. No one witnessed the fall or the chain of events preceding the fall. Ms. Satterfield was sitting on the base of the steps and conscious. There was a lot of blood on the side of her face and a pool of blood on the ground. Mr. Murdaugh stated he asked Gloria a series of questions to establish her mental capacity and that she knew who everyone was and where she was. ***She told him that a dog caused her to fall***. Shortly after Mr. Murdaugh arrived, EMS arrived and tended to her. Mr. Murdaugh said he has four dogs: (1) Bubba, a yellow lab, about 6 years old; (2) Bourbon, a female chocolate lab, about 1 ½ years old; (3) Blue, a labradoodle, about 1 year old; and (4) Sassy, a German Shorthair Pointer, age 6 months. Bourbon was purchased from Lazy Lab Kennels. *Bourbon was sent to obedience school and had been back 1 day prior to the accident. Bret Lawson was the individual who owned the obedience school. There is nothing in the records to suggest any behavioral problems with or aggressive tendencies in any of the four dogs. We are attempting to identify whether Mr. Lawson has any available liability insurance.* Mrs. Murdaugh knew Gloria was coming to the house to pick up a check for work she had done. Gloria did not live with the insured. She lived in Furman, Hampton County, South Carolina. She had worked for the Murdaughs for 20 years. She babysat the insured's children when they were infants and other routine tasks. Gloria knew and was familiar with three of the four dogs; however, *Mr. Murdaugh indicated he was unsure whether she was familiar with Bourbon*. The insured never had any prior incidents involving any of the dogs being vicious or biting anyone but stated | Nautilus memo, p. 1, NAUTILUS_000771-72; included as Exhibit 1. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| | *Bourbon was very hyper and disturbed all of the other dogs, wanting to have all the attention. Mr. Murdaugh believes all of the dogs rushed Gloria for attention.* The insured has no surveillance cameras. The primary carrier, Lloyds, secured photographs of the residence and steps in question on 4/2/18. Several dogs are depicted in the photographs. Their adjuster reported that the dogs were very friendly and none of them jumped on him. The subject property is a 1700-acre property with a hunting lodge. There are no neighbors that would have captured the incident on any surveillance system the neighbors might have. ***South Carolina's dog bite statute imposes strict liability where the injury is caused by a dog jumping on a person.*** The plaintiff must prove there was an "attack;" however, South Carolina courts have widely interpreted this to include when a dog "jumps on or pounces upon" the injured person. *The only defenses are: (1) unlawfully being on the premises; and (2) provoking the dog. Neither of those scenarios appear to be the case with this loss.* As there were no witnesses, the only version of events we currently have are the insured's statements that the claimant told him his dog jumped on her causing her to fall and that his dog had behavioral issues including jumping on people. We will be obtaining medical records to determine what other version(s) of events may have been given. | |
| 11/12/2018 5:35 PM | Amy C. Miller ("Ms. Miller"), the Nautilus adjuster assigned to this claim, emailed J.R. Murphy, Esq. ("Mr. Murphy"), one of the lawyers with MURPHY & GRANTLAND, LLC retained by Nautilus to represent Mr. Murdaugh and assist Nautilus in evaluating the claim. Ms. Miller's email states they were "expecting that we will receive a policy and time-limited demand in short order," and also requests Mr. Murphy began gathering medical records from the healthcare providers and the identity of the first responders who treated Ms. Satterfield. | Miller email dated Nov. 12, 2018, NAUTILUS_00255; included as Exhibit 2. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| 11/06/2018 | "Certain Underwriters at Lloyds, London," had issued to Mr. Murdaugh and Maggie Murdaugh, an underlying $500,000 primary policy. R. Scott Wallinger, Jr., Esq., a lawyer with COLLINS & LACY, prepared a letter titled "Second Comprehensive Report," which was later provided to Nautilus. Mr. Wallinger's letter included comments in the Executive Summary on page 2, "Satterfield told Mr. Murdaugh, who arrive soon after, that the dogs had 'tripped her up.'" The letter also includes notes on page 7 from *Mr. Wallinger's interview with Maggie Murdaugh stating, "Maggie said that **Satterfield's relatives told Maggie that 'the dogs tripped Gloria up.'"** The letter also notes that "Maggie said it was not uncommon for the four dogs, who were friendly to visitors, to 'get under people's feet' whenever people came to the house." Also included in the letter are comments about Mr. Wallinger's interview with Paul Murdaugh. The letter states, "Paul remembers that his father Alex arrived and asked what happened and that **Satterfield 'said something about dogs**.'" | Wallinger letter to Caitlin Crist, dated Nov. 6, 2018; NAUTILUS_002303-14, included as Exhibit 3. |
| 11/12/2018 | Ms. Miller received a letter from T. David Rheney, Esq., a South Carolina lawyer with GALLIVAN WHITE & BOYD, who had been retained by "Certain Underwriters at Lloyds, London," who had issued the underlying $500,000 primary policy. After describing their investigation into the Satterfield Estate's claim, Nautilus was advised that "Underwriters has determined, in good faith, that the payment of the Policy limits of $500,000 is reasonable and in the best interests of the insureds as it is likely there will be exposure beyond the Policy limits given the circumstances surrounding Ms. Satterfield's death, the amount of medical bills incurred and other potential economic damages." | Murphy letter to Miller, dated Nov. 12, 2018; NAUTILUS_002324, included as Exhibit 4. *See also,* Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 19:5-19:12; included as Exhibit 26. |
| 11/??/2018 | John M. Grantland, Esq. ("Mr. Grantland") testified about his initial involvement in the matter as follows:<br><br>14:11    Q. Okay. And when did you first get involved?<br>14:12    A. Not until, I think, November of '18. I | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 14:11-14:17; included as Exhibit 26. |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| | 14:13  mean, I think the case was assigned to my partner,<br>14:14  J.R. Murphy, and when a decision was made that we're<br>14:15  going to try to go to mediation, I'm -- I'm -- I know<br>14:16  dog bite cases.  I know the Fourteenth Circuit, so<br>14:17  I -- J.R. asked me to step in and take it from there. | |
| 11/??/2018 | Mr. Grantland testified that Nautilus had made the decision to mediate before he got involved:<br><br>15:14    A.  Yes.  I mean, we were -- I mean, *by the time*<br>15:15  *it came to me,* it was like we were -- we were -- *a*<br>15:16  *decision had been made to go to mediation*, and we're<br>15:17  going to at least investigate all of our defenses,<br>15:18  defenses on -- well, defenses regarding what happened<br>15:19  and -- and her -- and why she fell and -- and her --<br>15:20  her injuries -- | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 15:14-15:20; included as Exhibit 26. |
| 11/27/2018 | Nautilus investigated all aspects of the claim, including potential claims against the dog trainer, who had trained the Murdaughs' dog, Bourbon.<br><br>Ms. Miller emailed Mr. Murphy and Mr. Grantland including "a report from our independent adjuster who met with the dog trainer, Brett Lawson. Brett described Bourbon as a good dog with no behavioral issues whatsoever." | Miller email to Murphy and Grantland, dated Nov. 27, 2018; NAUTILUS_000287, included as Exhibit 5. |
| ~ 11/27/2018 | Mr. Grantland testified about the investigations into the dog trainer as follows:<br><br>17:21  Q.  -- generically describe some of this, but it<br>17:22  appears that *there were investigations of one of the*<br>17:23  *dog trainers*.  Is that --<br>17:24    A.  That's my understanding about -- Scott<br>17:25  Wallinger may have done -- he -- I know Scott went to<br>18:1  the property and did a lot of interviewing and a lot<br>18:2  of -- a lot of the hands-on initial interviewing of<br>18:3  what happened -- of investigation of what happened,<br>18:4  and he shared his information with us.<br>18:5    Q.  Okay.  So in addition to -- and so there was<br>18:6  some investigation about the dogs and the dog<br>18:7  training for the -- I think *there were* --<br>18:8    A.  That's my understanding.<br>18:9    Q.  -- *four dogs on the property* --<br>18:10    A.  *I think so*.<br>18:11    Q.  -- that day?<br>18:12    A.  Uh-huh.  I think so. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 17:21-18:12; included as Exhibit 26. |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| 01/07/2019 | Mr. Grantland sent a letter to Ms. Miller providing "an update on this case," and a summary of his conversations with a medical expert, **Dr. Prichard**, concerning his opinions on Ms. Satterfield's medical history and cause of death. | Grantland letter to Miller, dated Jan. 7, 2019; NAUTILUS_000296_001-002, included as Exhibit 6;<br><br>Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 18:13-18:17; included as Exhibit 26. |
| ~ 01/??/2019 | Mr. Grantland testified about the fact and medical investigations as follows:<br><br>21:19  Q.  Okay.  Did you interview anyone besides Alex<br>21:20  Murdaugh?<br>21:21      A.  No.  That's -- I mean, I -- I had -- I hired<br>21:22  two doctors to -- and gave them, Dr. Pritchard and<br>21:23  Dr. Westerkam -- and gave them records and talked to<br>21:24  them and reported their findings to -- to Nautilus.<br>21:25      Q.  Did you have any discussions with Maggie<br>22:1  Murdaugh?<br>22:2      A.  No.  Never talked to her.<br>22:3      Q.  How about any discussions with Paul<br>22:4  Murdaugh?<br>22:5      A.  No.<br>22:6      Q.  Did you see the notes in the file about<br>22:7  statements they had made --<br>22:8      A.  Yes.<br>22:9      Q.  -- about the events?<br>22:10      A.  Yes.<br>22:11      Q.  Both Paul and Maggie?<br>22:12      A.  Right.  From Scott Wallinger. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 21:19-22:12; included as Exhibit 26. |
| 01/09/2019 | Mr. Grantland sent a letter to Mr. Fleming advising Nautilus "*would like to set up a mediation*" and requesting medical records from various healthcare providers who treated Ms. Satterfield. | Grantland letter to Fleming, dated Jan. 9, 2019; NAUTILUS_000325_001-002, included as Exhibit 7. |
| ~ 01/??/2019 | Mr. Grantland testified about the decision by Nautilus to "get this claim settled" as follows:<br><br>22:19      Had the decision to mediate been made before<br>22:20  you got directly involved?<br>22:21      A.  Yes.<br>22:22      Q.  Okay.  So your instructions were basically,<br>22:23  "Let's get this claim settled"? | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 22:19-23:2; included as Exhibit 26. |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
|  | 22:24    A. Yes. Let's work with Amy on -- in doing<br>22:25  what we can do to -- to -- and do whatever<br>23:1  investigation we can do regarding her damages and to<br>23:2  get the best settlement we can for Alex. |  |
| 01/29/2019 – 02/15/2019 | Mr. Fleming and his staff provided Gloria Satterfield's medical records to Mr. Grantland and Nautilus, allowing Nautilus to proceed with mediation. | Miller to Grantland email thread, dated Jan. 29, 2019 to Feb. 15, 2019; NAUTILUS_000410-419, includes Exhibit 8. |
| ~ 01/??/2019 | Mr. Grantland testified about the South Carolina strict liability dog bite statute as follows:<br><br>24:12  A. Yeah. "South Carolina's dog bite statute<br>24:13  does impose strict liability in cases where the<br>24:14  injury was caused by the dog jumping on the injured<br>24:15  party."<br>24:16    Q. So the strict liability issue was a concern<br>24:17  as part of the claim evaluation was maturing,<br>24:18  correct?<br>24:19    A. Right. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 24:12-24:19; included as Exhibit 26. *See also*, Memorandum dated July 11, 2018, included is Exhibit 1, to Grantland deposition; included as Exhibit 27. |
| 02/25/2019 | Nautilus retained an independent adjuster to interview the first responders about whether dogs were involved in the incident with Ms. Satterfield. | Miller email to Grantland, dated February 25, 2019; NAUTILUS_000465-466, included as Exhibit 9. |
| 02/25/2019 | Nautilus did not want Mr. Murdaugh to give a deposition or speak during the mediation "to give his 'the dog knocked me over' version of the incident." | Grantland to Miller email, dated February 25, 2019; NAUTILUS_000474-0475, included as Exhibit 10. |
| ~ 2/??/2019 | Mr. Grantland testified about the concern by Nautilus about a significant verdict in Hampton County as follows:<br><br>29:7  Q. This letter -- and I'll let you -- if you'd<br>29:8  like to look at it. On page 2 of the letter, the --<br>29:9  let's see, the second full paragraph includes some<br>29:10  concerns or descriptions, I should say, about<br>29:11  Mr. Murdaugh's reputation in Hampton County and the<br>29:12  Lowcountry. Is it fair to say that was a concern of<br>29:13  how this whole lawsuit would play out if there was a<br>29:14  lawsuit? | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 29:7-29:18; included as Exhibit 26. |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| | 29:15    A. Yes.<br>29:16    Q. And so for the insured's benefit, that was a<br>29:17  risk that Nautilus was aware of.<br>29:18    A. Absolutely. | |
| ~03/??/2019 | Mr. Grantland testified about their concerns of the potential verdict if the matter was tried in Hampton County:<br><br>30:1   A. I mean, when we were evaluating the case,<br>30:2  you know, Hampton, Allendale, the Fourteenth Circuit<br>30:3  is not like every other county in South Carolina, and<br>30:4  we discussed prior verdicts in Hampton. I had a<br>30:5  PowerPoint that Mark Tinsley had provided me on a<br>30:6  case years before from cases he and Woody had tried<br>30:7  down there, just astronomical verdicts on nominal<br>30:8  damages, and I shared that with them, and so -- and,<br>30:9  you know, with $700,000 in medical bills -- and if<br>30:10  Alex is admitting fault, I mean, the verdict could --<br>30:11  could exceed his coverage, so we -- we definitely had<br>30:12  discussions about the danger of having a case down in<br>30:13  Hampton --<br>30:14    Q. Okay.<br>30:15    A. -- or a trial in Hampton. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 30:1-30:15; included as Exhibit 26. |
| ~03/??/2019 | Mr. Grantland testified about Maggie Murdaugh's statements about the dogs:<br><br>32:20  Q. We've seen references in a few of these<br>32:21  materials where *reports were that Maggie, for*<br>32:22  *instance, heard from some Satterfield family members*<br>32:23  *that a dog was involved in the fall.* Do you recall<br>32:24  seeing that?<br>32:25    A. I do. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 32:20-32:25; included as Exhibit 26. |
| ~03/??/2019 | Mr. Grantland testified about his conversations with Scott Wallinger:<br><br>34:16  Q. Did you have any conversations with Scott<br>34:17  Wallinger prior to the mediation --<br>34:18    A. Yes.<br>34:19    Q. -- about the investigation he had done?<br>34:20    A. Yes.<br>34:21    Q. Tell me about that conversation.<br>34:22    A. I mean, just -- just, you know, confirming,<br>34:23  you know, his -- you know, everything he had done,<br>34:24  and, you know, he -- he thoroughly investigated<br>34:25  whether a dog was involved, what evidence was a dog | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 34:16-35:7; included as Exhibit 26. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| | 35:1  involved in the -- in Ms. Satterfield's fall, and, I<br>35:2  mean, I did more investigation into what was the<br>35:3  cause of her death and what evidence from the medical<br>35:4  side was there of whether a dog was involved or<br>35:5  whether the fall caused her to die, and so that's --<br>35:6  he did the liability piece, and I did more of the<br>35:7  damages piece. | |
| ~03/??/2019 | Mr. Grantland testified about Maggie Murdaugh's and Paul Murdaugh's statements about the dogs:<br><br>36:9    Q.  What about the next -- the statement on the<br>36:10  next page, page 8?  And this is the comments about<br>36:11  his interview with Paul Murdaugh and it says --<br>36:12  midway through that bolded paragraph, it says, "Paul<br>36:13  remembers that his father, Alex, arrived and asked<br>36:14  what happened and that Satterfield, quote, 'Said<br>36:15  something about the dogs,' close quote."<br>36:16        Similarly, did -- was that a material<br>36:17  consideration in Nautilus's decision about --<br>36:18      A.  I mean, it was consistent.  I guess, it --<br>36:19  you know, it was -- it was all consistent with what<br>36:20  Alex had said.  I mean, this -- this is consistent<br>36:21  with what Alex said, and it's consistent with what<br>36:22  Maggie said.  But I didn't interview Paul or Maggie.<br>36:23  The only information I had would have been from<br>36:24  Scott. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 36:9-36:24; included as Exhibit 26. |
| 03/06/2019 | Nautilus and Mr. Grantland determined they would have Dr. Westerkam evaluate whether Ms. Satterfield's pre-existing medical conditions and medications she was taking that may have contributed to her fall. | Grantland – Miller email thread dated Mar. 6, 2019; NAUTILUS_000533-535, included as Exhibit 11. |
| 03/08/2019 | Ms. Miller sent Mr. Grantland an email advising that "Murdaugh's teen-age son (a minor) using Murdaugh's boat with other teenagers on board crashed into a bridge on 2/24/19. All of them were intoxicated. 1 for tally. Police arrived at 2 AM to investigate accident and all were lawyered up. 1 of the teens was missing for a week and was found in the water. Charges likely to be filed against Murdaugh's son." | Miller to Grantland email, dated Mar. 8, 2019; NAUTILUS_000554, included as Exhibit 12. |
| 03/11/2019 | Dr. Westerkam prepared and Independent Medical Examination report for Mr. Grantland, stating, in | Dr. Westerkam report, dated Mar. 11, 2019; |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| | relevant part, "Therefore, *I believe the patient's cause of death is multifactorial*. The mild traumatic head injury may have been the initial event, but her multiple underlying medical problems compromised her ability to recover from such an event and led ultimately to her demise." | NAUTILUS_002240, included is Exhibit 14. *See also*, Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 68:20-69:12; included as Exhibit 26. |
| < 03/14/2019 | Mr. Grantland testified about the absence of any statements or advocacy on behalf of Mr. Fleming affecting Nautilus's decision to settle as follows:<br><br>48:22  Q.  Okay.  *Were there any statements from Cory*<br>48:23  *Fleming about the liability part of the evaluation*<br>48:24  *that was important to Nautilus or to you*?<br>48:25    *A.  No.*  I mean, I think at some point Cory said<br>49:1  he wanted Alex to give a deposition under the cloak<br>49:2  of mediation to hear Alex's side of the story and --<br>49:3  because he had -- I think he said he had never heard<br>49:4  Alex's version of the story, but everyone else did,<br>49:5  but in any event, that's, you know -- *but, no.* | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 48:22-49:5; included as Exhibit 26. |
| < 03/14/2019 | Mr. Grantland testified about the absence of any statements or advocacy on behalf of Mr. Fleming affecting Nautilus's decision to settle as follows:<br><br>**Q.  Were you aware of Cory Fleming having any involvement until he appeared as the lawyer?  I mean any involvement in Ms. Satterfield's death.**<br>    *A.  No.*  I mean, I don't know when he got involved, and I just know that when I got the case and the claim was made, Cory was the Satterfield's attorney. | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 72:21-73:2; included as Exhibit 26. |
| < 03/14/2019 | Mr. Grantland testified about the absence of any statements or advocacy on behalf of Mr. Fleming affecting Nautilus's decision to settle as follows:<br><br>83:22  I do want to find out did -- *were there*<br>83:23  *any statements by Mr. Cory Fleming that were*<br>83:24  *discussed in your room in terms of positions taken on*<br>83:25  *behalf of the estate of Gloria Satterfield?*<br>84:1    A.  You mean settlement demands or --<br>84:2    Q.  Well, not so much the settlement demands,<br>84:3  but *statements of fact or conclusions* or, you know,<br>84:4  *assertions about what happened or things of that*<br>84:5  *nature from --* | Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 83:22-84:12; included as Exhibit 26. |

| Date | Established and Undisputed Facts | Record Support |
|------|-------------------------------|----------------|
| | 84:6   *A. No.*<br>**84:7**   **Q. -- Cory Fleming?**<br>84:8   *A. No.* I mean, he was in a separate room, and<br>84:9  we said hello, but that was -- you know, I mean, Cory<br>84:10  said some things towards the end of the mediation<br>84:11  but -- regarding settlement, but -- **but not about the**<br>84:12 **facts**. | |
| 03/14/2019 | Mr. Grantland sent a mediation statement to the mediator, Jon L. Austen, Esq., stating, in relevant part, "For purposes of mediation, I do not intend to argue liability. I do not see a benefit to Alec to argue that [Ms. Satterfield] may have simply lost her balance when he says his dogs knocked her down. However, despite [Ms. Satterfield]'s young age, I do not believe the fall was the sole cause of her death. Her underlying health conditions also contributed to her death." | Grantland letter to Austen, dated Mar. 14, 2019; NAUTILUS_000568-570, included as Exhibit 13.[2] |
| 03/18/2019 | Ms. Miller and Mr. Grantland exchanged emails discussing venue in Hampton County, the size of verdicts in that county, and the value of the Satterfield Estate's claims. Mr. Grantland characterized venue in Hampton County as, "*It is really like an alternative universe or the twilight zone down there*. Honestly, *if we want to settle on Friday, I think it will take closer to $3M to $4M*. … The only way we settle for less than near our limits is if the Satterfield sons are reasonable and want the money now." | Miller - Grantland email thread, dated Mar. 18, 2019; NAUTILUS_000577-578, included as Exhibit 14; and Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 80:8-81:6; included as Exhibit 26. |
| 03/22/2019 | Mediation was conducted in the Charleston offices of Mr. Austen, but the claims were not resolved until Monday, March 25, 2019, when Nautilus confirmed the availability of $3,800,000 to resolve the Satterfield Estate's claims. | |
| 03/22/2019 | Mr. Grantland testified about the status of the negotiations at the end of mediation as follows: | Deposition of John M. Grantland, Esq., taken |

[2] This mediation statement is being offered into evidence pursuant to Rule 8(c)(4), SCADR, "There is no confidentiality attached to information that is disclosed during a mediation: (4) offered for the limited purpose in judicial proceedings of establishing, refuting, approving, voiding, or reforming a settlement agreement reached during a mediation[.]"

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| | 84:22  A.  Right.  I mean, ultimately it came down<br>84:23  to -- and I don't know how many back-and-forths there<br>84:24  was, but Austen gave a proposal, and sometimes<br>84:25  mediators do that, and it was 3 -- I think it was the<br>85:1  3.8 number, and it was more than we had, and it was a<br>85:2  lot less than -- I think their demand was 4.5 or<br>85:3  something like that.<br>85:4         And -- and Cory -- I mean, that was --<br>85:5  that's kind of where we left it, and the last thing I<br>85:6  said to -- the last thing Cory said to me was he's<br>85:7  talked to Tony, and if we can get that, we can settle<br>85:8  the case.<br>85:9      Q.  This number, the mediator's number --<br>85:10    A.  Yeah.  The mediator's proposal.<br>85:11     Q.  -- Mr. Austen, ultimately became the<br>85:12  number --<br>85:13    A.  Right.<br>85:14     Q.  -- 3.8 million.  Okay. | Mar. 12, 2024, 84:22-85:14; included as Exhibit 26. |
| 03/25/2019 | Mr. Grantland emailed Mr. Fleming and Mr. Wallinger "*to confirm we have a settlement in this case with Nautilus paying $3.8M and Brit paying $505k.*" Mr. Grantland also states, "My office will work on the court approval documents ASAP. The agreements we prepare will all have be (sic.) 'In re Gloria Satterfield' in the caption." | Grantland email to Fleming and Wallinger, dated Mar. 25, 2019; NAUTILUS_000593, included as Exhibit 15. Deposition of John M. Grantland, Esq., taken Mar. 12, 2024, 88:13-18; included as Exhibit 26. |
| 04/02/2019 | Mr. Grantland emailed Ms. Miller stating, "Plaintiff's attorney asked for the check to be written as follows: *Chad Westendorf as Personal Representative of the Estate of Gloria Satterfield and Moss, Kuhn and Fleming attorneys*[.] Plaintiff's w-9 is attached." | Grantland email to Miller dated Apr. 2, 2019; NAUTILUS_000620, included is Exhibit 16. |
| 04/17/2019 | Mr. Grantland emailed Ms. Miller responding to her questions about why he was preparing the "court approval documents," and explaining that "*In SC, defense counsel, typically prepare the court approval documents.*" | Grantland email to Miller dated Apr. 17, 2019; NAUTILUS_000660, included as Exhibit 17. |
| 04/22/2019 | Mr. Grantland sent a letter to Mr. Fleming enclosing the $3,800,000 settlement proceeds check made payable to *Chad Westendorf as Personal* | Grantland letter to Fleming, dated Apr. 22, 2019; M&G000020 and |

| Date | Established and Undisputed Facts | Record Support |
|------|----------------------------------|----------------|
| | *Representative of the Estate of Gloria Satterfield and Moss, Kuhn and Fleming, P.A.* Although the letter goes on to state, "Please hold the settlement funds in trust until the Petition and Order Approving Settlement have been signed and filed at the *Probate Court settlement hearing*[,]" later developments changed the plans on the court in which the wrongful death settlement approval hearing took place and on filing the Order. | NAUTILUS_002565-566, included is Composite Exhibit 18. |
| 04/22/2019 | Mr. Fleming testified about the letter from Mr. Grantland dated April 22, 2019, with the enclosed settlement proceeds check as follows: <br><br> 48:7    Q.   This letter told you to hold the funds in <br> 48:8  your trust account until there was a signed and <br> 48:9  filed order from the probate court; is that <br> 48:10  correct? <br> 48:11        MR. CLEMENT: Objection to the form. <br> 48:12    A.   It says:  Please hold these settlement <br> 48:13  funds in trust until the petition and order <br> 48:14  approving settlement have been signed and filed at <br> 48:15  the probate court settlement hearing. <br> 48:16    Q.   That's a pretty standard request in your <br> 48:17  experience? <br> 48:18    A.   The holding funds is, not the probate <br> 48:19  part. <br> 48:20    Q.   Leaving probate aside, so holding funds <br> 48:21  until there has been an order approving the <br> 48:22  settlement and filed, is that a pretty standard <br> 48:23  request? <br> 48:24    A.   That's standard to hold the funds until <br> 48:25  there is an order approving settlement, yes. | Deposition of Cory Fleming, taken Feb. 14, 2024, 48:7-48:25; included as Exhibit 25. |
| 05/06/2019 | Mr. Grantland and Ms. Miller exchanged emails about the wrongful death settlement approval hearing. Mr. Grantland explained, "We hope to have the hearing next week in *common pleas court*. We were originally going to do the approval in probate court since that would be more secretive and under the radar. But the probate court is backed up and will not give us a date. We can have the hearing next week with the Circuit Court judge, and Corey Fleming and I are both working on getting it scheduled with the judge." | Grantland email to Miller dated May 6, 2019; NAUTILUS_000678-679, included is Exhibit 19. |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| 05/10/2019 | Mr. Grantland and Ms. Miller exchanged emails about the wrongful death settlement approval hearing being scheduled for Monday, May 13, 2019. Ms. Miller responded stating, "Good news. *I am anxious to put this one to bed.*" | Grantland - Miller email thread, dated May 10, 2019; NAUTILUS_000681-682, included is Exhibit 20. |
| 05/13/2019 | The wrongful death settlement approval hearing was heard by the Hon. Carmen T. Mullen in the Hampton County Courthouse with Mr. Fleming and Mr. Westendorf in attendance. Mr. Grantland testified that he went to the Beaufort County Courthouse under the mistaken belief that the hearing was being held there. During the hearing, Judge Mullen signed the Order Approving Settlement prepared by Mr. Grantland and gave the signed order to Mr. Fleming. | Order Approving Settlement, dated May 13, 2019; M&G000045, included as Exhibit 21.<br><br>Grantland depo., 108:1 – 108:20 taken on March 12, 2024; included as Exhibit 26. |
| 05/13/2019 3:41 PM | **After returning from the hearing, Mr. Fleming emailed Mr. Grantland a digital copy of the signed original Order.** | Fleming email to Grantland with digital copy of original Order, dated May 13, 2019; M&G000785 and M&G000045-048, included as Exhibit 22. |
| >04/22/2024 | Mr. Fleming testified about the modification of the plans for the Order Approving Settlement as follows:<br><br>50:23  Q.  So in what way did you not have a duty to<br>50:24  comply with the instructions to hold the funds in<br>50:25  trust until the order approving settlement was<br>51:1  signed and filed?<br>51:2        MR. CLEMENT: Objection to form.<br>51:3    A.  Those instructions were modified.<br>51:4    Q.  In what way?<br>51:5    A.  *There was a specific understanding between*<br>51:6  *myself and counsel for Nautilus that first that we*<br>51:7  *were not going to have the probate court do it*<br>51:8  *because we typically used the circuit court.*  We<br>51:9  never used the probate court for approval.  That's<br>51:10  not to say you can't; it's just easier in my<br>51:11  experience to get the circuit court to do it,<br>51:12  wherever it may be.  *Then secondly that the signed*<br>51:13  *order -- I was not going to be responsible for the*<br>51:14  *filing of the signed order.* | Deposition of Cory Fleming, taken Feb. 14, 2024, 50:23-52:6; included as Exhibit 25. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| | 51:15    Q.  You say you had an understanding about<br>51:16  that.  How did that understanding come to be?<br>51:17    A.  There was a discussion.  I don't remember<br>51:18  exactly.  *I think Mr. Murdaugh initiated it, but he*<br>51:19  *indicated to Mr. Grantland that he did not want the*<br>51:20  *settlement filed until the boat wreck stuff -- I*<br>51:21  *think we all know what I'm talking about -- until*<br>51:22  *the publicity from the boat wreck calmed down.*<br>51:23    ***So I agreed to have it approved and that I***<br>51:24  ***would send it to Mr. Grantland, and then***<br>51:25  ***Mr. Grantland could file it whenever he felt***<br>52:1  ***necessary***.<br>52:2    Q.  You referred to I believe counsel for<br>52:3  Nautilus.  You mean counsel for Mr. Murdaugh;<br>52:4  correct?<br>52:5    A.  I'm sorry.  I thought it was one and the<br>52:6  same, but yes. | |
| 05/13/2019<br>5:49 PM | Mr. Grantland emailed Ms. Miller stating in relevant part, "attached is the order approving the settlement. The original is on the way." | Grantland email to Miller dated May 13, 2019, 5:49 PM EST; M&G001935 and M&G000045-048, included as Exhibit 23. |
| 05/13/2019 | **Also, after returning from the hearing, Mr. Fleming, sent a letter to Mr. Grantland providing "the original Order Approving Settlement, …."** | Fleming letter to Grantland with the original Order, dated May 13, 2019; M&G SUPP TO SECOND ODC SUB 025, included as Exhibit 24. |
| > 05/13/2019 | Mr. Fleming further testified about the modification of the plans for the Order Approving Settlement as follows:<br><br>54:3    Q.  And you agree that you had a<br>54:4  responsibility to hold -- whatever the modification<br>54:5  of any agreement was, you agree you had a<br>54:6  responsibility to hold the funds in trust until<br>54:7  there was a valid settlement; correct?<br>54:8      MS. WILLIAMSON:  Object to form.<br>54:9      MR. PENDARVIS:  Objection.<br>54:10      MR. CLEMENT:  Objection to the form.<br>54:11    A.  I believe that I complied with everything<br>54:12  I was supposed to comply with regarding that. | Deposition of Cory Fleming, taken Feb. 14, 2024, 54:3-54:12; included as Exhibit 25. |

| Date | Established and Undisputed Facts | Record Support |
|---|---|---|
| > 05/13/2019 | Mr. Fleming further testified about the plans for filing the Order Approving Settlement as follows:<br><br>57:23   I do remember, however, explaining<br>57:24  to the judge that -- she didn't need to be told,<br>57:25  but that there was lots of publicity and that we<br>58:1   wanted to delay the filing for sometime until it<br>58:2   went down and that I would leave it either -- I did<br>58:3   not say I would file it, but I would leave it to<br>58:4   them to determine when they wanted to file it,<br>58:5   "them" meaning Alec's side, not differentiating him<br>58:6   or the insurance company or anybody, but I'll leave<br>58:7   it to them when it will be filed. | Deposition of Cory Fleming, taken Feb. 14, 2024, 57:23-58:7; included as Exhibit 25. |
| > 05/13/2019 | Mr. Fleming further testified about the modification of the plans for the Order Approving Settlement as follows:<br><br>58:13  Q.  No disagreements, correct, that following<br>58:14  that hearing you disbursed money from Moss, Kuhn &<br>58:15  Fleming's trust account to Forge without the order<br>58:16  having been filed?<br>58:17       MR. PENDARVIS:  Form objection.<br>58:18  A.  I certainly disbursed money, and it<br>58:19  appears that the order has not been filed; however,<br>58:20  all parties knew it was not going to be filed<br>58:21  including Mr. Grantland. | Deposition of Cory Fleming, taken Feb. 14, 2024, 58:13-58:21; included as Exhibit 25. |
| > 05/13/2019 | During Mr. Fleming's deposition taken in this case, Mr. Fleming testified that he did not plead "guilty to conspiracy relating to the death of Gloria Satterfield," but instead that he pled guilty to attempted wire fraud. | Fleming depo., 9:1-9:23 taken on February 14, 2024; included as Exhibit 25. |
| > 05/13/2019 | Mr. Fleming testified concerning his fee arrangements as follows:<br><br>24:8       Q. Mr. Fleming, what was your agreement with<br>24:9   regard to how you would be compensated for your<br>24:10  efforts?<br>24:11     A.  Well, there really wasn't an agreement.<br>24:12  Early on I made the assumption that I wasn't going<br>24:13  to be compensated because I was just writing a<br>24:14  letter and this was just to get the money for the<br>24:15  Satterfield boys.  As I got more involved in it we<br>24:16  did not have a discussion about me being<br>24:17  compensated at all.  That did not happen until | Fleming depo, taken Feb. 14, 2024, 24:8-25:7; included as Exhibit 25. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| | 24:18  after the first check was issued, I guess, on the<br>24:19  first policy.<br>24:20         I spoke with Alec, and he had said that he<br>24:21  wanted me to cut the sort of standard fee, if you<br>24:22  will, and so -- and I don't remember the specific<br>24:23  conversation, but I reduced my fee down.  That was<br>24:24  the discussion we had about my compensation at that<br>24:25  point.<br>25:1     Q.  So I want to make sure I heard correctly.<br>25:2         There was no agreement initially, and then<br>25:3  once a check came in you had an agreement with<br>25:4  Mr. Murdaugh that you would reduce your standard<br>25:5  fee?<br>25:6     A.  Yes.  I would reduce the fee, and I don't<br>25:7  remember what the dollar amount was. | |
| > 05/13/2019 | Mr. Fleming testified concerning his knowledge of Mr. Murdaugh's plans to misappropriate the Satterfield Estate's settlement proceeds as follows:<br><br>40:24  Q.  Mr. Fleming, you previously admitted I<br>40:25  believe that you were aware that Mr. Murdaugh<br>41:1  intended to steal at least some of the money; is<br>41:2  that correct?<br>41:3     A.  *That's not correct.*<br>41:4     Q.  How is that incorrect, please?<br>41:5     A.  It's too broad a statement.  I did not<br>41:6  know until it -- there was a time that I knew it,<br>41:7  but it was not during any of the time frame that<br>41:8  we've been discussing.<br>41:9     **Q.  When did you come to be aware that he**<br>41:10  *intended to steal a portion of the money?*<br>41:11     A.  I'm going to push back a little bit on<br>41:12  your characterization.  I'm not going to call it<br>41:13  steal.  I'm just going to tell you what happened.<br>41:14  I will tell you what we discussed, and then you can<br>41:15  put whatever label you want to on it.  I'm not<br>41:16  trying to be cute.  I don't want to use labels.<br>41:17         ***It was subsequent to the second settlement***<br>41:18  ***and the discussions about distribution of the***<br>41:19  ***funds.***  I had at his request but also my<br>41:20  acquiescence agreed to significantly reduce that<br>41:21  portion of my fee as well.  The difference this<br>41:22  time was that ***Mr. Murdaugh*** -- he ***said, well, that's***<br>41:23  ***about $700,000 that you're not charging them.***<br>41:24  ***You're going to have to cut me in on some of that***<br>41:25  ***extra, you know, just for fun money, like trips and***<br>42:1  ***stuff like that, you know, talking about no***<br>42:2  ***specific number, but in the 100 to 200 thousand***<br>42:3  ***dollar range is what he was talking about with no*** | Deposition of Cory Fleming, taken Feb. 14, 2024, 40:24-43:5; included as Exhibit 25. |

| Date | Established and Undisputed Facts | Record Support |
|------|--------------------------------|----------------|
| | 42:4 *discussion on how he would draw it out, but that* <br> 42:5 *discussion did not occur until we were talking* <br> 42:6 *about me reducing my fee.* <br> 42:7    Q.  So how would that have worked, <br> 42:8 Mr. Fleming? <br> 42:9    A.  I cannot for the life of me know other <br> 42:10 than -- I mean I can only guess as to how because <br> 42:11 it never happened, and so I don't know, but I was <br> 42:12 thinking it was probably going to be some sort of <br> 42:13 expenditure-type thing.  You know, padding an <br> 42:14 expense account type thing was what ran through my <br> 42:15 mind. <br> 42:16    Q.  So by that you mean on the first statement <br> 42:17 given to the Court there would be too much money in <br> 42:18 one of the categories, and Mr. Murdaugh would keep <br> 42:19 a portion of that? <br> 42:20    A.  No, because that wouldn't have -- *it* <br> 42:21 *didn't need a category because the fee was* <br> 42:22 *reflected as, you know, something million dollars* <br> 42:23 *when the actual fee was much, much less, and that* <br> 42:24 *left a gap.  So his message, if you will, the way* <br> 42:25 *he explained it to me was they would get -- "they"* <br> 43:1 *being the boys would get an additional $500,000 or* <br> 43:2 *something, ballpark numbers, and that I would carve* <br> 43:3 *a little out for him to have fun with, fun money,* <br> 43:4 *and so that money would have appeared to be my fee* <br> 43:5 *to the Court.* | |
| > 05/13/2019 | Mr. Fleming testified concerning his knowledge of Mr. Murdaugh's theft of the Satterfield Estate's settlement proceeds as follows: <br><br> 45:8    Q.  Mr. Fleming, do you agree that <br> 45:9 Mr. Murdaugh would never have been able to steal <br> 45:10 these funds had the Satterfields been aware of the <br> 45:11 settlements? <br> 45:12        MR. CLEMENT:  Object to the form. <br> 45:13    A.  I don't know.  Now I realize he was very <br> 45:14 clearly capable of a lot of things, so I don't know <br> 45:15 what he could have done. <br> 45:16    Q.  So it's fair to say but for this <br> 45:17 coordinated effort masterminded by Mr. Murdaugh, <br> 45:18 the insurance funds wouldn't have been obtained and <br> 45:19 he wouldn't have stolen them; correct? <br> 45:20        MR. PENDARVIS:  Objection. <br> 45:21        MS. ALLEN:  Objection. <br> 45:22    A.  I think that if Mr. Murdaugh hadn't stolen <br> 45:23 the money, then it wouldn't have been stolen. | Deposition of Cory Fleming, taken Feb. 14, 2024, 45:8-45:23; included as Exhibit 25. |

## ARGUMENTS

As a matter of law and undisputed fact, Mr. Fleming is entitled to an order granting Summary Judgment on all claims asserted against him in the Second Amended Complaint.

**I.     NAUTILUS PRESENTS NO EVIDENCE SHOWING MR. FLEMING CONSPIRED WITH ANYONE TO DEFRAUD NAUTILUS INTO PAYING THE SATTERFIELD ESTATE'S CLAIM THAT NAUTILUS HAD INVESTIGATED AND EVALUATED FOR OVER A YEAR.**

There is no causal connection between the decision Nautilus, its lawyers, and adjusters made to settle the Satterfield Estate claim and any act or omission by Mr. Fleming. As the record reveals, there was very little, if any, advocacy by Mr. Fleming that affected the decision Nautilus made to settle. Mr. Fleming's role in the settlement with Nautilus was basically limited to gathering and providing Nautilus with Ms. Satterfield's medical records.

The evidence and testimony reveal that the Nautilus, lawyers retained by Nautilus, its adjusters, and private adjusters investigated and evaluated the factual basis and legal issues related to the Satterfield Estate's claims for over a year before the case was settled. The evidence and testimony also reveal the decision Nautilus made to settle was based on a combination of 1) the concerns about Mr. Murdaugh's strict liability under the South Carolina dog liability statute given the statements obtained by Lloyd's of London and Nautilus given by Mr. Murdaugh, Maggie Murdaugh, Paul Murdaugh, and possibly Ms. Satterfield to members of her family about the Murdaughs' dogs causing her to fall; 2) their medical experts' opinions that the trauma from the fall was "a cause" of Ms. Satterfield's death; 3) concerns about their insured, Mr. Murdaugh, providing testimony at trial supporting the Satterfield Estate's claims; 4) concerns about the possibility – even likelihood – of a verdict in Hampton County in excess of policy limits; and 5) concerns expressed by their insured, Mr. Murdaugh, on how a lawsuit in Hampton County would

be extremely detrimental to him on multiple levels.

Nothing in the record establishing that anything Mr. Fleming did or said—other than providing copies of Ms. Satterfield's medical records—affected the decision Nautilus made to settle the Satterfield Estate's claims. There is nothing in the record establishing the combination or agreement between Mr. Murdaugh and Mr. Fleming to commit an unlawful act or to commit a lawful act by unlawful means *prior* to the decision by Nautilus to settle the Satterfield Estate's claims. There is nothing in the record establishing the commission of a covert act by Mr. Murdaugh or Mr. Fleming in furtherance of the conspiracy *prior* to the decision by Nautilus to settle the Satterfield Estate's claims.

There is nothing in the record establishing Mr. Fleming—as counsel for an adverse party—breached an independent duty he owed to Nautilus or otherwise acted in his own personal interests that Nautilus relied on in making its decision to settle with the Satterfield Estate. *See Douglass ex rel. Louthian v. Boyce*, 542 S.E.2d 715, 717 (S.C. 2001) (emphasis added) (citing *Stiles v. Onorato*, 457 S.E.2d 601 (S.C. 1995) ("[A]n attorney may be held liable for conspiracy where, in addition to representing his client, he breaches some independent duty to a third person or acts in his own personal interest, outside the scope of his representation of the client."). *See also, Argoe v. Three Rivers Behavioral Ctr. & Psychiatric Sols.*, 697 S.E.2d 551, 554 (S.C. 2010) ("[A]n attorney owes no duty to a non-client unless he breaches some independent duty to a third person or acts in his own personal interest, outside the scope of his representation of the client.").

The record establishes that all of Mr. Fleming's "bad acts" in breach of his duties to the Satterfield Estate occurred after Nautilus decided to settle; after Nautilus obtained from the Satterfield Estate a binding Release of all claims; after a South Carolina Circuit Court judge signed an Order Approving Settlement of the Estate's wrongful death claims; and after the original signed

Order Approving Settlement was mailed to the lawyer retained by Nautilus to defend the claims against its insured. The record also establishes that none of Mr. Fleming's "bad acts" caused any damage whatsoever to Nautilus. Nautilus had already made its decision to settle, obtained a Release of all claims fully executed by the Satterfield Estate, issued the settlement proceeds check, and received an Order signed by a South Carolina Circuit Court judge approving the wrongful death settlement. The only parties adversely affected by Mr. Fleming's "bad acts" were the Satterfield Estate and its beneficiaries; and those claims have been resolved.

In *Paradis v. Charleston County School District*, 861 S.E.2d 774 (2021), the South Carolina Supreme Court restated the elements of civil conspiracy as

(1) the combination or agreement of two or more persons,
(2) to commit an unlawful act or a lawful act by unlawful means,
(3) together with the commission of an overt act in furtherance of the agreement, and
(4) damages proximately resulting to the plaintiff.

861 S.E.2d at 780.

As aptly noted in Justice Few's concurring opinion in *Paradis*, "[T]he law should never permit a court or a jury to impose civil liability for lawful, non-tortious conduct." 861 S.E.2d at 785 (Few, J., concurring). Mr. Fleming's activities and advocacy were "lawful, non-tortious conduct" and typical for a lawyer representing an estate pursuing wrongful death claims up to the point when the Nautilus issued its settlement proceeds check and obtained a Release from the Satterfield Estate.

There is no evidence of any "overt act" by Mr. Fleming prior to the settlement. *See Paradis*, 861 S.E.2d at 780; *Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (S.C. 1981). There is also no evidence that Mr. Fleming intended to harm Nautilus. In footnote nine of the *Paradis* decision, the Supreme Court explicitly recognized civil conspiracy as an "intentional tort"

for which "an intent to harm . . . remains an inherent part of the analysis." 861 S.E.2d at 780 n.9.

There is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on Nautilus's claims for civil conspiracy.

## II.    NAUTILUS PRESENTS NO EVIDENCE SHOWING MR. FLEMING VIOLATED ANY ELEMENT OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT.

Nautilus cannot show or present evidence establishing any element of a claim under the South Carolina Unfair Trade Practices Act ("UTPA"). The UTPA declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are ... unlawful." S.C. CODE ANN. § 39-5-20(a) (1985). To recover in an action under the UTPA, the plaintiff must show:

1.   the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce;
2.   the unfair or deceptive act affected [the] public interest; and
3.   the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive acts.

*Wright v. Craft,* 640 S.E.2d 486, 498 (S.C. App. 2006); *Bailey v. Finger*, No. 9:21-CV-04123-DCN, 2023 WL 3818500, at *2 (D.S.C. June 5, 2023).

Nautilus presents no evidence that Mr. Fleming "engaged in an unfair or deceptive act" directed toward Nautilus or that Nautilus relied on in making its decision to settle the Satterfield Estate's claims. *See* (the arguments in the preceding section).

Nautilus can present no evidence establishing that Mr. Fleming's alleged "unfair or deceptive acts" can or will affect the public interest because Mr. Fleming has been disbarred and is no longer licensed to practice law in any state.

An alleged unfair or deceptive act or practice can be shown to affect the public interest by

demonstrating a potential for repetition. *Haley Nursery Co. v. Forrest*, 381 S.E.2d 906, 908 (S.C. 1989). Demonstration of the potential for repetition can be establishing either of two ways: "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." *Wright*, 640 S.E.2d at 502. However, "the plaintiff in a SCUTPA action is required only to allege and prove those facts sufficient to demonstrate potential for repetition; at that point, plaintiff has proven an adverse effect on the public interest sufficient to recover under the SCUTPA." *Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc.*, 176 F. Supp. 2d 510, 516 (D.S.C. 2001). Relief under the UTPA is "not available to redress a private wrong where the public interest is unaffected." *Columbia E. Assocs. v. Bi-Lo, Inc.*, 386 S.E.2d 259, 263 (S.C. App. 1989); *see also Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc*., 351 S.E.2d 347, 350-51 (S.C. App. 1986).

The allegations directed toward Mr. Fleming in the Second Amended Complaint filed on the half of Nautilus all focus on Mr. Fleming's role as a lawyer and counsel for the Satterfield Estate. *See e.g.*, (Second Amended Complaint, ¶¶ 3, 15, 16, and 17; Dkt. 154). In Paragraph 17 of its Second Amended Complaint Nautilus alleged that "Fleming [has been] suspended from the practice of law and indicted." On November 7, 2023, the Georgia Supreme Court issued its opinion styled *In the Matter of Cory Howerton Fleming*, 895 S.E.2d 301 (Ga. 2023) disbarring Mr. Fleming from practicing law in Georgia; and on November 30, 2023, the Supreme Court of South Carolina issued its opinion styled, *In the Matter of Cory Howerton Fleming*, 895 S.E.2d 672 (S.C. 2023), disbarring Mr. Fleming from the practice along South Carolina. Because Mr. Fleming has been disbarred from the practice of law in Georgia and South Carolina, and is not licensed in any other state, Nautilus cannot show or present any evidence that it is "likely" Mr. Fleming's alleged

deceptive acts "will continue to occur absent deterrence; or" that there is any "potential for repetition of the unfair and deceptive acts." *See Wright*, 640 S.E.2d at 502. As such, Nautilus can present no facts establishing a genuine dispute over whether Mr. Fleming's alleged deceptive acts can or will "affect the public interest." With no license to practice law, Mr. Fleming's alleged deceptive acts do not have the potential for repetition. *Id*.

The third and final element of an UTPA action under S.C. CODE ANN. § 39-5-140(a) requires that the plaintiff suffer an "ascertainable loss of money or property, real or personal, ***as a result of*** the use or employment by another person of an unfair or deceptive method, act or practice." *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc*., 777 S.E.2d 176, 189 (S.C. 2015) (quoting S.C. CODE Ann. § 39-5-140(a) (emphasis added)). Thus, the UTPA requires that a plaintiff suffer an actual loss, injury, or damage, and requires a causal connection between the injury-in-fact and the alleged unfair or deceptive acts or practices. *Id*. (citing S.C. CODE ANN. § 39-5-140(a)). Nautilus cannot establish the causal connection based on the testimony and evidence in the record.

Under this damages element, Nautilus seeks to recover its "contribution to the Satterfield settlement" (Dkt. 154, p. 12, ¶ 50), and "treble damages and attorneys' fees." (Dkt. 154, p. 12, ¶ 54). The available testimony and evidence, however, Nautilus has not presented and cannot present evidence that creates a genuine dispute over whether it relied on Mr. Fleming's alleged "unlawful trade practices" in making his decision to settle the wrongful death claims asserted on behalf of the Satterfield Estate. It did not. The evidence overwhelmingly establishes Nautilus made its own decision to settle based on its independent investigation and evaluation of the Satterfield Estate's claims. In addition, the testimony and evidence in the record shows that all of Mr. Fleming's "bad acts" occurred after Nautilus made its decision to settle.

There is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on Nautilus's claims for an alleged violation of the UFTPA.

## III. NAUTILUS OFFERS NO EVIDENCE ESTABLISHING THAT MR. FLEMING BREACHED ANY AGREEMENT WITH OR ANY FIDUCIARY DUTY TO NAUTILUS OR THAT ANY ACTIONS BY MR. FLEMING PROXIMATELY CAUSED DAMAGES TO NAUTILUS.

Nautilus has not and cannot present any evidence showing Mr. Fleming breached any agreement or fiduciary duties he owed to Nautilus has not and cannot present any evidence establishing a proximate causal link between any of Mr. Fleming's acts or omissions and any alleged damages claim by Nautilus.

In the Fifth Cause of Action alleged by Nautilus in its Second Amended Complaint, Nautilus makes several conclusory allegations, including the allegations in Paragraph 60, claiming, "A fiduciary duty was owed by Fleming, … to Nautilus, on account of the deposit of funds paid by Nautilus for the benefit of the Satterfield Estate into MKF's trust account by Fleming, to ensure the funds were distributed to the intended beneficiaries only after an order approving the settlement had been signed and filed." *See* (Dkt. 154, p. 13, ¶ 60). Nautilus' Sixth Cause of Action asserts claims against Mr. Fleming for "breach of an agreement." *See* (Dkt. 154, p. 13, ¶P 65-70). Both of these causes of action are founded upon Mr. Grantland's letter to Mr. Fleming delivering the settlement proceeds check. This letter states, *"Please hold the settlement funds in trust until the Petition and Order Approving Settlement have been signed and filed at the Probate Court settlement hearing."* *See* (Grantland letter to Fleming, dated Apr. 22, 2019; M&G000020 and NAUTILUS_002565-566, included is Composite Exhibit 19). The plans for the settlement approval hearing and filing of the Order were changed by agreement, and the testimony and evidence concerning the modification of those plans is the basis for Mr. Fleming's motion for

summary judgment on these two causes of action.

The were discussions between Mr. Grantland and Mr. Fleming regarding the wrongful death settlement approval hearing and treatment of the Order Approving Settlement, where counsel agreed the hearing would take place in Circuit Court not Probate Court; and given the publicity concerns expressed by Mr. Murdaugh about the boat accident, counsel agreed that Mr. Grantland, Nautilus, and Mr. Murdaugh would determine when the Order would be filed. *See* (Deposition of Cory Fleming, taken Feb. 14, 2024, 50:23-52:6; included as Exhibit 26) ("*I was not going to be responsible for the <u>filing</u> of the signed order.*") ("*I think Mr. Murdaugh initiated it, but he indicated to Mr. Grantland that he did not want the settlement filed until the boat wreck stuff – I think we all know what I'm talking about – until the publicity from the boat wreck calmed down. So I agreed to have it approved and that I would send it to Mr. Grantland, and then Mr. Grantland could file it whenever he felt necessary.*") Consistent with Mr. Fleming's testimony are: 1) his email to Mr. Grantland on May 13, 2019, providing a digital copy of the original Order Approving Settlement and 2) Mr. Fleming's letter of the same date with the enclosed original Order Approving Settlement. *See* (Fleming email to Grantland with digital copy of original Order, dated May 13, 2019; M&G000785 and M&G000045-048, included as Exhibit 23); (Grantland email to Miller dated May 13, 2019, 5:49 PM EST; M&G001935 and M&G000045-048, included as Exhibit 24); and (Fleming letter to Grantland with the original Order, dated May 13, 2019; M&G SUPP TO SECOND ODC SUB 025, included as Exhibit 25).

Although Mr. Grantland testified in 2024, that he understood he would receive a filed copy of the Order Approving Settlement, it is significantly important to note that in 2019 when he received the email (and the letter) with the "original Order" that had not been filed, he did not send a reply email, make a phone call, or send a letter to Mr. Fleming questioning why the Order had

not been filed. The same is true for Ms. Miller / Nautilus, when she received Mr. Fleming's email forwarded by Mr. Grantland. At that point, Nautilus was in total control of when, where, and how the Order would be filed. Nothing was preventing Nautilus from filing the Order at that point.

All of the evidence and testimony on this point can be reasonably viewed in only one way: The terms of Mr. Grantland's April 22, 2019, letter to Mr. Fleming were modified such that Nautilus and Mr. Murdaugh were in control of filing the Order. Mr. Fleming satisfied all the modified conditions in Mr. Grantland's April 22, 2019, letter.

"To establish a claim for breach of fiduciary duty, Plaintiffs must show: (1) the existence of a fiduciary relationship; (2) a breach of that duty; and (3) damages proximately resulting from the wrongful conduct of the defendant." *Wellin v. Wellin*, No. 2:13-CV-1831-DCN, 2014 WL 234216, at *5 (D.S.C. Jan. 22, 2014) (citing *Turpin v. Lowther*, 745 S.E.2d 397, 401 (S.C. App. 2013)). The existence of a fiduciary duty is a question of law for the court. *See Vortex Sports & Entm't, Inc. v. Ware*, 662 S.E.2d 444, 450 (S.C. App. 2008) (citing *Clearwater Trust v. Bunting*, 626 S.E.2d 334, 337 (S.C. 2006)). "A confidential or fiduciary relationship exists when one imposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *SSI Med. Servs., Inc. v. Cox*, 392 S.E.2d 789, 794 (S.C. 1990). "To establish the existence of a fiduciary relationship, the facts and circumstances must indicate the party reposing trust in another has some foundation for believing the one so entrusted will act not in his own behalf but in the interest of the party so reposing." *Moore v. Moore*, 599 S.E.2d 467, 472 (S.C. App. 2004).

"The elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *J & W Corp. of Greenwood v. Broad Creek Marina of Hilton*

*Head, LLC*, 896 S.E.2d 328, 342 (S.C. App. 2023) (citing *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. App. 2009)).

Nautilus has not and cannot present facts establishing Mr. Fleming's breach of any duty from Mr. Fleming to Nautilus, even if the Court determines a fiduciary relationship existed. Nautilus has not and cannot present facts establishing a causal link between any acts or omissions by Mr. Fleming because 1) Nautilus already had to deliver the $3.8 million settlement proceeds to the agent for the Satterfield Estate under the terms of the Release and under the terms of the Order Approving Settlement signed by Judge Mullen; and 2) the terms permitting dispersal of the settlement proceeds as outlined in Mr. Grantland's April 22, 2019 letter to Mr. Fleming were modified and Mr. Fleming satisfied all the modified terms.

There is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on Nautilus's claims for breach of fiduciary duty and for breach of any agreement flowing from Mr. Grantland's April 22, 2019, letter to Mr. Fleming.

**IV.    THERE IS NO EVIDENCE SHOWING MR. FLEMING AIDED AND ABETTED MR. MURDAUGH'S FRAUD BEFORE NAUTILUS ENTERED INTO A BINDING SETTLEMENT AGREEMENT WITH THE SATTERFIELD ESTATE, ISSUED ITS SETTLEMENT CHECK, AND THE CIRCUIT COURT APPROVED THE WRONGFUL DEATH SETTLEMENT.**

Because South Carolina has never recognized a claim for "aiding and abetting fraud," this claim by Nautilus should be dismissed as a matter of law. The only "aiding and abetting fraud" matter addressed by the South Carolina Supreme Court concerned whether an "aiding and abetting securities fraud" was available under a specific statute, and the Court flatly rejected that proposition. *See Atlanta Skin & Cancer Clinic, P.C. v. Hallmark Gen. Partners, Inc.*, 463 S.E.2d 600, 604 (S.C. 1995) (finding is no implied cause of action for aiding and abetting state Uniform Securities Act violation outside of express remedy contained in S.C. CODE ANN. § 35–1–1500).

Even if this Court analogized Nautilus's purported claim for "aiding and abetting fraud" to a claim for "aiding and abetting breach of fiduciary duty," which has been recognized by the appellate courts in South Carolina, summary judgment should be granted on such a claim because the undisputed facts establish that Nautilus can prove no element of the claim. "The elements for a cause of action of aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages." *Vortex Sports & Entm't, Inc. v. Ware*, 662 S.E.2d 444, 448 (S.C. App. 2008).

Nautilus makes no allegations and can offer no evidence establishing the existence of a fiduciary duty between Mr. Fleming and Nautilus because there is no evidence showing Nautilus "impose[d] a special confidence in" Mr. Fleming, as counsel for an adverse party, the Satterfield Estate, "so that [Mr. Fleming], in equity and good conscience, is bound to act in good faith and with due regard to the interests of [Nautilus]." *See SSI Med. Servs., Inc. v. Cox*, 392 S.E.2d at 794. Mr. Grantland's April 22, 2019, letter to Mr. Fleming did not create a fiduciary relationship between Mr. Fleming and Nautilus. Even if it were determined the April 22, 2019, letter did give rise to a fiduciary relationship, Nautilus can present no evidence establishing that Mr. Fleming "knowingly participated" in Mr. Murdaugh's theft of the settlement proceeds.

There is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on Nautilus's claims for "aiding and abetting fraud," which is never been recognized under South Carolina jurisprudence.

## V.    THERE IS NO EVIDENCE SHOWING NAUTILUS CAN ESTABLISH A CLAIM AGAINST MR. FLEMING FOR "MONEY HAD AND RECEIVED OR FOR "UNJUST ENRICHMENT."

Summary judgment is appropriate on Nautilus's claims for "money had and received" and its claims for "unjust enrichment," because once Mr. Westendorf signed the Release and the circuit

court signed the Order Approving Settlement, the settlement proceeds belonged to the Satterfield Estate and did not belong to Nautilus.

An action for money had and received exists where a defendant has money belonging to the plaintiff which in equity should be repaid to the plaintiff. *Okatie River, L.L.C. v. Se. Site Prep, L.L.C.*, 577 S.E.2d 468, 472 (S.C. App. 2003) (citing *Jackson v. White*, 194 F. 677 (4th Cir. 1912); 42 C.J.S. IMPLIED CONTRACTS § 11 (1991). "In order to recover on a count for money had and received, ... the plaintiff must show he has equity and conscience on his side, and that he could recover in a court of equity." *Okatie River, LLC* at 472 (citing *Marvin v. McRae*, 24 S.C.L. (Rice) 171, 176–77 (1839)). "An action for money had and received is based upon a quasi-contract or a contract implied in law. *Okatie River, LLC*, at 473 (citing *King County v. Odman*, 8 Wash.2d 32, 111 P.2d 228, 229 (1941); 66 Am. Jur. 2d RESTITUTION AND IMPLIED CONTRACTS § 172 (2001))."

In *Myrtle Beach Hospital, Inc. v. City of Myrtle Beach*, 532 S.E.2d 868 (2000), the South Carolina Supreme Court held that "quantum meruit, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy." 532 S.E.2d at 872. In addition, the South Carolina Supreme Court adopted the "*Scudder May*" test "as the sole test for a quantum meruit/ quasi-contract/implied by law claim." 532 S.E.2d at 872. This test requires the plaintiff showing the following:

(1)    a benefit conferred by plaintiff upon the defendant;
(2)    realization of that benefit by the defendant; and
(3)    retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value.

532 S.E.2d at 872 (citing *Columbia Wholesale Co. v. Scudder May, N.V.*, 440 S.E.2d 129 (S.C. 1994)).

Nautilus has not and cannot present any evidence showing it ever issued a check payable

to Mr. Fleming or conferred a benefit to Mr. Fleming. The settlement proceeds check was payable to the Personal Representative of the Satterfield Estate and Moss, Kuhn, & Fleming, LLC ("MKF"). As confirmed in Mr. Grantland's testimony, Nautilus never agreed to pay any attorneys' fees directly to the lawyers or law firm representing the Satterfield Estate. Whatever attorneys' fees were to be paid to MKF was a matter between MKF and the Satterfield Estate. Similarly, Nautilus has not and cannot present any evidence showing Mr. Fleming was unjustly enriched by any payment or other benefit from Nautilus to Mr. Fleming.

There is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on Nautilus's claims for "money had and received and for "unjust enrichment.

## VI.    THERE IS NO EVIDENCE SHOWING MR. FLEMING CONVERTED ANY FUNDS BELONGING TO NAUTILUS.

Summary judgment is appropriate on Nautilus's claims for "conversion" because there is no evidence establishing that Mr. Fleming "converted" any asset or funds belonging to Nautilus.

Conversion is a wrongful act emanating from either a wrongful taking or wrongful detention. *Moore v. Weinberg*, 644 S.E.2d 740, 749 (S.C. App. 2007); *Kirby v. Horne Motor Co.*, 366 S.E.2d 259 (S.C. App. 1988). Conversion is defined as "the unauthorized assumption and exercise of the rights of ownership over goods or personal chattels belonging to another, to the alteration of their condition or to the exclusion of the rights of the owner." *Mullis v. Trident Emergency Physicians*, 570 S.E.2d 549, 550-51 (S.C. App. 2002). To prevail in a conversion action, the plaintiff must prove either title or right to possession of the property at the time of the conversion. *Oxford Fin. Co. v. Burgess*, 402 S.E.2d 480, 482 (S.C. 1991). Conversion cannot arise from the defendant's exercise of a legal right over the property. *Castell v. Stephenson Finance Co.*, 135 S.E.2d 311 (S.C. 1964). There can be no conversion of money unless there is an obligation on

the defendant to deliver a specific, identifiable fund to the plaintiff. *Richardson's Restaurants, Inc. v. National Bank of South Carolina*, 304 S.C. 289 (S.C. App. 1990).

To recover in an action for conversion, the plaintiff must prove:

(1)    an interest by the plaintiff in the thing converted;
(2)    the defendant converted the property to his own use;
(3)    the use was without the plaintiff's permission.

*Crane v. Citicorp. Nat'l Servs., Inc.*, 437 S.E.2d 50 (S.C. 1993) (to maintain an action for conversion, plaintiff must establish either title to or right to possession of the personal property in issue) *superseded by statute on other grounds by Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461 (S.C. 2004)); *Robinson v. Saxon Mills*, 117 S.E. 424 (1923) (to establish tort of conversion, plaintiff must prove either title to or right to possession of personal property at time of conversion).

Nautilus can present no evidence showing it had any interest in the settlement proceeds after the Personal Representative for the Satterfield Estate signed the Release, the executed Release was delivered to counsel for Nautilus, and the Circuit Court signed and approved the Order Approving Settlement. At that point the settlement proceeds belonged exclusively to the Satterfield Estate with Nautilus no longer having "an interest" in the settlement proceeds.

There is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law on Nautilus's claim for "conversion."

## VII.    THERE IS NO EVIDENCE SHOWING MR. FLEMING CONDUCTED OR PARTICIPATED IN ANY "RACKETEERING ACTIVITY" OR OTHERWISE VIOLATED RICO.

### A.    Summary judgment is appropriate under the § 1962(a) claim filed on behalf of Nautilus.

To state a claim under § 1962(a), a plaintiff must allege that

> (1) a defendant person (2) received income derived from (3) a pattern of
> racketeering activity (4) and invested the racketeering income or its proceeds (5) in
> the acquisition of an interest in or the establishment or operation of (6) any
> enterprise (7) engaged in, or the activities of which affect, interstate or foreign
> commerce.
>
> In short, § 1962(a) prohibits a person from receiving income from a pattern of
> racketeering activity and ***then using that income in the operation of an enterprise
> engaged in commerce***.

*Fitzgibbons on behalf of Dir. of S.C. Dep't of Ins. v. Atkinson*, No. 817CV02092TMCJDA, 2019
WL 5856265, at *4–5 (D.S.C. Aug. 22, 2019), *report and recommendation adopted,* No. 8:17-
CV-02092-DCC, 2020 WL 1065408 (D.S.C. Mar. 5, 2020) (citing *May v. Peninger*, No. 2:07-cv-
00864-CWH, 2008 WL 509470, at *11 (D.S.C. Feb. 22, 2008) (citing 18 U.S.C. § 1962(a))
(internal quotes and citations omitted) (emphasis added).

Mr. Fleming is entitled to summary judgment as to Nautilus' § 1962(a) claim because
Nautilus has no evidence to establish an essential element of the claim, that is, that Mr. Fleming
"used" or "invested" any alleged "racketeering income or proceeds" into any enterprise.

**B.  Summary judgment is appropriate under the § 1962(c) claim filed on behalf of
Nautilus.**

> To state a claim under § 1962(c), a plaintiff must allege that (1) a defendant person
> (2) employed or associated with (3) an enterprise, engaged in, or the activities of
> which affect, interstate or foreign commerce, (4) conducts or participates in the
> conduct of the affairs of the enterprise (5) through a pattern of racketeering activity.
> In short, § 1962(c) prohibits a person employed or associated with an enterprise
> from conducting that enterprise through a ***pattern of racketeering activity***.

*Fitzgibbons*, at *5 (D.S.C. Aug. 22, 2019), *report and recommendation adopted,* No. 8:17-CV-
02092-DCC, 2020 WL 1065408 (D.S.C. Mar. 5, 2020) (citing *Sadighi v. Daghighfekr*, 36 F. Supp.
2d 279, 295-96 (D.S.C. 1999); and 18 U.S.C. § 1962(c) (internal quotes and citations omitted)
(emphasis added).

Mr. Fleming is entitled to summary judgment as to Nautilus' § 1962(c) claim because there is no evidence or testimony in the record demonstrating that Mr. Fleming participated in the alleged RICO enterprise "through a pattern of racketeering activity." Nautilus cannot point to any evidence of testimony showing that Mr. Fleming "knowingly and intentionally engaged in an association in fact or an enterprise … to abuse and manipulate, as well as conspiring to abuse and manipulate, the legal process in Hampton County to achieve fraudulent and illegal ends, … transmuting a system designed to right legal wrongs into a legal wrong in and of itself." *See* (Dkt. 154, p. 17, ¶ 106). Nautilus can point to no evidence showing Mr. Fleming participated in a *pattern of racketeering activity*. At worst, Mr. Fleming's misconduct was limited to his representation of the Satterfield Estate, and even then, the alleged "bad acts" by Mr. Fleming occurred after Nautilus settled with the Satterfield Estate.

### C.  Summary judgment is appropriate under the § 1962(d) claim filed on behalf of Nautilus.

Section 1962(d) prohibits conspiring to violate 18 U.S.C. § 1962(a), (b), or (c). To prove a 1962(d) violation, a plaintiff must show (1) the existence of a conspiracy to participate in an enterprise; (2) that the enterprise affects interstate commerce through a pattern of racketeering activity; (3) that the defendant joined the conspiracy with knowledge of the purpose of the conspiracy; and (4) that during the time the defendant was a member of the conspiracy, ***defendant knew someone would commit at least two racketeering acts in furtherance of the enterprise***. If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

*Fitzgibbons*, at *5 (D.S.C. Aug. 22, 2019), *report and recommendation adopted,* No. 8:17-CV-02092-DCC, 2020 WL 1065408 (D.S.C. Mar. 5, 2020) (citing *Salinas v. U.S.*, 522 U.S. 52, 63–65 (1997) (citing 18 U.S.C. § 1962(d)) (emphasis added).

Mr. Fleming is entitled to summary judgment as to Nautilus' § 1962(d) claim because there is no evidence or testimony in the record demonstrating *that while the alleged conspiracy was*

ongoing, Mr. Fleming "**knew someone would commit at least two racketeering acts in furtherance of the enterprise**."

### <u>CONCLUSION</u>

Defendant, Cory Fleming, respectfully moves for an Order granting summary judgment in his favor as to all claims asserted on behalf of Nautilus in its Second Amended Complaint, on the grounds there is no genuine dispute as to any material fact and Mr. Fleming is entitled to judgment as a matter of law.

Respectfully submitted,

/s/ *Thomas A. Pendarvis*
Thomas A. Pendarvis (Fed. Id. 5785)
710 Boundary Street, Suite 1-A
Beaufort, SC 29902
843.524.9500
Thomas@PendarvisLaw.com

Counsel for Defendant, Cory Fleming

Beaufort, South Carolina

March 19, 2024