```
 1               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT SOUTH CAROLINA
 2                   CHARLESTON DIVISION

 3
                         DEPOSITION OF H. FRED KUHN, JR.
 4                       30(b)(6) MOSS & KUHN, P.A.

 5

 6   NAUTILUS INSURANCE COMPANY,

 7
                  Plaintiff,
 8

 9
            vs.            CASE NO. 2:22-cv-1307-RMG
10

11   RICHARD ALEXANDER MURDAUGH, SR.; CORY FLEMING;
     MOSS & KUHN, P.A.; CHAD WESTENDORF; and PALMETTO
12   STATE BANK,

13
                  Defendants.
14   _____

15

16   DEPONENT:           H. FRED KUHN, JR.

17
     DATE:               JULY 21, 2023
18

19   TIME:               10:01 A.M.

20
     LOCATION:           PENDARVIS LAW OFFICES, PC
21                       BEAUFORT, SC

22

23   REPORTED BY:        KELLY B. BAEKELANDT, RPR,
                         CSR (GA)
24                       CLARK BOLEN
                         CHARLESTON, SC  29405
25                       843-762-6294
                            WWW.CLARKBOLEN.COM
```

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4                EPTING & RANNIK, LLC
                  BY:  JAAN G. RANNIK
 5                BY:  CLINTON T. MAGILL (VIA VC)
                  46A STATE STREET
 6                CHARLESTON, SC 29401

 7

 8   ON BEHALF OF DEFENDANT CORY FLEMING:

 9                PENDARVIS LAW OFFICES, PC
                  BY:  THOMAS A. PENDARVIS
10                710 BOUNDARY STREET
                  UNIT A1
11                BEAUFORT, SC 29902

12   ON BEHALF OF DEFENDANT MOSS & KUHN, P.A.:

13                HOOD LAW FIRM, LLC
                  BY:  ROBERT H. "BOBBY" HOOD
14                172 MEETING STREET
                  CHARLESTON, SC 29401
15

16   ON BEHALF OF DEFENDANT CHAD WESTENDORF (VIA VC):

17                WILLS MASSALON & ALLEN, LLC
                  BY:  CHRISTY FORD ALLEN
18                97 BROAD STREET
                  CHARLESTON, SC 29401
19

20   ON BEHALF OF PALMETTO STATE BANK (VIA VC):

21                WALKER GRESSETTE
                  FREEMAN & LINTON, LLC
22                BY:  G. TREHOLM WALKER
                  BY:  THOMAS P. GRESSETTE, JR.
23                PO BOX 22167
                  CHARLESTON, SC 29413
24

25
```

Clark Bolen, Inc.

1                         INDEX

2

    EXAMINATION                                      PAGE
3
      BY MR. RANNIK                                   5
4     BY MS. ALLEN                                   45
      BY MR. RANNIK                                  69
5     CERTIFICATE OF REPORTER                        75
      DEPONENT CORRECTION SHEET                      76
6

7                         EXHIBITS

8   EXHIBIT               DESCRIPTION               PAGE

9   Plf. Exhibit    Nautilus Insurance               6
    No. 1           Company's Second Amended
10                  Notice of 30(b)(6)
                    Deposition of Moss & Kuhn,
11                  P.A.
    Plf. Exhibit    Moss & Kuhn Trust, Customer      24
12  No. 2           Balance Detail as of
                    September 30, 2021, MOSS &
13                  KUHN 0002-3
    Plf. Exhibit    Images of deposit ticket         27
14  No. 3           and checks, PSB 000355
    Plf. Exhibit    Check images, MOSS & KUHN        27
15  No. 4           0068
    Plf. Exhibit    Check images, BBT                27
16  No. 5           (9-27-2021)-001311
    Plf. Exhibit    Check image, MOSS & KUHN         27
17  No. 6           0106
    Plf. Exhibit    Check image, MOSS & KUHN         27
18  No. 7           0107
    Plf. Exhibit    CNA, Lawyers Professional        30
19  No. 8           Liability Policy
                    Declarations, MOSS & KUHN
20                  0004
    Plf. Exhibit    General Star Indemnity           31
21  No. 9           Company, Lawyers
                    Professional Liability
22                  Insurance Policy,
                    Declarations Page, MOSS &
23                  KUHN 0001
    Dft. Exhibit    Email chain, CHF_00239-241       49
24  No. 1
    Dft. Exhibit    Series of documents              50
25  No. 2           Bates-stamped
                    CHF_00288-289, C

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

```
 1                    WESTENDORF_000004, C
                      WESTENDORF_000031-33, C
 2                    WESTENDORF_000036-38, C
                      WESTENDORF_000015, C
 3                    WESTENDORF_000023-26, C
                      WESTENDORF_000016-21, and C
 4                    WESTENDORF_000013-14
     Dft. Exhibit    November 30, 2018, email       61
 5   No. 3           chain and W-9,
                     CHF_00237-238
 6   Dft. Exhibit    Email chain, CHF_00334,        62
     No. 4           CHF_00332, CHF_00329,
 7                   CHF_00330, and CHF_00331
     Dft. Exhibit    Email chain, CHF_00157         63
 8   No. 5
     Dft. Exhibit    (Not admitted)                 66
 9   No. 6
     Dft. Exhibit    October 7, 2021, letter        66
10   No. 7           from Thomas E. Lydon

11

12
     Requested Information                          68
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1              H. FRED KUHN, JR.,

2    having been first duly sworn, was examined and

3    testified as follows:

4                    EXAMINATION

5    BY MR. RANNIK:

6         Q.  Good morning, Mr. Kuhn.  I hold you in

7    very high esteem from the work we've done

8    together and I've always enjoyed working with

9    you.  I don't think this deposition is going to

10   take very long and I appreciate you being here

11   this morning.

12              All the basic standard questions.  Have

13   you had your deposition taken before?

14        A.  Not that I can recall.

15        Q.  Okay.  You know all the rules, but I'm

16   required to, of course, say that if you don't

17   understand any of my incomprehensible questions,

18   because there will be some, please let me know

19   and I'll rephrase.  And if you give an answer,

20   I'm going to assume that you've understood my

21   question if that's fair enough.

22        A.  That's fair.

23        Q.  All right.  Of course if you need a

24   break, let me know.  I don't think it's going to

25   get that long.

1          What have you done to prepare for

2     today's deposition?

3          A.   I was sent by email a package of

4     documents, looked like they're records from my

5     firm.  They were Bates-labeled Moss & Kuhn pages

6     X through Y, I looked -- looked through those.

7          Q.   Okay.  About 300 pages; does that sound

8     right?

9          A.   That sounds right.

10         Q.   Okay.  Did you speak to anybody other

11    than your counsel?

12         A.   No.

13         Q.   Okay.  Now, of course you're testifying

14    today on behalf of Moss & Kuhn.  I'm just going

15    to show you what I'd like to mark as Exhibit 1,

16    which is the notice of deposition.

17              MR. RANNIK:  If you can just mark

18    that.

19              (Plf. Exhibit No. 1 marked for

20    identification.)

21         Q.   And I'll ask you just to flip to the

22    Exhibit A and the topics there.  And just confirm

23    for me that you're able to testify to the best of

24    the organization's knowledge as to these topics

25    today?

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1        A.  Yes.

2        Q.  Okay.  All right.  Where are you from,

3   Mr. Kuhn?

4        A.  Beaufort.

5        Q.  Okay.  And where'd you go to school?

6        A.  Beaufort.

7        Q.  All right.  Where'd you go to law

8   school?

9        A.  USC.

10       Q.  Okay.  And when did you graduate?

11       A.  1980.

12       Q.  Okay.  And where did you work after you

13  graduated?

14       A.  The predecessor of the law firm I'm at

15  now.  It was called Moss, Carter, Branton &

16  Bailey.

17       Q.  Okay.  All right.  Well, let's talk

18  about that a little bit.  So it's now Moss &

19  Kuhn, previously it was Moss, Kuhn & Fleming.

20  When did it change from Moss, Kuhn & Fleming to

21  Moss & Kuhn?

22       A.  I do not recall.  It was many years ago.

23       Q.  Okay.  Okay.  It was many years from

24  Moss, Kuhn & Fleming to Moss & Kuhn?

25       A.  Oh.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1      Q.   Sorry, I --

2      A.   No.

3      Q.   -- know I kind of jumped ahead there.

4      A.   I'm sorry.  From Moss, Kuhn & Fleming to

5  Moss & Kuhn, shortly after Mr. Fleming was

6  temporarily suspended --

7      Q.   Okay.

8      A.   -- which would have been sometime

9  around -- gracious, whenever that was.

10      Q.   2021, 2022?

11      A.   Yeah, October 2021.

12      Q.   Okay.  When the firm changed its name,

13  did it reorganize or was it just a name change

14  for the same entity?

15      A.   Just a name change.

16      Q.   Okay.  Tell me --

17           MR. RANNIK:  We have a little bit

18  of an echo.

19           MR. PENDARVIS:  I'm fixing that.

20      A.   Well, a little bit of reorganization.

21  Cory was no longer a member of the firm.

22      Q.   Of course.  Of course.

23      A.   So a little bit of reorganization, but

24  basically a name change.

25      Q.   But it wasn't like a new entity was

1    filed with the --

2        A.  No.

3        Q.  -- Secretary of State?

4        A.  No.

5        Q.  Okay.

6              MR. PENDARVIS:  Just a second.

7              Go ahead.

8              MR. RANNIK:  All right.  I think

9    maybe your mic is still on.

10              MR. PENDARVIS:  I'm trying.  This

11    is new.

12              MR. RANNIK:  Got it?  All right.  I

13    think we're good.

14        Q.  Tell me a little bit about the firm's

15    governing documents.  Do you have a partnership

16    agreement?  An operating agreement?

17        A.  We have an old operating agreement.

18        Q.  Okay.  Approximately how old?

19        A.  30 years.

20        Q.  Okay.  Fair enough.  And ever been

21    amended?

22        A.  Not that I know of.

23        Q.  Okay.  Let's talk a little bit about the

24    partnership structure.  In its current form --

25    well, let's say -- no, not in its current form.

1    In the form it existed in 2018-2019 when Cory

2    Fleming was still a shareholder, how were profits

3    and expenses shared between the members or --

4    members or shareholders, however you called it?

5        A.   The expenses were shared equally.  The

6    firm paid them.

7        Q.   Okay.

8        A.   Profits was on an ad hoc basis.  If we

9    were all equally responsible for the profit, we'd

10   divide it equally.  If one of us was more

11   responsible for the profit, it would be a

12   disproportionate division.

13       Q.   Okay.  Sort of the -- would there be --

14   so a disproportionate division.  Would there

15   still be a split of all -- if there's a profit in

16   any case, would there be a split of that profit

17   among the partners or was it sort of eat what you

18   kill and if you worked on it you're going to get

19   a piece?

20       A.   I don't recall any division or anybody's

21   excluded.

22       Q.   Okay.  Okay.  Was there a managing

23   partner?

24       A.   No.

25       Q.   Okay.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    A.  No.  No.  We all -- everything was

2  unanimous usually.

3    Q.  Okay.  And were there any other partners

4  other than the three of yourselves?

5    A.  No.

6    Q.  Okay.  Any other lawyers other than the

7  three of yourselves?

8    A.  There was.  Kimberly Smith was there

9  while it was Moss, Kuhn & Fleming.

10    Q.  She was an associate?

11    A.  An associate.  And I think that was the

12  only one who was -- while it was Moss, Kuhn &

13  Fleming.

14    Q.  Okay.

15    A.  There was Mike -- Michael Matthews, but

16  I think that was before Cory.  Thomas O'Quinn, I

17  think that was before Cory.  Andrew Safran, I

18  think that was before Cory.  I'm trying to think

19  of who all has been there as an associate.

20    Yeah, I think Kimberly Smith would be

21  the only one who was there when Cory was also

22  there.

23    Q.  Okay.  In 2018-2019, what were the

24  relative ownership percentages of the firm?

25    A.  One third, one third, one third.

1        Q.   Okay.   When did Mr. Fleming join the

2    firm?

3        A.   I do not recall.

4        Q.   Okay.   Was he in law school around the

5    same time as you?

6        A.   No.

7        Q.   Okay.

8        A.   No.

9        Q.   A fair amount younger?

10        A.   Yes.

11        Q.   Okay.

12        A.   I think about 10 years younger, 15 years

13    younger maybe.

14        Q.   Okay.   Do you recall when he became a

15    partner?

16        A.   I do not.

17        Q.   Okay.

18        A.   He was with the solicitor's office and

19    came over, so I don't remember when that was.

20        Q.   Okay.   Do you remember if he joined as a

21    partner or did he come as an associate?

22        A.   I do not recall, but he became partner

23    pretty quickly.

24        Q.   Okay.

25        A.   If he was an associate, it wasn't for

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    very long.

2        Q.   Okay.  So in terms of the partners, you

3    know, authorizations and rights and things like

4    that within the firm, am I right that in 2018 and

5    2019 Mr. Fleming was authorized to accept a

6    representation or was it something that he would

7    have to clear with the other partners first?

8        A.   No, totally up to him.

9        Q.   Okay.  And so he could set the terms of

10   the representation?

11       A.   Yes.

12       Q.   He could send -- handle the case and

13   send demand letters on firm letterhead and

14   prepare settlement documents, all of those sorts

15   of things?

16       A.   Yes.

17       Q.   Okay.  How about depositing funds into

18   the escrow account, was he authorized to do that

19   or was that something that needed to be brought

20   to the partners?

21       A.   No.  He'd do that on his own.

22       Q.   Okay.  And disbursements --

23       A.   Each of us --

24       Q.   -- were the same?

25       A.   Correct.

1       Q.   Okay.   In terms of staffing cases

2   involving paralegals, is that something that

3   would have to come to the partnership or he was

4   authorized to put in staff as needed in the case?

5       A.   I'm not sure I understand.   He had a

6   paralegal who worked for him.

7       Q.   That was --

8       A.   We each had dedicated paralegals.

9       Q.   That was exactly my question.   Okay.

10      A.   Okay.   Yeah.   We each had dedicated

11  paralegals who worked --

12      Q.   Okay.

13      A.   -- he had a paralegal for him, I have a

14  paralegal for me, Jim has a paralegal for him.

15      Q.   Okay.   Did you ever work with each

16  other's paralegals at all or was it really

17  totally segregated?

18      A.   Very -- very rarely unless there's a

19  project that we needed help on --

20      Q.   Okay.

21      A.   -- but -- but typically not.

22      Q.   Okay.   All right.   Did you guys

23  collaborate regularly on cases or were you sort

24  of working in your silos and -- how did that work

25  when a new matter came in, would you -- here's

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    one of my incomprehensible questions.  See, I

2    told you there would be one.

3         Well, just tell me about a case comes

4    into the firm, how would you guys handle it?

5    Would it be something that was the subject of

6    discussion or was it someone would just report

7    and say, hey, I got this case and that was --

8         A.  Not even that.  If someone asked me to

9    represent them and I agreed, I would do it and

10   Jim and Cory might never know about it.

11        Q.  Okay.

12        A.  And same way, we're all -- we handled

13   our own cases.

14        Q.  Okay.  All right.

15        A.  And we didn't have to have each other's

16   approval for a case, if that's what you're

17   getting at.

18        Q.  Yeah.

19        A.  We just decide on our own do we want to

20   take this case, if so we take it.

21        Q.  Okay.  All right.

22        A.  And particularly Cory.  Cory's in a

23   different building from Jim and I, he's not even

24   in the same building so we might never ever even

25   see his clients.

1    Q.   Okay.   Where was his office?

2    A.   We have two -- two buildings on the same

3    lot.

4    Q.   Got it.   Okay.

5    A.   We have two separate -- there's an old

6    house and then before I joined the firm they

7    built another house behind that house to hold

8    more lawyers.   This is when it was Moss, Branton,

9    Bailey, Dore, Jesse -- there were a lot more

10   folks.

11   Q.   Got it.

12   A.   Yeah.

13   Q.   Got it.   Okay.

14   A.   So Cory is in the back building, Jim and

15   I are in the front building.

16   Q.   And so you guys wouldn't be responsible

17   for supervising, you know, his staff because --

18   A.   No.

19   Q.   -- there's --

20   A.   I'm sorry.

21   Q.   -- and supervising him and his matters

22   because you're equal partners and --

23   A.   Correct.

24   Q.   Okay.   All right.   I believe that Alex

25   Murdaugh was an attorney with Moss & Kuhn in one

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  of its iterations at some point; is that correct?

2      A.  Yes.

3      Q.  Do you recall when?

4      A.  I do not.  It would have been just right

5  after he got out of law school --

6      Q.  Okay.

7      A.  -- whenever that was.  It was quite a

8  while ago.

9      Q.  Okay.  He was an associate?

10     A.  Yes.

11     Q.  Okay.  And, then, do you remember about

12 how long he stayed with the firm?

13     A.  It was not long.  A year, maybe two.

14     Q.  Okay.  Did you work with him when he was

15 with the firm?

16     A.  Nope.  Jim mostly supervised him.

17     Q.  Okay.  All right.

18     A.  I mean, if he had a question or

19 something, but -- but he -- he -- he mainly

20 worked with Jim on Jim's cases.

21     Q.  Okay.

22     A.  So Jim would take in a case, ask Alex to

23 help him on it, and that's sort of how it works

24 since he was brand new.

25     Q.  Got it.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    A.   They -- they worked together.

2    Q.   Okay.  Do you recall why he left the

3  firm?

4    A.   He wanted to go back home.

5    Q.   Okay.

6    A.   Reason he gave me.

7    Q.   Yeah.

8    A.   He missed Hampton.

9    Q.   All right.

10    A.   Believe it or not, Beaufort's too big of

11  a city for him.  That's -- seriously, I think he

12  wanted to work with his dad, his grandfather, his

13  brother --

14    Q.   Uh-huh.

15    A.   -- and -- and go back home.

16    Q.   Yep.  Join the family firm.

17    A.   And he was -- you know, he was -- he had

18  just gotten married, was -- hadn't had any kids

19  yet but I'm sure that was in the future and he

20  wanted to raise them in the country around his

21  family, not -- not here.

22    Q.   Okay.  Has the firm continued to work

23  with Alec Murdaugh over the years, as in

24  referring cases back and forth, serving as

25  cocounsel?

1      A.   Based on what I know now, Cory did.

2      Q.   And -- well, tell me a little bit about

3   that.  How often?  What do you know?

4      A.   What I know now, it happened maybe eight

5   times over the last 23 years.

6      Q.   Okay.  And what detail can you give me

7   about those times?

8      A.   None off the top of my head.

9      Q.   Fair enough.

10      A.   Other than Satterfield.  Yeah.

11      Q.   All right.

12      A.   But I did look to see what checks had

13   been written to Alec Murdaugh ever from the firm

14   and there were, if I remember right, like eight

15   or nine times a check had been written to Alec

16   Murdaugh.  So I'm assuming those are cases that

17   Cory would have worked with him on those cases

18   over the last -- I think the last of -- the

19   oldest one was like 2001.

20      Q.   Okay.  Okay.

21      A.   I've never worked with Alec on any case.

22   Jim tells me he's never worked with Alec on any

23   case.

24      Q.   Okay.

25      A.   But apparently Cory had.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    Q.  All right.

2    A.  Which I did not know of until all -- all

3 this hit the fan.

4    Q.  Okay.

5    A.  There'd be no reason for me to know.

6    Q.  Did Alec ever refer cases to Moss & Kuhn

7 other than -- are you aware of any cases he

8 referred to Moss & Kuhn other than perhaps the

9 ones he worked as cocounsel with Cory on?

10    A.  Not that -- no.

11    Q.  Okay.  Are you aware of Moss & Kuhn

12 having referred any cases to his firm?

13    A.  No.  Except, like I say, digging through

14 the records to see what the relationship might

15 have been, I see there are about eight or nine

16 checks over the last years that were written from

17 our firm to Murdaugh.

18    Q.  Okay.  Okay.

19    A.  And I assume those are cases they worked

20 on together.

21    Q.  Okay.  Aside from those checks that

22 you've uncovered and reviewed, any other sources

23 of information about the cases that Fleming and

24 Mr. Murdaugh would have worked on together?

25    A.  The Satterfield case.  I mean, again,

1  after all this hit the fan --

2      Q.  Right.

3      A.  -- I, of course, looked into that.

4      Q.  Okay.  Are there any other records the

5  firm has that would show the extent to which

6  Mr. Fleming and Mr. Murdaugh worked together on

7  cases in the past?

8      A.  No.  I looked.

9      Q.  Okay.

10     A.  Not just me, but the Office of

11 Disciplinary Counsel, Attorney General's Office,

12 State Grand Jury, they've all looked.

13     Q.  Have you come across anything involving

14 the Pinckney case and Mr. Fleming's involvement?

15     A.  I think that is one of the checks that

16 was written to Mr. Murdaugh in about 2017.

17     Q.  Okay.

18     A.  I remember the amount's like, don't

19 quote me, 4 grand or something like that.

20     Q.  Okay.

21         MR. HOOD:  4,516.

22     A.  There you go.

23     Q.  All right.  I think there may also have

24 been a check written to PMPED from that trust

25 fund as well, from that, you know, trust account

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    as well.  Anyway, I'll have to go back and

2    refresh my memory on that.

3         But my memory is that there was $350,000

4    held in trust for a Medicaid lien.  The Medicaid

5    lien ended up being a fair amount less and then

6    some of the money went to Mr. Murdaugh, some of

7    it went to PMPED, and it didn't go back to the

8    Pinckneys.

9         But does that ring any bells?  Does

10   that --

11        A.  No.

12        Q.  Fair enough.  Fair enough.  So I think I

13   already know the answer to this question, but who

14   from the firm was involved in any way with the

15   Satterfield representation?

16        A.  From what I've discovered, just Cory.

17        Q.  Okay.  And his paralegal?

18        A.  Well, yeah.

19        Q.  Any other administrative staff or --

20        A.  No.

21        Q.  Okay.  Was there -- was it a case that

22   was ever discussed between the partners at any

23   time?

24        A.  No.  Never -- never heard of the word

25   Satterfield until it all hit the fan.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    Q.   Okay.   Let me talk to you about some of

2  the firm admin.   Who does the firm's bookkeeping?

3    A.   A lady named Lynn Davidson.

4    Q.   Okay.   That name is familiar to me and I

5  don't know why.   Is she local?

6    A.   Yes.

7    Q.   Okay.   Is she a CPA?

8    A.   No.   No.

9    Q.   Just an accountant?

10    A.   She's been a bookkeeper for -- her

11  mother was our bookkeeper before she was.

12    Q.   Okay.   Does she reconcile the firm's

13  operating and trust accounts?

14    A.   Yes.

15    Q.   Okay.   Is there lawyer involvement in

16  reconciling the trust account?

17    A.   I guess, yes.   She does the work, we

18  look it over.

19    Q.   Sure.

20    A.   Yeah.

21    Q.   Sure.   That's how we do it in my firm as

22  well.   And who looks it over?

23    A.   We all can look it over.   I usually look

24  it over about once a month if -- that's the goal

25  at least.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1        Q.   Okay.

2        A.   Yeah.

3        Q.   All right.  The firm's bank statements

4    and things like that, I guess they go to her, she

5    puts things into -- do you guys use QuickBooks?

6        A.   Yeah.

7        Q.   She puts it into QuickBooks and

8    reconciles it and you sort of get that printout

9    that -- it's like a trust reconciliation printout

10   that shows in and out and that it lines up?

11       A.   Roughly, yeah.

12       Q.   Okay.  All right.  I'd like to show you

13   what we'll mark as Exhibit 2, and this is one of

14   the documents that was produced from Moss &

15   Kuhn's file.

16            (Plf. Exhibit No. 2 marked for

17   identification.)

18       Q.   All right.  Are you familiar with what

19   you're looking at there?

20       A.   This is one of the documents I looked

21   at, that was sent to me to look at for today.

22       Q.   Okay.  And would you agree that that's a

23   ledger that shows the money coming in and out of

24   the firm's trust account with relation to the

25   Satterfield matter?

1    A.  Yes.

2    Q.  Okay.  Mr. Kuhn, a lot of what I want to

3  do with the exhibits today is just authenticate

4  them.  So is that a document that's kept in the

5  ordinary course of business?

6    A.  Yes.

7    Q.  And it's a true and accurate

8  representation of the funds going in and out of

9  that account?

10    A.  Yes.

11    Q.  Okay.  It does show about -- I think

12  this document is from -- this reconciliation is

13  as of 2021.  And it shows a balance of $113,800

14  remaining.  Do you know if those funds still

15  remain in escrow?

16    A.  They do not.

17    Q.  Okay.  When -- or where did they go to?

18    A.  Ultimately, to the Satterfields, but I

19  think through Eric Bland, their lawyer.

20    Q.  Okay.

21    A.  I think that's who it was sent to.

22    Q.  Okay.  Do you recall about when that

23  would have been?

24    A.  It would have been after all this rose

25  up and we went through our books and said, hey,

1  we're holding $113,800 that does not belong to

2  us, who does it belong to.  And we figured out

3  who it belonged to and sent -- sent it off to I

4  think it was Eric Bland at the time.

5      Q.  Okay.  Got it.

6      A.  So around late 2021, early 2022.

7      Q.  Okay.  Do you agree that an escrow agent

8  has a fiduciary duty both to the payer and the

9  payee of funds?

10     A.  A fiduciary duty to payer and payee?

11 No, I believe they have a fiduciary duty to who

12 the funds belong to.  I don't know, I -- that's

13 not necessarily always the payer and/or the

14 payee.

15     Q.  So --

16     A.  The fiduciary duty is to generally our

17 client to whom the funds belong.

18     Q.  But if a party pays money into escrow

19 and they're being held for some period while

20 rights are being determined for example, would

21 the party holding the money, would the escrow

22 agent owe a duty to the payer to make sure those

23 funds are safeguarded and available to go to the

24 payee when the time comes?

25              MR. HOOD:  Object to the form.

1      A.  Not necessarily.  No, I don't think so.

2      Q.  Okay.  All right.  Let's continue on

3   our -- with some document authentication.  I'll

4   hand you what we'll mark as Exhibit 3, please.

5           MR. RANNIK:  And, here, we can go

6   ahead and just mark all of these.

7               (Plf. Exhibit No. 3 marked for

8   identification.)

9               (Plf. Exhibit No. 4 marked for

10  identification.)

11              (Plf. Exhibit No. 5 marked for

12  identification.)

13              (Plf. Exhibit No. 6 marked for

14  identification.)

15              (Plf. Exhibit No. 7 marked for

16  identification.)

17     Q.  All right.  So we've marked, just now,

18  Exhibits 3 through 7.  Could I get you to just

19  flip through them, let me know if you recognize

20  them, and if they are true and authentic

21  representations of checks written out of Moss &

22  Kuhn's accounts?

23          MR. HOOD:  So, Jaan, the only

24  thing, Exhibit 3 has a deposit ticket for Alec.

25  Obviously, that's not one of their --

1          MR. RANNIK:  Correct.

2          MR. HOOD:  So he can't authenticate

3  that, but I mean.

4          MR. RANNIK:  Correct.  No, you're

5  absolutely right.

6      Q.  If you'll look down at the actual check

7  however, would you have any reason to believe

8  that's not an accurate and authentic

9  representation of a check written out of the

10  trust account on March 30th, 2017?

11      A.  I'm not sure if you asked me if it is or

12  isn't, but, yes, this -- this is a check from

13  our -- our account.

14      Q.  Okay.  Whose signature is that on the

15  check, do you recognize it?

16      A.  Could be Cory's, but I can't swear to

17  it.

18      Q.  Okay.  No worries.

19      A.  I -- that --

20      Q.  It looks a little different from --

21      A.  It looks a little different from what

22  his usual signature is, but, yeah, if I had to

23  guess.

24      Q.  Okay.  That was the same conclusion I

25  came to is it doesn't look quite the same.  So,

1  hang on, let's go through these one at a time,

2  then.  Let's look at number 4.  Number 4,

3  authentic, true, and -- a true representation of

4  this particular check?

5      A.  Yes.

6      Q.  Okay.  And is that Cory Fleming's

7  signature?

8      A.  Appears to be, yes.

9      Q.  Okay.  Let's look at number 5.  And same

10  questions.

11      A.  Yes, and yes.

12      Q.  Okay.  And number 6, same questions.

13      A.  I don't see a signature.  It might be

14  there, but, yes, this is a -- it does appear to

15  be a copy of a check from our trust account.

16      Q.  Okay.

17      A.  A true and accurate copy.

18      Q.  And number 7, same thing.

19      A.  That -- this is a true and accurate copy

20  of a check from our trust account, yes.

21      Q.  Okay.  All right.  And I'd like to show

22  you what's -- now, I've done a clever thing where

23  I've put two numbers on this one.  But, no, this

24  one is number 8.  Okay.

25                  (Plf. Exhibit No. 8 marked for

1    identification.)

2        Q.   All right.   Mr. Kuhn, I've just handed

3    you Exhibit 8, which appears to be the dec page

4    for a CNA malpractice policy.   Is that correct

5    and do you recognize it?

6        A.   Yes, that is correct and I recognize it.

7        Q.   Okay.   And I believe it provides for

8    $500,000 in coverage per claim with an aggregate

9    of $1,000,000?

10       A.   Yes.

11       Q.   Do you know if this is claims made or

12   occurrence-based coverage?

13       A.   I believe it's a claims made.

14       Q.   Okay.   And can you please remind me the

15   applicable dates of coverage for that policy?

16       A.   I believe it's January -- let me find it

17   on here -- yeah, January 4th, 2021, to

18   January 4th, 2022.

19       Q.   Okay.   Was this the policy then that

20   was -- no, this was not in place when the claim

21   was made; is that correct?

22       A.   Are you talking about the claim we're

23   here about today?

24       Q.   Yes.

25       A.   Correct.

1    Q.  Okay.  And is CNA providing a defense or

2    contributing to the defense at all in this

3    matter?

4    A.  I'm really not clear on that.  I -- to

5    my knowledge, they're not, but I could be wrong.

6    Q.  Okay.

7    A.  If they are, I have not been informed.

8    Q.  Okay.  All right.  So then let's look at

9    what we'll mark as Exhibit 9.

10    (Plf. Exhibit No. 9 marked for

11    identification.)

12    Q.  All right.  And Exhibit 9, is that

13    another dec page from General Star?

14    A.  Yes.

15    Q.  And was this the coverage in place when

16    Moss & Kuhn was served with this lawsuit?

17    A.  Yes.

18    Q.  Okay.  Now, it says Moss & Kohn on

19    there, I believe that's just a typo, right?

20    A.  I believe so, yep.

21    Q.  Okay.  And so I understand that Moss &

22    Kuhn has $100,000 in coverage per occurrence.  Is

23    that blanket or does that only apply to claims

24    involving Alex Murdaugh?

25    A.  That would be blanket.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    Q.   Okay.  And is the lowered limit a result

2  of Mr. Fleming's activities and having to settle

3  other claims?

4    A.   Yeah.

5    Q.   Okay.

6    A.   CNA told us basically go to hell.  Yeah.

7    Q.   Okay.  Do you know if this is eroding

8  limits coverage?

9    A.   I believe it is.

10    Q.   Okay.  Are there any other -- is there

11  any other insurance available to Moss & Kuhn with

12  relation to this claim?

13    A.   No.

14    Q.   Okay.  Has Moss & Kuhn performed any

15  work for Palmetto State Bank?

16    A.   Not that I know of, no.

17    Q.   Okay.  Has it referred any of its client

18  to Palmetto State Bank for loans?

19    A.   I never have.  And, to my knowledge,

20  nobody else has either.

21    Q.   Okay.  To your knowledge, has Palmetto

22  State ever referred any work to Moss & Kuhn?

23    A.   Not to my knowledge.

24    Q.   Okay.  Other than in the Satterfield

25  matter with Mr. Fleming, has the firm had any

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    interaction with Chad Westendorf?

2        A.   No, never heard of him.

3        Q.   How about any of the Laffittes, Russell

4    Laffitte, Charlie Laffitte?

5        A.   No.

6        Q.   Okay.  I think -- and it's possible that

7    Russell Laffitte was a conservator in the

8    Pinckney case, but they kind of run together a

9    little bit.  So I suppose there's a change that

10   Cory Fleming and Russell Laffitte had some

11   working together in that regard, but you're not

12   aware of any other instances?

13       A.   I'm aware of none.

14       Q.   Okay.  Other than this lawsuit that

15   Nautilus brought, who else has brought claims

16   against Moss & Kuhn in relation to Alex Murdaugh?

17       A.   Oh, the Satterfields.  I'm just

18   thinking.  It's been such a turmoil.  Those are

19   all the civil claims that I can think of.

20            Like I say, state grand jury did a lot

21   of investigating and Office of Disciplinary

22   Counsel did a lot of investigating, but I don't

23   think they took action.

24            As far as civil claims, I think the

25   Satterfields is it.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1      Q.  Okay.  So no other pending actions

2  besides this one?

3      A.  Not that I can recall.

4      Q.  Okay.  Has Moss & Kuhn ever been sued

5  before other than in connection with Alex

6  Murdaugh?  And other than malpractice or

7  frivolous malpractice claims?

8      A.  Oh, no.

9      Q.  Okay.

10      A.  No.

11      Q.  Okay.  Does Moss & Kuhn --

12      A.  Now, we had a -- we had a malpractice

13  claim brought against us because of stuff

14  Kimberly Smith had done --

15      Q.  Okay.  Okay.

16      A.  -- but that's all I can think of right

17  now.

18      Q.  All right.  And what was the nature of

19  that claim?

20      A.  She misrepresented to a client the

21  status of their case --

22      Q.  Okay.

23      A.  -- I think summarizes it.

24      Q.  Okay.

25      A.  And I was sued once by an opposing

1  party.  They didn't like me, I guess.  That's all

2  I can think of right now.

3      Q.  Okay.  The opposing party, what claim

4  did they bring?

5      A.  My client record -- was a personal

6  representative of an estate and they had taken

7  money that didn't belong to them, that belonged

8  to the beneficiaries, and they sued her and me

9  and there was another lawyer involved.  Just

10  pretty much everybody.

11     Q.  Okay.  Got it.

12     A.  Yeah.

13     Q.  Does Moss & Kuhn use Forge Consulting

14  for its structured settlements?

15     A.  Never heard of Forge until this

16  happened.

17     Q.  Okay.  All right.

18     A.  We use Ringler, USAA, another company --

19  I never heard the word Forge until all this came

20  about.

21     Q.  Okay.  When you use a structure -- when

22  you use a structure for a settlement, how does

23  that work?  Who delivers the funds to the

24  structured settlement company?

25     A.  Oh, typically most of the ones I have

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  worked with have been for children.  And for tax

2  purposes, we always have the -- it has all been

3  personal injury cases.  We've had the liability

4  carrier send the premium for the annuity.  So not

5  so much talking about structured settlement

6  annuities, directly to the annuity company --

7      Q.  Uh-huh.

8      A.  -- with -- that's with children.  With

9  adults, usually, again for tax purposes, we do it

10  the same way.  Although I know there have been

11  instances where they wanted the money so they

12  could shop around themselves.

13      Q.  Okay.

14      A.  Or they weren't sure, do I really want

15  to structure something out and get guaranteed

16  money down the road or do I want to take all this

17  money myself and invest it.  So sometimes with an

18  adult we disburse it just like -- and they --

19  they shop around themselves.

20      Q.  Okay.

21      A.  Children always -- I can't think of any

22  exception with children it always go the --

23  straight.  The adults usually, because they

24  usually want that tax break --

25      Q.  Okay.

1      A.  -- but sometimes not.

2      Q.  Okay.  Are there ever instances where

3  the funds get delivered to you as the counsel for

4  the party and then you send it to the structured

5  settlement company?

6      A.  I can't think of any time I've ever done

7  that, because if -- if I know -- if my -- me and

8  my client know it's going to go to purchase an

9  annuity, we -- we do it straight out so they get

10  that tax advantage.  So it's usually on that

11  situation where the -- where the adult is not

12  sure or they just want to do the shopping

13  themselves, they think they can get a better deal

14  than the insurance company or they just don't

15  trust the insurance company.

16      Q.  Sure.

17      A.  Yeah.  But -- but typically if -- no, I

18  wouldn't get the money and turn right around and

19  get the -- get the annuity.

20          MR. RANNIK:  Okay.  All right.  If

21  we can take a couple minutes, I think I might be

22  done.

23          THE WITNESS:  Okay.

24          MR. RANNIK:  But let me just call

25  my cocounsel and see if there's anything I've

1  forgotten and then we'll see who else has some

2  questions.

3                    (A recess transpired.)

4       Q.  Just a few follow-up questions.  Does

5  the name Mary Ann Westendorf ring a bell?

6       A.  Not at all other than the Westendorf

7  last name --

8       Q.  Okay.

9       A.  -- but not -- Mary Ann doesn't sound

10 familiar at all.

11      Q.  Okay.  We saw an email, I think it was

12 from Tanya King where it's about Chad Westendorf

13 being named as the personal representative and I

14 think Tanya King writes is that Mary Ann's

15 husband and we didn't know who Mary Ann

16 Westendorf was or what the relationship was, so

17 that's why I asked the question.

18      A.  No, no idea.

19      Q.  Okay.  You mentioned that with some of

20 Mr. Fleming's files going back a ways you weren't

21 able to locate, you know, copies of the documents

22 in the files.  Is that -- I'm guessing probably

23 they were beyond the retention policy?

24      A.  Yeah.

25      Q.  Okay.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    A.  Yes, sir.

2    Q.  Okay.  How long is the retention policy?

3    A.  Oh, I think it's seven years.

4    Q.  Okay.

5    A.  Some files we keep longer than that if

6  there's a reason.

7    Q.  Okay.

8    A.  Wills, stuff where we might have --

9    Q.  Okay.

10    A.  But generally seven years.

11    Q.  Okay.

12    A.  Seven to eight to nine years.

13    Q.  All right.  Okay.  The only thing that I

14  believe you saw from the Pinckney file was that

15  check from 2017.  Would you expect that there

16  would still be a file there or do you think maybe

17  did Mr. Fleming, you know, remove files?

18    A.  I -- I don't know if he removed any

19  files.  Not to my knowledge.  I think the

20  Pinckney file should still be around.

21        And I didn't actually see the check, I

22  saw the QuickBooks printout that there was a

23  check to Alexander Murdaugh associated with

24  Pinckney.

25    Q.  Okay.  Okay.

1       A.   I think we should still have that
2  Pinckney file though --
3       Q.   Okay.
4       A.   -- but I'm not positive, but I think we
5  do.
6       Q.   All right.
7       A.   It'd be a 2017 case.  I know that there
8  was a check, so I can look and see.
9       Q.   Okay.  Well, thank you.  Is Tanya King
10 still employed by the firm?
11      A.   Yes.
12      Q.   Okay.  And who does she work with?
13      A.   Me, now.
14      Q.   Okay.
15      A.   I took over.  Cory did all the firm's
16 criminal defense work.
17      Q.   Okay.
18      A.   And I quit doing criminal defense work
19 basically when Cory came to the firm, whenever
20 that was, and sent all my criminal defense work
21 to Cory.  When he retired, I inherited all those
22 criminal cases back.
23      Q.   Okay.
24      A.   And so she's stayed on to help me
25 dispose of all those criminal cases.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    Q.  Okay.  I think you mentioned that in the

2    review of the trust account reconciliation the --

3    oh, I forgot -- Lynn Davidson would review the

4    bank records and then give you a printout.  Would

5    the printout she'd give you include the bank

6    records?  Would you ever review those?

7    A.  I'd have -- the bank statement?

8    Q.  Yes.

9    A.  My main purpose was making sure that our

10    records and the bank records matched.

11    Q.  Okay.

12    A.  Yes.

13    Q.  Okay.  Got it.  Got it.  Got it.  Now, I

14    believe Kimberly Smith worked -- you said she

15    came from the solicitor's office -- or, no, you

16    said Alex Murdaugh came from the solicitor's

17    office.

18    A.  Yeah.  Kimberly did too, though.

19    Q.  Okay.  Do you know if they were there at

20    the same time?

21    A.  No, they weren't.  No, she came way

22    after Alec left.

23    Q.  Way after.  Okay.

24    A.  Yeah.

25    Q.  Okay.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1     A.  I mean, Alec left -- his kids weren't

2     even born yet when he left.  I mean.

3     Q.  Okay.

4     A.  Yeah.

5     Q.  Got it.  Got it.  Can I get you to have

6     a look at Exhibit 2, please, and I want to just

7     ask a couple of questions.  So, the very last

8     line of the first page there's an entry for a

9     $50,000 check to Moss, Kuhn & Fleming.  Would

10    that be to Moss, Kuhn & Fleming's operating

11    account?

12    A.  I don't know for sure, but I -- I

13    believe so, yes.

14    Q.  Okay.

15    A.  It looks like the attorney's fees and

16    typically that would go to the operating account.

17    Q.  Okay.  What -- other than the trust and

18    the operating account, does Moss -- does the firm

19    have any other accounts?

20    A.  That's it.

21    Q.  Okay.  Okay.  So if we flip to the

22    second page.  The third from last entry there is

23    another payment to Moss, Kuhn & Fleming.  Same

24    thing, you would expect that goes to the

25    operating account?

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1        A.    Yes.

2        Q.    Okay.   Now, there are some checks here

3    that go to Cory Fleming personally.    Does that

4    strike you as odd given what you explained about

5    how profits were shared?    Would you expect that

6    all funds would go to the firm and then profits

7    would be disbursed from there rather than

8    Mr. Fleming making payments to himself from the

9    trust account?

10       A.    I do not know why those checks were made

11   to him personally.

12       Q.    Okay.   Does it strike you as unusual?

13       A.    Yeah.   That's not typically how we --

14   how it would be done.    Could be a good reason for

15   it, but I just couldn't say.

16       Q.    Sure.   Fair enough.   I think it's an

17   obvious question, but to state it for the record.

18   Does the firm admit that the various deeds of

19   Cory Fleming for which he lost his license and

20   has been indicted were wrong?

21       A.    I don't think I can judge that.

22       Q.    Yeah.

23       A.    I mean, he pled guilty in federal court,

24   I know that much.    I think from that you can

25   conclude that there's something amiss.    But I

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  have no personal knowledge that he did anything

2  wrong, so that's a question you'll have to direct

3  to him.

4       Q.  Okay.  But the -- if the allegations

5  that have been made against him are true and are

6  proven true or he admits them as true, would you

7  agree that they would be -- they would

8  indicate -- they would constitute wrongful

9  conduct?

10      A.  There are all kind of allegations made

11  against him, so, I mean, you got to be more

12  specific.

13      Q.  Sure.  Okay.  The allegation of being

14  involved with Alex Murdaugh to steal the money

15  relating to the Satterfield matter, would you --

16  if that was proven or admitted, would you

17  consider that to be wrong?

18      A.  If that was true, absolutely.

19      Q.  Okay.

20      A.  Yeah, stealing's wrong.

21      Q.  And I think we'll leave that there.

22           MR. RANNIK:  All right.  Mr. Kuhn,

23  I think that's all that I've got for you.

24           THE WITNESS:  All right.

25           MR. RANNIK:  I appreciate your time

1   here today.

2               THE WITNESS:  No problem.

3               MR. RANNIK:  Anybody else have

4   questions?

5               MR. HOOD:  Anybody on Zoom?

6               MS. ALLEN:  Yes, I have some

7   questions.  I don't know if anybody from the bank

8   does.  Whoever wants to go first.

9               MR. PENDARVIS:  I have no questions

10  on behalf of Cory Fleming.

11              MR. WALKER:  This is Thomas and

12  Trenholm Walker.  I have no questions on behalf

13  of the bank.

14                  EXAMINATION

15  BY MS. ALLEN:

16      Q.  All right.  Mr. Kuhn, I'm Christy Allen.

17  I represent Chad Westendorf in this case and I do

18  have a couple questions for you.  Do I understand

19  you said at the beginning of this deposition that

20  you have reviewed the -- I guess the Moss, Kuhn &

21  Fleming file on the Satterfield matter and that

22  that's what you had reviewed in preparation for

23  today?

24      A.  No.  I looked at -- Bobby had emailed me

25  a series of documents and they were Bates-stamped

1    Moss & Kuhn pages 1 through -- I think almost 300

2    pages and that -- that's what I looked at.  I

3    have not looked at the --

4         Q.  Okay.

5         A.  -- Satterfield file.

6         Q.  Okay.  And just so I can maybe do this a

7    little quicker.  So there's a set of documents

8    that were produced in this case with Moss & Kuhn

9    Bates labels at the bottom.  There was more than

10   300 pages total, but do you believe that you guys

11   were working from one unitary set?

12        A.  Yes.

13        Q.  Okay.  All right.  And do you have any

14   other information than what's in those files

15   about the Satterfield matter more specific to

16   that matter and how it was handled?

17        A.  Other than what I've read in the paper,

18   that'd be about it.

19        Q.  Okay.  So the information that you've

20   got, if -- whatever is in those files is --

21   represents the information that the law firm has

22   as it relates to Satterfield?

23        A.  That'd be correct, yes, ma'am.

24        Q.  Okay.  Let me just go through a few --

25   and I've got a couple of exhibits, but we'll see

1  if we can get through this a little quicker.

2  Sorry, everybody thought they were getting ready

3  to go home super early, but hopefully I won't

4  take too long.

5       Do you -- have you been able to identify

6  any information or any evidence of a written fee

7  agreement between your firm and Chad Westendorf?

8       A.  I'm not aware of any, but I have not

9  looked for that.  And my role with the physical

10  Satterfield file was making sure it was complied,

11  compiled, preserved, put together, and sent to

12  the appropriate authorities, ODC, state grand

13  jury, that type of thing.

14      Q.  So if no written fee agreement has been

15  produced, then you're not aware that there is

16  one?

17      A.  I do not recall seeing one, but I have

18  not -- I did not go through the Satterfield file.

19  I did not look through it.

20      Q.  Okay.  I'm just asking you if -- if it's

21  not in there, you don't have any information that

22  there is one?

23      A.  Oh, if it's not in there, then, no, I

24  would have no other information.  That's correct.

25      Q.  Okay.  Is it -- was it your firm's

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

48

1   practice to have written fee agreements?

2       A.  With clients, yes.

3       Q.  Okay.  Do you have any information other

4   than what's in the files that you've referenced

5   to about how the amount of attorney's fees were

6   determined and -- with regard to the estate of

7   Satterfield representation?

8       A.  No.

9       Q.  Do you have any information regarding

10  how it was determined how much Chad Westendorf

11  was going to be paid as the personal

12  representative?

13      A.  No.

14      Q.  Let me show you what I've got as

15  Exhibit 1 that I sent to the court reporter.  I

16  don't know if you can see it or not.  Let me try

17  to share my screen.  I thought we were totally

18  virtual today, but I guess not.  Let's see here.

19          All right.  I got a document that's been

20  marked as Exhibit 1, Defendant Exhibit 1.

21  That -- we're going to just -- you can -- I can

22  scan it.  I don't know if you have it in front of

23  you other than my shared screen.  I'll go through

24  it and I've got just a couple of quick questions.

25  This is an email from Tanya King.  I think that

1    was Cory's paralegal, right?

2                    (Dft. Exhibit No. 1 marked for

3    identification.)

4        A.  She was, yes.

5        Q.  And she still works for your firm and

6    works for you?

7        A.  Yes.

8        Q.  This is an email between Tanya and Cory

9    discussing the appointment of Chad Westendorf as

10   the PR.  And he -- they say here, we will have to

11   talk about how to get a different person

12   appointed.

13                  Do you have any idea what that's in

14   reference to?

15       A.  No.

16       Q.  And then we look down here, Cory writes,

17   he, meaning Chad, is the VP of the bank and we

18   want him to be the PR to manage the money.

19                  Do you know who we is in that email?

20       A.  I do not.

21       Q.  Other than what's in the file, do you

22   have any information about how it was Chad

23   Westendorf became the successor personal

24   representative of the estate of Gloria

25   Satterfield?

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1      A.   I do not.

2      Q.   Okay.   Let me show you what is marked as

3   Exhibit 2.   And I'll represent to you -- and if

4   you want to take a minute to look through this,

5   please do.   This is 22 pages from the CHF -- no,

6   this is -- yeah, that's CHF, that's Cory Fleming

7   Bates label.   And what -- what -- I'll tell you

8   what they are.   Based on the documents that have

9   been produced, these are the only communications,

10  written communications that I've been able to

11  locate in the files between Cory and Chad

12  directly.

13           If you'll want to just take a second and

14  scan through them.   I don't know if you can.

15           (Dft. Exhibit No. 2 marked for

16  identification.)

17           MS. ALLEN:   Is the court reporter

18  able to put those in front of him on the screen?

19           THE COURT REPORTER:   I do not -- I

20  just have the Zoom link.   I can maybe pull them

21  up on my computer and then show him.   Hold on,

22  just give me a second.

23           MR. HOOD:   Christy, are they Bates

24  stamped?

25           MS. ALLEN:   Yeah.   I just wanted to

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  give him a second to scan through them.

2                MR. HOOD:  Right.

3                MS. ALLEN:  I don't --

4                MR. HOOD:  I mean are they Bates

5  stamped?  If they're Bates stamped, I can pull

6  them up on my computer.  That's why I'm asking.

7                MS. ALLEN:  It might -- it may not

8  all be -- oh, yeah.  Let me -- can I just take a

9  minute break.

10               And then, Bobby, how about I just

11 email you the whole -- just the whole set.

12               MR. HOOD:  That's fine.

13               MS. ALLEN:  Can we take a minute

14 break and let's do it that way so this will go a

15 little quicker?  Thank you.

16               We'll go off the record.

17               (A recess transpired.)

18    Q.  Okay.  Mr. Kuhn, like I said, there is

19 22 pages of this exhibit and they are what I

20 believe to be all the communications between Chad

21 Westendorf and Cory Fleming that were produced as

22 part of either Cory Fleming's or Moss, Kuhn &

23 Fleming's files or Chad Westendorf's files for

24 that matter.

25               So the first exchange looks like a

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1   request from Chad Westendorf to Cory in January

2   of 2019 requesting copies of a document that was

3   signed with the judge.  I think it would have

4   been the first settlement approval hearing.  Next

5   one is a letter dated March 14th from Cory to

6   Chad advising him that there was going to be a

7   mediation on March 22nd in the Satterfield

8   matter.

9          The next exchange is March 19th prior to

10  the mediation.  There is an exchange between Chad

11  and Cory about Chad not being able to attend the

12  mediation in person because he has staff out.

13  And there's a couple emails about how to reach

14  him by phone.

15         Then the next one is April 25th, 2015,

16  so after the mediation.  It looks like Cory

17  emails and says, will you be in the office.  I

18  need to send my investigator to get the check

19  endorsed.  The time of that would be the second

20  settlement check paid by Nautilus.  And he

21  responds, yes, but I'll be out tomorrow.

22         Do you know who Cory's investigator was?

23  A.   Yes.  Mostly likely it would have been

24  Barton J. Adams.

25  Q.   Okay.  Is that BJ, is that how he's

1  referred to?

2       A.  BJ, yes.  He goes by BJ.

3       Q.  And what was his relationship to the

4  firm?

5       A.  He was an investigator, office manager,

6  jack-of-all-trades.

7       Q.  So he was an employee?

8       A.  Yes, he was an employee.

9       Q.  And is he still employed?

10      A.  No.  No, he retired.

11      Q.  All right.  Next exchange,

12  September 15th of 2021, so that would have been

13  after a lot of disclosures were made with regard

14  to Alec Murdaugh and the Satterfield money.

15  There's reference that Cory wrote to Chad saying

16  his paralegal is gathering documents that Chad

17  had requested and will send them over.

18           And there's the next letter that looks

19  like the documents that Chad asked -- I think it

20  was a phone call that happened just prior to that

21  and Cory provided to Chad a September '21, looks

22  like the order approving Satterfield's settlement

23  and that's the whole thing of 4.3 million.  A

24  copy of the February -- I mean a copy of the

25  release agreement from the earlier settlement.  I

1  think that would have been two years prior, a

2  petition, more approval of that settlement that

3  had been signed in May of 2019.

4         Next correspondence is around that same

5  date, September 17th of '21, where Cory emailed

6  Chad and we can read it, but they spoke and then

7  Cory disclosed to Chad that he had learned that

8  Alec Murdaugh had been stealing money and that

9  the Satterfield money was involved, and told him

10  he couldn't represent him, and they had a

11  conflict of interest and I guess that was the end

12  of the relationship.

13         Did you ever have any discussions with

14  Cory about this conflict of interest letter?

15      A.  No.

16      Q.  Do you understand -- do you know what he

17  meant by he had a conflict of interest at this

18  time?

19      A.  All I know is what I'm reading in the

20  letter.  No.

21      Q.  Okay.  All right.  And then it looks

22  like that's the same letter.

23         So I'm assuming that that's all the

24  communications that were in your file between

25  Cory and Chad.  I've got a couple questions

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  related to that.  Do you know of any other

2  communications other than these?

3      A.  I do not know of any.  Bear in mind, I

4  have not studied that file, but --

5      Q.  Okay.

6      A.  -- I don't know of any others.

7      Q.  Okay.  And just skimming through these,

8  you agree that there's nothing about terms of any

9  representation agreement?

10     A.  That's what it appears, yes.

11     Q.  There's nothing about how attorney fees

12  are going to be charged?

13     A.  I did not see that.

14     Q.  Nothing about whatever Chad Westendorf

15  would be paid, a fee or how much?

16     A.  No, I didn't see that in there.

17     Q.  There was no indication in these

18  communications that Cory explained any of the

19  responsibilities of being a personal

20  representative to Chad Westendorf, is there?

21     A.  That's correct.

22     Q.  Do you have any information that anybody

23  at the law firm explained any responsibilities of

24  being a PR to Chad Westendorf?

25     A.  No.

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1      Q.   Okay.  Do you have any indication that

2  anybody at the firm provided copies of any of

3  Gloria Satterfield's medical records to Chad

4  Westendorf?

5      A.   No.  I was not involved with this file

6  at all.

7      Q.   Okay.  No indication that the firm

8  provided Chad information about the -- like, I

9  think, Trident Hospital made a claim for $600,000

10  in costs.  Any information that Chad was provided

11  any information about that claim?

12      A.   No.  Bear in mind, when I say I don't

13  that doesn't mean that Cory didn't do that, just

14  I wouldn't have --

15      Q.   I understand.

16      A.   -- been there.  If it happened --

17      Q.   You're --

18      A.   -- I would not have been there.  So, to

19  my knowledge, no --

20      Q.   You're --

21      A.   -- I don't have any information.

22      Q.   -- here for the firm --

23          MR. HOOD:  Yeah.  Christy, these

24  aren't topics --

25      Q.   I'm just --

1    MR. HOOD:  These aren't topic that

2  were noticed and, I mean, so you're asking him

3  his personal knowledge as opposed to the firm

4  and --

5    MS. ALLEN:  Oh, I don't mean his

6  personal -- I'm not asking his personal

7  knowledge, I'm asking him you as the law firm.

8  And I do think they're covered by the topics.

9    MR. HOOD:  Well, I mean, the

10  problem is is that the firm can only answer what

11  they know absent talking to Cory because he's

12  taking the Fifth and we're unable to speak with

13  him.  So --

14    MS. ALLEN:  I understand.

15    MR. HOOD:  Okay.

16    MS. ALLEN:  I understand that.

17    Q.  And when I say you, I mean the firm.

18    A.  Okay.  Well, since Cory was partner --

19  if that was done, it would have been done by

20  Cory.

21    Q.  I understand.

22    A.  And since I wasn't there --

23    Q.  So I'm asking if you as the firm have

24  any information other than what we've seen here.

25  And my understanding, the answer is no?

1    A.  The answer's no.  But just to keep it

2  clear, if the firm did it, it would have been

3  done by Cory.  So he's the only one --

4    Q.  Right.  But he --

5    A.  -- who can answer that question.  Since

6  to my knowledge --

7    Q.  Right.  But he's not here --

8    A.  -- neither I --

9    Q.  -- he's not designated as a 30(b)(6)

10  person to testify.

11    A.  That's correct.

12    Q.  Okay.  I don't think we are

13  misunderstanding each other.  I understand you've

14  got the firm -- the file and that -- and I'm just

15  trying to confirm that's the entire amount of

16  information the person who is here representing

17  the law firm has as far as answering these

18  questions.

19    A.  That is correct.  Know absolutely

20  nothing about it --

21    Q.  Okay.

22    A.  -- other than what's in the file.

23    Q.  All right.  Understanding Exhibit 2 is

24  the communications -- I represented that are the

25  only communications that I see in the file

1  between Cory and Chad, you agree that there's no

2  indication that Cory provided Chad any, like,

3  draft pleadings, there's no communications about

4  what was going on, no indication that he sought

5  Chad's approval in advance of any hearing

6  petition that was signed, right?

7      A.  That is not reflected in Exhibit 2,

8  that's correct.

9      Q.  Okay.  Does -- do you know, and I say

10 you, the firm know if any person at the law firm

11 even drafted the pleadings, the petitions as it

12 relates to the Gloria Satterfield settlement?

13     A.  I -- the only one who could answer that

14 would be Cory.  I have no idea who drafted the

15 pleadings.

16     Q.  Okay.  Any indication in Exhibit 2 that

17 Cory and Chad communicated prior to the Gloria

18 Satterfield mediation --

19          MR. HOOD:  You broke --

20     Q.  -- about the mediation itself.

21     A.  One second --

22          MR. HOOD:  You broke up a little

23 bit.

24     A.  Can you repeat that?

25     Q.  Yeah.  Let me rephrase that.  In

1    Exhibit 2 there was some email about whether or

2    not Chad could be present at the mediation due to

3    some kind of conflict.  And then there was a

4    letter from Cory to Chad saying the mediation is

5    on March 22nd.  Those are the only two

6    communications in Exhibit 2.

7         My question to you is do you have any --

8    you meaning the firm have any other information

9    that Cory communicated with Chad about the

10   mediation itself prior to it taking place?

11        A.   No.

12        Q.   Did anybody at the firm enter any time

13   to be charged in the Gloria Satterfield case?

14        A.   Not -- not that I know of.

15        Q.   Any indication that -- let's see.  Let's

16   look at -- let me strike that.

17        Let's look at Exhibit 3, which I've got

18   up on the screen.  And I'll scroll down.  Let's

19   see.  Okay.  So Exhibit 3 is an email from Tanya

20   King to -- going from Tanya to J. Johnsen, who is

21   that -- oh, I'm sorry, that's at Gallivan White &

22   Boyd, I apologize.  They're copying Cory.  So it

23   looks like they're sending the law firm's W-9.

24   And there's an indication here to make Chad as

25   personal representative and Moss, Kuhn & Fleming

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  as the payee on the check.  And then if we look

2  down at the second page, this looks like the W-9

3  for the firm.

4        Do you recognize that to be the number,

5  your --

6        A.  It is.

7        Q.  -- tax ID number?

8            (Dft. Exhibit No. 3 marked for

9  identification.)

10       A.  It is.

11       Q.  And then let's look at what's been

12  marked as Exhibit 4 and this is more emails.

13  This is April 2019 discussing the -- who goes on

14  the check.  And here it's Cory telling John

15  Grantland, Chad and Moss, Kuhn & Fleming is who's

16  on the check and he said Chad does not need a

17  W-9, he is not receiving the funds.

18       If you look down here, Cory tells John

19  he meant to add Moss, Kuhn & Fleming on the

20  check.

21       And then Cory is emailing John and

22  says -- I guess the question was how do you want

23  the check made out and he says I want it made out

24  to Chad and then there's an ID number.

25       But if we look back at the W-9 for your

1    firm, I believe that's the same number as your

2    firm.

3              (Dft. Exhibit No. 4 marked for

4    identification.)

5         A.  Yes, it is.

6         Q.  Do you see that?  So that's not Chad's.

7              And then just to kind of familiarize you

8    with this email.  After that, that's when Cory

9    responds and says, no, we need to add Moss,

10   Kuhn & Fleming, you see that.

11             Do you have any -- I mean, would you

12   agree that Cory acting on behalf of your firm

13   affirmatively had Moss, Kuhn & Fleming added to

14   that check?

15        A.  Yes.

16        Q.  And do you have any information that

17   Chad Westendorf was involved in that decision in

18   any way?

19        A.  I don't know one way or the other, so

20   no.

21        Q.  Okay.

22             MR. PENDARVIS:  I just got kicked

23   out of Zoom.  I don't know whether the rest did.

24             I'm back in.

25        Q.  There was reference to Forge Consulting

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1  in this file.  I think I heard you say earlier

2  you had not heard of Forge until this came up; is

3  that right?

4      A.  That is correct.

5      Q.  Okay.  And so you, meaning the firm,

6  other than what's in the files that have been

7  produced, you don't have any information that

8  Cory obtained any documentation from Forge

9  Consulting as it relates to a structured

10  settlement --

11      A.  That's correct.

12      Q.  -- right?

13      A.  Yes.

14      Q.  Okay.  If we look at what's been marked

15  as Exhibit 5.  Do you see that?  I think it's an

16  October 6th, 2020, email?

17              (Dft. Exhibit No. 5 marked for

18  identification.)

19      A.  Yes.

20      Q.  This is an email from October 6th of

21  2020 between Tanya and Cory and it talks about

22  the prior check for 2.9 million that was sent to

23  Forge and there being 231,000 left in the trust

24  account.  And, then, the bottom email it looks

25  like Cory communicates that we are now able to

1  send money to Forge -- additional money to Forge

2  in this case.

3          Any indication that Cory or anybody at

4  your firm communicated with Chad Westendorf in

5  any way about monies going to Forge either the

6  first check or even the second one in 2020?

7      A.  All I would -- I don't -- all I would

8  know would be what was in the file.  And I don't

9  know what all --

10     Q.  Okay.

11     A.  -- is in the file, so no.

12     Q.  Okay.  Well, Exhibit 2 I've referenced

13  all the communication in the file between the two

14  of them and there wasn't anything with regard to

15  Forge in it, right?

16     A.  I cannot recall if there was a reference

17  to Forge in that or not.

18     Q.  Okay.  You don't have -- do you have any

19  information that Cory or anybody at the firm

20  communicated to Chad in October of 2020 that

21  there was still money left in the estate law firm

22  trust account?

23     A.  Not that I'm aware of.

24     Q.  Okay.  Any indication that Cory or

25  anybody at the firm communicated with Chad about

1   the stipulation of dismissal that was ultimately

2   signed by Cory and Alec in October of 2020?

3       A.  Yes, there's an indication.  There could

4   be something in the file since I'm not familiar

5   with the file.  But to my knowledge, there is

6   not.

7       Q.  Okay.

8       A.  I have not seen anything that would --

9       Q.  Other than --

10      A.  -- show that.  Yeah.

11      Q.  Other than what may be in the documents

12  that have been produced, you as the law firm

13  don't have any additional information about that?

14      A.  That is correct.

15      Q.  Okay.  Do you have any information that

16  Chad Westendorf had any knowledge whatsoever of

17  any scheme to misappropriate any of the Gloria

18  Satterfield settlement funds?

19      A.  No.

20      Q.  Do you have any information to support

21  the allegation that Cory made any agreement with

22  Chad to misappropriate any funds from the

23  Satterfield settlement fund?

24      A.  No.

25      Q.  Assuming Cory misappropriated funds from

1  the Satterfield settlement monies, do you have

2  any information that Chad Westendorf participated

3  in that misappropriation in any way?

4      A.  No.

5      Q.  Do you have any information to indicate

6  that Cory Fleming ever disclosed to Chad

7  Westendorf that he had misappropriated monies

8  from the Satterfield settlement account?

9      A.  No.

10     Q.  Give me one second, let me see what else

11 I've got and I might be almost done.

12         Okay.  I've just got a few more.  Let me

13 show you what's been marked as Exhibit Number 7.

14             (Dft. Exhibit No. 6 not identified

15 for the record.)

16             (Dft. Exhibit No. 7 marked for

17 identification.)

18     Q.  Okay.  Mr. Kuhn, this is an October 7th,

19 2021, letter from Tommy Lydon who originally was

20 representing Mr. Westendorf to Thomas Pendarvis

21 and David Overstreet who I understand were your

22 firm lawyers at the time.  Take a second to look

23 at it and I just have a couple questions.

24         First of all, do you recall receiving

25 this letter?

67

1      A.  I don't recall it right now, but I've

2   only read the first sentence.

3      Q.  Okay.  Just take a second.

4      A.  Okay.  You can scroll down farther.

5      Q.  Okay.

6      A.  Okay.  You can scroll a little bit

7   farther to the last paragraph.

8          Okay.

9      Q.  Okay.  You agree this is a notice of a

10  claim by Chad Westendorf against your firm?

11     A.  Say that again?  I'm sorry.

12     Q.  You agree this is a notice of a

13  potential claim by Chad Westendorf against your

14  law firm?

15     A.  I -- I guess -- I'm reading it for the

16  first time that I know of so, I -- I -- I don't

17  know.

18     Q.  Okay.  Do you know if you turned this

19  over to your insurance company?

20     A.  No.

21     Q.  Do you know if you received any

22  reservation of rights or denial letter or

23  response from your insurance company for this

24  letter?

25     A.  I do not recall that if we did.

1      Q.  If you had, is that something that you

2  could provide to your lawyers so they could

3  produce it?

4      A.  Yeah, I could look and see.

5              (This page contains Requested

6  Information to be supplied by counsel and/or the

7  deponent.)

8              MS. ALLEN:  Okay.  That's all the

9  questions I have.  Thank you.

10              THE WITNESS:  Okay.  Thank you.

11              MR. RANNIK:  Bobby and Fred, would

12  you permit about a minute of follow-up

13  questioning from me?

14              MR. HOOD:  Of course.

15              MR. RANNIK:  And I -- I'm jumping

16  in here.  I assume nobody has -- I think we've

17  heard from everybody else that no one else has

18  questions, but I don't want to jump in line if

19  anybody does.

20              MR. PENDARVIS:  No questions for

21  Mr. Fleming.

22              MR. WALKER:  No questions on behalf

23  of Palmetto State Bank at this time.

24              MR. RANNIK:  Okay.  Well, thanks.

25                   EXAMINATION

1   BY MR. RANNIK:

2       Q.   I asked you about Mr. Fleming's conduct

3   and the extent to which it would be wrongful.

4   Let me put a little more meat on that bone.

5   Would it be wrong to disburse settlement funds in

6   a wrongful death action in which there's an

7   estate without first having a filed or approving

8   the settlement?

9       A.   To disburse the funds before the order

10  approving settlement is signed?

11      Q.   Is filed.

12      A.   Is filed?  Usually we don't get the

13  funds until that's done, so I've never had that

14  come up.

15      Q.   And if it did, would you agree --

16      A.   You say wrong.  I certainly wouldn't do

17  it.

18      Q.   Yeah.

19      A.   Yeah.

20      Q.   Yeah.  Would it be wrong to disburse

21  settlement funds in a manner inconsistent with an

22  order approving the settlement?

23      A.   It'd depend on the inconsistency.

24      Q.   How about in the amount of fees being

25  taken from the funds, for example?

1    A.  You wouldn't take more fee than what's

2    approved.  You could, I guess, waive some of your

3    fees if you wanted to, but you certainly wouldn't

4    take more that the -- than what's approved.

5    Q.  Okay.  Would it be wrong to misrepresent

6    to the Court the amount of expenses incurred in a

7    case as parts of a petition to approve a

8    settlement?

9    A.  Yes.

10   Q.  Would it be wrong to disburse settlement

11   funds in a manner inconsistent with the payor's

12   instructions about how and when to disburse them?

13   A.  Not necessarily.

14   Q.  If an instruction was given not to

15   release funds until an order approving a

16   settlement has been signed and filed and the

17   funds were disbursed before any order was filed,

18   would that be wrong?

19            MR. HOOD:  Object to the form.

20   A.  It would depend.  Often when the carrier

21   sends me a settlement check, the cover letter

22   will say something like hold these funds in trust

23   until your client has signed the release or hold

24   these funds in trust until an order approving

25   settlement's been issued.  In such a case, yes,

1    it would be wrong.

2         Q.   Okay.   Would it be wrong to arrange to

3    prevent an order approving the settlement being

4    filed?

5         A.   Unless there was good reason for that.

6         Q.   Would bad publicity for the defendant be

7    a good reason for that?

8         A.   I don't know.   I don't have any opinion

9    on that.

10        Q.   And would it be wrong to dismiss an

11   action without one's client's consent?

12        A.   Yeah.   I mean, they hire you to bring

13   the action so if you dismiss it and they don't

14   know about it, yes, that would be wrong.

15             MR. RANNIK:   Okay.   Thank you so

16   much, Mr. Kuhn.   That's all I've got.

17             MR. HOOD:   Anything else on Zoom?

18             MR. WALKER:   Nothing from Palmetto

19   State Bank.   Thank you.

20             MS. ALLEN:   Nothing from Chad

21   Westendorf.

22             MR. HOOD:   All right.   Y'all have a

23   good weekend.

24             THE WITNESS:   Y'all take care.

25             MR. WALKER:   Thank you.   You too.

1          MS. ALLEN:  Thanks.  You too.

2          THE COURT REPORTER:  Anyone on the

3   Zoom, would anybody like to order a copy of the

4   transcript before y'all log off?

5          MR. WALKER:  Kelly, this is

6   Trenholm for Palmetto State Bank.  We would like

7   a copy.

8          THE COURT REPORTER:  Okay.

9          MR. WALKER:  We only need one copy.

10  Tom was on for part of this too, but we would

11  like one copy.  An electronic is fine.

12         THE COURT REPORTER:  Okay.  Would

13  you like the exhibits attached?

14         MR. WALKER:  Yes, please.

15         THE COURT REPORTER:  Great.  Thank

16  you.

17         Ms. Allen, would you like a copy?

18         MS. ALLEN:  No.  Thank you.

19         THE COURT REPORTER:  Okay.

20         Thank you.  Y'all have a great

21  weekend.

22         MR. HOOD:  He'll read and sign.

23         THE COURT REPORTER:  Okay.  And do

24  you want me to send that to you, Mr. Hood, or

25  directly to Mr. Kuhn?

1              MR. HOOD:  You can send it to me.

2              THE COURT REPORTER:  Okay.  Thank

3    you.  And, Mr. Hood, would you like a copy of

4    this?

5              MR. HOOD:  Sure.

6              THE COURT REPORTER:  Okay.  Do you

7    take paper copy, electronic or both?

8              MR. HOOD:  E-tran, please.

9              THE COURT REPORTER:  E-tran.  With

10   exhibits?

11             MR. HOOD:  Sure.

12             THE COURT REPORTER:  Alrighty.

13             Mr. Pendarvis, would you like a

14   copy?

15             MR. PENDARVIS:  That's okay.

16             THE COURT REPORTER:  Okay.  Thank

17   you.

18             And I believe we have your standard

19   order.

20             MR. RANNIK:  Yes, indeed.

21             THE COURT REPORTER:  Would you like

22   the exhibits attached?

23             MR. RANNIK:  No, thanks.  That's

24   okay.

25             THE COURT REPORTER:  Okay.  Thank

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

1    you.
2                    (The witness, after having been
3    advised of his right to read and sign this
4    transcript, does not waive that right.)
5                    (The deposition concluded at
6    11:35 A.M.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    CERTIFICATE OF REPORTER
                STATE OF SOUTH CAROLINA
2               COUNTY OF BEAUFORT

3

                     I, KELLY B. BAEKELANDT, Registered
4    Professional Reporter and Notary Public for the
     State of South Carolina at Large, do hereby
5    certify that the witness in the foregoing
     deposition was by me duly sworn to testify to the
6    truth, the whole truth and nothing but the truth
     in the within-entitled cause; that said
7    deposition was taken at the time and location
     therein stated; that the testimony of the witness
8    and all objections made at the time of the
     examination were recorded stenographically by me
9    and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full,
10   complete and true record of the testimony of the
     witness and of all objections made at the time of
11   the examination; and that the witness was given
     an opportunity to read and correct said
12   deposition and to subscribe the same.
                     Should the signature of the witness
13   not be affixed to the deposition, the witness
     shall not have availed himself/herself of the
14   opportunity to sign or the signature has been
     waived.
15                   I further certify that I am neither
     related to nor counsel for any party to the cause
16   pending or interested in the events thereof.
                     Witness my hand, I have hereunto
17   affixed my official seal on July 25, 2023, at
     Bluffton, Beaufort County, South Carolina.
18

19

20                    KELLY B. BAEKELANDT
                  REGISTERED PROFESSIONAL REPORTER
21                RPR, CSR (Georgia)
                  My Commission expires
22                June 16, 2026

23

24

25

```
 1                    DEPONENT CORRECTION SHEET
             I, the undersigned, H. FRED KUHN, JR., do
 2      hereby certify that I have read the foregoing
        deposition and wish to make the following
 3      clarifications and/or corrections, if any.

 4      PAGE     LINE     CHANGE          REASON

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20                    H. FRED KUHN, JR.          Date

21
        KB
22

23

24

25
```

**WORD INDEX**

**< $ >**
**$1,000,000**  30:9
**$100,000**  31:22
**$113,800**  25:13  26:1
**$350,000**  22:3
**$50,000**  42:9
**$500,000**  30:8
**$600,000**  56:9

**< 0 >**
**0001**  3:23
**0002-3**  3:13
**000355**  3:14
**0004**  3:20
**0068**  3:15
**0106**  3:17
**0107**  3:18

**< 1 >**
**1**  3:9, 24  6:15, 19
  46:1  48:15, 20  49:2
**10**  12:12
**10:01**  1:19
**11:35**  74:6
**14th**  52:5
**15**  12:12
**15th**  53:12
**16**  75:22
**172**  2:14
**17th**  54:5
**1980**  7:11
**19th**  52:9

**< 2 >**
**2**  3:12, 25  24:13, 16
  42:6  50:3, 15
  58:23  59:7, 16
  60:1, 6  64:12
**2.9**  63:22
**2:22-cv-1307-RMG**
  1:6
**2001**  19:19
**2015**  52:15
**2017**  21:16  28:10
  39:15  40:7
**2018**  4:4  13:4
**2018-2019**  10:1
  11:23

**2019**  13:5  52:2
  54:3  61:13
**2020**  63:16, 21  64:6,
  20  65:2
**2021**  3:12  4:9
  8:10, 11  25:13
  26:6  30:17  53:12
  66:19
**2022**  8:10  26:6
  30:18
**2023**  1:16  75:17
**2026**  75:22
**21**  1:16  53:21  54:5
**22**  50:5  51:19
**22167**  2:23
**22nd**  52:7  60:5
**23**  19:5
**231,000**  63:23
**24**  3:11
**25**  75:17
**25th**  52:15
**27**  3:13, 14, 15, 16,
  17
**29401**  2:6, 14, 18
**29405**  1:24
**29413**  2:23
**29902**  2:10

**< 3 >**
**3**  3:14  4:5  27:4, 7,
  18, 24  60:17, 19
  61:8
**30**  3:12, 18  4:4
  9:19
**30(b)(6**  1:4  3:10
  58:9
**300**  6:7  46:1, 10
**30th**  28:10
**31**  3:20

**< 4 >**
**4**  3:15  4:6  21:19
  27:9  29:2  61:12
  62:3
**4,516**  21:21
**4.3**  53:23
**45**  3:4
**46A**  2:5
**49**  3:23

**4th**  30:17, 18

**< 5 >**
**5**  3:1, 16  4:8
  27:11  29:9  63:15,
  17
**50**  3:24

**< 6 >**
**6**  3:9, 17  4:9
  27:13  29:12  66:14
**61**  4:4
**62**  4:6
**63**  4:7
**66**  4:8, 9
**68**  4:10
**69**  3:4
**6th**  63:16, 20

**< 7 >**
**7**  3:18  4:9, 10
  27:15, 18  29:18
  66:13, 16
**710**  2:9
**75**  3:5
**76**  3:5
**7th**  66:18

**< 8 >**
**8**  3:19  29:24, 25
  30:3
**843-762-6294**  1:25

**< 9 >**
**9**  3:21  31:9, 10, 12
**9-27-2021)-001311**
  3:16
**97**  2:18

**< A >**
**A.M**  1:19  74:6
**A1**  2:10
**able**  6:23  38:21
  47:5  50:10, 18
  52:11  63:25
**absent**  57:11
**absolutely**  28:5
  44:18  58:19
**accept**  13:5

**account**  13:18
  21:25  23:16  24:24
  25:9  28:10, 13
  29:15, 20  41:2
  42:11, 16, 18, 25
  43:9  63:24  64:22
  66:8
**accountant**  23:9
**accounts**  23:13
  27:22  42:19
**accurate**  25:7  28:8
  29:17, 19
**acting**  62:12
**action**  33:23  69:6
  71:11, 13
**actions**  34:1
**activities**  32:2
**actual**  28:6
**ad**  10:8
**Adams**  52:24
**add**  61:19  62:9
**added**  62:13
**additional**  64:1
  65:13
**admin**  23:2
**administrative**  22:19
**admit**  43:18
**admits**  44:6
**admitted**  4:8  44:16
**adult**  36:18  37:11
**adults**  36:9, 23
**advance**  59:5
**advantage**  37:10
**advised**  74:3
**advising**  52:6
**affirmatively**  62:13
**affixed**  75:13, 17
**agent**  26:7, 22
**aggregate**  30:8
**ago**  7:22  17:8
**agree**  24:22  26:7
  44:7  55:8  59:1
  62:12  67:9, 12
  69:15
**agreed**  15:9
**agreement**  9:16, 17
  47:7, 14  53:25
  55:9  65:21
**agreements**  48:1
**ahead**  8:3  9:7  27:6

Alec  18:*23*  19:*13, 15, 21, 22*  20:*6*  27:*24*  41:*22*  42:*1*  53:*14*  54:*8*  65:*2*
Alex  16:*24*  17:*22*  31:*24*  33:*16*  34:*5*  41:*16*  44:*14*
ALEXANDER  1:*11*  39:*23*
allegation  44:*13*  65:*21*
allegations  44:*4, 10*
ALLEN  2:*17*  3:*4*  45:*6, 15, 16*  50:*17, 25*  51:*3, 7, 13*  57:*5, 14, 16*  68:*8*  71:*20*  72:*1, 17, 18*
Alrighty  73:*12*
Amended  3:*9*  9:*21*
amiss  43:*25*
amount  12:*9*  22:*5*  48:*5*  58:*15*  69:*24*  70:*6*
amount's  21:*18*
and/or  26:*13*  68:*6*  76:*3*
Andrew  11:*17*
Ann  38:*5, 9, 15*
Ann's  38:*14*
annuities  36:*6*
annuity  36:*4, 6*  37:*9, 19*
answer  5:*19*  22:*13*  57:*10, 25*  58:*5*  59:*13*
answering  58:*17*
answer's  58:*1*
anybody  6:*10*  45:*3, 5, 7*  55:*22*  56:*2*  60:*12*  64:*3, 19, 25*  68:*19*  72:*3*
anybody's  10:*20*
Anyway  22:*1*
apologize  60:*22*
apparently  19:*25*
appear  29:*14*
Appears  29:*8*  30:*3*  55:*10*
applicable  30:*15*

apply  31:*23*
appointed  49:*12*
appointment  49:*9*
appreciate  5:*10*  44:*25*
appropriate  47:*12*
approval  15:*16*  52:*4*  54:*2*  59:*5*
approve  70:*7*
approved  70:*2, 4*
approving  53:*22*  69:*7, 10, 22*  70:*15, 24*  71:*3*
Approximately  9:*18*
April  52:*15*  61:*13*
arrange  71:*2*
Aside  20:*21*
asked  15:*8*  28:*11*  38:*17*  53:*19*  69:*2*
asking  47:*20*  51:*6*  57:*2, 6, 7, 23*
associate  11:*10, 11, 19*  12:*21, 25*  17:*9*
associated  39:*23*
assume  5:*20*  20:*19*  68:*16*
assuming  19:*16*  54:*23*  65:*25*
attached  72:*13*  73:*22*
attend  52:*11*
attorney  16:*25*  21:*11*  55:*11*
attorney's  42:*15*  48:*5*
authentic  27:*20*  28:*8*  29:*3*
authenticate  25:*3*  28:*2*
authentication  27:*3*
authorities  47:*12*
authorizations  13:*3*
authorized  13:*5, 18*  14:*4*
available  26:*23*  32:*11*
availed  75:*13*
aware  20:*7, 11*  33:*12, 13*  47:*8, 15*

64:*23*

< B >
back  16:*14*  18:*4, 15, 24*  22:*1, 7*  38:*20*  40:*22*  61:*25*  62:*24*
bad  71:*6*
BAEKELANDT  1:*23*  75:*2, 20*
Bailey  7:*16*  16:*9*
Balance  3:*12*  25:*13*
BANK  1:*12*  2:*20*  24:*3*  32:*15, 18*  41:*4, 5, 7, 10*  45:*7, 13*  49:*17*  68:*23*  71:*19*  72:*6*
Barton  52:*24*
Based  19:*1*  50:*8*
basic  5:*12*
basically  8:*24*  32:*6*  40:*19*
basis  10:*8*
Bates  46:*9*  50:*7, 23*  51:*4, 5*
Bates-labeled  6:*5*
Bates-stamped  3:*25*  45:*25*
BBT  3:*15*
Bear  55:*3*  56:*12*
BEAUFORT  1:*21*  2:*10*  7:*4, 6*  75:*2, 17*
Beaufort's  18:*10*
beginning  45:*19*
BEHALF  2:*3, 6, 12, 16, 20*  6:*14*  45:*10, 12*  62:*12*  68:*22*
believe  16:*24*  18:*10*  26:*11*  28:*7*  30:*7, 13, 16*  31:*19, 20*  32:*9*  39:*14*  41:*14*  42:*13*  46:*10*  51:*20*  62:*1*  73:*18*
bell  38:*5*
bells  22:*9*
belong  26:*1, 2, 12, 17*  35:*7*
belonged  26:*3*  35:*7*
beneficiaries  35:*8*
best  6:*23*

better  37:*13*
beyond  38:*23*
big  18:*10*
bit  7:*18*  8:*17, 20, 23*  9:*14, 23*  19:*2*  33:*9*  59:*23*  67:*6*
BJ  52:*25*  53:*2*
Bland  25:*19*  26:*4*
blanket  31:*23, 25*
Bluffton  75:*17*
BOBBY  2:*13*  45:*24*  51:*10*  68:*11*
BOLEN  1:*24*
bone  69:*4*
bookkeeper  23:*10, 11*
bookkeeping  23:*2*
books  25:*25*
born  42:*2*
bottom  46:*9*  63:*24*
BOUNDARY  2:*9*
BOX  2:*23*
Boyd  60:*22*
brand  17:*24*
Branton  7:*15*  16:*8*
break  5:*24*  36:*24*  51:*9, 14*
bring  35:*4*  71:*12*
BROAD  2:*18*
broke  59:*19, 22*
brother  18:*13*
brought  13:*19*  33:*15*  34:*13*
building  15:*23, 24*  16:*14, 15*
buildings  16:*2*
built  16:*7*
business  25:*5*

< C >
call  37:*24*  53:*20*
called  7:*15*  10:*4*
care  71:*24*
CAROLINA  1:*1*  75:*1, 4, 17*
carrier  36:*4*  70:*20*
Carter  7:*15*
CASE  1:*6*  10:*16*  13:*12*  14:*4*  15:*3, 7, 16, 20*  17:*22*  19:*21,*

23  20:25  21:14
22:21  33:8  34:21
40:7  45:17  46:8
60:13  64:2  70:7, 25
cases  14:1, 23
15:13  17:20  18:24
19:16, 17  20:6, 7, 12,
19, 23  21:7  36:3
40:22, 25
cause  75:6, 15
certainly  69:16
70:3
CERTIFICATE  3:5
75:1
certify  75:5, 15
76:2
CHAD  1:11  2:16
33:1  38:12  45:17
47:7  48:10  49:9,
17, 22  50:11  51:20,
23  52:1, 6, 10, 11
53:15, 16, 19, 21
54:6, 7, 25  55:14, 20,
24  56:3, 8, 10  59:1,
2, 17  60:2, 4, 9, 24
61:15, 16, 24  62:17
64:4, 20, 25  65:16,
22  66:2, 6  67:10, 13
71:20
Chad's  59:5  62:6
chain  3:23  4:5, 6, 7
change  7:20  8:13,
15, 24  33:9  76:4
changed  8:12
charged  55:12
60:13
CHARLESTON  1:2,
24  2:6, 14, 18, 23
Charlie  33:4
Check  3:14, 15, 16,
17  19:15  21:24
28:6, 9, 12, 15  29:4,
15, 20  39:15, 21, 23
40:8  42:9  52:18,
20  61:1, 14, 16, 20,
23  62:14  63:22
64:6  70:21
checks  3:14  19:12
20:16, 21  21:15

27:21  43:2, 10
CHF  50:5, 6
CHF_00157  4:7
CHF_00237-238  4:5
CHF_00239-241
3:23
CHF_00288-289
3:25
CHF_00329  4:6
CHF_00330  4:7
CHF_00331  4:7
CHF_00332  4:6
CHF_00334  4:6
children  36:1, 8, 21,
22
CHRISTY  2:17
45:16  50:23  56:23
city  18:11
civil  33:19, 24
claim  30:8, 20, 22
32:12  34:13, 19
35:3  56:9, 11
67:10, 13
claims  30:11, 13
31:23  32:3  33:15,
19, 24  34:7
clarifications  76:3
CLARK  1:24
clear  13:7  31:4
58:2
clever  29:22
client  26:17  32:17
34:20  35:5  37:8
70:23
clients  15:25  48:2
client's  71:11
CLINTON  2:5
CNA  3:18  30:4
31:1  32:6
cocounsel  18:25
20:9  37:25
collaborate  14:23
come  12:21  14:3
21:13  69:14
comes  15:3  26:24
coming  24:23
Commission  75:21
communicated
59:17  60:9  64:4,

20, 25
communicates  63:25
communication
64:13
communications
50:9, 10  51:20
54:24  55:2, 18
58:24, 25  59:3  60:6
COMPANY  1:6
3:21  35:18, 24
36:6  37:5, 14, 15
67:19, 23
Company's  3:9
compiled  47:11
complete  75:10
complied  47:10
computer  50:21
51:6
computer-aided  75:9
conclude  43:25
concluded  74:5
conclusion  28:24
conduct  44:9  69:2
confirm  6:22  58:15
conflict  54:11, 14,
17  60:3
connection  34:5
consent  71:11
conservator  33:7
consider  44:17
constitute  44:8
Consulting  35:13
62:25  63:9
contains  68:5
continue  27:2
continued  18:22
contributing  31:2
copies  38:21  52:2
56:2
copy  29:15, 17, 19
53:24  72:3, 7, 9, 11,
17  73:3, 7, 14
copying  60:22
Correct  13:25
16:23  17:1  28:1, 4
30:4, 6, 21, 25  46:23
47:24  55:21  58:11,
19  59:8  63:4, 11
65:14  75:11

CORRECTION  3:5
76:1
corrections  76:3
correspondence  54:4
CORY  1:11  2:6
8:21  10:1  11:16,
17, 18, 21  15:10, 22
16:14  19:1, 17, 25
20:9  22:16  29:6
33:10  40:15, 19, 21
43:3, 19  45:10
49:8, 16  50:6, 11
51:21, 22  52:1, 5, 11,
16  53:15, 21  54:5, 7,
14, 25  55:18  56:13
57:11, 18, 20  58:3
59:1, 2, 14, 17  60:4,
9, 22  61:14, 18, 21
62:8, 12  63:8, 21, 25
64:3, 19, 24  65:2, 21,
25  66:6
Cory's  15:22  28:16
49:1  52:22
costs  56:10
counsel  6:11  21:11
33:22  37:3  68:6
75:15
country  18:20
COUNTY  75:2, 17
couple  37:21  42:7
45:18  46:25  48:24
52:13  54:25  66:23
course  5:16, 23
6:13  8:22  21:3
25:5  68:14
COURT  1:1  43:23
48:15  50:17, 19
70:6  72:2, 8, 12, 15,
19, 23  73:2, 6, 9, 12,
16, 21, 25
cover  70:21
coverage  30:8, 12,
15  31:15, 22  32:8
covered  57:8
CPA  23:7
criminal  40:16, 18,
20, 22, 25
CSR  1:23  75:21
current  9:24, 25

**Customer** 3:*11*

**< D >**
**dad** 18:*12*
**DATE** 1:*16* 54:*5*
  76:*20*
**dated** 52:*5*
**dates** 30:*15*
**David** 66:*21*
**Davidson** 23:*3* 41:*3*
**deal** 37:*13*
**death** 69:*6*
**dec** 30:*3* 31:*13*
**decide** 15:*19*
**decision** 62:*17*
**Declarations** 3:*19,*
  *22*
**dedicated** 14:*8, 10*
**deeds** 43:*18*
**DEFENDANT** 2:*6,*
  *12, 16* 48:*20* 71:*6*
**Defendants** 1:*12*
**defense** 31:*1, 2*
  40:*16, 18, 20*
**delivered** 37:*3*
**delivers** 35:*23*
**demand** 13:*13*
**denial** 67:*22*
**depend** 69:*23* 70:*20*
**DEPONENT** 1:*16*
  3:*5* 68:*7* 76:*1*
**deposit** 3:*13* 27:*24*
**depositing** 13:*17*
**DEPOSITION** 1:*2*
  3:*10* 5:*9, 13* 6:*2,*
  *16* 45:*19* 74:*5*
  75:*5, 7, 12, 13* 76:*2*
**DESCRIPTION** 3:*8*
**designated** 58:*9*
**Detail** 3:*12* 19:*6*
**determined** 26:*20*
  48:*6, 10*
**Dft** 3:*23, 24* 4:*4, 6,*
  *7, 8, 9* 49:*2* 50:*15*
  61:*8* 62:*3* 63:*17*
  66:*14, 16*
**different** 15:*23*
  28:*20, 21* 49:*11*
**digging** 20:*13*
**direct** 44:*2*

**directly** 36:*6* 50:*12*
  72:*25*
**disburse** 36:*18*
  69:*5, 9, 20* 70:*10, 12*
**disbursed** 43:*7*
  70:*17*
**disbursements** 13:*22*
**Disciplinary** 21:*11*
  33:*21*
**disclosed** 54:*7* 66:*6*
**disclosures** 53:*13*
**discovered** 22:*16*
**discussed** 22:*22*
**discussing** 49:*9*
  61:*13*
**discussion** 15:*6*
**discussions** 54:*13*
**dismiss** 71:*10, 13*
**dismissal** 65:*1*
**dispose** 40:*25*
**disproportionate**
  10:*12, 14*
**DISTRICT** 1:*1*
**divide** 10:*10*
**DIVISION** 1:*2*
  10:*12, 14, 20*
**document** 25:*4, 12*
  27:*3* 48:*19* 52:*2*
**documentation** 63:*8*
**documents** 3:*24*
  6:*4* 9:*15* 13:*14*
  24:*14, 20* 38:*21*
  45:*25* 46:*7* 50:*8*
  53:*16, 19* 65:*11*
**doing** 40:*18*
**Dore** 16:*9*
**draft** 59:*3*
**drafted** 59:*11, 14*
**due** 60:*2*
**duly** 5:*2* 75:*5*
**duty** 26:*8, 10, 11, 16,*
  *22*

**< E >**
**earlier** 53:*25* 63:*1*
**early** 26:*6* 47:*3*
**eat** 10:*17*
**echo** 8:*18*
**eight** 19:*4, 14*
  20:*15* 39:*12*

**either** 32:*20* 51:*22*
  64:*5*
**electronic** 72:*11*
  73:*7*
**Email** 3:*23* 4:*4, 6,*
  *7* 6:*3* 38:*11* 48:*25*
  49:*8, 19* 51:*11*
  60:*1, 19* 62:*8*
  63:*16, 20, 24*
**emailed** 45:*24* 54:*5*
**emailing** 61:*21*
**emails** 52:*13, 17*
  61:*12*
**employed** 40:*10*
  53:*9*
**employee** 53:*7, 8*
**ended** 22:*5*
**endorsed** 52:*19*
**enjoyed** 5:*8*
**enter** 60:*12*
**entire** 58:*15*
**entity** 8:*14, 25*
**entry** 42:*8, 22*
**EPTING** 2:*4*
**equal** 16:*22*
**equally** 10:*5, 9, 10*
**Eric** 25:*19* 26:*4*
**eroding** 32:*7*
**escrow** 13:*18* 25:*15*
  26:*7, 18, 21*
**estate** 35:*6* 48:*6*
  49:*24* 64:*21* 69:*7*
**esteem** 5:*7*
**E-tran** 73:*8, 9*
**events** 75:*16*
**everybody** 35:*10*
  47:*2* 68:*17*
**evidence** 47:*6*
**exactly** 14:*9*
**EXAMINATION**
  3:*1* 5:*4* 45:*14*
  68:*25* 75:*8, 11*
**examined** 5:*2*
**example** 26:*20*
  69:*25*
**exception** 36:*22*
**exchange** 51:*25*
  52:*9, 10* 53:*11*
**excluded** 10:*21*

**EXHIBIT** 3:*8, 9, 11,*
  *13, 14, 15, 16, 17, 18,*
  *20, 23, 24* 4:*4, 6, 7, 8,*
  *9* 6:*15, 19, 22* 24:*13,*
  *16* 27:*4, 7, 9, 11, 13,*
  *15, 24* 29:*25* 30:*3*
  31:*9, 10, 12* 42:*6*
  48:*15, 20* 49:*2*
  50:*3, 15* 51:*19*
  58:*23* 59:*7, 16*
  60:*1, 6, 17, 19* 61:*8,*
  *12* 62:*3* 63:*15, 17*
  64:*12* 66:*13, 14, 16*
**EXHIBITS** 3:*7*
  25:*3* 27:*18* 46:*25*
  72:*13* 73:*10, 22*
**existed** 10:*1*
**expect** 39:*15* 42:*24*
  43:*5*
**expenses** 10:*3, 5*
  70:*6*
**expires** 75:*21*
**explained** 43:*4*
  55:*18, 23*
**extent** 21:*5* 69:*3*

**< F >**
**fair** 5:*21, 22* 9:*20*
  12:*9* 19:*9* 22:*5, 12*
  43:*16*
**familiar** 23:*4* 24:*18*
  38:*10* 65:*4*
**familiarize** 62:*7*
**family** 18:*16, 21*
**fan** 20:*3* 21:*1*
  22:*25*
**far** 33:*24* 58:*17*
**farther** 67:*4, 7*
**February** 53:*24*
**federal** 43:*23*
**fee** 47:*6, 14* 48:*1*
  55:*15* 70:*1*
**fees** 42:*15* 48:*5*
  55:*11* 69:*24* 70:*3*
**fiduciary** 26:*8, 10,*
  *11, 16*
**Fifth** 57:*12*
**figured** 26:*2*
**file** 24:*15* 39:*14, 16,*
  *20* 40:*2* 45:*21*

46:5  47:10, 18
49:21  54:24  55:4
56:5  58:14, 22, 25
63:1  64:8, 11, 13
65:4, 5
**filed**  9:1  69:7, 11,
12  70:16, 17  71:4
**files**  38:20, 22  39:5,
17, 19  46:14, 20
48:4  50:11  51:23
63:6
**find**  30:16
**fine**  51:12  72:11
**FIRM**  2:13  6:5
7:14  8:12, 21  10:6
11:24  12:2  13:4,
13  15:4  16:6
17:12, 15  18:3, 16,
22  19:13  20:12, 17
21:5  22:14  23:2,
21  32:25  40:10, 19
42:18  43:6, 18
46:21  47:7  49:5
53:4  55:23  56:2, 7,
22  57:3, 7, 10, 17, 23
58:2, 14, 17  59:10
60:8, 12  61:3  62:1,
2, 12  63:5  64:4, 19,
21, 25  65:12  66:22
67:10, 14
**firm's**  9:14  23:2,
12  24:3, 24  40:15
47:25  60:23
**first**  5:2  13:7  42:8
45:8  51:25  52:4
64:6  66:24  67:2,
16  69:7
**fixing**  8:19
**FLEMING**  1:11
2:6  7:19, 20, 24
8:4, 5  10:2  11:9,
13  12:1  13:5
20:23  21:6  32:25
33:10  39:17  42:9,
23  43:3, 8, 19  45:10,
21  50:6  51:21
60:25  61:15, 19
62:10, 13  66:6
68:21

**Fleming's**  21:14
29:6  32:2  38:20
42:10  51:22, 23
69:2
**flip**  6:21  27:19
42:21
**folks**  16:10
**following**  76:2
**follows**  5:3
**follow-up**  38:4
68:12
**FORD**  2:17
**foregoing**  75:5, 9
76:2
**Forge**  35:13, 15, 19
62:25  63:2, 8, 23
64:1, 5, 15, 17
**forgot**  41:3
**forgotten**  38:1
**form**  9:24, 25  10:1
26:25  70:19
**forth**  18:24
**FRED**  1:2, 16  5:1
68:11  76:1, 20
**FREEMAN**  2:21
**frivolous**  34:7
**front**  16:15  48:22
50:18
**full**  75:9
**fund**  21:25  65:23
**funds**  13:17  25:8,
14  26:9, 12, 17, 23
35:23  37:3  43:6
61:17  65:18, 22, 25
69:5, 9, 13, 21, 25
70:11, 15, 17, 22, 24
**further**  75:15
**future**  18:19

< G >
**GA**  1:23
**Gallivan**  60:21
**gathering**  53:16
**General**  3:20  31:13
**generally**  26:16
39:10
**General's**  21:11
**Georgia**  75:21
**getting**  15:17  47:2

**give**  5:19  19:6
41:4, 5  50:22  51:1
66:10
**given**  43:4  70:14
75:11
**Gloria**  49:24  56:3
59:12, 17  60:13
65:17
**go**  7:5, 7  9:7  18:4,
15  21:22  22:1, 7
24:4  25:17  26:23
27:5  29:1  32:6
36:22  37:8  42:16
43:3, 6  45:8  46:24
47:3, 18  48:23
51:14, 16
**goal**  23:24
**goes**  42:24  53:2
61:13
**going**  5:9, 20, 24
6:14  10:18  25:8
37:8  38:20  48:11,
21  52:6  55:12
59:4  60:20  64:5
**Good**  5:6  9:13
43:14  71:5, 7, 23
**gotten**  18:18
**governing**  9:15
**gracious**  8:9
**graduate**  7:10
**graduated**  7:13
**Grand**  21:12, 19
33:20  47:12
**grandfather**  18:12
**Grantland**  61:15
**Great**  72:15, 20
**GRESSETTE**  2:21,
22
**guaranteed**  36:15
**guess**  23:17  24:4
28:23  35:1  45:20
48:18  54:11  61:22
67:15  70:2
**guessing**  38:22
**guilty**  43:23
**guys**  14:22  15:4
16:16  24:5  46:10

< H >

**Hampton**  18:8
**hand**  27:4  75:16
**handed**  30:2
**handle**  13:12  15:4
**handled**  15:12
46:16
**hang**  29:1
**happened**  19:4
35:16  53:20  56:16
**head**  19:8
**heard**  22:24  33:2
35:15, 19  63:1, 2
68:17
**hearing**  52:4  59:5
**He'd**  13:21
**held**  22:4  26:19
**hell**  32:6
**He'll**  72:22
**help**  14:19  17:23
40:24
**hereunto**  75:16
**hey**  15:7  25:25
**high**  5:7
**himself/herself**  75:13
**hire**  71:12
**hit**  20:3  21:1  22:25
**hoc**  10:8
**hold**  5:6  16:7
50:21  70:22, 23
**holding**  26:1, 21
**home**  18:4, 15  47:3
**HOOD**  2:13  21:21
26:25  27:23  28:2
45:5  50:23  51:2, 4,
12  56:23  57:1, 9, 15
59:19, 22  68:14
70:19  71:17, 22
72:22, 24  73:1, 3, 5,
8, 11
**hopefully**  47:3
**Hospital**  56:9
**house**  16:6, 7
**husband**  38:15

< I >
**ID**  61:7, 24
**idea**  38:18  49:13
59:14
**identification**  6:20
24:17  27:8, 10, 12,

*14, 16* 30:*1* 31:*11*
49:*3* 50:*16* 61:*9*
62:*4* 63:*18* 66:*17*
**identified** 66:*14*
**identify** 47:*5*
**image** 3:*16, 17*
**Images** 3:*13, 14, 15*
**include** 41:*5*
**incomprehensible**
*5:17* 15:*1*
**inconsistency** 69:*23*
**inconsistent** 69:*21*
*70:11*
**incurred** 70:*6*
**Indemnity** 3:*20*
**INDEX** 3:*1*
**indicate** 44:*8* 66:*5*
**indication** 55:*17*
56:*1, 7* 59:*2, 4, 16*
60:*15, 24* 64:*3, 24*
65:*3*
**indicted** 43:*20*
**Information** 4:*10*
20:*23* 46:*14, 19, 21*
47:*6, 21, 24* 48:*3, 9*
49:*22* 55:*22* 56:*8,*
*10, 11, 21* 57:*24*
58:*16* 60:*8* 62:*16*
63:*7* 64:*19* 65:*13,*
*15, 20* 66:*2, 5* 68:*6*
**informed** 31:*7*
**inherited** 40:*21*
**injury** 36:*3*
**instances** 33:*12*
36:*11* 37:*2*
**instruction** 70:*14*
**instructions** 70:*12*
**INSURANCE** 1:*6*
*3:9, 22* 32:*11*
*37:14, 15* 67:*19, 23*
**interaction** 33:*1*
**interest** 54:*11, 14, 17*
**interested** 75:*16*
**invest** 36:*17*
**investigating** 33:*21,*
*22*
**investigator** 52:*18,*
*22* 53:*5*

**involved** 22:*14*
35:*9* 44:*14* 54:*9*
56:*5* 62:*17*
**involvement** 21:*14*
23:*15*
**involving** 14:*2*
21:*13* 31:*24*
**issued** 70:*25*
**It'd** 40:*7* 69:*23*
**iterations** 17:*1*
**its** 8:*12* 9:*24, 25*
17:*1* 32:*17* 35:*14*

< J >
**JAAN** 2:*4* 27:*23*
**jack-of-all-trades**
53:*6*
**January** 30:*16, 17,*
*18* 52:*1*
**Jesse** 16:*9*
**Jim** 14:*14* 15:*10,*
*23* 16:*14* 17:*16, 20,*
*22* 19:*22*
**Jim's** 17:*20*
**John** 61:*14, 18, 21*
**Johnsen** 60:*20*
**join** 12:*1* 18:*16*
**joined** 12:*20* 16:*6*
**JR** 1:*2, 16* 2:*22*
*5:1* 76:*1, 20*
**judge** 43:*21* 52:*3*
**JULY** 1:*16* 75:*17*
**jump** 68:*18*
**jumped** 8:*3*
**jumping** 68:*15*
**June** 75:*22*
**Jury** 21:*12* 33:*20*
*47:13*

< K >
**KB** 76:*20*
**keep** 39:*5* 58:*1*
**KELLY** 1:*23* 72:*5*
*75:2, 20*
**kept** 25:*4*
**kicked** 62:*22*
**kids** 18:*18* 42:*1*
**kill** 10:*18*
**Kimberly** 11:*8, 20*
34:*14* 41:*14, 18*

**kind** 8:*3* 33:*8*
44:*10* 60:*3* 62:*7*
**King** 38:*12, 14*
40:*9* 48:*25* 60:*20*
**know** 5:*15, 18, 24*
8:*3* 9:*22* 13:*3*
15:*10* 16:*17* 18:*17*
19:*1, 3, 4* 20:*2, 5*
21:*25* 22:*13* 23:*5*
25:*14* 26:*12* 27:*19*
30:*11* 32:*7, 16*
36:*10* 37:*7, 8*
38:*15, 21* 39:*17, 18*
40:*7* 41:*19* 42:*12*
43:*10, 24* 45:*7*
48:*16, 22* 49:*19*
50:*14* 52:*22* 54:*16,*
*19* 55:*1, 3, 6* 57:*11*
58:*19* 59:*9, 10*
60:*14* 62:*19, 23*
64:*8, 9* 67:*16, 17, 18,*
*21* 71:*8, 14*
**knowledge** 6:*24*
31:*5* 32:*19, 21, 23*
39:*19* 44:*1* 56:*19*
57:*3, 7* 58:*6* 65:*5,*
*16*
**Kohn** 31:*18*
**KUHN** 1:*2, 4, 11, 16*
2:*12* 3:*10, 11, 13, 14,*
*16, 17, 19, 23* 5:*1, 6*
6:*5, 14* 7:*3, 19, 20,*
*21, 24* 8:*4, 5* 11:*9,*
*12* 16:*25* 20:*6, 8, 11*
25:*2* 30:*2* 31:*16,*
*22* 32:*11, 14, 22*
33:*16* 34:*4, 11*
35:*13* 42:*9, 10, 23*
44:*22* 45:*16, 20*
46:*1, 8* 51:*18, 22*
60:*25* 61:*15, 19*
62:*10, 13* 66:*18*
71:*16* 72:*25* 76:*1,*
*20*
**Kuhn's** 24:*15* 27:*22*

< L >
**label** 50:*7*
**labels** 46:*9*

**lady** 23:*3*
**Laffitte** 33:*4, 7, 10*
**Laffittes** 33:*3*
**Large** 75:*4*
**late** 26:*6*
**LAW** 1:*19* 2:*6, 13*
7:*7, 14* 12:*4* 17:*5*
46:*21* 55:*23* 57:*7*
58:*17* 59:*10* 60:*23*
64:*21* 65:*12* 67:*14*
**lawsuit** 31:*16* 33:*14*
**lawyer** 23:*15* 25:*19*
35:*9*
**Lawyers** 3:*18, 21*
11:*6* 16:*8* 66:*22*
68:*2*
**learned** 54:*7*
**leave** 44:*21*
**ledger** 24:*23*
**left** 18:*2* 41:*22*
42:*1, 2* 63:*23* 64:*21*
**letter** 4:*9* 52:*5*
53:*18* 54:*14, 20, 22*
60:*4* 66:*19, 25*
67:*22, 24* 70:*21*
**letterhead** 13:*13*
**letters** 13:*13*
**Liability** 3:*19, 21*
36:*3*
**license** 43:*19*
**lien** 22:*4, 5*
**limit** 32:*1*
**limits** 32:*8*
**line** 42:*8* 68:*18*
76:*4*
**lines** 24:*10*
**link** 50:*20*
**LINTON** 2:*21*
**little** 7:*18* 8:*17, 20,*
*23* 9:*14, 23* 19:*2*
28:*20, 21* 33:*9*
46:*7* 47:*1* 51:*15*
59:*22* 67:*6* 69:*4*
**LLC** 2:*4, 13, 17, 21*
**loans** 32:*18*
**local** 23:*5*
**locate** 38:*21* 50:*11*
**LOCATION** 1:*19*
75:*7*
**log** 72:*4*

long 5:*10, 25* 13:*1*
17:*12, 13* 39:*2* 47:*4*
longer 8:*21* 39:*5*
look 19:*12* 23:*18,
23* 24:*21* 28:*6, 25*
29:*2, 9* 31:*8* 40:*8*
42:*6* 47:*19* 49:*16*
50:*4* 60:*16, 17*
61:*1, 11, 18, 25*
63:*14* 66:*22* 68:*4*
looked 6:*4, 6* 21:*3,
8, 12* 24:*20* 45:*24*
46:*2, 3* 47:*9*
looking 24:*19*
looks 23:*22* 28:*20,
21* 42:*15* 51:*25*
52:*16* 53:*18, 21*
54:*21* 60:*23* 61:*2*
63:*24*
lost 43:*19*
lot 16:*3, 9* 25:*2*
33:*20, 22* 53:*13*
lowered 32:*1*
Lydon 4:*10* 66:*19*
Lynn 23:*3* 41:*3*

< M >
ma'am 46:*23*
MAGILL 2:*5*
main 41:*9*
making 41:*9* 43:*8*
47:*10*
malpractice 30:*4*
34:*6, 7, 12*
manage 49:*18*
manager 53:*5*
managing 10:*22*
manner 69:*21*
70:*11*
March 28:*10* 52:*5,
7, 9* 60:*5*
mark 6:*15, 17*
24:*13* 27:*4, 6* 31:*9*
marked 6:*19* 24:*16*
27:*7, 9, 11, 13, 15, 17*
29:*25* 31:*10* 48:*20*
49:*2* 50:*2, 15* 61:*8,
12* 62:*3* 63:*14, 17*
66:*13, 16*

married 18:*18*
Mary 38:*5, 9, 14, 15*
MASSALON 2:*17*
matched 41:*10*
matter 14:*25* 24:*25*
31:*3* 32:*25* 44:*15*
45:*21* 46:*15, 16*
51:*24* 52:*8*
matters 16:*21*
Matthews 11:*15*
mean 17:*18* 20:*25*
28:*3* 42:*1, 2* 43:*23*
44:*11* 51:*4* 53:*24*
56:*13* 57:*2, 5, 9, 17*
62:*11* 71:*12*
meaning 49:*17*
60:*8* 63:*5*
meant 54:*17* 61:*19*
meat 69:*4*
mediation 52:*7, 10,
12, 16* 59:*18, 20*
60:*2, 4, 10*
Medicaid 22:*4*
medical 56:*3*
MEETING 2:*14*
member 8:*21*
members 10:*3, 4*
memory 22:*2, 3*
mentioned 38:*19*
41:*1*
mic 9:*9*
Michael 11:*15*
Mike 11:*15*
million 53:*23* 63:*22*
mind 55:*3* 56:*12*
minute 50:*4* 51:*9,
13* 68:*12*
minutes 37:*21*
misappropriate
65:*17, 22*
misappropriated
65:*25* 66:*7*
misappropriation
66:*3*
misrepresent 70:*5*
misrepresented
34:*20*
missed 18:*8*
misunderstanding
58:*13*

money 22:*6* 24:*23*
26:*18, 21* 35:*7*
36:*11, 16, 17* 37:*18*
44:*14* 49:*18* 53:*14*
54:*8, 9* 64:*1, 21*
monies 64:*5* 66:*1, 7*
month 23:*24*
morning 5:*6, 11*
MOSS 1:*4, 11* 2:*12*
3:*10, 11, 12, 14, 16,
17, 19, 22* 6:*5, 14*
7:*15, 18, 19, 20, 21,
24* 8:*4, 5* 11:*9, 12*
16:*8, 25* 20:*6, 8, 11*
24:*14* 27:*21* 31:*16,
18, 21* 32:*11, 14, 22*
33:*16* 34:*4, 11*
35:*13* 42:*9, 10, 18,
23* 45:*20* 46:*1, 8*
51:*22* 60:*25* 61:*15,
19* 62:*9, 13*
mother 23:*11*
MURDAUGH 1:*11*
16:*25* 18:*23* 19:*13,
16* 20:*17, 24* 21:*6,
16* 22:*6* 31:*24*
33:*16* 34:*6* 39:*23*
41:*16* 44:*14* 53:*14*
54:*8*

< N >
name 8:*12, 13, 15,
24* 23:*4* 38:*5, 7*
named 23:*3* 38:*13*
nature 34:*18*
NAUTILUS 1:*6*
3:*9* 33:*15* 52:*20*
necessarily 26:*13*
27:*1* 70:*13*
need 5:*23* 52:*18*
61:*16* 62:*9* 72:*9*
needed 13:*19* 14:*4,
19*
neither 58:*8* 75:*15*
never 15:*10, 24*
19:*21, 22* 22:*24*
32:*19* 33:*2* 35:*15,
19* 69:*13*
new 8:*25* 9:*11*
14:*25* 17:*24*

nine 19:*15* 20:*15*
39:*12*
Nope 17:*16*
Notary 75:*4*
Notice 3:*10* 6:*16*
67:*9, 12*
noticed 57:*2*
November 4:*4*
number 29:*2, 9, 12,
18, 24* 61:*4, 7, 24*
62:*1* 66:*13*
numbers 29:*23*

< O >
Object 26:*25* 70:*19*
objections 75:*8, 10*
obtained 63:*8*
obvious 43:*17*
Obviously 27:*25*
occurrence 31:*22*
occurrence-based
30:*12*
October 4:*9* 8:*11*
63:*16, 20* 64:*20*
65:*2* 66:*18*
ODC 47:*12*
odd 43:*4*
office 12:*18* 16:*1*
21:*10, 11* 33:*21*
41:*15, 17* 52:*17*
53:*5*
OFFICES 1:*19* 2:*6*
official 75:*17*
Oh 7:*25* 33:*17*
34:*8* 35:*25* 39:*3*
41:*3* 47:*23* 51:*8*
57:*5* 60:*21*
Okay 5:*15* 6:*7, 10,
13* 7:*2, 5, 10, 12, 17,
23* 8:*7, 12, 16* 9:*5,
18, 20, 23* 10:*7, 13,
22, 25* 11:*3, 6, 14, 23*
12:*1, 4, 7, 11, 14, 17,
20, 24* 13:*2, 9, 17, 22*
14:*1, 9, 10, 12, 15, 20,
22* 15:*11, 14, 21*
16:*1, 4, 13, 24* 17:*6,
9, 11, 14, 17, 21* 18:*2,
5, 22* 19:*6, 20, 24*
20:*4, 11, 18, 21* 21:*4,

9, 17, 20   22:17, 21
23:1, 4, 7, 12, 15
24:1, 12, 22   25:2, 11,
17, 20, 22   26:5, 7
27:2   28:14, 18, 24
29:6, 9, 12, 16, 21, 24
30:7, 14, 19   31:1, 6,
8, 18, 21   32:1, 5, 7,
10, 14, 17, 21, 24
33:6, 14   34:1, 4, 9,
11, 15, 22, 24   35:3,
11, 17, 21   36:13, 20,
25   37:2, 20, 23   38:8,
11, 19, 25   39:2, 4, 7,
9, 11, 13, 25   40:3, 9,
12, 14, 17, 23   41:1,
11, 13, 19, 23, 25
42:3, 14, 17, 21   43:2,
12   44:4, 13, 19   46:4,
6, 13, 19, 24   47:20,
25   48:3   50:2
51:18   52:25   54:21
55:5, 7   56:1, 7
57:15, 18   58:12, 21
59:9, 16   60:19
62:21   63:5, 14
64:10, 12, 18, 24
65:7, 15   66:12, 18
67:3, 4, 5, 6, 8, 9, 18
68:8, 10, 24   70:5
71:2, 15   72:8, 12, 19,
23   73:2, 6, 15, 16, 24,
25
old   9:17, 18   16:5
oldest   19:19
once   23:24   34:25
ones   20:9   35:25
one's   71:11
operating   9:16, 17
23:13   42:10, 16, 18,
25
opinion   71:8
opportunity   75:11,
14
opposed   57:3
opposing   34:25
35:3
O'Quinn   11:16

order   53:22   69:9,
22   70:15, 17, 24
71:3   72:3   73:19
ordinary   25:5
organization's   6:24
originally   66:19
other's   14:16   15:15
Overstreet   66:21
owe   26:22
ownership   11:24

< P >
P.A   1:4, 11   2:12
3:11
package   6:3
PAGE   3:1, 8, 22
30:3   31:13   42:8,
22   61:12   68:5   76:4
pages   6:5, 7   46:1, 2,
10   50:5   51:19
paid   10:6   48:11
52:20   55:15
PALMETTO   1:11
2:20   32:15, 18, 21
68:23   71:18   72:6
paper   46:17   73:7
paragraph   67:7
paralegal   14:6, 13,
14   22:17   49:1
53:16
paralegals   14:2, 8,
11, 16
part   51:22   72:10
participated   66:2
particular   29:4
particularly   15:22
partner   10:23
12:15, 21, 22   57:18
partners   10:17
11:3   13:2, 7, 20
16:22   22:22
partnership   9:15,
24   14:3
parts   70:7
party   26:18, 21
35:1, 3   37:4   75:15
payee   26:9, 10, 14,
24   61:1
payer   26:8, 10, 13,

22
payment   42:23
payments   43:8
payor's   70:11
pays   26:18
PC   1:19   2:6
PENDARVIS   1:19
2:6, 9   8:19   9:6, 10
45:9   62:22   66:20
68:20   73:13, 15
pending   34:1   75:16
percentages   11:24
performed   32:14
period   26:19
permit   68:12
person   49:11   52:12
58:10, 16   59:10
personal   35:5   36:3
38:13   44:1   48:11
49:23   55:19   57:3,
6   60:25
personally   43:3, 11
petition   54:2   59:6
70:7
petitions   59:11
phone   52:14   53:20
physical   47:9
piece   10:19
Pinckney   21:14
33:8   39:14, 20, 24
40:2
Pinckneys   22:8
place   30:20   31:15
60:10
Plaintiff   1:6   2:3
pleadings   59:3, 11,
15
please   5:18   27:4
30:14   42:6   50:5
72:14   73:8
pled   43:23
Plf   3:9, 11, 13, 14,
15, 16, 17, 18, 20
6:19   24:16   27:7, 9,
11, 13, 15   29:25
31:10
PMPED   21:24   22:7
PO   2:23
point   17:1

Policy   3:19, 22
30:4, 15, 19   38:23
39:2
positive   40:4
possible   33:6
potential   67:13
PR   49:10, 18   55:24
practice   48:1
predecessor   7:14
premium   36:4
preparation   45:22
prepare   6:1   13:14
present   60:2
preserved   47:11
pretty   12:23   35:10
prevent   71:3
previously   7:19
printout   24:8, 9
39:22   41:4, 5
prior   52:9   53:20
54:1   59:17   60:10
63:22
probably   38:22
problem   45:2   57:10
produce   68:3
produced   24:14
46:8   47:15   50:9
51:21   63:7   65:12
Professional   3:18,
21   75:4, 20
profit   10:9, 11, 15,
16
profits   10:2, 8   43:5,
6
project   14:19
proven   44:6, 16
provide   68:2
provided   53:21
56:2, 8, 10   59:2
provides   30:7
providing   31:1
PSB   3:14
Public   75:4
publicity   71:6
pull   50:20   51:5
purchase   37:8
purpose   41:9
purposes   36:2, 9
put   14:4   29:23

47:11  50:18  69:4
puts  24:5, 7

< Q >
question  5:21  14:9
17:18  22:13  38:17
43:17  44:2  58:5
60:7  61:22
questioning  68:13
questions  5:12, 17
15:1  29:10, 12
38:2, 4  42:7  45:4,
7, 9, 12, 18  48:24
54:25  58:18  66:23
68:9, 18, 20, 22
quick  48:24
QuickBooks  24:5, 7
39:22
quicker  46:7  47:1
51:15
quickly  12:23
quit  40:18
quite  17:7  28:25
quote  21:19

< R >
raise  18:20
RANNIK  2:4  3:1,
4  5:5  6:17  8:17
9:8, 12  27:5  28:1,
4  37:20, 24  44:22,
25  45:3  68:11, 15,
24  69:1  71:15
73:20, 23
rarely  14:18
reach  52:13
read  46:17  54:6
67:2  72:22  74:3
75:11  76:2
reading  54:19
67:15
ready  47:2
really  14:16  31:4
36:14
Reason  18:6  20:5
28:7  39:6  43:14
71:5, 7  76:4
recall  5:14  7:22
10:20  12:3, 14, 22
17:3  18:2  25:22

34:3  47:17  64:16
66:24  67:1, 25
received  67:21
receiving  61:17
66:24
recess  38:3  51:17
recognize  27:19
28:15  30:5, 6  61:4
reconcile  23:12
reconciles  24:8
reconciliation  24:9
25:12  41:2
reconciling  23:16
record  35:5  43:17
51:16  66:15  75:10
recorded  75:8
records  6:4  20:14
21:4  41:4, 6, 10
56:3
refer  20:6
reference  49:14
53:15  62:25  64:16
referenced  48:4
64:12
referred  20:8, 12
32:17, 22  53:1
referring  18:24
reflected  59:7
refresh  22:2
regard  33:11  48:6
53:13  64:14
regarding  48:9
Registered  75:2, 20
regularly  14:23
related  55:1  75:15
relates  46:22  59:12
63:9
relating  44:15
relation  24:24
32:12  33:16
relationship  20:14
38:16  53:3  54:12
relative  11:24
release  53:25  70:15,
23
remain  25:15
remaining  25:14
remember  12:19, 20
17:11  19:14  21:18

remind  30:14
remove  39:17
removed  39:18
reorganization  8:20,
23
reorganize  8:13
repeat  59:24
rephrase  5:19
59:25
report  15:6
REPORTED  1:23
REPORTER  3:5
48:15  50:17, 19
72:2, 8, 12, 15, 19, 23
73:2, 6, 9, 12, 16, 21,
25  75:1, 4, 20
represent  15:9
45:17  50:3  54:10
representation  13:6,
10  22:15  25:8
28:9  29:3  48:7
55:9
representations
27:21
representative  35:6
38:13  48:12  49:24
55:20  60:25
represented  58:24
representing  58:16
66:20
represents  46:21
request  52:1
Requested  4:10
53:17  68:5
requesting  52:2
required  5:16
reservation  67:22
responds  52:21
62:9
response  67:23
responsibilities
55:19, 23
responsible  10:9, 11
16:16
rest  62:23
result  32:1
retention  38:23
39:2
retired  40:21  53:10
review  41:2, 3, 6

reviewed  20:22
45:20, 22
RICHARD  1:11
right  5:23  6:8, 9
7:2, 7, 17  9:8, 12
13:4  14:22  15:14,
21  16:24  17:4, 17
18:9  19:11, 14
20:1  21:2, 23  24:3,
12, 18  27:2, 17  28:5
29:21  30:2  31:8,
12, 19  34:16, 18
35:2, 17  37:18, 20
39:13  40:6  44:22,
24  45:16  46:13
48:19  49:1  51:2
53:11  54:21  58:4,
7, 23  59:6  63:3, 12
64:15  67:1  71:22
74:3, 4
rights  13:3  26:20
67:22
ring  22:9  38:5
Ringler  35:18
road  36:16
ROBERT  2:13
role  47:9
rose  25:24
Roughly  24:11
RPR  1:23  75:21
rules  5:15
run  33:8
Russell  33:3, 7, 10

< S >
safeguarded  26:23
Safran  11:17
Satterfield  19:10
20:25  22:15, 25
24:25  32:24  44:15
45:21  46:5, 15, 22
47:10, 18  48:7
49:25  52:7  53:14
54:9  59:12, 18
60:13  65:18, 23
66:1, 8
Satterfields  25:18
33:17, 25
Satterfield's  53:22

Deposition of H. Fred Kuhn Jr. 30(b)(6) Moss & Kuhn, P.A.

56:3
**saw** 38:11 39:14, 22
**saying** 53:15 60:4
**says** 31:18 52:17
61:22, 23 62:9
**SC** 1:21, 24 2:6, 10,
14, 18, 23
**scan** 48:22 50:14
51:1
**scheme** 65:17
**school** 7:5, 8 12:4
17:5
**screen** 48:17, 23
50:18 60:18
**scroll** 60:18 67:4, 6
**seal** 75:17
**Second** 3:9 9:6
42:22 50:13, 22
51:1 52:19 59:21
61:2 64:6 66:10,
22 67:3
**Secretary** 9:3
**See** 15:1, 25 19:12
20:14, 15 29:13
37:25 38:1 39:21
40:8 46:25 48:16,
18 55:13, 16 58:25
60:15, 19 62:6, 10
63:15 66:10 68:4
**seeing** 47:17
**seen** 57:24 65:8
**segregated** 14:17
**send** 13:12, 13 36:4
37:4 52:18 53:17
64:1 72:24 73:1
**sending** 60:23
**sends** 70:21
**sent** 6:3 24:21
25:21 26:3 40:20
47:11 48:15 63:22
**sentence** 67:2
**separate** 16:5
**September** 3:12
53:12, 21 54:5
**Series** 3:24 45:25
**seriously** 18:11
**served** 31:16
**serving** 18:24
**set** 13:9 46:7, 11

51:11
**settle** 32:2
**settlement** 13:14
35:22, 24 36:5
37:5 52:4, 20
53:22, 25 54:2
59:12 63:10 65:18,
23 66:1, 8 69:5, 8,
10, 21, 22 70:8, 10,
16, 21 71:3
**settlements** 35:14
**settlement's** 70:25
**seven** 39:3, 10, 12
**share** 48:17
**shared** 10:3, 5 43:5
48:23
**shareholder** 10:2
**shareholders** 10:4
**she'd** 41:5
**SHEET** 3:5 76:1
**shop** 36:12, 19
**shopping** 37:12
**shortly** 8:5
**show** 6:15 21:5
24:12 25:11 29:21
48:14 50:2, 21
65:10 66:13
**shows** 24:10, 23
25:13
**sign** 72:22 74:3
75:14
**signature** 28:14, 22
29:7, 13 75:12, 14
**signed** 52:3 54:3
59:6 65:2 69:10
70:16, 23
**silos** 14:24
**sir** 39:1
**situation** 37:11
**skimming** 55:7
**Smith** 11:8, 20
34:14 41:14
**solicitor's** 12:18
41:15, 16
**Sorry** 8:1, 4 16:20
47:2 60:21 67:11
**Sort** 10:13, 17
14:23 17:23 24:8
**sorts** 13:14

**sought** 59:4
**sound** 6:7 38:9
**sounds** 6:9
**sources** 20:22
**SOUTH** 1:1 75:1, 4,
17
**speak** 6:10 57:12
**specific** 44:12 46:15
**split** 10:15, 16
**spoke** 54:6
**SR** 1:11
**staff** 14:4 16:17
22:19 52:12
**staffing** 14:1
**stamped** 50:24 51:5
**standard** 5:12
73:18
**Star** 3:20 31:13
**STATE** 1:12 2:5,
20 9:3 21:12
32:15, 18, 22 33:20
43:17 47:12 68:23
71:19 72:6 75:1, 4
**stated** 75:7
**statement** 41:7
**statements** 24:3
**STATES** 1:1
**status** 34:21
**stayed** 17:12 40:24
**steal** 44:14
**stealing** 54:8
**stealing's** 44:20
**stenographically**
75:8
**stipulation** 65:1
**straight** 36:23 37:9
**STREET** 2:5, 9, 14,
18
**strike** 43:4, 12
60:16
**structure** 9:24
35:21, 22 36:15
**structured** 35:14, 24
36:5 37:4 63:9
**studied** 55:4
**stuff** 34:13 39:8
**subject** 15:5
**subscribe** 75:12
**successor** 49:23

**sued** 34:4, 25 35:8
**summarizes** 34:23
**super** 47:3
**supervised** 17:16
**supervising** 16:17,
21
**supplied** 68:6
**support** 65:20
**suppose** 33:9
**sure** 14:5 18:19
23:19, 21 26:22
28:11 36:14 37:12,
16 41:9 42:12
43:16 44:13 47:10
73:5, 11
**suspended** 8:6
**swear** 28:16
**sworn** 5:2 75:5

< T >
**take** 5:10 15:20
17:22 36:16 37:21
47:4 50:4, 13 51:8,
13 66:22 67:3
70:1, 4 71:24 73:7
**taken** 5:13 35:6
69:25 75:7
**talk** 7:17 9:23
23:1 49:11
**talking** 30:22 36:5
57:11
**talks** 63:21
**Tanya** 38:12, 14
40:9 48:25 49:8
60:19, 20 63:21
**tax** 36:1, 9, 24
37:10 61:7
**Tell** 8:16 9:14
15:3 19:2 50:7
**telling** 61:14
**tells** 19:22 61:18
**temporarily** 8:6
**terms** 13:2, 9 14:1
55:8
**testified** 5:3
**testify** 6:23 58:10
75:5
**testifying** 6:13
**testimony** 75:7, 10

thank 40:9 51:15
68:9, 10 71:15, 19,
25 72:15, 18, 20
73:2, 16, 25
thanks 68:24 72:1
73:23
that'd 46:18, 23
thereof 75:16
thing 27:24 29:18,
22 39:13 42:24
47:13 53:23
things 13:3, 15
24:4, 5
think 5:9, 24 9:8,
13 11:11, 16, 17, 18,
20 12:12 18:11
19:18 21:15, 23
22:12 25:11, 19, 21
26:4 27:1 33:6, 19,
23, 24 34:16, 23
35:2 36:21 37:6,
13, 21 38:11, 14
39:3, 16, 19 40:1, 4
41:1 43:16, 21, 24
44:21, 23 46:1
48:25 52:3 53:19
54:1 56:9 57:8
58:12 63:1, 15
68:16
thinking 33:18
third 11:25 42:22
THOMAS 2:9, 22
4:10 11:16 45:11
66:20
thought 47:2 48:17
three 11:4, 7
ticket 3:13 27:24
TIME 1:19 12:5
22:23 26:4, 24
29:1 37:6 41:20
44:25 52:19 54:18
60:12 66:22 67:16
68:23 75:7, 8, 10
times 19:5, 7, 15
today 6:14, 25
24:21 25:3 30:23
45:1, 23 48:18
today's 6:2
told 15:2 32:6 54:9

Tom 72:10
Tommy 66:19
tomorrow 52:21
top 19:8
topic 57:1
topics 6:22, 24
56:24 57:8
total 46:10
totally 13:8 14:17
48:17
transcribed 75:9
transcript 72:4
74:4
transcription 75:9
transpired 38:3
51:17
TREHOLM 2:22
Trenholm 45:12
72:6
Trident 56:9
true 25:7 27:20
29:3, 17, 19 44:5, 6,
18 75:10
Trust 3:11 21:24,
25 22:4 23:13, 16
24:9, 24 28:10
29:15, 20 37:15
41:2 42:17 43:9
63:23 64:22 70:22,
24
truth 75:6
try 48:16
trying 9:10 11:18
58:15
turmoil 33:18
turn 37:18
turned 67:18
two 16:2, 5 17:13
29:23 54:1 60:5
64:13
type 47:13
typically 14:21
35:25 37:17 42:16
43:13
typo 31:19

< U >
Uh-huh 18:14 36:7
Ultimately 25:18

65:1
unable 57:12
unanimous 11:2
uncovered 20:22
undersigned 76:1
understand 5:17
14:5 31:21 45:18
54:16 56:15 57:14,
16, 21 58:13 66:21
understanding
57:25 58:23
understood 5:20
UNIT 2:10
unitary 46:11
UNITED 1:1
unusual 43:12
USAA 35:18
USC 7:9
use 24:5 35:13, 18,
21, 22
usual 28:22
usually 11:2 23:23
36:9, 23, 24 37:10
69:12

< V >
various 43:18
VC 2:5, 16, 20
virtual 48:18
VP 49:17
vs 1:6

< W >
W-9 4:5 60:23
61:2, 17, 25
waive 70:2 74:4
waived 75:14
WALKER 2:21, 22
45:11, 12 68:22
71:18, 25 72:5, 9, 14
want 15:19 25:2
36:14, 16, 24 37:12
42:6 49:18 50:4,
13 61:22, 23 68:18
72:24
wanted 18:4, 12, 20
36:11 50:25 70:3
wants 45:8
way 15:12 22:14
36:10 41:21, 23

51:14 62:18, 19
64:5 66:3
ways 38:20
weekend 71:23
72:21
Well 7:17 8:20
9:25 15:3 19:2
21:25 22:1, 18
23:22 40:9 57:9,
18 64:12 68:24
went 22:6, 7 25:25
we're 9:13 15:12
26:1 30:22 48:21
57:12
WESTENDORF
1:11 2:16 33:1
38:5, 6, 12, 16 45:17
47:7 48:10 49:9,
23 51:21 52:1
55:14, 20, 24 56:4
62:17 64:4 65:16
66:2, 7, 20 67:10, 13
71:21
WESTENDORF_000
004 4:1
WESTENDORF_000
013-14 4:4
WESTENDORF_000
015 4:2
WESTENDORF_000
016-21 4:3
WESTENDORF_000
023-26 4:3
WESTENDORF_000
031-33 4:1
WESTENDORF_000
036-38 4:2
Westendorf's 51:23
we've 5:7 27:17
36:3 57:24 68:16
whatsoever 65:16
where'd 7:5, 7
White 60:21
WILLS 2:17 39:8
wish 76:2
within-entitled 75:6
WITNESS 37:23
44:24 45:2 68:10
71:24 74:2 75:5, 7,

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

*10, 11, 12, 13, 16*
**word**  22:*24*  35:*19*
**work**  5:*7*  7:*12*
 14:*15, 24*  17:*14*
 18:*12, 22*  23:*17*
 32:*15, 22*  35:*23*
 40:*12, 16, 18, 20*
**worked**  10:*18*  14:*6,*
*11*  17:*20*  18:*1*
 19:*17, 21, 22*  20:*9,*
*19, 24*  21:*6*  36:*1*
*41:14*
**working**  5:*8*  14:*24*
 33:*11*  46:*11*
**works**  17:*23*  49:*5, 6*
**worries**  28:*18*
**writes**  38:*14*  49:*16*
**written**  19:*13, 15*
 20:*16*  21:*16, 24*
 27:*21*  28:*9*  47:*6,*
*14*  48:*1*  50:*10*
**wrong**  31:*5*  43:*20*
 44:*2, 17, 20*  69:*5, 16,*
*20*  70:*5, 10, 18*  71:*1,*
*2, 10, 14*
**wrongful**  44:*8*  69:*3,*
*6*
**wrote**  53:*15*
**WWW.CLARKBOL**
**EN.COM**  1:*25*

**< Y >**
**Y'all**  71:*22, 24*
 72:*4, 20*
**Yeah**  8:*11*  11:*20*
 14:*10*  15:*18*  16:*12*
 18:*7*  19:*10*  22:*18*
 23:*20*  24:*2, 6, 11*
 28:*22*  30:*17*  32:*4,*
*6*  35:*12*  37:*17*
 38:*24*  41:*18, 24*
 42:*4*  43:*13, 22*
 44:*20*  50:*6, 25*
 51:*8*  56:*23*  59:*25*
 65:*10*  68:*4*  69:*18,*
*19, 20*  71:*12*
**year**  17:*13*
**years**  7:*22, 23*  9:*19*
 12:*12*  18:*23*  19:*5*

 20:*16*  39:*3, 10, 12*
 54:*1*
**Yep**  18:*16*  31:*20*
**younger**  12:*9, 12, 13*

**< Z >**
**Zoom**  45:*5*  50:*20*
 62:*23*  71:*17*  72:*3*

## WORD LIST

**< $ >**
**$1,000,000** *(1)*
**$100,000** *(1)*
**$113,800** *(2)*
**$350,000** *(1)*
**$50,000** *(1)*
**$500,000** *(1)*
**$600,000** *(1)*

**< 0 >**
**0001** *(1)*
**0002-3** *(1)*
**000355** *(1)*
**0004** *(1)*
**0068** *(1)*
**0106** *(1)*
**0107** *(1)*

**< 1 >**
**1** *(9)*
**10** *(1)*
**10:01** *(1)*
**11:35** *(1)*
**14th** *(1)*
**15** *(1)*
**15th** *(1)*
**16** *(1)*
**172** *(1)*
**17th** *(1)*
**1980** *(1)*
**19th** *(1)*

**< 2 >**
**2** *(13)*
**2.9** *(1)*
**2:22-cv-1307-RMG**
  *(1)*
**2001** *(1)*
**2015** *(1)*
**2017** *(4)*
**2018** *(2)*
**2018-2019** *(2)*
**2019** *(4)*
**2020** *(5)*
**2021** *(9)*
**2022** *(3)*
**2023** *(2)*

**2026** *(1)*
**21** *(3)*
**22** *(2)*
**22167** *(1)*
**22nd** *(2)*
**23** *(1)*
**231,000** *(1)*
**24** *(1)*
**25** *(1)*
**25th** *(1)*
**27** *(5)*
**29401** *(3)*
**29405** *(1)*
**29413** *(1)*
**29902** *(1)*

**< 3 >**
**3** *(9)*
**30** *(4)*
**30(b)(6** *(3)*
**300** *(3)*
**30th** *(1)*
**31** *(1)*

**< 4 >**
**4** *(8)*
**4,516** *(1)*
**4.3** *(1)*
**45** *(1)*
**46A** *(1)*
**49** *(1)*
**4th** *(2)*

**< 5 >**
**5** *(7)*
**50** *(1)*

**< 6 >**
**6** *(6)*
**61** *(1)*
**62** *(1)*
**63** *(1)*
**66** *(2)*
**68** *(1)*
**69** *(1)*
**6th** *(2)*

**< 7 >**
**7** *(8)*

**710** *(1)*
**75** *(1)*
**76** *(1)*
**7th** *(1)*

**< 8 >**
**8** *(4)*
**843-762-6294** *(1)*

**< 9 >**
**9** *(4)*
**9-27-2021)-001311**
  *(1)*
**97** *(1)*

**< A >**
**A.M** *(2)*
**A1** *(1)*
**able** *(7)*
**absent** *(1)*
**absolutely** *(3)*
**accept** *(1)*
**account** *(18)*
**accountant** *(1)*
**accounts** *(3)*
**accurate** *(4)*
**acting** *(1)*
**action** *(4)*
**actions** *(1)*
**activities** *(1)*
**actual** *(1)*
**ad** *(1)*
**Adams** *(1)*
**add** *(2)*
**added** *(1)*
**additional** *(2)*
**admin** *(1)*
**administrative** *(1)*
**admit** *(1)*
**admits** *(1)*
**admitted** *(2)*
**adult** *(2)*
**adults** *(2)*
**advance** *(1)*
**advantage** *(1)*
**advised** *(1)*
**advising** *(1)*
**affirmatively** *(1)*
**affixed** *(2)*

**agent** *(2)*
**aggregate** *(1)*
**ago** *(2)*
**agree** *(9)*
**agreed** *(1)*
**agreement** *(8)*
**agreements** *(1)*
**ahead** *(3)*
**Alec** *(12)*
**Alex** *(7)*
**ALEXANDER** *(2)*
**allegation** *(2)*
**allegations** *(2)*
**ALLEN** *(19)*
**Alrighty** *(1)*
**Amended** *(2)*
**amiss** *(1)*
**amount** *(6)*
**amount's** *(1)*
**and/or** *(3)*
**Andrew** *(1)*
**Ann** *(3)*
**Ann's** *(1)*
**annuities** *(1)*
**annuity** *(4)*
**answer** *(6)*
**answering** *(1)*
**answer's** *(1)*
**anybody** *(12)*
**anybody's** *(1)*
**Anyway** *(1)*
**apologize** *(1)*
**apparently** *(1)*
**appear** *(1)*
**Appears** *(3)*
**applicable** *(1)*
**apply** *(1)*
**appointed** *(1)*
**appointment** *(1)*
**appreciate** *(2)*
**appropriate** *(1)*
**approval** *(4)*
**approve** *(1)*
**approved** *(2)*
**approving** *(7)*
**Approximately** *(1)*
**April** *(2)*
**arrange** *(1)*
**Aside** *(1)*

Deposition of H. Fred Kuhn, Jr. 30(b)(6) Moss & Kuhn, P.A.

asked  (5)
asking  (6)
associate  (6)
associated  (1)
assume  (3)
assuming  (3)
attached  (2)
attend  (1)
attorney  (3)
attorney's  (2)
authentic  (3)
authenticate  (2)
authentication  (1)
authorities  (1)
authorizations  (1)
authorized  (3)
available  (2)
availed  (1)
aware  (7)

< B >
back  (10)
bad  (1)
BAEKELANDT  (3)
Bailey  (2)
Balance  (2)
BANK  (15)
Barton  (1)
Based  (2)
basic  (1)
basically  (3)
basis  (1)
Bates  (5)
Bates-labeled  (1)
Bates-stamped  (2)
BBT  (1)
Bear  (2)
BEAUFORT  (6)
Beaufort's  (1)
beginning  (1)
BEHALF  (10)
believe  (17)
bell  (1)
bells  (1)
belong  (5)
belonged  (2)
beneficiaries  (1)
best  (1)
better  (1)

beyond  (1)
big  (1)
bit  (10)
BJ  (3)
Bland  (2)
blanket  (2)
Bluffton  (1)
BOBBY  (4)
BOLEN  (1)
bone  (1)
bookkeeper  (2)
bookkeeping  (1)
books  (1)
born  (2)
bottom  (2)
BOUNDARY  (1)
BOX  (1)
Boyd  (1)
brand  (1)
Branton  (2)
break  (4)
bring  (2)
BROAD  (1)
broke  (2)
brother  (1)
brought  (4)
building  (4)
buildings  (1)
built  (1)
business  (1)

< C >
call  (2)
called  (2)
care  (1)
CAROLINA  (4)
carrier  (2)
Carter  (1)
CASE  (23)
cases  (16)
cause  (1)
certainly  (2)
CERTIFICATE  (2)
certify  (3)
CHAD  (51)
Chad's  (2)
chain  (4)
change  (6)
changed  (1)

charged  (2)
CHARLESTON  (6)
Charlie  (1)
Check  (29)
checks  (8)
CHF  (1)
CHF_00157  (1)
CHF_00237-238  (1)
CHF_00239-241  (1)
CHF_00288-289  (1)
CHF_00329  (1)
CHF_00330  (1)
CHF_00331  (1)
CHF_00332  (1)
CHF_00334  (1)
children  (4)
CHRISTY  (4)
city  (1)
civil  (2)
claim  (11)
claims  (8)
clarifications  (1)
CLARK  (1)
clear  (3)
clever  (1)
client  (6)
clients  (2)
client's  (1)
CLINTON  (1)
CNA  (4)
cocounsel  (3)
collaborate  (1)
come  (4)
comes  (2)
coming  (1)
Commission  (1)
communicated  (5)
communicates  (1)
communication  (1)
communications
  (10)
COMPANY  (10)
Company's  (1)
compiled  (1)
complete  (1)
complied  (1)
computer  (2)
computer-aided  (1)
conclude  (1)

concluded  (1)
conclusion  (1)
conduct  (2)
confirm  (2)
conflict  (4)
connection  (1)
consent  (1)
conservator  (1)
consider  (1)
constitute  (1)
Consulting  (3)
contains  (1)
continue  (1)
continued  (1)
contributing  (1)
copies  (3)
copy  (13)
copying  (1)
Correct  (19)
CORRECTION  (2)
corrections  (1)
correspondence  (1)
CORY  (68)
Cory's  (4)
costs  (1)
counsel  (6)
country  (1)
COUNTY  (2)
couple  (8)
course  (8)
COURT  (19)
cover  (1)
coverage  (6)
covered  (1)
CPA  (1)
criminal  (5)
CSR  (2)
current  (2)
Customer  (1)

< D >
dad  (1)
DATE  (3)
dated  (1)
dates  (1)
David  (1)
Davidson  (2)
deal  (1)
death  (1)

dec  (2)
decide  (1)
decision  (1)
Declarations  (2)
dedicated  (2)
deeds  (1)
DEFENDANT  (5)
Defendants  (1)
defense  (5)
delivered  (1)
delivers  (1)
demand  (1)
denial  (1)
depend  (2)
DEPONENT  (4)
deposit  (2)
depositing  (1)
DEPOSITION  (13)
DESCRIPTION  (1)
designated  (1)
Detail  (2)
determined  (3)
Dft  (14)
different  (4)
digging  (1)
direct  (1)
directly  (3)
disburse  (6)
disbursed  (2)
disbursements  (1)
Disciplinary  (2)
disclosed  (2)
disclosures  (1)
discovered  (1)
discussed  (1)
discussing  (2)
discussion  (1)
discussions  (1)
dismiss  (2)
dismissal  (1)
dispose  (1)
disproportionate  (2)
DISTRICT  (2)
divide  (1)
DIVISION  (4)
document  (5)
documentation  (1)
documents  (13)
doing  (1)

Dore  (1)
draft  (1)
drafted  (2)
due  (1)
duly  (2)
duty  (5)

< E >
earlier  (2)
early  (2)
eat  (1)
echo  (1)
eight  (4)
either  (3)
electronic  (2)
Email  (16)
emailed  (2)
emailing  (1)
emails  (3)
employed  (2)
employee  (2)
ended  (1)
endorsed  (1)
enjoyed  (1)
enter  (1)
entire  (2)
entity  (2)
entry  (2)
EPTING  (1)
equal  (1)
equally  (3)
Eric  (2)
eroding  (1)
escrow  (5)
estate  (5)
esteem  (1)
E-tran  (2)
events  (1)
everybody  (3)
evidence  (1)
exactly  (1)
EXAMINATION
  (6)
examined  (1)
example  (2)
exception  (1)
exchange  (4)
excluded  (1)
EXHIBIT  (58)

EXHIBITS  (7)
existed  (1)
expect  (3)
expenses  (3)
expires  (1)
explained  (3)
extent  (2)

< F >
fair  (9)
familiar  (4)
familiarize  (1)
family  (2)
fan  (3)
far  (2)
farther  (2)
February  (1)
federal  (1)
fee  (5)
fees  (5)
fiduciary  (4)
Fifth  (1)
figured  (1)
file  (22)
filed  (7)
files  (12)
find  (1)
fine  (2)
FIRM  (63)
firm's  (8)
first  (11)
fixing  (1)
FLEMING  (33)
Fleming's  (8)
flip  (3)
folks  (1)
following  (1)
follows  (1)
follow-up  (2)
FORD  (1)
foregoing  (3)
Forge  (12)
forgot  (1)
forgotten  (1)
form  (5)
forth  (1)
FRED  (6)
FREEMAN  (1)
frivolous  (1)

front  (3)
full  (1)
fund  (2)
funds  (24)
further  (1)
future  (1)

< G >
GA  (1)
Gallivan  (1)
gathering  (1)
General  (2)
generally  (2)
General's  (1)
Georgia  (1)
getting  (2)
give  (7)
given  (3)
Gloria  (6)
go  (26)
goal  (1)
goes  (3)
going  (15)
Good  (6)
gotten  (1)
governing  (1)
gracious  (1)
graduate  (1)
graduated  (1)
Grand  (4)
grandfather  (1)
Grantland  (1)
Great  (2)
GRESSETTE  (2)
guaranteed  (1)
guess  (10)
guessing  (1)
guilty  (1)
guys  (5)

< H >
Hampton  (1)
hand  (2)
handed  (1)
handle  (2)
handled  (2)
hang  (1)
happened  (4)
head  (1)

heard  *(7)*
hearing  *(2)*
He'd  *(1)*
held  *(2)*
hell  *(1)*
He'll  *(1)*
help  *(3)*
hereunto  *(1)*
hey  *(2)*
high  *(1)*
himself/herself  *(1)*
hire  *(1)*
hit  *(3)*
hoc  *(1)*
hold  *(5)*
holding  *(2)*
home  *(3)*
HOOD  *(28)*
hopefully  *(1)*
Hospital  *(1)*
house  *(3)*
husband  *(1)*

< I >
ID  *(2)*
idea  *(3)*
identification  *(15)*
identified  *(1)*
identify  *(1)*
image  *(2)*
Images  *(3)*
include  *(1)*
incomprehensible  *(2)*
inconsistency  *(1)*
inconsistent  *(2)*
incurred  *(1)*
Indemnity  *(1)*
INDEX  *(1)*
indicate  *(2)*
indication  *(11)*
indicted  *(1)*
Information  *(28)*
informed  *(1)*
inherited  *(1)*
injury  *(1)*
instances  *(3)*
instruction  *(1)*
instructions  *(1)*

INSURANCE  *(8)*
interaction  *(1)*
interest  *(3)*
interested  *(1)*
invest  *(1)*
investigating  *(2)*
investigator  *(3)*
involved  *(6)*
involvement  *(2)*
involving  *(3)*
issued  *(1)*
It'd  *(2)*
iterations  *(1)*
its  *(6)*

< J >
JAAN  *(2)*
jack-of-all-trades  *(1)*
January  *(4)*
Jesse  *(1)*
Jim  *(8)*
Jim's  *(1)*
John  *(3)*
Johnsen  *(1)*
join  *(2)*
joined  *(2)*
JR  *(6)*
judge  *(2)*
JULY  *(2)*
jump  *(1)*
jumped  *(1)*
jumping  *(1)*
June  *(1)*
Jury  *(3)*

< K >
KB  *(1)*
keep  *(2)*
KELLY  *(4)*
kept  *(1)*
kicked  *(1)*
kids  *(2)*
kill  *(1)*
Kimberly  *(5)*
kind  *(5)*
King  *(5)*
know  *(61)*
knowledge  *(13)*
Kohn  *(1)*

KUHN  *(63)*
Kuhn's  *(2)*

< L >
label  *(1)*
labels  *(1)*
lady  *(1)*
Laffitte  *(4)*
Laffittes  *(1)*
Large  *(1)*
late  *(1)*
LAW  *(16)*
lawsuit  *(2)*
lawyer  *(3)*
Lawyers  *(6)*
learned  *(1)*
leave  *(1)*
ledger  *(1)*
left  *(6)*
letter  *(12)*
letterhead  *(1)*
letters  *(1)*
Liability  *(3)*
license  *(1)*
lien  *(2)*
limit  *(1)*
limits  *(1)*
line  *(3)*
lines  *(1)*
link  *(1)*
LINTON  *(1)*
little  *(16)*
LLC  *(4)*
loans  *(1)*
local  *(1)*
locate  *(2)*
LOCATION  *(2)*
log  *(1)*
long  *(7)*
longer  *(1)*
look  *(24)*
looked  *(11)*
looking  *(1)*
looks  *(12)*
lost  *(1)*
lot  *(6)*
lowered  *(1)*
Lydon  *(2)*
Lynn  *(2)*

< M >
ma'am  *(1)*
MAGILL  *(1)*
main  *(1)*
making  *(3)*
malpractice  *(4)*
manage  *(1)*
manager  *(1)*
managing  *(1)*
manner  *(2)*
March  *(5)*
mark  *(6)*
marked  *(21)*
married  *(1)*
Mary  *(4)*
MASSALON  *(1)*
matched  *(1)*
matter  *(10)*
matters  *(1)*
Matthews  *(1)*
mean  *(16)*
meaning  *(3)*
meant  *(2)*
meat  *(1)*
mediation  *(9)*
Medicaid  *(2)*
medical  *(1)*
MEETING  *(1)*
member  *(1)*
members  *(2)*
memory  *(2)*
mentioned  *(2)*
mic  *(1)*
Michael  *(1)*
Mike  *(1)*
million  *(2)*
mind  *(2)*
minute  *(4)*
minutes  *(1)*
misappropriate  *(2)*
misappropriated  *(2)*
misappropriation  *(1)*
misrepresent  *(1)*
misrepresented  *(1)*
missed  *(1)*
misunderstanding  *(1)*

money  *(17)*
monies  *(3)*
month  *(1)*
morning  *(2)*
MOSS  *(54)*
mother  *(1)*
MURDAUGH  *(18)*

< N >
name  *(7)*
named  *(2)*
nature  *(1)*
NAUTILUS  *(4)*
necessarily  *(3)*
need  *(5)*
needed  *(3)*
neither  *(2)*
never  *(11)*
new  *(4)*
nine  *(3)*
Nope  *(1)*
Notary  *(1)*
Notice  *(4)*
noticed  *(1)*
November  *(1)*
number  *(11)*
numbers  *(1)*

< O >
Object  *(2)*
objections  *(2)*
obtained  *(1)*
obvious  *(1)*
Obviously  *(1)*
occurrence  *(1)*
occurrence-based
  *(1)*
October  *(7)*
ODC  *(1)*
odd  *(1)*
office  *(9)*
OFFICES  *(2)*
official  *(1)*
Oh  *(10)*
Okay  *(229)*
old  *(3)*
oldest  *(1)*
once  *(2)*
ones  *(2)*

one's  *(1)*
operating  *(7)*
opinion  *(1)*
opportunity  *(2)*
opposed  *(1)*
opposing  *(2)*
O'Quinn  *(1)*
order  *(9)*
ordinary  *(1)*
organization's  *(1)*
originally  *(1)*
other's  *(2)*
Overstreet  *(1)*
owe  *(1)*
ownership  *(1)*

< P >
P.A  *(4)*
package  *(1)*
PAGE  *(10)*
pages  *(7)*
paid  *(4)*
PALMETTO  *(8)*
paper  *(2)*
paragraph  *(1)*
paralegal  *(7)*
paralegals  *(4)*
part  *(2)*
participated  *(1)*
particular  *(1)*
particularly  *(1)*
partner  *(5)*
partners  *(7)*
partnership  *(3)*
parts  *(1)*
party  *(6)*
payee  *(5)*
payer  *(4)*
payment  *(1)*
payments  *(1)*
payor's  *(1)*
pays  *(1)*
PC  *(2)*
PENDARVIS  *(12)*
pending  *(2)*
percentages  *(1)*
performed  *(1)*
period  *(1)*
permit  *(1)*

person  *(5)*
personal  *(11)*
personally  *(2)*
petition  *(3)*
petitions  *(1)*
phone  *(2)*
physical  *(1)*
piece  *(1)*
Pinckney  *(6)*
Pinckneys  *(1)*
place  *(3)*
Plaintiff  *(2)*
pleadings  *(3)*
please  *(7)*
pled  *(1)*
Plf  *(18)*
PMPED  *(2)*
PO  *(1)*
point  *(1)*
Policy  *(7)*
positive  *(1)*
possible  *(1)*
potential  *(1)*
PR  *(3)*
practice  *(1)*
predecessor  *(1)*
premium  *(1)*
preparation  *(1)*
prepare  *(2)*
present  *(1)*
preserved  *(1)*
pretty  *(2)*
prevent  *(1)*
previously  *(1)*
printout  *(5)*
prior  *(6)*
probably  *(1)*
problem  *(2)*
produce  *(1)*
produced  *(7)*
Professional  *(4)*
profit  *(4)*
profits  *(4)*
project  *(1)*
proven  *(2)*
provide  *(1)*
provided  *(5)*
provides  *(1)*
providing  *(1)*

PSB  *(1)*
Public  *(1)*
publicity  *(1)*
pull  *(2)*
purchase  *(1)*
purpose  *(2)*
purposes  *(2)*
put  *(5)*
puts  *(2)*

< Q >
question  *(10)*
questioning  *(1)*
questions  *(21)*
quick  *(1)*
QuickBooks  *(3)*
quicker  *(3)*
quickly  *(1)*
quit  *(1)*
quite  *(2)*
quote  *(1)*

< R >
raise  *(1)*
RANNIK  *(24)*
rarely  *(1)*
reach  *(1)*
read  *(7)*
reading  *(2)*
ready  *(1)*
really  *(3)*
Reason  *(8)*
recall  *(15)*
received  *(1)*
receiving  *(2)*
recess  *(2)*
recognize  *(5)*
reconcile  *(1)*
reconciles  *(1)*
reconciliation  *(3)*
reconciling  *(1)*
record  *(5)*
recorded  *(1)*
records  *(8)*
refer  *(1)*
reference  *(4)*
referenced  *(2)*
referred  *(5)*
referring  *(1)*

reflected  *(1)*
refresh  *(1)*
regard  *(4)*
regarding  *(1)*
Registered  *(2)*
regularly  *(1)*
related  *(2)*
relates  *(3)*
relating  *(1)*
relation  *(3)*
relationship  *(4)*
relative  *(1)*
release  *(3)*
remain  *(1)*
remaining  *(1)*
remember  *(5)*
remind  *(1)*
remove  *(1)*
removed  *(1)*
reorganization  *(2)*
reorganize  *(1)*
repeat  *(1)*
rephrase  *(2)*
report  *(1)*
REPORTED  *(1)*
REPORTER  *(20)*
represent  *(4)*
representation  *(8)*
representations  *(1)*
representative  *(6)*
represented  *(1)*
representing  *(2)*
represents  *(1)*
request  *(1)*
Requested  *(3)*
requesting  *(1)*
required  *(1)*
reservation  *(1)*
responds  *(2)*
response  *(1)*
responsibilities  *(2)*
responsible  *(3)*
rest  *(1)*
result  *(1)*
retention  *(2)*
retired  *(2)*
review  *(3)*
reviewed  *(3)*
RICHARD  *(1)*

right  *(60)*
rights  *(3)*
ring  *(2)*
Ringler  *(1)*
road  *(1)*
ROBERT  *(1)*
role  *(1)*
rose  *(1)*
Roughly  *(1)*
RPR  *(2)*
rules  *(1)*
run  *(1)*
Russell  *(3)*

< S >
safeguarded  *(1)*
Safran  *(1)*
Satterfield  *(25)*
Satterfields  *(3)*
Satterfield's  *(2)*
saw  *(3)*
saying  *(2)*
says  *(5)*
SC  *(7)*
scan  *(3)*
scheme  *(1)*
school  *(1)*
screen  *(4)*
scroll  *(3)*
seal  *(1)*
Second  *(13)*
Secretary  *(1)*
See  *(23)*
seeing  *(1)*
seen  *(2)*
segregated  *(1)*
send  *(9)*
sending  *(1)*
sends  *(1)*
sent  *(9)*
sentence  *(1)*
separate  *(1)*
September  *(4)*
Series  *(2)*
seriously  *(1)*
served  *(1)*
serving  *(1)*
set  *(4)*
settle  *(1)*

settlement  *(26)*
settlements  *(1)*
settlement's  *(1)*
seven  *(3)*
share  *(1)*
shared  *(4)*
shareholder  *(1)*
shareholders  *(1)*
she'd  *(1)*
SHEET  *(2)*
shop  *(2)*
shopping  *(1)*
shortly  *(1)*
show  *(10)*
shows  *(3)*
sign  *(3)*
signature  *(6)*
signed  *(7)*
silos  *(1)*
sir  *(1)*
situation  *(1)*
skimming  *(1)*
Smith  *(4)*
solicitor's  *(3)*
Sorry  *(6)*
Sort  *(5)*
sorts  *(1)*
sought  *(1)*
sound  *(2)*
sounds  *(1)*
sources  *(1)*
SOUTH  *(4)*
speak  *(2)*
specific  *(2)*
split  *(2)*
spoke  *(1)*
SR  *(1)*
staff  *(4)*
staffing  *(1)*
stamped  *(3)*
standard  *(2)*
Star  *(2)*
STATE  *(16)*
stated  *(1)*
statement  *(1)*
statements  *(1)*
STATES  *(1)*
status  *(1)*
stayed  *(2)*

steal  *(1)*
stealing  *(1)*
stealing's  *(1)*
stenographically  *(1)*
stipulation  *(1)*
straight  *(2)*
STREET  *(4)*
strike  *(3)*
structure  *(4)*
structured  *(5)*
studied  *(1)*
stuff  *(2)*
subject  *(1)*
subscribe  *(1)*
successor  *(1)*
sued  *(3)*
summarizes  *(1)*
super  *(1)*
supervised  *(1)*
supervising  *(2)*
supplied  *(1)*
support  *(1)*
suppose  *(1)*
sure  *(16)*
suspended  *(1)*
swear  *(1)*
sworn  *(2)*

< T >
take  *(17)*
taken  *(4)*
talk  *(4)*
talking  *(3)*
talks  *(1)*
Tanya  *(8)*
tax  *(5)*
Tell  *(5)*
telling  *(1)*
tells  *(2)*
temporarily  *(1)*
terms  *(4)*
testified  *(1)*
testify  *(3)*
testifying  *(1)*
testimony  *(2)*
thank  *(13)*
thanks  *(3)*
that'd  *(2)*
thereof  *(1)*

thing  *(7)*
things  *(4)*
think  *(56)*
thinking  *(1)*
third  *(4)*
THOMAS  *(6)*
thought  *(2)*
three  *(2)*
ticket  *(2)*
TIME  *(18)*
times  *(3)*
today  *(8)*
today's  *(1)*
told  *(3)*
Tom  *(1)*
Tommy  *(1)*
tomorrow  *(1)*
top  *(1)*
topic  *(1)*
topics  *(4)*
total  *(1)*
totally  *(3)*
transcribed  *(1)*
transcript  *(2)*
transcription  *(1)*
transpired  *(2)*
TREHOLM  *(1)*
Trenholm  *(2)*
Trident  *(1)*
true  *(11)*
Trust  *(19)*
truth  *(3)*
try  *(1)*
trying  *(3)*
turmoil  *(1)*
turn  *(1)*
turned  *(1)*
two  *(8)*
type  *(1)*
typically  *(5)*
typo  *(1)*

**< U >**
Uh-huh  *(2)*
Ultimately  *(2)*
unable  *(1)*
unanimous  *(1)*
uncovered  *(1)*
undersigned  *(1)*

understand  *(11)*
understanding  *(2)*
understood  *(1)*
UNIT  *(1)*
unitary  *(1)*
UNITED  *(1)*
unusual  *(1)*
USAA  *(1)*
USC  *(1)*
use  *(5)*
usual  *(1)*
usually  *(7)*

**< V >**
various  *(1)*
VC  *(3)*
virtual  *(1)*
VP  *(1)*
vs  *(1)*

**< W >**
W-9  *(5)*
waive  *(2)*
waived  *(1)*
WALKER  *(10)*
want  *(14)*
wanted  *(6)*
wants  *(1)*
way  *(10)*
ways  *(1)*
weekend  *(2)*
Well  *(14)*
went  *(3)*
we're  *(6)*
WESTENDORF  *(27)*
WESTENDORF_000004  *(1)*
WESTENDORF_000013-14  *(1)*
WESTENDORF_000015  *(1)*
WESTENDORF_000016-21  *(1)*
WESTENDORF_000023-26  *(1)*
WESTENDORF_000031-33  *(1)*
WESTENDORF_000

036-38  *(1)*
Westendorf's  *(1)*
we've  *(5)*
whatsoever  *(1)*
where'd  *(2)*
White  *(1)*
WILLS  *(2)*
wish  *(1)*
within-entitled  *(1)*
WITNESS  *(13)*
word  *(2)*
work  *(15)*
worked  *(14)*
working  *(4)*
works  *(3)*
worries  *(1)*
writes  *(2)*
written  *(11)*
wrong  *(15)*
wrongful  *(3)*
wrote  *(1)*
WWW.CLARKBOLEN.COM  *(1)*

**< Y >**
Y'all  *(4)*
Yeah  *(36)*
year  *(1)*
years  *(12)*
Yep  *(2)*
younger  *(3)*

**< Z >**
Zoom  *(5)*